

No *Shepard's Signal*™
*As of: January 23, 2014 1:54 PM EST*

# Baffa v. Stat Health Immediate Med. Care, P.C.

United States District Court for the Eastern District of New York
September 17, 2013, Decided; September 17, 2013, Filed
No 11-cv-4709 (JFB) (GRB)

**Reporter:** 2013 U.S. Dist. LEXIS 132884; 2013 WL 5234231

CHRISTINA BAFFA, Plaintiff, VERSUS STAT HEALTH IMMEDIATE MEDICAL CARE, P.C., Defendant.

---

**Core Terms**

---

terminate, pregnancy, summary judgment, pregnant, receptionist, probationary period, gender discrimination, misconduct, hire, temporal proximity, uncontroverted evidence, discriminatory, patient, pretext, morning sickness, biller, rational jury, prima facie, undisputed, state law claim, replacement, phone, discriminatory intent, probationary employee, patient information, no rational jury, non-discriminatory, genuine, animus, confidential

**Counsel:** **[*1]** For Plaintiff: Peter Arcadio Romero and Edward Lee Sample, II, Frank & Associates P.C., Farmingdale, New York.

For Defendant: Sharon P. Stiller, Abrams, Fensterman, Rochester, New York.

**Judges:** JOSEPH F. BIANCO, United States District Judge.

**Opinion by:** JOSEPH F. BIANCO

---

**Opinion**

---

# MEMORANDUM AND ORDER

Joseph F. Bianco, District Judge:

Plaintiff Christina Baffa ("Baffa" or "plaintiff") commenced this action against Stat Health Immediate Medical Care, P.C. ("STAT Health" or "defendant") alleging that defendant violated Title VII of the Civil Rights Act of 1964, *42 U.S.C. §§ 2000e et seq.* ("Title VII") and *Article 15 of the Executive Law of the State of New York § 296.* Plaintiff alleges that she was the subject of gender discrimination when she was terminated from her employment as a probationary medical receptionist in September 2010. Specifically, plaintiff contends that she was terminated because she was pregnant. Defendant contends that its decision to terminate plaintiff was not based upon any discriminatory motive, but rather was based upon the conclusion of plaintiff's three-month period as a probationary employee, as well as plaintiff's misconduct and unsatisfactory performance as an employee.

Defendant now moves **[*2]** for summary judgment on all claims, pursuant to *Rule 56 of the Federal Rules of Civil Procedure.* For the reasons set forth below, the Court grants the defendant's motion in its entirety with respect to the federal claim, and declines to exercise supplemental jurisdiction over the state law claim. In essence, plaintiff relies on temporal proximity between the announcement of her pregnancy in mid-August 2010 and her termination on September 24, 2010 as the sole evidence for her discrimination claim. As a threshold matter, there is other evidence in the record that explains the timing of the termination — namely, plaintiff was a 90-day probationary employee who was hired on June 19, 2010 and, thus, her termination coincided with the end of

her probationary period. In any event, defendant has articulated a non-discriminatory reason for her discharge — that is, poor performance — and temporal proximity alone is insufficient to demonstrate pretext. In connection with the non-discriminatory reason for termination, it is uncontroverted that nine employees (excluding supervisors) submitted affidavits to this Court regarding plaintiff's poor job performance and stating that they and/or other employees **[*3]** complained to management about plaintiff. Although plaintiff disputes that her performance was poor, she does not dispute that these complaints were made or that these employees lacked discriminatory animus. Moreover, it is undisputed that (1) even prior to learning about her pregnancy, the staff at STAT Health was critical of plaintiff's performance, and (2) shortly before plaintiff's termination, one of STAT Health's medical billers documented in an email that plaintiff incorrectly entered patient information. In the face of this overwhelming, uncontroverted evidence of complaints about her poor performance, plaintiff has no evidence from which a rational jury could conclude that the articulated reason for her termination was a pretext for gender discrimination based upon pregnancy. To the extent that plaintiff attempts to rely upon two facts, namely, that she was terminated on the same day that she had to excuse herself on two or three occasions because of morning sickness, and that her supervisor allegedly said at the time of termination that plaintiff should not worry about the termination because she would be having her baby soon and have many things to look forward to, the events **[*4]** of that day cannot possibly allow a rational jury to conclude that plaintiff's pregnancy was a motivating factor in the termination. First, there is no evidence that the supervisor knew of the morning sickness earlier that day and, as noted above, the timing of the termination coincided with the end of plaintiff's probationary period and a recent email from a medical biller about errors by plaintiff. Second, the alleged comment is innocuous and has

no probative value as to discriminatory intent in light of the entire record. The lack of evidence of gender discrimination based on the pregnancy is further demonstrated by the uncontroverted evidence that: (1) defendant employed two pregnant employees in 2010 who suffered no adverse treatment (including one employee who has been pregnant three times while employed at STAT Health); (2) defendant permitted two grandmothers to take leave in 2010 to help care for their grandchildren; and (3) plaintiff's eventual replacement was pregnant at the time she was hired. In short, even construing the facts most favorably to plaintiff, no rational jury could possibly conclude, in light of the uncontroverted evidence in the record, that plaintiff was **[*5]** terminated based upon her gender as a result of her pregnancy.

I. BACKGROUND

A. FACTUAL BACKGROUND

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 Statements of Facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of N.Y .*, 422 F.3d 47, 50-51 (2d Cir. 2005). Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any evidence in the record to contradict it.[1]

1. Plaintiff's Job Performance

STAT Health is an immediate care medical practice facility (often referred to as an urgent care facility) with locations in Smithtown, New York and Port Jefferson, New York. (Def.'s 56.1 ¶¶ 1-2.) On approximately June 19, 2010, STAT Health hired plaintiff as a part-time medical receptionist. (*Id.* **[*6]** ¶¶ 20, 24; *see also* Decl. of Sharon Stiller ("Stiller Decl.") Ex. A, Dep. of Christina Baffa ("Baffa Dep."), at

---

[1]   In addition, although the parties' Rule 56.1 statements contain specific citations to the record to support their statements, the Court cites to the Rule 56.1 statements, rather than to the underlying citations to the record.

2013 U.S. Dist. LEXIS 132884, *6

41.) Plaintiff had no prior experience as a medical receptionist. (Def.'s 56.1 ¶ 23.) Plaintiff was told that she would be a probationary employee for the first three months of her employment and that she would be reviewed at the end of her probationary period. (Baffa Dep. at 67-68.)

Susan Dougherty ("Dougherty") was the office administrator at STAT Health during plaintiff's employment and made decisions regarding the hiring and firing of receptionists. (Aff. of Susan Dougherty ("Dougherty Aff.") ¶¶ 1, 5.) Dinah Hamilton ("Hamilton") was the Medical Assistant Manager. (Aff. of Dinah Hamilton ("Hamilton Aff.") ¶ 1.) Although defendant states that Hamilton did not have hiring and firing authority over receptionists (Def.'s 56.1 ¶ 14), Hamilton stated at her deposition that she is involved in interviewing and disciplining employees (Stiller Decl. Ex. C, Dep. of Dinah Hamilton ("Hamilton Dep.") at 39). In any event, it is undisputed that Hamilton worked closely with the receptionists on a daily basis. (Hamilton Aff. ¶¶ 3, 5.)

According to employees of STAT Health, from the beginning [*7] of her employment, plaintiff made numerous errors regarding inputting patient information and other data as part of the "registration" duties of a receptionist. (*See* Dougherty Aff. ¶ 10 ("From the inception, Ms. Baffa performed her job duties poorly."); Hamilton Aff. ¶ 9 ("I heard numerous staff members complain that Ms. Baffa was lazy, not performing her work and that she continuously made errors in inputting the patient and insurance information."); Aff. of Isaiah Rhem Bennett ("Bennett Aff.") ¶ 3 ("From the time that she was hired until she was terminated, Ms. Baffa continued to make registration errors, which I caught as a medical biller. For example, she would fail to enter the full insurance identification number, so that the reimbursement request would be denied.").) Plaintiff disputes that this occurred, stating that she "rarely made mistakes while performing the registration function." (Decl. of Edward L. Sample, II ("Sample Decl.") Ex. A, Aff. of Christina Baffa ("Baffa Aff.") ¶ 34.) In addition, plaintiff contends that "inputting errors were common amongst the receptionists." (*Id.* ¶ 35.) However, Dougherty states that most receptionists did not make mistakes often, and that [*8] the errors that plaintiff made should never have occurred. (Stiller Decl. Ex. B, Dep. of Susan Dougherty ("Dougherty Dep.") at 126 -27; *see also* Aff. of Danielle Markert ("Markert Aff.") ¶ 6 ("We expect and most receptionists are able to correctly and accurately perform the registration functions within one to two months of hire.").) Dougherty noted that, because plaintiff did not adequately perform her registration functions as a receptionist, she was never trained on discharge duties even though receptionists commonly learn this during their probationary period. (Dougherty Aff. ¶ 11.)

In July 2010, before plaintiff learned she was pregnant, Hamilton reminded plaintiff that it was necessary for her to answer the phone by the second ring. (Baffa Dep. at 90.) In fact, plaintiff admitted that, prior to learning about her pregnancy, "staff at STAT Health were critical of [her] performance." (*Id.*)

Plaintiff states that, on approximately August 15, 2010, she learned she was pregnant and immediately notified defendant, including Dougherty and Hamilton, as well as several receptionists. (Baffa Aff. ¶¶ 11-12.)[2]

After plaintiff learned she was pregnant, plaintiff received warnings regarding more serious misconduct. Dougherty states that, on August 30, 2010, she "heard Ms. Baffa reveal patient information within earshot of a crowded waiting room." (Dougherty Aff. ¶ 20; *see also* Def.'s 56.1 ¶ 39.) Although this account differs from the employee disciplinary notice Dougherty wrote on August 30 — which states that a patient overheard plaintiff complain

---

2   Dougherty and Hamilton both state that they did not learn that plaintiff was pregnant [*9] until September 24, 2010, the date of her discharge. (Dougherty Aff. ¶ 32; Hamilton Aff. ¶ 11.) However, this dispute is immaterial to the Court's decision because, as discussed *infra*, plaintiff's federal claim cannot survive summary judgment even if the decisionmakers were aware of her pregnancy in mid-August.

about another patient (*see* Dougherty Aff. Ex. 5) — plaintiff admitted at her deposition that she received a verbal warning from Dougherty regarding patient confidentiality (Baffa Dep. at 91 -93). Plaintiff disputes that she disclosed any confidential information and claims that other receptionists committed this misconduct. (Baffa Aff. ¶¶ 23-25.)

In August 2010, Hamilton received a phone call from a staff member at STAT Health's Port Jefferson [*10] office where plaintiff was working that day. According to Hamilton, the staff member complained that plaintiff was not doing her work. As a result, Hamilton called plaintiff and ²told her to get back to work.² (Hamilton Aff. ¶ 8.) Plaintiff states that Hamilton yelled at her and sent her home from work, despite plaintiff's explanation that she had just arrived and was completing her tasks. (Baffa Dep. at 43-44, 51-52; *see also* Baffa Aff. ¶ 21.)

Plaintiff also states that, on August 31, 2010, she was discharged from work early for sitting in the office kitchen and texting, even though she has never texted on her phone during working hours and did not even ²own a phone with texting capability² at that time. (Baffa Aff. ¶ 26.)[3]

At the end of plaintiff's probationary period, Dougherty received two e-mails from Isaiah Rhem Bennett (²Bennett²), one of STAT Health's medical billers. The emails documented plaintiff incorrectly entering patient [*11] information. (Dougherty Aff. ¶ 24; *see also* Bennett Aff. Ex. 1 (emails from Bennett to plaintiff, cc'ing Dougherty, documenting these alleged errors).) Dougherty states that the mistakes were ²serious² because one error resulted in a ²costly delay in billing,² and the other resulted in an entire patient chart having to ²be deleted and reentered.² (Dougherty Aff. ¶

25.) Bennett elaborates that this latter mistake ²would be dangerous for the patient² if it was not noticed because ²no one would have been able to locate the chart.² (Bennett Aff. ¶ 12.)[4]

As well as these specific incidents, defendant submitted affidavits from numerous employees other than Hamilton and Dougherty indicating [*12] that plaintiff's job performance was unsatisfactory or that plaintiff committed misconduct throughout her probationary period, and that complaints were made to management about plaintiff's poor performance. (*See, e.g.*, Aff. of Rebecca Dougherty (²Rebecca Dougherty Aff.²) ¶ 3 (²Ms. Baffa was lazy and very slow in performing her job duties which was a problem for the other receptionists who had to pick up the slack. I complained about her and I heard the other employees complaining about her failure to do her work, as well as the mistakes that she made.²); Aff. of Melissa Demetres (²Demetres Aff.²) ¶ 3 (²I observed Ms. Baffa shy away from doing work. In fact, I reported this to the management at STAT Health, because this meant that others had to do her work.²); *id.* ¶ 4 (²Ms. Baffa also frequently discussed confidential patient information in front of other patients. I recall that one patient called and complained because the patient had heard her say something about another patient.²); Aff. of Jessica McIntyre (²McIntyre Aff.²) ¶ 10 (²I complained to Susan Dougherty about [plaintiff] and her lack of work ethic.²); Bennett Aff. ¶ 3 (²From the time that she was hired until she was terminated, [*13] Ms. Baffa continued to make registration errors, which I caught as a medical biller. For example, she would fail to enter the full insurance identification number, so that the reimbursement request would be denied.²); *id.* ¶ 5 (stating that plaintiff made an ²inordinate number of mistakes²); *id.* ¶ 12 (stating that some of plaintiff's mistakes were ²par-

---

3  At her deposition, Hamilton stated that ²it looked like she was texting, but maybe I misunderstood it. Either way she was definitely sitting in the kitchen on her phone. Whether she was doing something else on it, I have no idea.² (Hamilton Dep. at 86.)

4  Plaintiff emphasizes that she did not receive the emails notifying her of these mistakes because, although they were addressed to her, she had changed her e-mail address and told defendant of that change. (*See* Pl.'s 56.1 ¶ 48.) In any event, whether plaintiff was notified of her errors prior to her termination is irrelevant for purposes of defendant's motion because no rational juror could conclude that defendant's failure to properly notify plaintiff of her errors is indicative of discriminatory animus.

ticularly egregious[2]); Aff. of Brittany Alvarenga ([2]Alvarenga Aff.[2]) ¶¶ 5-6 ([2]I complained about her job performance and I heard a large number of other employees complain about her failure to perform her job duties........These performance problems continued from the time she was hired until the time she was terminated.[2]); Markert Aff. ¶¶ 8-9 (stating that she observed plaintiff make mistakes and attempted to help her correct them but that [2][n]onetheless, Ms. Baffa continued to make errors[2]); *id*. ¶ 9 (stating that she complained to management about plaintiff's job performance); *id*. ¶ 16 (stating that she did not know plaintiff was pregnant and that she [2]was not surprised that she was terminated at the end of her probationary period because despite our efforts to help her, she continued to make errors throughout her probationary period, [*14] and not perform her job duties[2].) Although plaintiff disputes the veracity of these statements regarding her job performance, plaintiff does not dispute that these employees complained about her or that these employees believed she was an unsatisfactory employee. Moreover, there is no allegation by plaintiff that these employees had any discriminatory animus.

## 2. Plaintiff's Termination

On September 24, 2010, plaintiff experienced morning sickness. (Baffa Aff. ¶ 18.) Plaintiff states that she had to excuse herself to the bathroom on two or three occasions. (*Id*.) According to plaintiff, when Hamilton asked plaintiff if she was feeling well, plaintiff told Hamilton that she was experiencing morning sickness but could continue working. (*Id*. ¶ 19.) Plaintiff asserts that Hamilton sent plaintiff home and [2]screamed[2] at plaintiff: [2]You have to go home! We can't have you throwing up like this! Not in front of patients! I don't want the doctors to know![2] (*Id*.) Hamilton disputes this, claiming that she never said anything along these lines to plaintiff and never yelled at her. (Hamilton Aff. ¶ 12.) Hamilton states that she merely advised plaintiff to eat crackers to help with morning sickness [*15] and sent plaintiff home because the front desk could not be without coverage. (*Id*.) Hamilton advised plaintiff that she could re-

turn later if she felt better. (*Id*.)

When plaintiff returned to the office, she was directed to speak to Dougherty. (Baffa Aff. ¶ 20.) According to plaintiff, Dougherty told her, [2]I don't think this is going to work out. Don't worry, you'll be having a baby soon. You have lots of things to look forward to. Enjoy bringing your baby in.[2] (*Id*.) Dougherty disputes this version of the events. Dougherty claims that she was out of the office on the morning of September 24 and unaware of plaintiff's morning sickness. (Dougherty Aff. ¶¶ 29, 33.) Dougherty states that she showed plaintiff the e-mails (received just days earlier) from Bennett regarding mistaken data entry and notified plaintiff of her termination. (*Id*. ¶ 30.) Dougherty claims that plaintiff then said, [2][b]ut I'm pregnant.[2] (*Id*. ¶ 32.) Dougherty then congratulated plaintiff on her pregnancy and told her that she should bring the baby into the office. (*Id*.)

## 3. Defendant's Treatment of Pregnant Employees

Defendant has had other pregnant employees who have not been terminated. In 2010, two of STAT Health's [*16] forty employees were pregnant and neither were terminated. (Def.'s 56.1 ¶ 83.) Both were given as many weeks of maternity leave as they requested. (*Id*.) In fact, one of those employees, Charlotte Mooney, has been pregnant three times while an employee of STAT Health and has experienced morning sickness during one of those pregnancies. (*Id*. ¶¶ 85-87.) Plaintiff argues that these employees are not similarly situated because they are medical billers and not receptionists. In addition, during 2010, STAT Health permitted two grandparents to take leave to help care for their grandchildren. (*Id*. ¶ 92.)

Plaintiff's immediate replacement was not pregnant, but was also terminated for performance-related issues, (*id*. ¶ 97); that employee's replacement (plaintiff's eventual replacement) was four months pregnant at the time of hiring (*id*. ¶ 98).

## B. Procedural Background

Plaintiff filed the complaint in this action on September 27, 2011. Defendant answered the complaint on November 14, 2011. The parties engaged in discovery throughout 2012. On February 28, 2013, defendant moved for summary judgment. Plaintiff submitted her opposition on May 8, 2013, and defendant submitted its reply on May 30, 2013. [*17] The Court held oral argument on July 12, 2013. The Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to *Federal Rule of Civil Procedure 56(a)*, a court may only grant a motion for summary judgment if [2]the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[2] *Fed. R. Civ. P. 56(a)*. The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).[2]A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.[2] *Fed. R. Civ. P. 56(c)(1)*. The court [2]is not [*18] to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.[2] *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (summary judgment is unwarranted if [2]the evidence is such that a reasonable jury could return a verdict for the nonmoving party[2]).

Once the moving party has met its burden, the opposing party [2]must do more than simply show that there is some metaphysical doubt as to the material facts. [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*[2] *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). As the Supreme Court stated in *Anderson*, [2][i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.[2] *477 U.S. at 249-50* (citations omitted). Indeed, [2]the mere existence of [*19] some alleged factual dispute between the parties[2] alone will not defeat a properly supported motion for summary judgment. *Id*. at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth [2]concrete particulars[2] showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co*., 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp*., 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment [2]merely to assert a conclusion without supplying supporting arguments or facts.[2] *Bell-South Telecomms., Inc. v. W.R. Grace & Co*., 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp*., 585 F.2d at 33).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs*., 22 F.3d 1219, 1224 (2d Cir. 1994). [*20] Nonetheless, [2]summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.[2] *McLee v.*

*Chrysler Corp* ., 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc* ., 239 F.3d 456, 466 (2d Cir. 2001) ([2]It is now beyond cavil that summary judgment may be appropriate even in the fact -intensive context of discrimination cases.[2]).

*Schiano v. Quality Payroll Sys., Inc* ., 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co* ., 258 F.3d 62, 69 (2d Cir. 2001)).

III. DISCUSSION

Defendant now moves for summary judgment, arguing that plaintiff cannot establish a *prima facie* case of gender discrimination, and in any event, defendant had a legitimate, non -discriminatory reason for its action that plaintiff cannot establish was pretextual.

A. Plaintiff's Gender Discrimination Claim[5]

1. Legal Standard

Title VII prohibits discrimination against an employee based on her gender, race, or national origin. *See 42 U.S.C. § 2000e-2(a)*. The Pregnancy Discrimination Act amended Title VII's definition of gender discrimination to include disparate treatment [2]because of or on the basis of pregnancy, childbirth, or related medical conditions.[2] *Id*. *§ 2000e(k)*; *see also Saks v. Franklin Covey Co* ., 316 F.3d 337, 343 (2d Cir. 2003). Here, plaintiff claims she was discriminated against by defendant on the basis of her gender when she was terminated because of her pregnancy.

The [2]ultimate issue[2] in any employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employ-

ment action was motivated, at least in part, by an [2]impermissible reason,[2] i.e., that there was discriminatory intent. *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities* , 115 F.3d 116, 119 (2d Cir. 1997). **[*22]** In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case must satisfy the three step *McDonnell Douglas test*.

First, a plaintiff must establish a *prima facie* case of unlawful discrimination by showing that (1) she is a member of a protected class (2) who performed her job satisfactorily (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination (or retaliation). *See McDonnell Douglas Corp. v. Green* , 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 & n.13 (1973) (noting that elements of a *prima facie* case vary depending on factual circumstances); *Stratton v. Dep't for the Aging for the City of N.Y* ., 132 F.3d 869, 879 (2d Cir. 1997).

Second, if the plaintiff establishes a *prima facie* case, [2]a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision.[2] *Stratton* , 132 F.3d at 879; *see also Reeves v. Sanderson Plumbing Prods. Inc* ., 530 U.S. 133, 142-43, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). [2]The purpose of this step is to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent **[*23]** while the plaintiff founders on the difficulty of proving discriminatory intent.[2] *Stratton* , 132 F.3d at 879 (citation and internal quotation marks omitted).

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it [2]simply drops out of the picture.[2] *St. Mary's Honor Ctr. v. Hicks* , 509 U.S. 502, 510-11, 113 S. Ct. 2742,

---

[5]   In plaintiff's complaint, plaintiff also alleges that she was discriminated against when defendant reduced plaintiff's hours in September 2010 without explanation. (Compl. ¶ 15.) However, plaintiff does not advance this argument in her memorandum of law in opposition to summary judgment, nor did plaintiff's counsel make this claim [**21] at oral argument. Thus, it appears to have been abandoned. In any event, plaintiff has not introduced any evidence that her hours were reduced without explanation, and there is also no evidence that any such reduction in hours was due to discrimination. Thus, to the extent such a claim is still being asserted, it also cannot survive summary judgment.

125 L. Ed. 2d 407 (1993); *see also* *James v. N.Y. Racing Ass'n* , 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that a reasonable jury could conclude that more likely than not the employer's actions were motivated, at least in part, by a discriminatory reason. *See* *James* , 233 F.3d at 154; *Connell v. Consol. Edison Co. of N.Y., Inc* ., 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000).

To meet this burden, the plaintiff may rely on evidence presented to establish her *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa* , 539 U.S. 90, 99-101, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). It is not sufficient, however, for a plaintiff merely to show that she satisfies [2]*McDonnell Douglas's* minimal [*24] requirements of a *prima facie* case[2] and to put forward [2]evidence from which a factfinder could find that the employer's explanation . . . was false.[2] *James* , 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.;* *Connell* , 109 F. Supp. 2d at 207-08.

As the Second Circuit observed in *James*, [2]the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove — particularly discrimination.[2] *233 F.3d at 157; see also* *Norton v. Sam's Club* , 145 F.3d 114, 118 (2d Cir. 1998) ([2]The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.[2]).

2. Application

Defendant argues that plaintiff cannot establish a *prima facie* case of gender discrimination

[*25] in connection with her termination because her numerous instances of misconduct were a sufficient justification for discharge, and that plaintiff was not terminated under circumstances giving rise to an inference of discrimination. For the purpose of this motion, the Court assumes that plaintiff has satisfied the minimal burden required by *McDonnell Douglas* to make out a *prima facie* case of gender discrimination.

Defendant has put forth legitimate, nondiscriminatory reasons for plaintiff's termination — namely that plaintiff's performance as a receptionist was [2]unsatisfactory[2] and filled with mistakes and misconduct. (*See* Def.'s Mem. at 15.) Specifically, plaintiff committed two serious data-entry errors at the end of her probationary period, received an official reprimand for disclosing confidential patient information, numerous STAT Health employees complained about the large number of mistakes plaintiff made, employees believed that plaintiff was lazy, plaintiff was sent home for using her cell phone during working hours, and plaintiff had to be reminded about answering the phone properly.

Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented [*26] sufficient evidence from which a reasonable jury could find gender discrimination by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole. *See* *Stern v. Trs. of Columbia Univ* ., 131 F. 3d 305, 314 (2d Cir. 1997).

a. Temporal Proximity and Plaintiff's Probationary Status

In essence, plaintiff's *only* evidence in her favor in this case is the purported temporal proximity between defendant learning of plaintiff's pregnancy and the termination. According to plaintiff, she notified both Dougherty and Hamilton of her pregnancy on approximately August 15, 2013, just one month prior to her termination. There is also no dispute that plaintiff was fired on the same day she experienced morning sickness and was sent home by Hamilton.

[2]Temporal proximity between the plaintiff's termination and her pregnancy, childbirth, or related medical condition can raise an inference of discrimination.[2] *Briggs v. Women in Need, Inc., 819 F. Supp. 2d 119, 128 (E.D.N.Y. 2011)*. For example, in *Smith v. K & F Industries, Inc., 190 F. Supp. 2d 643 (S.D.N.Y. 2002)*, the court denied the employer's motion for summary judgment when the plaintiff-employee received her first negative [*27] performance evaluations one month after she announced her pregnancy. See *id. at 648-51*. However, [2][w]hile timing may be sufficient to establish an inference of discrimination, the close proximity of a termination to the plaintiff's announcement of her pregnancy alone is insufficient to demonstrate a pretext.[2] *Forde v. Beth Israel Med. Ctr., 546 F. Supp. 2d 142, 152 (S.D.N.Y. 2008)* (citation and internal quotation marks omitted); *see also Briggs, 819 F. Supp. 2d at 128* ([2][C]ourts have noted that an inference of discrimination arises from temporal proximity between the plaintiff's termination and the announcement of her pregnancy or her request for maternity leave only when accompanied by other circumstantial evidence.[2]). In *Smith*, it was not simply the temporal proximity that required a denial of summary judgment, but also numerous pregnancy-related comments made by the employer combined with the lack of credibility of the employer's proffered non-discriminatory reason for termination. *190 F. Supp. 2d at 648-51*.

As a threshold matter, there is strong, uncontroverted evidence proffered by defendant as to the reason for the timing of the termination that has nothing to do with plaintiff [*28] allegedly notifying defendant of her pregnancy in mid-August 2010 or her morning sickness on the day of her termination. On approximately June 19, 2010, plaintiff was hired as a probationary employee with a three-month term of probation and was told that she would be reviewed at the end of her probationary period. (*See* Def.'s 56.1 ¶¶ 20, 27.)[6] It is undisputed that she was terminated approximately three months after her employment began, i.e., at the end of her probationary period when she was to be reviewed and a determination was to be made as to whether her employment with the company would continue. Accordingly, no rational jury could conclude that the timing of the discharge was suspicious when STAT Health planned to review plaintiff's performance and determine whether to offer her full employment in mid-September. [2]It is logical that an employer, having received several complaints about the performance of a probationary employee approaching the end of his probationary period of employment, would seek to terminate the employee..[2] *Smith v. Da Ros, 777 F. Supp. 2d 340, 361 (D. Conn. 2011)* (granting summary judgment to town on plaintiff's Section 1983 claim alleging that he [*29] was terminated for exercising his *First Amendment* rights and stating that [2]the logical and plausible explanation for the timing of Mr. Smith's discharge is that Mr. Smith's probationary period was nearing its end[2]); *see also Chavez v. City of Osceola, 324 F. Supp. 2d 986, 995 (S.D. Iowa 2004)* ([2]Poor performance by a probationary employee is an obvious basis for termination of employment..[2]).

The timing of the termination is not only explained by the end of plaintiff's probationary period, but also by two serious mistakes that plaintiff made in the days just prior to her termination. It is undisputed that Bennett, one of the medical billers, noticed two input errors on September 20 and September 23 that could have had serious consequences. (*See* Bennett Aff. ¶ 12 (stating that [2][t]hese mistakes

---

[6]   In her submissions to the Court, and again at oral argument, plaintiff disputed that she was hired on approximately June 19, 2010. (*See, e.g.*, Baffa Aff. ¶ 2 (stating that she began her employment on June 16, 2013).) However, at her deposition, plaintiff admitted that she was hired on approximately June 19, 2010 and began training on approximately June 21, 2010. (Baffa Dep. at 41.) At oral argument, plaintiff's counsel attempted to use this inconsistency to demonstrate that plaintiff's probationary period had expired at the time of her termination and that she was no longer a probationary employee. However, plaintiff does not claim that she was given her end-of-probation review at any point prior to September 24, 2010, or that anyone ever told her that she was no longer a probationary employee. [*30] Therefore, the Court finds that it is undisputed that plaintiff was still a probationary employee at the time of her termination, even if she was not terminated until a few days after her three-month probationary period technically ended.

were particularly egregious²).) The revelation of this misconduct after the employer allegedly learned of her pregnancy is also sufficient to negate any possible temporal proximity. See *Nolley v. Swiss Reinsurance Am. Corp .*, 857 F. Supp. 2d 441, 461 (S.D.N.Y. 2012) (²An intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice to raise the inference.²), aff'd *12-1734-CV, 2013 U.S. App. LEXIS 13181, 2013 WL 3214640 (2d Cir. June 27, 2013)*; see also *Vasconcellos v. Pier 1 Imports (U.S.), Inc .*, CA No. 06-484, 2008 U.S. Dist. LEXIS 105957, 2008 WL 4601036, at *5 (D.R.I. Apr. 28, 2008) [*31] (Report and Recommendation) (²As to timing, Plaintiff is correct that the decision to terminate came shortly after she disclosed her pregnancy. However, Plaintiff neglects to appreciate that the decision came even closer in time to her untruthfulness.² (citing *Kiel v. Select Artificials, Inc .*, 169 F.3d 1131, 1136 (8th Cir. 1999) (²[Plaintiff's] intervening unprotected conduct [insulting co-owner of business and ²indulging in an angry outburst²] eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination.²))).

Accordingly, in light of this uncontroverted evidence negating the temporal proximity, the Court finds that no rational jury could conclude that the temporal proximity in this case supports an inference of discrimination. Instead, a rational jury would find that plaintiff was terminated in September 2010 because that was when defendant intended to review her status as a probationary employee and because plaintiff committed two serious errors in the days before her termination. In any event, even assuming *arguendo* that a rational jury believed [*32] that the temporal proximity supported an inference of gender discrimination, there is no other evidence in the record of discriminatory animus. As set forth below, defendant has articulated a non-discriminatory reason for the termination and has submitted uncontroverted evidence to support that reason, and plaintiff has no evidence from which a rational jury could find that such reason was a

pretext for gender discrimination due to her pregnancy.

b. Reasons for Termination

Plaintiff argues that the reasons given for her discharge were pretext for discrimination because she did not commit the misconduct, i.e., she did not reveal confidential patient information, did not text on her phone, and did not commit nearly the number of mistakes defendant claims she did.

Plaintiff's arguments raise issue only as to the accuracy or the wisdom of defendant's decision to terminate her, but fail to create a triable issue of fact as to whether the proffered reasons for plaintiff's termination were a pretext for discrimination. The question in any discrimination case is not whether defendant's decision to fire plaintiff was correct but whether it was discriminatory. See, e.g., *McPherson v. N.Y.C. Dept. of Educ .*, 457 F.3d 211, 216 (2d Cir. 2006) [*33] (²In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what 'motivated the employer...'² (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens* , 460 U.S. 711, 716, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983))); *Koleskinow v. Hudson Valley Hosp. Ctr .*, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009) (²Where a plaintiff has been terminated for misconduct, the question is not 'whether the employer reached a correct conclusion in attributing fault [to the plaintiff] , but whether the employer made a good-faith business determination.'² (alteration in original) (quoting *Baur v. Rosenberg, Minc, Falkoff & Wolff* , No. 07 Civ. 8835, 2008 U.S. Dist. LEXIS 99819, 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008))); *Agugliaro v. Brooks Bros., Inc .*, 927 F. Supp. 741, 747 (S.D.N.Y. 1996) (²Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status.²).

Plaintiff's counsel repeatedly insisted at oral argument that whether plaintiff committed this

2013 U.S. Dist. LEXIS 132884, *33

misconduct is a disputed issue of material fact. However, to reiterate, [*34] the relevant question is not whether plaintiff committed this misconduct, but whether the employer's proffered reasons for terminating plaintiff were pretext. It is undisputed that: (1) the end of plaintiff's probationary period coincided with plaintiff's termination; (2) nine employees of STAT Health (*excluding* supervisors Hamilton and Dougherty) submitted affidavits to this Court relating to plaintiff's poor job performance and stating that they, or other employees, complained to management about plaintiff; (3) Bennett, a medical biller, noticed two serious mistakes regarding data entry at the end of plaintiff's probationary period; (4) plaintiff's job performance was so poor that STAT Health decided to never train her regarding the discharge functions of the receptionist job; (5) Hamilton sent plaintiff home for using her phone in the kitchen during work hours; (6) plaintiff was reprimanded for not working diligently enough; and (7) plaintiff was reprimanded for discussing confidential patient information. Even construing all inferences in plaintiff's favor, no rational jury could conclude that defendant's actions were motivated by her pregnancy. It is apparent that any rational [*35] jury would conclude that defendant terminated plaintiff's employment because the employer and its employees honestly believed that plaintiff was a poor receptionist that committed serious mistakes. *See Riddick v. MAIC, Inc ., 445 F. App'x 686, 689 (4th Cir. 2011)* (per curiam) (upholding grant of summary judgment to employer when plaintiff's thin evidence was [2]insufficient to overcome by a preponderance of evidence the uncontested affidavits of her subordinates that she was a difficult supervisor[2] and that it was [2]uncontroverted[2] that plaintiff had [2]performance issues[2] prior to her pregnancy); *Forde , 546 F. Supp. 2d at 152* ([2]In light of the well-documented evidence of [] dissatisfaction with [plaintiff's] performance long before her announcement that she was pregnant, a trier of fact could not reasonably find from the timing and sequence of events that the reason for [plaintiff's] dismissal was pretextual.[2]); *see also Brown v. Soc'y for Seaman's Children , 194 F. Supp. 2d 182, 191 (E.D.N.Y.*

2002) ([2][A]lthough plaintiff felt she had been treated unfairly, . . . [t]here simply is no basis in the record from which a rational juror could find that the reasons given for plaintiff's termination [*36] . . . were false or a pretext for discrimination.[2]).

Plaintiff has also not brought forward any evidence to suggest that discriminatory animus motivated defendant's decision in connection with her termination. *See Yu v. N.Y.C. Hous. Dev. Corp ., 494 F. App'x 122, 125 (2d Cir. 2012)* (summary order) (stating that to survive summary judgment, the Court must hold that a reasonable jury could find that the [2]proffered reasons for [the employer's action] were pretextual and that the real reason was discriminatory animus[2]). In response to the uncontroverted evidence discussed above, including the complaints from other employees and the medical biller about plaintiff's performance, plaintiff seeks to point to evidence of the events of the day of her termination (September 24, 2010) to show that a rational jury could draw an inference of gender discrimination. In particular, plaintiff argues that she was terminated on the same day that she had morning sickness and that supervisor Dougherty allegedly told plaintiff, at the time of termination, the following: [2]I don't think this is going to work out. Don't worry, you'll be having a baby soon. You have lots of things to look forward to. Enjoy bringing [*37] your baby in.[2] (Baffa Aff. ¶ 20.)

The Court concludes that no rational jury could find pretext from the events of September 24, 2010, especially in light of the other uncontroverted evidence in the record and, thus, such events are insufficient to create a genuine issue of disputed fact that survives summary judgment. As a threshold matter, there is no evidence that Dougherty was aware of the morning sickness episode earlier that morning, in-

SCOTT WEISS

2013 U.S. Dist. LEXIS 132884, *37

cluding Hamilton allegedly yelling at plaintiff.[7] In any event, as noted *supra*, there is uncontroverted evidence in the record that explains the timing of the termination decision — namely, the end of the probationary period and the email from the medical biller complaining about plaintiff's errors. Moreover, the alleged comment by Dougherty is insufficient, by itself or in light of the entire record, to permit a rational jury to infer gender discrimination. First, the statement does not in any way, even construed most favorably to plaintiff, link the termination decision to any issues regarding plaintiff's pregnancy. This is not a case where there is any evidence that plaintiff's time away from work due to pregnancy or childbirth was an issue; to [*38] the contrary, it was plaintiff's time *at work* (namely, the evidence of numerous complaints about her performance) that was the issue. In other words, the comment does not even imply that plaintiff was being terminated because she needed to spend more time with her family or because there was a concern that her pregnancy and/or future motherhood would interfere with her ability to perform her job. Instead, the comment, even if made as plaintiff alleges, simply reflects Dougherty's attempt to avoid any disappointment from the termination by pointing to the positive impact that the birth of the child will have in plaintiff's life. It is completely unconnected, even in plaintiff's version, to any comment about her performance or the reason for termination. Thus, the Court believes that the comment has little or no probative value as it relates to the critical issue — that is, whether the termination decision was a pretext for gender discrimination. *See Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 115 (2d Cir. 2007)* (noting that ²[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative [*39] that re-

mark will be²); *see also Riordan v. BJ's Wholesale Club, Inc., No. 08-CV-1229, 2011 U.S. Dist. LEXIS 3906, 2011 WL 124500, at *11 (N.D.N.Y. Jan. 14, 2011)* (granting summary judgment to employer in age-discrimination case and stating that supervisor's comment urging plaintiff to ²go to Florida² was ²innocuous² and ²[n]othing about the comment, or the context in which it was delivered, suggests discriminatory intent²); *Cozzi v. Great Neck Union Free Sch. Dist., No. 05-CV-1389, 2009 U.S. Dist. LEXIS 74305, 2009 WL 2602462, at *17 (E.D.N.Y. Aug. 21, 2009)* (analyzing remarks in age-discrimination case — such as ²don't you want to spend more time with your grandchildren?² — and noting that ²the Court doubts whether [the supervisor's] remarks are indicative of animus of any sort²); *Infante v. Ambac Fin. Grp., No. 03-CV-8880, 2006 U.S. Dist. LEXIS 4310, 2006 WL 44172, at *7 (S.D.N.Y. Jan. 5, 2006)* (concluding that interview questions and statements, including question about how being a mother ²fit into the mix,² were ²innocuous and do not suggest that anyone at [defendant company] was discriminating against her either on the basis of her recent pregnancy or on the basis of any assumptions about how women with children structure their lives²). In any event, even assuming [*40] *arguendo* that some discriminatory intent could be inferred from this innocuous comment, it is insufficient to allow a rational jury in this case to find the articulated, nondiscriminatory reason for the termination was a pretext for gender discrimination. The Second Circuit has made clear that stray remarks, even if made by a decisionmaker, ²*without more*, cannot get a discrimination suit to a jury.² *Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998)* (citing *Woroski v. Nashua Corp., 31 F.3d 105, 109-10 (2d Cir. 1994)), abrogated on other grounds by Reeves, 530 U.S. at 147-48.* Here, plaintiff has nothing more and, as discussed in

---

[7]   The Court notes that, although plaintiff claims that Hamilton yelled at her when she sent her home, plaintiff does not assert that Hamilton made any comments regarding her gender [*41] or pregnancy; rather, Hamilton, after plaintiff had to excuse herself to go to the bathroom two or three times, allegedly made reference to the fact that plaintiff could not be throwing up in front of patients and needed to go home. Although Hamilton disputes plaintiff's version of the events, even assuming *arguendo* that such a comment were made by Hamilton and known to Dougherty, it does not create an issue of fact on whether Dougherty's decision to terminate plaintiff based upon complaints about her performance was a pretext for gender/pregnancy discrimination given the other, uncontroverted evidence regarding that decision, discussed herein.

SCOTT WEISS

detail *supra*, even construing this evidence most favorably to plaintiff, no rational jury could find the decision was a pretext for gender/pregnancy discrimination in light of the other uncontroverted evidence in the record, including, *inter alia*, the complaints about plaintiff's performance and the fact that the eventual replacement was pregnant at the time she was hired.

There is also no evidence of general pregnancy related comments or negative actions towards other pregnant women, or any other evidence that could remotely support an inference of gender or pregnancy discrimination. (*See* Baffa Dep. at 50-51 (plaintiff admitting that no employees at STAT Health made any [2]demeaning comments in general about pregnant women[2] or [2]negative[2] comments about pregnant women).) To the contrary, the uncontroverted evidence demonstrates that defendant treats pregnant employees and employees with new children in their life **[*42]** extremely favorably. As stated *supra*, it is undisputed that: (1) defendant employed in 2010 two pregnant employees and neither was terminated or treated adversely; (2) both employees received as much maternity leave as requested; (3) one of those employees has been pregnant three times while an employee at STAT Health; and (4) defendant permitted two grandmothers in 2010 to take leave to help care for their grandchildren. This Court recognizes that [2]an employer may not escape liability for discriminating against a given employee . . . *simply because* it can prove it treated other members of the employee's group favorably,[2] *Graham v. Long Island R.R* ., 230 F.3d 34, 43 (2d Cir. 2000) (emphasis added). However, the Court is not relying on this uncontroverted evidence alone; in fact, the Court's ruling would be the same in the absence of this evidence based upon the uncontroverted evidence of complaints about plaintiff's performance by other employees and the absence of any evidence proffered by plaintiff that defendant harbored a discriminatory animus towards her because of her pregnancy or towards any other pregnant employee. In fact, perhaps the most compelling evidence of the absence **[*43]** of any such motive is the undisputed evidence that plaintiff's eventual replacement was pregnant at the time of her hiring. Notably, plaintiff was unable to provide any explanation as to why, if defendant was discriminating against her because she was pregnant, defendant would ultimately hire a pregnant woman to replace her. *See Pickworth v. Entrepreneurs' Org ., 261 F. App'x 491, 493 (4th Cir. 2008)* (per curiam) (upholding grant of summary judgment in employer's favor and holding that plaintiff failed to establish a *prima facie* showing of pregnancy discrimination when plaintiff not only [2]failed to establish that she was performing at an acceptable level at the time she was terminated,[2] but also when plaintiff's [2]replacement was pregnant at the time she was promoted to [plaintiff's] former position[2]).

In sum, considering the evidence as a whole, and viewing all of the evidence in the light most favorable to plaintiff, no reasonable jury could find that plaintiff's pregnancy was a motivating factor in her termination. Although plaintiff has offered several arguments to defeat summary judgment, [2]their combined weight is negligible, and no disputed material issues of fact remain.[2] *Pisana v. Merrill Lynch & Co ., No. 93 Civ. 4541, 1995 U.S. Dist. LEXIS 10296, 1995 WL 438715 at *9 (S.D.N.Y. July 24, 1995).* **[*44]** Plaintiff has put forth no evidence, other than her pregnancy and superficial temporal proximity, from which discrimination could be inferred. Those bare facts are countered by the undisputed, overwhelming evidence weighing against plaintiff's allegations — namely, that plaintiff engaged, or at the very least defendant believed she engaged, in multiple acts of misconduct and unsatisfactory performance, and that defendant continued to hire and retain pregnant employees following plaintiff's termination. Thus, in light of the absence of evidence in support of plaintiff's claims, and the overwhelming evidence weighing against an inference of discriminatory intent, no rational jury could find that plaintiff was fired because of her pregnancy. Indeed, the only reasonable conclusion is that plaintiff was fired based on her misconduct and poor performance. Even if defendant was mistaken and plaintiff was a satisfactory employee that did not commit misconduct, that would only raise a

question of fact in this case as to whether plaintiff was fired unfairly, not whether she was the subject of discrimination. *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) (stating [*45] that an [2]employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason[2]); *see also Norton*, 145 F.3d at 120; *Lambert v. McCann Erickson*, 543 F. Supp. 2d 265, 280 (S.D.N.Y. 2008).

The Court recognizes that it must proceed with great caution in granting summary judgment in discrimination cases where intent, as drawn from inferences, is a core issue. However, as the Second Circuit has noted, [2][t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.[2] *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). That is precisely the situation here. Plaintiff relies on pure speculation and has not produced sufficient evidence to support a rational finding that, more likely than not, plaintiff's pregnancy was a motivating factor for her termination. Accordingly, the Court finds that plaintiff has failed to raise a genuine question of fact as to her Title VII claim and grants defendant's motion for summary judgment on that claim.

## C. New York [*46] State Claim

Plaintiff's complaint also asserts a cause of action under New York State law. Having determined that the federal claim does not survive summary judgment, the Court concludes that retaining jurisdiction over any state law claims is unwarranted. *28 U.S.C. § 1367(c)(3)*; *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966). [2]In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to *Rule 12(b)(6)* or summary judgment grounds, courts should 'abstain

from exercising pendent jurisdiction.'[2] *Birch v. Pioneer Credit Recovery, Inc*., No. 06-CV-6497T, 2007 U.S. Dist. LEXIS 41834, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc*., 784 F.2d 44, 53 (2d Cir. 1986)).

Therefore, in the instant case, the Court, in its discretion, [2]'decline[s] to exercise supplemental jurisdiction'[2] over plaintiff's state law claim because [2]it 'has dismissed all claims over which it has original jurisdiction.'[2] *Kolari v. N.Y.-Presbyterian Hosp*., 455 F.3d 118, 122 (2d Cir. 2006) (quoting *28 U.S.C. § 1367(c)(3)*); *see also Cave v. E. Meadow Union Free Sch. Dist*., 514 F.3d 240, 250 (2d Cir. 2008) ([2]We have [*47] already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction.[2]); *Karmel v. Claiborne, Inc*., No. 99 Civ. 3608, 2002 U.S. Dist. LEXIS 12842, 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ([2]Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by *§ 1367(c)*, or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.[2]).

Accordingly, pursuant to *28 U.S.C. § 1367(c)(3)*, the Court declines to retain jurisdiction over the remaining state law claim given the absence of any federal claims that survive summary judgment and dismisses plaintiff's state law claim without prejudice.

## IV. Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment in its entirety with respect to the federal claim. The Court declines to exercise [*48] supplemental jurisdiction over the state law claim, and dismisses the state law claim without prejudice. The Clerk of the Court shall enter judgment accordingly and close the case.

SCOTT WEISS





Positive
As of: January 21, 2014 10:38 PM EST

# Edwards v. City of New York

United States District Court for the Southern District of New York
December 16, 2005, Decided ; December 19, 2005, Filed
03 Civ. 9407 (PAC)

**Reporter:** 2005 U.S. Dist. LEXIS 34376; 2005    WL 3466009

MICHAEL EDWARDS, Plaintiff, - against - THE CITY OF NEW YORK., Defendant.

## Core Terms

terminate, inspectors, overtime, summary judgment, hostile work environment, disparate treatment, prima facie, discriminatory, municipality, deposition, custom, nonmoving party, license, bumble, burden of production, continued employment, municipal policy, prima facie case, genuine issue of material fact, smoke, void, nondiscriminatory, pervasive, pretext, collective bargaining agreement, similarly situated, genuine issue, grievance, proffer, senior

## Case Summary

### Procedural Posture

Defendant city sought summary judgment on employment discrimination and wrongful termination claims of plaintiff, a former employee, under *42 U.S.C.S. § 1981* and *N.Y. Exec. Law § 296*, as well as a claim under *42 U.S.C.S. § 1983* that the city's failure to provide him with an administrative hearing prior to his termination violated his Fourteenth Amendment right to due process.

### Overview

Plaintiff was an air pollution inspector and alleged that he was disciplined and eventually terminated for conduct for which similarly situated white employees were not disciplined or terminated. However, the court noted that plaintiff provided no evidence that would suggest that his supervisors' conduct was racially motivated and further, provided no statistics, affidavits, or other concrete evidence to demonstrate that other inspectors were actually treated differently. Plaintiff's allegations related to the city's treatment of a similarly situated white employee nine years earlier did not provide a basis to establish an inference of discrimination. The court also found that the disparate treatment and hostile work environment claims failed as a matter of law because the city provided ample evidence to establish that plaintiff was terminated due to insubordinate and unprofessional conduct. Finally, the court dismissed plaintiff's due process claim because the Article 78 proceeding available to plaintiff constituted an adequate post-deprivation remedy for purpose of the due process clause of the Fourteenth Amendment.

### Outcome

Defendant's motion for summary judgment was granted in its entirety.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > General Overview

*HN1* Summary judgment is appropriate if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. *Fed. R. Civ. P. 56(c)*. An issue of fact is ²material² when it

2005 U.S. Dist. LEXIS 34376, *34376

might affect the outcome of the suit under the governing law. An issue of fact is ²genuine² when the evidence permits a reasonable jury to find in favor of the nonmoving party.

Civil Procedure > ... > Summary Judgments > Burdens of Proof > General Overview

*HN2* The burden of demonstrating that no genuine issue of material fact exists falls on the party seeking summary judgment. If the moving party establishes the absence of a genuine issue of material fact, a limited burden of production shifts to the nonmovant, who must come forward with specific facts showing that there is a genuine issue for trial. If the nonmoving party fails to establish a genuine issue of material fact, summary judgment should be granted.

Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > General Overview

*HN3* In determining whether a genuine issue of material fact exists upon a motion for summary judgment, the court must examine all evidence in the light most favorable to the nonmoving party. Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment. Consequently, summary judgment on an issue of fact is not appropriate if there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party.

Civil Procedure > ... > Summary Judgments > Burdens of Proof > General Overview

*HN4* Despite the court's obligation to review all evidence in favor of the nonmoving party, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. Mere conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact. The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts, he must offer some hard evidence showing that his version of the events is not wholly fanciful.

Civil Rights Law > ... > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination
Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

*HN5* Where a plaintiff sues a municipality pursuant to *42 U.S.C.S. § 1981*, he must demonstrate, as a threshold showing, that any alleged violation of his constitutional rights occurred pursuant to a municipal ²policy² or ²custom.²

Civil Rights Law > ... > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination
Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

*HN6* A municipality may not be held liable on a theory of respondent superior. Therefore, a plaintiff seeking damages under *42 U.S.C.S. § 1983* does not have recourse against a municipality unless the plaintiff can show that the violation of his constitutional rights was driven by the municipality itself, pursuant to a municipal ²policy² or ²custom.² The United States Supreme Court has extended this holding to apply to *42 U.S.C.S. § 1981* claims.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

*HN7* Evidence of a single instance of unconstitutional conduct by an employee of the city does not establish a municipal ²policy² or ²custom.² A municipal ²policy² exists where: (1) the city has promulgated a formal rule advocating or supporting the contested conduct, or (2) a single act is taken by a municipal employee who, as a matter of state law, has final policy making authority in the area in which the action was taken. A municipal ²custom² exists, regardless of whether the practice received formal approval by the appropriate decision maker, where the relevant practice is so widespread as to have the force of law. To succeed on this theory, plaintiff must prove the existence of a practice that is permanent.

Civil Rights Law > Protection of Rights > Contractual Relations & Housing > Equal Rights Under the Law

SCOTT WEISS

(sec. 1981)
Labor & Employment Law > ... > Title VII Discrimination > Scope & Definitions > General Overview

*HN8* *42 U.S.C.S. § 1981* protects against discrimination on the basis of race or color. The statute guarantees to all persons an equal right to make and enforce contracts, *42 U.S.C.S. § 1981*, includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. *42 U.S.C.S. § 1981(b)*. Therefore, a plaintiff alleging employment discrimination on the basis of race may bring a claim under *§ 1981* in addition to, or instead of, a claim for discrimination under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*

Labor & Employment Law > ... > Disparate Impact > Evidence > Burdens of Proof
Labor & Employment Law > Discrimination > Reconstruction Statutes
Labor & Employment Law > Discrimination > Title VII Discrimination

*HN9* The United States Supreme Court has established a three-step test governing the order and allocation of proof in discrimination cases under Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e et seq.* First, a plaintiff must present facts sufficient to establish a prima facie case that he suffered from a discriminatory employment action on the basis of his race. The plaintiff may establish his prima facie case by either direct, statistical or circumstantial evidence. The burden of establishing a prima facie case is not a heavy one. One might characterize it as minimal. If the plaintiff meets this burden, a presumption of discrimination arises. Also, the same elements constitute a claim for employment discrimination under *42 U.S.C.S. § 1981*, as under Title VII.

Labor & Employment Law > ... > Disparate Impact > Evidence > Burdens of Proof
Labor & Employment Law > Discrimination > Title VII Discrimination

*HN10* Once a plaintiff establishes a prima facie case of employment discrimination, the burden shifts to the defendant to rebut the presumption by providing a legitimate, nondiscriminatory reason for its actions. The United States Court of Appeals for the Second Circuit has observed: The defendant's burden of production also is not a demanding one; defendant need only offer such an explanation for the employment decision. Although the burden of production shifts to the defendant, the ultimate burden of persuasion remains always with plaintiff. If an employer articulates a nondiscriminatory reason for its conduct, the inference of discrimination raised by plaintiff's prima facie case simply drops out of the picture.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

*HN11* Once a defendant meets its burden of production under the McDonnell Douglas burden shifting analysis, the burden shifts back to the plaintiff to prove that the employer's nondiscriminatory explanation is pretextual. As the United States Supreme Court has established, when the employer has met its burden of production the factual inquiry proceeds to a new level of specificity. The inquiry turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced. The plaintiff must provide enough evidence of pretext that a rational fact finder could conclude that the employer's presumptively valid reasons for its conduct were in fact a cover up for a racially discriminatory decision. A plaintiff attempting to establish pretext may not prevail by establishing only falsity, but must prove, in addition, that a motivating reason was discrimination. The plaintiff retains the burden of persuasion. If the plaintiff does not meet this burden, the plaintiff's discrimination claims must fail.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

*HN12* While the presumption of discrimination ²drops out of the picture² under the McDonnell Douglas burden shifting analysis once defendant proffers a legitimate, nondiscriminatory explanation for its employment action, a

2005 U.S. Dist. LEXIS 34376, *34376

court may still consider the evidence establishing a plaintiff's prima facie case and the inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual. Other evidence that may be considered to establish, or rebut, a claim of pretext include facts as to the defendant's treatment of plaintiff during his prior term of employment and defendant's general policy and practice with respect to minority employment. Consequently, the court must take a case-by-case approach, with the court examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.

Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof

**HN13** In disparate treatment claims involving the discharge of an employee, a plaintiff must show that he or she: (1) was a member of a protected class; (2) was qualified for the position; (3) was discharged; and (4) the discharge occurred in circumstances giving rise to an inference of discrimination.

Labor & Employment Law > ... > Disparate Treatment > Evidence > General Overview

**HN14** In determining whether an employee's job performance is satisfactory pursuant to disparate treatment claims, courts may rely on the evaluations rendered by supervisors.

Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof
Labor & Employment Law > Discrimination > Racial Discrimination

**HN15** For purposes of race based disparate treatment claims, a plaintiff may establish an inference of discrimination by showing (1) that the employer retained a similarly situated white employee who engaged in similar conduct or (2) that the employer treated plaintiff differently from other similarly situated white employees.

Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof

**HN16** The United States Court of Appeals for the Second Circuit has described the burden of establishing a prima facie case of employment discrimination as ²minimal.² A plaintiff must merely present some evidence from which a reasonable fact finder could determine that the plaintiff's termination occurred under circumstances giving rise to an inference of discrimination. However, the burden of establishing pretext is a higher burden than that required to establish the prima facie case, because at this stage plaintiff is without the benefit of any presumptions. At this stage, plaintiff's initially vague allegation of discrimination must be increasingly sharpened and focused.

Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof

**HN17** Once a defendant responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the fact finder must then decide not whether that evidence is credible, but whether the rejection was discriminatory within the meaning of the statute.

Labor & Employment Law > ... > Harassment > Racial Harassment > Hostile Work Environment

**HN18** To establish a prima facie case of hostile work environment, a plaintiff must demonstrate that: (1) his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) a specific basis exists for imputing the conduct that created the hostile work environment to the employer. As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness. The inquiry is fact-specific and must be determined on a case-by-case basis.

Labor & Employment Law > ... > Harassment > Racial Harassment > Hostile Work Environment

**HN19** Whether certain comments or conduct created a hostile work environment depends

SCOTT WEISS

upon the quantity, frequently, and severity of the conduct. To amount to a hostile work environment, a plaintiff must have suffered a steady barrage of opprobrious conduct by his employer, not merely sporadic instances of undesirable conduct.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN20* Fourteenth Amendment due process applies only where the plaintiff has an identifiable liberty or property interest. U.S. Const., amend. XIV. When protected interests are implicated, the right to some kind of prior hearing is paramount. However, the range of protected interests is bounded, and an interest in one's continued employment is protected by the Fourteenth Amendment only in limited circumstances.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN21* Continued employment with a public entity is not a liberty interest protected by the Fourteenth Amendment, but may be a protected property interest if the plaintiff had already acquired interests in specific benefits. However, a public employee without tenure, a formal contract, or any other promise-express or implied-of continued employment is not protected by the Fourteenth Amendment.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN22* In the context of *N.Y. C.P.L.R. § 7801* proceedings seeking reinstatement by terminated state employees, provisional employees have no expectation of tenure and rights attendant thereto and therefore may be terminated at any time without charges preferred, a statement of reasons given or a hearing held. The threshold issue is always whether plaintiff has a property or liberty interest protected by the United States Constitution. Only if a protected interest is identified must the court consider whether the defendant deprived the plaintiff of that interest without due process of law. While private contracts and collective bargaining agreements may create for an employee

a right to a pre-termination hearing not automatically provided as a matter of law, these privately created rights are neither constitutional nor statutory.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN23* The Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful post-deprivation remedy. The United States Court of Appeals for the Second Circuit has held that an *N.Y. C.P.L.R. § 7801* proceeding is a perfectly adequate post-deprivation remedy, because it provides a hearing and a means of redress for the petitioner and permits constitutional issues to be decided in the proceeding. To this end, a terminated state or city employee may bring an *§ 7801* proceeding in New York state court to compel his reinstatement.

Labor & Employment Law > Discrimination > Actionable Discrimination
Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

*HN24* In applying *N.Y. Exec. Law § 296* to discrimination cases, both New York state and federal courts have looked to federal cases interpreting federal discrimination statutes for guidance. Accordingly, the same McDonnell Douglas three-part, burden-shifting test applies to a claim of discrimination under New York law as under federal law.

**Counsel:** [*1] For Michael Edwards, Plaintiff: Philip Anaekperechi Akakwam, Brooklyn, NY.

For The City of New York, Defendant: Diana Goell Voigt, NYC Law Department, Office of the Corporation Counsel, New York, NY; Gerard Schiano-Strain, New York City Law Department, New York, NY.

**Judges:** PAUL A. CROTTY, United States District Judge.

Case 2:12-cv-05506-JFB-GRB   Document 51-2   Filed 01/24/14   Page 20 of 142 PageID #: 561

Page 6 of 24
2005 U.S. Dist. LEXIS 34376, *1

**Opinion by:** PAUL A. CROTTY

---

| **Opinion** |

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Michael Edwards, an African-American male, brings this action against defendant The City of New York (²the City²), [1] his former employer, alleging disparate treatment, hostile work environment, and wrongful termination of his employment at the New York City Department of Environmental Protection (²DEP²) on the basis of race. Plaintiff brings his claims under 42 U.S.C. § 1981 and the New York State Executive Law § 296. Plaintiff also brings a claim under 42 U.S.C. § 1983, alleging that the DEP's failure to provide him with an administrative hearing prior to his termination violated his Fourteenth Amendment right to due process. Defendant now moves for summary judgment on all claims. For the reasons explained [*2] below, defendant's motion for summary judgment is GRANTED.

BACKGROUND

I. FACTS AND ALLEGATIONS

A. Plaintiff's Employment with DEP

*1. Plaintiff's Education and Job Titles*

Edwards, a certified environmental specialist, obtained a Bachelor's degree in Environmental Science, with honors, prior to commencing employment with the DEP. (Pl.'s Dep. 78:12-78:14, 78:17-78:18.) In addition, Edwards continued his education part time while working at the DEP, pursuing a master's degree from City University of New York (²CUNY²). (Pl.'s Dep. 261:14-261:15; Schiano-Strain Decl., Exs. J & [*3] L.)

Edwards began working for the DEP on July 6, 1999, as a Provisional Junior Engineering Work Study Trainee. (Schiano-Strain Decl., Ex. B.) On August 20, 2001, Edwards was appointed as a Provisional Air Pollution Inspector in the DEP Bureau of Environmental Compliance. [2] ( Id.) Edwards remained in that position until the DEP terminated his employment on January 3, 2003. ( Id.)

[*4] *2. Writing of Violations*

As a provisional air pollution inspector, a large part of Edwards's job was to conduct field inspections to observe and investigate excessive air contaminants or excessive noise, in violation of the New York City Code. (Schiano-Strain Decl., Ex. N.) When Edwards identified a violation, he was required to write up a notice of violation to the offending entity or individual. ( Id.) He was also expected to testify at Environmental Control Board (²ECB²) hearings, the administrative body that adjudicated contested violations. ( Id.)

Edwards was an aggressive violation writer. Both supervisors and fellow inspectors criticized Edwards for writing too many violations for each infraction. (Pl.'s Dep. 136:5-136:24.) As a result, Edwards's supervisors

---

[1]   Plaintiff originally sued the American Federation of State County and Municipal Employees, AFL-CIO, District Council 37 and Local 375, Civil Service Technical Guild under the Labor-Management Relations Act of 1947, in addition to the City. On February 19, 2004, the Court dismissed, with prejudice, all claims against those defendants, leaving only the City as a defendant. (Docket sheet, entry # 9; Def.'s Mem. of Law in Supp. 2.)

[2]   Edwards argues that his two job titles--Provisional Junior Engineering Work Study Trainee and Provisional Air Pollution Inspector --were contiguous with each other (Pl.'s Rule 56.1 Statement P50), though he does not provide any documentation--such as a promotion letter stating that the jobs were contiguous--to verify this assertion. Instead, plaintiff submits only the collective bargaining agreement entered into between the Commissioner of Labor Relations and the union that encompasses civil service employees in engineering and scientific positions. (Akakwam Decl., Ex. 10.) According to the contract, a provisional employee who has served for two years in the ²same or similar title² or ²related occupational group² in the same agency, and who is subject to a disciplinary action, is entitled to a conference to discuss the charges. ( Id., Art. IV, §§ 1 & 6.) The collective bargaining contract does not explain what ²the same or similar title² or ²related occupational group² encompasses, however, so reference to this contract does not compel or even suggest that the two job titles were, in fact, contiguous, as Edwards argues.

voided his violations on multiple occasions. (Pl.'s Dep. 89:16-93:16.) While Edwards concedes that it is standard practice for senior inspectors to review violations written by junior inspectors,[3] he complains that his violations were scrutinized more closely and more frequently than those written by other inspectors. (Pl.'s Dep. 160:9-161:16.) While Edwards now alleges that this disparate treatment is on **[\*5]** account of race, he admitted at his deposition that his violations were scrutinized and voided more than others because he wrote too many violations at each site, rather than focusing on only the most flagrant or serious violations, which was the usual practice by other inspectors. (Pl.'s Dep. 136:5-140:20.)

 Evidence of disparate treatment in the supervision and voiding of violations

Edwards provides no evidence of racial epithets, jokes, or preferences that would suggest that his supervisors' conduct was racially motivated. Further, Edwards provides no statistics, affidavits, or other concrete evidence to demonstrate that other inspectors were actually treated differently. In fact, despite Edwards's claim that supervisors questioned his violations constantly, he admits **[\*6]** that he wrote ²over one thousand² violations while working for the DEP, yet only ²like six or four or five² were actually voided. (Pl.'s Dep. 143: 5-143:24.)

Edwards's only evidence of disparate treatment by supervisors is his own self-serving deposition testimony. Edwards testified that Ms. Kelpin, the Deputy Commissioner of the BAN HAZMAT Department, ²told [his] supervisors to tell [him] not to write violations which were in the code,² and questioned his violations ²all the time² by writing sticky notes on his violations. (Pl.'s Dep. 89:20-89:22, 91:4-91:13.) Edwards admits in his deposition that he does not know if Ms. Kelpin commented about other inspectors' violations or if she scrutinized the violations of other black inspectors to a greater degree than white inspectors. (Pl.'s Dep. 93:21

-93:24.) Edwards does not explain why he believes that Ms. Kelpin's conduct was racially motivated, other than the fact that Ms. Kelpin is white, while Edwards is African American.

Edwards also testified that at one point Edwards's direct supervisor, Joe DiLeo, put another inspector in the field with Edwards. Edwards claims that Mr. DiLeo paired the two men together to ²hold [Edwards] **[\*7]** back² so he would not write so many violations, and alleges that this pairing was discriminatory because Mr. DiLeo did not tell other inspectors not to write so many violations. (Pl.'s Dep. 130:3-130:20.) Again, Edwards provides no evidence to suggest that Mr. DiLeo's conduct was racially motivated, and even admits in his deposition that he did not discuss the subject with other inspectors, white or black. (Pl.'s Dep. 130:16-132:20.)

Mr. DiLeo provides a different version of what happened. DiLeo explains he paired Edwards up with another, more senior inspector ²to guide him as to the type of violations he was issuing,² (DiLeo Dep. 41:17-41:22), because Edwards issued too many violations for the same incident. (DiLeo Dep. 41:13-44:21.) Mr. DiLeo described Edwards's violation writing as ²overkill.² (DiLeo Dep. 44:17.)

Edwards provides other unsubstantiated stories to support his claim of disparate treatment. For example, Edwards claims that Mr. Buffa, a white inspector, slept in his vehicle and therefore did not always answer the radio. If Edwards did not answer the radio, he would be ²yelled out [sic] or called out.² (Pl.'s Dep. 125:16; 125:22.) Edwards does not offer any witness **[\*8]** testimony or affidavits to support this allegation.

*3. Denial of Overtime*

Edwards also claims that he was denied opportunities to take part in specialized assignments and overtime as a result of his race. In support of this allegation, Edwards testified that

---

[3]   Recognizing the complexity of the position, the official description of an Air Pollution Inspector provided by the DEP expressly states that the work of an Air Pollution Inspector is done ²under supervision.² (Schiano-Strain Decl., Ex. N.)

he was bumped off the M.A.R.C.H. list--a spe-cial, ongoing project at the DEP that offered weekend overtime hours to employees--while similarly situated non-black employees regu-larly made the list. (Pl.'s Dep. 191:8-192:21.) Edwards does not offer any evidence to substan-tiate his claim that non-African American em-ployees made the list more often than he did, nor does he prove that African-American employ-ees were also bumped off the list at a higher rate than non-African American employees.

The M.A.R.C.H. list for November, submitted by defendant as an exhibit to support this mo-tion, shows that Edwards was, in fact, bumped off the December list. (Schiano-Strain Decl., Ex. F.) It also shows, however, that three other inspectors, at least one of whom was white, were also bumped off the Decem-ber and January M.A.R.C.H. lists. ( Id.) In fact, Edwards conceded that Edward Crilly, a white inspector, was also bumped off the M. [*9] A.R.C.H. list. (Pl.'s Dep. 192:22-193:10.)

In his deposition, Edwards admitted that he was given other overtime opportunities, particu-larly by working weekend [2] horn honking de-tail.[2] (Pl.'s Dep. 195:9-195:21.) The M.A.R.C.H. list also shows that Edwards was placed on the list for overtime work on Novem-ber 15, 2002, and that no inspector received more than one day of overtime on the Novem-ber list. (Schiano-Strain Decl., Ex. F.) In addi-tion, a DEP print-out of all Air Pollution Inspec-tors and their annual compensation reveals that Emmanuel Ojo, an African-American in-spector, had the highest overtime earnings for the 2001 calendar year. (Schiano-Strain Decl., Ex. G.)

### 4. Confrontations with Supervisors

Edwards clashed with his supervisors on at least two occasions. On September 13, 2001, Ed-wards was supposed to go to [2] smoke school[2] for training. (Pl.'s Dep. 248:11-248:24, 250:2-250:24; Schiano-Strain Decl., Exs. H & I.) He had arranged to meet up with Inspector Rob-ert Rasmussen at the office around 7:30 a.m., so that they could drive together, but Edwards was late due to traffic on the Brooklyn-

Queens Expressway. By the time Edwards got to the office at 8:15 a.m., Mr. Rasmussen had [*10] already left, but Mr. DiLeo, Mr. Mon-talvo, and a few other employees were at the of-fice having a meeting. Mr. DiLeo admonished Edwards, saying: [2]Mike, What are you doing here, I though you were supposed to be at smoke school.[2] (Schiano-Strain Decl., Ex. H.). Edwards explained his meeting with Mr. Ras-mussen and the reason for his delay, but Ed-wards was upset at the fact that Mr. DiLeo re-proached him, so he told Mr. DiLeo not to yell at him before he walked away. (Id.) Edwards then back tracked, went right up to Mr. DiLeo's face, and gave him [2]a warning[2] not to [2]speak to [him] in that tone of voice.[2] (Pl.'s Dep. 250:18-250:24.)

Edwards testified that he did not raise his voice at any time during the incident, (Id. 250:15-250:17), but Mr. DiLeo recounts that Ed-wards gave his warning in a [2]loud and threaten-ing manner.[2] (Schiano-Strain Dec., Ex. H.) Mr. Montalvo, who witnessed the incident, found Edwards's conduct [2]insubordinate,[2] and wrote a memorandum to Ms. Gail Kelpin, Di-rector of Enforcement, detailing the incident and recommending Edwards's termination for in-subordination. (Schiano-Strain Decl., Ex. I.) Mr. Montalvo also directed Mr. DiLeo to write a re-port of the incident, which [*11] he did, (Schiano-Strain Decl., Ex. H), though Mr. DiLeo testified that if Mr. Montalvo had not told him to write a report, he would not have, as he did not consider the incident [2]severe enough[2] to warrant a formal or official warning notice. (DiLeo Dep. 30:22-31:23, 32:14-32:17.) The report was added to Edwards's personnel file, but was not shown to Edwards at any time prior to this litigation. (DiLeo Dep. 31:24-32:13.)

The next day--the morning of September 14, 2001--Edwards and Mr. Montalvo had another confrontation, which Mr. Montalvo docu-mented in another memorandum to Ms. Kel-pin. (Schiano-Strain Decl., Ex. I.) At a staff meeting, another inspector suggested that in-spectors should not put American flags on city vehicles, to protect the safety of inspectors who had to travel into various neighborhoods throughout the city. ( Id.) Everyone--except Ed-

wards--agreed that this is a good policy. ( Id.) Edwards interjected that he had already purchased a flag and put it on his vehicle, and he did not want to remove it. ( Id.) Mr. Montalvo did not like this, so he cut in and stated that since it was a city vehicle, if Edwards refused to remove the flag Mr. Montalvo would just take [*12] Edwards's keys. ( Id.) At that point, Edwards gave in and agreed to remove it. ( Id.)

Mr. Montalvo made Edwards stay after the meeting. (Id.) Edwards told Mr. Montalvo that he did not like the way Mr. Montalvo spoke to him and [2]told him to give the keys[2] and did not like Mr. Montalvo's attitude. ( Id.) He also told another inspector who was present at the meeting that he [2]did not like taking orders,[2] to which Mr. Montalvo responded that if Edwards did not like taking orders, he was [2]in the wrong place.[2] ( Id.) Mr. Montalvo felt that Edwards spoke to him [2]with an attitude and intimidating tone of voice,[2] so he warned Edwards about his conduct. ( Id.) At that point, Edwards agreed to remove the flag and left. ( Id.)

At the same meeting, Edwards told Mr. Montalvo that he did not like the Manhattan office and felt that Mr. Montalvo had something against him. ( Id.) Mr. Montalvo stated in his memo: [2]I believe the reason [for Edwards's attitude] is that I did not allowed [sic] him to take extended lunch hours so he could attend his college during the day.[2] ( Id.)

### 5. Confrontations with the Public

In his deposition, Edwards recounts a number of arguments [*13] with members of the public, though he states that he never raised his voice or cursed at anyone. (Pl.'s Dep. 252:14-269:3.) Mr. Montalvo disagrees, however, and claims that he received complaints from members of the public and from other inspectors that Edwards yelled at people. Mr. Montalvo described Edwards as [2]a time bomb waiting to explode.[2] (Schiano Strain Decl., Ex. K, 2.) Montalvo stated in another memorandum that Edwards [2]speaks to complainant's [sic] in a hostile manner and in an attitude that is not professional,[2] (Schiano-Strain Decl., Ex. I, 2.) and

that he [2]plac[es] the accompanying inspector in precarious situations [because] they have to defend his unprofessional behavior.[2] ( Id.)

In an incident on October 9, 2002, Edwards confronted some construction workers operating a [2]hi-low[2] (forklift) at CUNY. (Pl.'s Dep. 257:18-262:12; Schiano-Strain Decl., Ex. L, 2.) Edwards stated that the workers' hi-low was creating carbon monoxide fumes, which he could smell from the third floor classroom. (Pl.'s Dep. 258:3-258:18.) Edwards was not on duty at the time, he was attending class, but he invoked his position as a DEP inspector by threatening to write a violation against [*14] the workers. (Pl.'s Dep. 261:5-261:6, 261:13-261:17.) Edwards claims that he did not get physical with the workers or bump into anyone, but he did raise his voice because he [2]was being cursed at and yelled at.[2] (Pl.'s Dep. 259:15-260:4.) Edwards says that when he yelled at the men, he merely told them to turn the hi-low off and threatened that if they did not turn it off, he would write a violation against them. (Pl.'s Dep. 260:19-261:8.)

The Incident Report submitted by the Public Safety Department at CUNY, which describes the incident as a [2]confrontation,[2] tells a slightly different story: Edwards [2]demanded[2] that the driver shut off his vehicle and demanded that the driver and the site safety manager produce their licenses so that Edwards could issue them both a summons. Edwards then [2]bumped[2] the two men and [2]kept yelling and screaming that he wanted to write a complaint.[2] (Schiano-Strain Decl., Ex. L, 2.) The public safety guards had to calm Edwards down and separate him from the crew so that he could come to the office and write a statement. Edwards wrote up a statement, as did the public safety officers and three of the construction workers. ( Id.)

Mr. Montalvo reports other [*15] incidents in the field. For example, he states that on or around October 28, 2002, he received a phone call at his Queens office from an irate [2]complainant screaming at [him] because Edwards went to her apt. to make a notice inspection and . . . told [the complainant] that if she did not shut up he was going to tie her up and tape her

mouth shut.[2] (Schiano-Strain Decl., Ex. K, 2.) Mr. Montalvo does not provide a witness statement from the complainant to support this allegation because he [2]forgot to ask her to write a letter of her complaint.[2] ( Id.) Edwards testified that he does not recall this incident. (Pl.'s Dep. 257:13-257:17.)

Mr. Montalvo relates another incident in which Edwards had a [2]hot argument[2] with a security guard at ECB, during which Edwards [2]grabbed him by his private and squeezed him until tears came out of the guards eyes.[2] (Schiano-Strain Decl., Ex. K, 2.) While the City does not provide any additional witness statements memorializing this incident, Mr. Montalvo's report states that the incident occurred in front of another inspector, Mr. Buffa, who eventually had to step in and break up the confrontation. ( Id.)

### 6. Confrontation at an E.C.B. Hearing

 [*16]  On at least one occasion, Edwards had trouble controlling his temper during an ECB hearing. According to the Decision and Order submitted by the ALJ in charge of the case, Edwards exhibited a [2]bizarre and unprovoked outburst at the hearing.[2] (Schiano-Strain Decl., Ex. M.) The ALJ relays:

> During cross-examination, Inspector Edwards was asked by respondent's counsel whether or not he went to the roof of the subject premises to verify that the smoke he observed from the street was, in fact, emanating from its smoke stack. To my [the ALJ's] complete surprise and consternation, Inspector Edwards went into a temper tantrum, accusing respondent's counsel of harassing him. Even after the senior inspector who accompanied him into the hearing took Inspector Edwards outside to calm him down, Inspector Edwards remained belligerent and edgy throughout the hearing. I find Inspector Edwards' behavior extremely disturbing and alarming.

( Id.) Mr. Montalvo heard about the inci-

dent from Mr. McCoy, the senior inspector who witnessed the outburst. (Schiano-Strain Decl., Ex. K, 2.) According to Mr. Montalvo, the ALJ was so upset that [2]she will never take one of his cases again.[2] ( [*17]  Id.)

Furthermore, the ALJ observes that the documentary evidence did not support Edwards's version of the incident. A photograph of the offending smoke stack--purportedly taken only three minutes after Edwards claims to have observed the smoke--shows no smoke emanating from the smoke stack at all. (Schiano-Strain Decl., Ex. M.) Edwards had no explanation for this discrepancy. ( Id.) Since respondent's defense was that the smoke observed by Edwards did not come from its smoke stack, Edwards's testimony on this issue was crucial. ( Id.) Weighing this evidence in light of Edwards's [2]bizarre[2] and defensive behavior on cross-examination, the ALJ did not find Edwards's testimony that the violation had actually occurred credible and found for respondent. ( Id.)

The one remaining violation written by Edwards had to be dismissed because Edwards cited the wrong Code section. ( Id.) Edwards originally cited § 122(b)(2), but later moved to amend the citation to state a violation of § 122(b)(1). ( Id.) It turns out that the correct section was § 123(e). ( Id.) Since Edwards had not referenced this section, or moved to amend the violation to cite this section, the ALJ was  [*18]  forced to dismiss the violation in full. ( Id.)

### 7. Work Evaluations and Pre-Termination Disciplinary Record

Edwards claims that he was never warned by any of his supervisors that there was a problem with his conduct. (Pl.'s Dep. 103:13-104:24.) Mr. Montalvo testifies, however, that Edwards was verbally warned about the problems he was having with plaintiff on multiple occasions. (Montalvo Dep. 31:5-31:12, 74:11-74:16.) Mr. Montalvo wanted to issue a written warning to Edwards, but was advised not to by his supervisor, Frank Cecora, who felt that since Ed-

wards was new, they should [2]give him a break, . . . work with him, [and] maybe he will get straightened out.[2] (Montalvo Dep. 31:13-32:23.)

Despite Mr. Montalvo's dissatisfaction with Edwards's conduct, Mr. DiLeo gave Edwards a good Performance Evaluation Report for the period from August 20, 2001 through December 31, 2001. (Akakwam Decl., Ex. 11.) On a scale of [2]unsatisfactory,[2] [2]conditional,[2] [2]good,[2] [2]very good,[2] or [2]outstanding,[2] Edwards was given scores of [2]very good[2] for each task, even tasks that were rated in part on the employee presenting himself and the Department [2]in a professional manner.[2] ( Id., Task Nos. [*19] 3 & 4.) Under [2]Justification for Overall Rating,[2] Mr. DiLeo wrote: [2]The short time Inspector Edwards has been with the Enforcement Unit, he has Distinguished himself positively from his fellow Inspectors. If he maintains his eagerness and Positive Attitude, he will prove an asset to the Dept.[2] ( Id.) Mr. DiLeo recommended that Edwards should be retained in his present title. ( Id.)

## B. Prior Complaints

Edwards admits that he never filed a complaint with the DEP's Office of Equal Employment Opportunity, though he knew of its existence and policies. (Pl.'s Dep. 243:11-244:3.) Edwards testified that he did not contact the DEP's Office of Equal Employment Opportunity because he [2]was suspicious of[2] the office. (Pl.'s Dep. 244:4-244:10.) He provides no explanation for this suspicion, other than to state that, based on a training seminar that he attended about the Office of Equal Employment Opportunity, he felt that if he [2]made a complaint, the complaint would not be answered.[2] (Pl.'s Dep. 244:11-244:22.)

## C. Plaintiff's Arrest and Termination

On December 6, 2002, Edwards was pulled over by the NYPD after making an illegal turn at the corner of Tillary and Adams Streets in Brooklyn. [*20] (Schiano-Strain Decl., Ex. O, 2.) Edwards was driving a city vehicle. (Pl.'s Dep. 281:7-281:10.) When the officer ran Edwards's license number, he discovered that Edwards's license had been suspended on November 24, 2002, due to Edwards's failure to respond to an earlier summons arising from an unrelated traffic violation on September 17, 2002. [4] (Akakwam Decl., Ex. 5 & 7.) Edwards was then arrested for driving with a suspended license. (Pl.'s Dep. 281:14-281:17.)

Edwards did not notify the DEP that his license was suspended at any time prior to the December 6, 2002 arrest. (Pl.'s Dep. 299:16-299:20.) Edwards claims that he did not notify the DEP of the suspension because he did not know until the day of the arrest that his license was suspended. ( Id.)

The same day, Edwards appeared before a court clerk or ALJ in the Traffic [*21] Violations Division of the Brooklyn DMV. (Pl.'s Dep. 315: 20-315:23.) Edwards posted a bond for an April 8, 2003 trial, so the suspension on his license was immediately lifted. (Akakwam Decl., Ex. 7.) DEP Inspector Rasmussen was present at this hearing, and informed the DEP the same day that the suspension of Edwards's license was lifted until the trial. (Pl.'s Rule 56.1 Statement P42.)

Edwards immediately notified the DEP of his arrest, as required by the rules and regulations of the DEP. [5] The same day (Dec. 6, 2002), the DEP sent Edwards a Notice of Interview,

---

[4]   It appears that the earlier violation arises from Edwards's failure to appear at a hearing scheduled in connection with a July 19, 1999 arrest for speeding. (Pl.'s Dep. 299:8-299:15.)

[5]   The DEP Uniform Code of Discipline requires that all employees notify the DEP of arrests and convictions. (Akakwam Decl., Ex. 6.) The policy was written up in a memorandum, dated May 18, 1999, that was distributed to all employees. ( Id.) An affected employee is required to promptly notify, in writing, both his location supervisor and the Office of Disciplinary Counsel. ( Id.) The employee is required to state certain specified information in the writing and attach a copy of the certificate of disposition. ( Id.) Employees are warned that failure to follow this procedure could result in disciplinary charges. ( Id.) It appears from the evidence presented by plaintiff that Edwards followed this procedure after his December 6, 2002 arrest, (Akakwam Decl., Ex. 5; DiLeo Dep. 49:2-49:10.), though defendant claims that Edwards never notified the Office of Disciplinary Counsel.

which informed Edwards that he was required to appear for an interview to prove that he had a valid driver's license, and therefore was in compliance with the DEP Uniform Code of Discipline, at a date and time to be announced. (Schiano-Strain Decl., Ex. R.) Edwards met with Mr. Highman of the DEP Office of Disciplinary Counsel on December 11, 2002. (Pl.'s Dep. 227:2-227:23.) At the meeting, Mr. Highman informed Edwards that he was aware that Edwards's license had been reinstated. ( Id.)

[*22] The DEP does not have a policy of automatic suspension for DEP employees who report arrests. (Montalvo Dep. 58:2-58:9.) Still, On December 9, 2002, Edwards was suspended from duty. (Akakwam Decl., Ex. 8.) On January 3, 2003, Edwards was terminated by the DEP. (Akakwam Decl., Ex. 9.)

According to a December 31, 2002 memorandum from Mr. Michael Gilsenan, Assistant Commissioner of the DEP, the DEP recommended Edwards's termination not only because of his failure to report the suspension of his license, as required under DEP policy, but also because of a ²history of misconduct.² (Schiano-Strain Decl., Ex. T.) According to the Report:

> Mr. Edwards has repeatedly been involved in verbal altercations with supervisors, coworkers and the public. We have received reports of him threatening to physically harm a complainant, and being involved in a physical altercation with a security guard at ECB. His outbursts have also been documented during ECB hearings where the Administrative Law Judge categorized his outburst as bizarre, and found his behavior to be extremely disturbing and alarming.

> Mr. Edwards have received repeated warnings from his supervisors and has

been advised that [*23] type of behavior is inappropriate, but it has not improved.

( Id.) The report does not identify the source(s) of these complaints. Based on this overall record, Edwards was terminated.

Plaintiff claims that he was disciplined and eventually terminated for conduct for which similarly situated white employees were not disciplined or terminated. (Pl.'s Dep. 206:14-206:17.) In his deposition, he alludes to an incident in 1993--nine years before Edwards's driving violation--in which Greg Astrosky, [6] a white inspector with the air and noise division of the DEP, was involved in a hit-and-run accident while under the influence of alcohol and cocaine. (Pl.'s Dep. 206:20-206:24.) Edwards states that the incident happened over the weekend and makes no mention of whether the incident occurred in a city-owned vehicle (as his own arrest did). (Pl.'s Dep. 206:22.) According to Edwards, Mr. Astrosky was not terminated from his position as a DEP inspector, (Pl.'s Dep. 207:3.), though the DEP claims that Mr. Ostrosky was, in fact, terminated as a result of the incident to which plaintiff refers. [7] (Def.'s Mem. of Law in Supp. 13.)

Other than Edwards's own account of the incident, which he claims he learned of from Senior Inspector McCoy, (Pl.'s Dep. 207:17-207:19), Edwards does not provide any documentary evidence or witness affidavits to support this somewhat ancient story. Moreover, Edwards does not provide any employee information to establish that Mr. Ostrosky was, at the time of the alleged incident, a ²similarly situated² employee, so that a reasonable trier of fact could compare the treatment of Mr. Ostrosky to that of Edwards and conclude that Edwards was treated differently on account of his

---

[6]   The City refers in its moving papers to ²Mr. Ostrosky,² but plaintiff refers consistently in his papers to ²Mr. Astrosky.² Therefore, wherever the decision refers to plaintiff's version of the incident, the name ²Astrosky² is used to be consistent with plaintiff's papers. Otherwise, the name ²Ostrosky² is used.

[7]   In its Memorandum of Law in Support of its Motion to Dismiss, the City states that, in fact, Mr. Ostrosky was terminated by the DEP as a result of the incident to which plaintiff refers. To support this assertion, however, defendant refers to pages in the transcript of the Montalvo deposition that were not attached with defendant's motion papers.

race. Edwards admits that he does not know Mr. Astrosky and has never discussed the incident with him. (Pl.'s Dep. 208:11-208:15.)

Edwards also tells of another incident in which **[\*25]** a DEP-employed tug boat operator was driving while intoxicated. (Pl.'s Dep. 216:11 -216:24.) Here too, Edwards provides no details of the incident, the race of the employee, or what punishment was meted out to the employee by the DEP. Thus, there is no way to compare the incident to Edwards's termination.

Plaintiff did not discuss either of these incidents with his supervisors. (Pl.'s Dep. 218:8-218:12.) Plaintiff also is not aware of whether black employees have been disciplined or fired by the DEP. (Pl.'s Dep. 218:13-218:17.) He has not discussed discipline with any of the other black employees with whom he worked. (Pl.'s Dep. 218:18-218:23.)

## II. PROCEDURAL HISTORY

At some point after January 3, 2003, Edwards filed a grievance with his union complaining about his termination, but for reasons not explained in the record, the union declined to pursue the grievance. As a result, on November 25, 2003, Edwards filed this action against the City and the union. (Pl.'s Compl.) Since Edwards failed to bring this action within four months after the union denied his request to bring a grievance, on February 19, 2004, Edwards voluntarily dismissed all claims against the union defendants. **[\*26]** (Docket Sheet, Entry # 9; December 1, 2005 Oral Argument; Def.'s Mem. of Law in Supp. 2.)

After full discovery, the City now moves for summary judgment on all claims. The City raises three separate grounds for dismissal of Edwards's *§ 1981* claims: (1) Edwards has failed to make out a prima facie case of discrimination; (2) Even if Edwards meets the minimal showing required to make out a prima facie case, he has failed to present any evidence that the DEP's legitimate, non-discriminatory reason for terminating him was mere pretext; and (3) Edwards is unable to establish that his termination was pursuant to a municipal policy or custom, and therefore plaintiff cannot sue the City under *§ 1981*. Defendant seeks to dismiss Edwards's due process claim on the ground that, as a provisional employee, Edwards had no protectible property right in his continued employment. Further, defendant argues, even if Edwards had a protectible property right, the DEP did not violate this right because an *Article 78* proceeding in New York state court serves as a meaningful postdeprivation remedy.

## DISCUSSION

## I. STANDARD ON MOTION FOR SUMMARY JUDGMENT

*HN1* Summary judgment is appropriate if ²the pleadings, **[\*27]** depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.² *Fed. R. Civ. P. 56(c)*. An issue of fact is ²material² when it ²might affect the outcome of the suit under the governing law.² *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. An issue of fact is ²genuine² when the evidence permits a reasonable jury to find in favor of the nonmoving party. *Id.*

*HN2* The burden of demonstrating that no genuine issue of material fact exists falls on the party seeking summary judgment. *Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970))*. If the moving party establishes the absence of a genuine issue of material fact, ²a limited burden of production shifts to the nonmovant, who must . . . come forward with 'specific facts showing that there is a genuine issue for trial.'² *Id.* (quoting *Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993))*. If the nonmoving party fails to establish **[\*28]** a genuine issue of material fact, summary judgment should be granted. *Id.*

*HN3* In determining whether a genuine issue of material fact exists, the Court must examine all evidence in the light most favorable to the

nonmoving party. *Anderson,* 477 U.S. at 255; *Make the Road by Walking, Inc. v. Turner,* 378 F.3d 133, 142 (2d Cir. 2004); *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir. 2003). ²Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.² *Jeffreys v. City of New York,* No. 03-257, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir. 1996) (internal quotations marks omitted)). Consequently, summary judgment on an issue of fact is not appropriate ²if there is *any* evidence in the record that could reasonably support a jury's verdict for the nonmoving party.² *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 254 (2d Cir. 2002) (emphasis added).

*HN4* Despite the Court's obligation to review all evidence in favor of the nonmoving party, ²the [*29] mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.² *Jeffreys,* 426 F.3d at 554 (quoting *Anderson,* 477 U.S. at 252). Mere ²conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact.² *Niagara Mohawk Power Corp. v. Jones Chemical, Inc.,* 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998)). The nonmoving party ²must do more than simply show that there is some metaphysical doubt as to the material facts,² *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), he ²must offer some *hard evidence* showing that [his] version of the events is not wholly fanciful.² *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998) (emphasis added).

While plaintiff offers many allegations of discrimination, they are all conclusory. Plaintiff's papers are devoid of any concrete evidence establishing discrimination. For this reason, defendant's [*30] motion for summary judgment must be granted.

II. MONELL LIABILITY

Plaintiff sued the City the City of New York pursuant to *§ 1981,* alleging that one of its agencies, the DEP, discriminated against him on the basis of race. Plaintiff did not sue any DEP employees in their individual capacity. *HN5* Because plaintiff sued only the City of New York, a municipality, he must demonstrate, as a threshold showing, that any alleged violation of his constitutional rights occurred pursuant to a municipal ²policy² or ²custom.² See *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); accord *Jeffes v. Barnes,* 208 F.3d 49, 56 (2d Cir. 2000). Since plaintiff makes no such showing, the Court must dismiss his claims of discrimination against the City brought pursuant to *42 U.S.C. § 1981.*

In Monell v. New York City Department of Social Services, the Supreme Court held that *HN6* ²a municipality may not be held liable on a theory of respondent superior.² *436 U.S. at 690-91.* Therefore, a plaintiff seeking damages under *§ 1983* does not have recourse against a municipality unless the plaintiff can show that the violation [*31] of his constitutional rights was driven by the municipality itself, pursuant to a municipal ²policy² or ²custom.² *Id.* at 691. The Supreme Court later extended this holding to apply to *§ 1981* claims. See *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 733, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989).

*HN7* Evidence of a single instance of unconstitutional conduct by an employee of the City does not establish a municipal ²policy² or ²custom². See *Davis v. City of New York,* 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 831, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985)). A municipal ²policy² exists where: (1) the City has promulgated a formal rule advocating or supporting the contested conduct, or (2) ²a single act is taken by a municipal employee who, as a matter of state law, has final policymaking authority in the area in which the action was taken.² *Davis,* 228 F. Supp. 2d at 336-37 (quoting *Monell,* 436 U.S. at 690 and *Pembaur v. City of Cinncinatti,* 475 U.S. 469, 479-82, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)). A municipal ²custom² exists, regardless of whether

the practice received formal approval by the appropriate decision maker, where **[*32]** [2]the relevant practice is so widespread as to have the force of law.[2] *Brown,* 520 U.S. 397, at 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626. [2]To succeed on this theory, plaintiff must prove the existence of a practice that is permanent.[2] *Davis,* 228 F. Supp. 2d at 337.

Plaintiff establishes neither a municipal policy nor a long-standing custom of discrimination by the City. In fact, in his opposition papers, plaintiff concedes that [2]there may not be a specific policy of the City defendant to discriminate[] against plaintiff and other black employee[s].[2] (Pl.'s Memo of Law 9). Instead, plaintiff urges the Court to break from settled precedent and find, in the absence of an officially promulgated policy or widespread pattern of similar conduct, that [2]it is enough to show the practice of the particular agency of the city resulted in violation of plaintiff's civil and constitutional rights.[2] (*Id.*) While plaintiff does not expressly define [2]practice,[2] he suggests that any proof of discrimination by DEP employees against plaintiff suffices to establish Monell liability. The case law does not support this proposition.

The Court declines to adopt plaintiff's interpretation of Monell. *Monell* **[*33]** and its progeny clearly establish that plaintiff cannot sue the City of New York without proof of a city-sanctioned policy or custom of discrimination. This rule would be rendered sterile if, as plaintiff asserts, mere conclusory allegations of a few isolated incidents of discrimination against an individual plaintiff were sufficient to hold the municipality liable. Plaintiff provided no evidence from which a reasonable jury could infer the existence of an actionable municipal policy or custom of discrimination. Accordingly, plaintiff's *§ 1981* claims against the City of New York must be DISMISSED. Since plaintiff did not assert any claims against DEP employees in their individual capacities, no *§ 1981* claims remain.

## III.  PLAINTIFF'S DISCRIMINATION CLAIMS

Notwithstanding plaintiff's complete inability to prevail under the *Monell* standard, since the parties devoted substantial space in their briefs to plaintiff's disparate treatment and hostile work environment claims, it is prudent to consider these claims in further detail. These claims are equally vulnerable and must be dismissed for the reasons set forth below.

A. Establishing Discrimination Under *42 U.S.C. § 1981*

 **[*34]** *HN8* *Section 1981* protects against discrimination on the basis of race or color. *Choudhury v. Polytechnic Inst. of New York,* 735 F.2d 38, 42 (2d Cir. 1984). The statute guarantees to all persons an equal right [2]to make and enforce contracts,[2] *42 U.S.C. § 1981(a),* which in 1991 was amended to include [2]the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.[2] *42 U.S.C. § 1981(b).* Therefore, a plaintiff alleging employment discrimination on the basis of race may bring a claim under *§ 1981* in addition to, or instead of, a claim for discrimination under Title VII, *42 U.S.C. § 2000e et seq.*

In McDonnell-Douglas Corp. v. Green, *HN9* the Supreme Court established a three-step test governing 'the order and allocation of proof[2] in discrimination cases. *411 U.S. 792, 800, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* [8] First, plaintiff must present facts sufficient to establish a prima facie case that he suffered from a discriminatory employment action on the basis of his race. *Id.* at 802. Plaintiff **[*35]** may establish his prima facie case [2]by either direct, statistical or circumstantial evidence.[2] *Bickerstaff v. Vassar College,* 196 F.3d 435 (2d Cir. 1999). [2]The burden of establishing a prima facie case is not a heavy one. One might characterize it as minimal.[2] *Carlton v. Mystic*

---

8   While McDonnell-Douglas was a case under Title VII, [2]the same elements constitute a claim for employment discrimination under *§ 1981* as under Title VII.[2] *Choudhury,* 735 F.2d at 44.

*Transp., Inc.,* 202 F.3d 129, 134 (2d Cir. 2000). If plaintiff meets this burden, a presumption of discrimination arises. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

**HN10** Once plaintiff establishes a prima facie case of discrimination, the burden shifts to defendant to rebut the presumption by providing a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas,* 411 U.S. at 802; *Dawson v. Bumble & Bumble,* 398 F.3d 211, 216 (2d Cir. 2005). [*36] This Circuit has observed:

> The defendant's burden of production also is not a demanding one; defendant need only offer such an explanation for the employment decision. Although the burden of production shifts to the defendant, the ultimate burden of persuasion remains always with plaintiff.

*Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 447 (2d Cir. 1999). If an employer articulates a nondiscriminatory reason for its conduct, the inference of discrimination raised by plaintiff's prima facie case [2]simply drops out of the picture.[2] *St. Mary's Honor Ctr.,* 509 U.S. at 511.

**HN11** Once defendant meets its burden of production, the burden shifts back to plaintiff to prove that the employer's nondiscriminatory explanation is pretextual. *St. Mary's Honor Ctr.,* 509 U.S. at 507-08.

As the Supreme Court established in *Texas Department of Community Affairs v. Burdine,* [2]when the employer has met its burden of production 'the factual inquiry proceeds to a new level of specificity.'[2] *St. Mary's Honor Ctr.,* 509 U.S. at 516 (quoting *Burdine,* 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). [2]The inquiry now turns from the few generalized [*37] factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced.[2] *Id.* Plaintiff must provide enough evidence of pretext that a rational fact finder

could conclude that the employer's [2]presumptively valid reasons[2] for its conduct [2]were in fact a coverup for a racially discriminatory decision.[2] *McDonnell Douglas,* 411 U.S. 805. A plaintiff attempting to establish pretext [2]may not prevail by establishing only [falsity], but must prove, in addition, that a motivating reason was discrimination.[2] *Bickerstaff v. Vassar College,* 196 F.3d 435, 447 (2d Cir. 1999) (internal quotation marks and citations omitted). [2]The plaintiff retains the burden of persuasion.[2] *St. Mary Honor Ctr.,* 509 U.S. at 518 (quoting *Burdine,* 450 U.S. at 256). If plaintiff does not meet this burden, plaintiff's discrimination claims must fail.

**HN12** While the presumption of discrimination [2]drops out of the picture[2] once defendant proffers a legitimate, nondiscriminatory explanation, the court [2]may still consider the evidence establishing plaintiff's prima facie case and the inferences [*38] properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.[2] *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (internal quotation marks omitted). Other evidence that may be considered to establish, or rebut, a claim of pretext include [2]facts as to the [defendant's] treatment of [plaintiff] during his prior term of employment . . . and [defendant's] general policy and practice with respect to minority employment.[2] *McDonnell Douglas,* 411 U.S. at 804-05. Consequently, the court must take a case-by-case approach, [2]with [the] court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'[2] *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. at 143 (internal quotation marks omitted)).

### B. Disparate Treatment

#### 1. Prima Facie Case

This Circuit has stated that **HN13** [2]in disparate treatment claims involving the discharge of

an employee, . . . plaintiff must show that [*39] he or she: (1) was a member of a protected class; (2) was qualified for the position; (3) was discharged; and (4) the discharge occurred in circumstances giving rise to an inference of discrimination.[2] *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir. 1991) (citing *McDonnell Douglas,* 411 U.S. at 802).

### First and Third Prongs

As an African American, plaintiff is clearly a member of a protected class. It is undisputed that plaintiff was discharged from his employment with the DEP as of January 3, 2003. Thus, plaintiff meets the first and third prongs of the *McDonnell Douglas* test without the need for further analysis.

### Second Prong

Plaintiff's temperament was not well suited for the job of Air Pollution Inspector with DEP. There is compelling evidence that plaintiff got angry at supervisors, colleagues, and the public, and lost his temper on multiple occasions. Given that Air Pollution Inspectors are required to interact with the public, particularly in the high-stress environment of writing code violations, the ability to remain calm, and not erupt into tantrums or exhibit defensive behavior under stress, may be considered a qualification for [*40] this position. In this sense, plaintiff has not established that he is qualified for the position.

Regardless, Edwards's educational background and prior performance evaluations do show that Edwards possessed the basic skills to qualify for the position. See, e.g., *Richardson v. Newburgh Enlarged City Sch. Dist.,* 984 F. Supp. 735, 742-43 (S.D.N.Y. 1997) (declining to find that plaintiff failed to prove that she was qualified for the position, where plaintiff's prior evaluations showed satisfactory performance, even though defendant also proffered evidence of unsatisfactory performance); *Melnyk v. Adria Labs.,* 799 F. Supp. 301, 313 (W.D.N.Y. 1992) (same). This Circuit has explained that *HN14* [2]in determining whether an employee's job performance is satisfactory, courts may .

. . rely on the evaluations rendered by supervisors.[2] *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir. 1985). Edwards has a Bachelor's Degree in Environmental Science, is a Certified Environmental Specialist, and successfully completed two years as a Provisional Junior Engineering Work Study Trainee with the DEP before being promoted. In addition, plaintiff's direct supervisor, [*41] Senior Inspector Joe DiLeo, gave him a satisfactory performance evaluation on December 31, 2001. In that evaluation, Mr. DiLeo states that plaintiff has [2]distinguished himself from his fellow inspectors,[2] and gives him [2]very good[2] ratings in every category. Based on this review, Mr. DiLeo recommended that plaintiff be retained in his present title. These facts are sufficient to establish that Edwards was qualified for his position, notwithstanding serious questions concerning temperament and personality.

### Fourth Prong

Plaintiff's prima facie case hinges on whether plaintiff has proffered sufficient evidence to establish that the DEP discharged him under circumstances giving rise to an inference of discrimination. *HN15* A plaintiff may establish an inference of discrimination by showing (1) that the employer retained a similarly situated white employee who engaged in similar conduct or (2) that the employer treated plaintiff differently from other similarly situated white employees. See *McDonnell Douglas,* 411 U.S. 804; *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir. 1997); *Richardson v. Newburgh Enlarged City School District,* 984 F. Supp. 735, 742 (S.D.N.Y. 1997). [*42] Viewing all evidence in the light most favorable to plaintiff, the Court is convinced that plaintiff establishes neither.

Plaintiff seeks to establish an inference of discrimination by alleging that nine years earlier the DEP retained a white DEP **employee** for more **egregious** **conduct** than the **conduct** for which plaintiff was terminated. To support this allegation, Plaintiff tells of Mr. Astrosky, a white DEP inspector, who was involved in a hit-and-run accident under the influence of alcohol and cocaine. Plaintiff alleges that the

Case 2:12-cv-05506-JFB-GRB   Document 51-2   Filed 01/24/14   Page 32 of 142 PageID #: 573

Page 18 of 24
2005 U.S. Dist. LEXIS 34376, *42

DEP retained Mr. Astrosky after this incident, a fact which plaintiff believes is proof that plaintiff's discharge nine years later was motivated by racial animus.

The problem with plaintiff's theory is that he supplies no admissible evidence to support it. Plaintiff claims that he heard about the Astrosky incident from another inspector. He admits that does not know Mr. Astrosky nor has he ever spoken to him about the incident. Plaintiff does not offer an accident report, employment file, witness affidavit, or any other admissible evidence to prove that Mr. Ostrosky was, in fact, retained by the DEP after the incident. While plaintiff alludes in his deposition **[*43]** to other incidents in which white inspectors were retained by the DEP after violations of DEP policy, he provides no specifics from which the Court could infer that these incidents are anything more than gossip. Plaintiff cannot create a genuine issue of fact solely by citing to his own deposition testimony. Such bare, unsubstantiated allegations, which are not admissible at trial, do not establish a  prima facie case of discrimination.

Plaintiff also attempts to prove that his discharge was discriminatory by alleging that during the course of his employment he was treated differently than similarly situated white inspectors, particularly with regard to overtime opportunities and the voiding of violations. Again, plaintiff offers no evidence to support these allegations. Plaintiff's only ²proof² of disparate treatment with regard to violations is his own testimony that he spoke with three Caucasian inspectors with whom he worked, all of whom stated that their violations were not scrutinized or voided as frequently as plaintiff's. None of these three inspectors submitted affidavits supporting plaintiff's testimony. Plaintiff admits that he did not speak with the other Caucasian **[*44]** inspectors with whom he worked about whether their violations were ever criticized or voided, nor did he ask other African-American inspectors if their violations were ever reviewed or voided by supervisory staff.

Similarly, plaintiff's relies solely on his own testimony to prove that he was bumped off over-time assignments more than white employees. Despite plaintiff's testimony, this conclusory allegation is belied by the evidence. A copy of an overtime assignment list for November 2001 affirmatively establishes that non-African American inspectors were also bumped off overtime lists. Edwards, himself, even admits that at least one white inspector was bumped off the same list from which plaintiff was removed. By plaintiff's own subsequent admission, it is undisputed that plaintiff was offered, and accepted, other overtime opportunities, including November overtime through the M.A.R.C.H. program and assignment on ²horn honking detail.² In addition, a DEP personnel document clearly establishes that the highest overtime hours for the 2001 calendar year were logged by an African-American inspector, raising substantial doubt that any denial of overtime by the DEP was driven by racial **[*45]** animus.

Plaintiff's failure to file a claim with the DEP's Office of Equal Employment Opportunity further undermines plaintiff's claim that, throughout his employment, he was discriminated against on the basis of race. At no time prior to the filing of this action did plaintiff complain of race discrimination. In fact, plaintiff showed such little concern for racial discrimination while employed with the DEP, he never thought to discuss the matter with other African-American inspectors. Furthermore, plaintiff fails to explain why, if the DEP was--as he alleges--biased against African-American inspectors, there were so many other African-American inspectors employed by the DEP. ( See Pl.'s Dep. 131:5-131:6 (naming five other black Air Pollution Inspectors)).

In sum, plaintiff asks this Court to find, merely from his own scant and conclusory testimony, that plaintiff's termination arose under circumstances giving rise to an inference of discrimination. ( See Pl.'s Memo of Law in Opp'n 3-9 (arguing extensively that the bare allegations contained in plaintiff's own deposition testimony are sufficient to create genuine issues of fact as to the reason for plaintiff's termination)). **[*46]**  This the Court declines to do so. Simply because (1) supervisors scrutinized plaintiff's violations and recommended his

termination, and (2) plaintiff is African American, does not impel the conclusion that (3) these supervisors discriminated against plaintiff *because* he is African American. [2] This is the type of groundless speculation that summary judgment is designed to root out.[2] *Richardson, 984 F. Supp. at 744*. Plaintiff has not met the evidentiary burden required to establish a prima facie case of race discrimination with regards to his termination.

## 2. Legitimate, Nondiscriminatory Reason and Pretext

Even assuming arguendo that plaintiff's bare allegations suffice to establish a prima facie case, [9] plaintiff still could not prevail on his disparate treatment claim. Defendant has proffered ample evidence to establish that plaintiff was terminated due to insubordinate and unprofessional conduct. Plaintiff himself admits that he confronted his direct supervisor about his [2]tone of voice[2] in front of other people, and the next day expressed an unwillingness to comply with a department decision to remove American flags from city-owned vehicles. [*47] He also does not contest that he drove a city vehicle with a suspended license, was pulled over by police on two separate occasions for traffic violations--at least one of which occurred while he was driving a DEP vehicle. Further, defendant provides documents from CUNY public safety officers and an ALJ presiding over an ECB hearing, all of whom are disinterested third parties, attesting to plaintiff's volatile temper. Plaintiff claims these incidents are insignificant, but they have nothing to do with race and they clearly support the defendant's explanation: that plaintiff was fired as a result of his own misconduct. Insubordinate and unprofessional conduct is a legitimate, non-discriminatory reason for terminating an employee. Thus, defendant has met its burden of producing a legitimate, non-discriminatory explanation for its termination of plaintiff, which rebuts plaintiff's prima facie case.

[*48] The burden of establishing pretext is a higher burden than that required to establish the prima facie case, because at this stage plaintiff is without the benefit of any presumptions. At this stage, plaintiff's [2]initially vague allegation of discrimination[2] must be [2]increasingly sharpened and focused.[2] *Meiri,* 759 F.2d at 995. As previously explained in the context of plaintiff's prima facie case, plaintiff has not provided any evidence, other than his own wholly unsubstantiated testimony, to establish that racial discrimination motivated defendant's decision to terminate plaintiff from his job as a Air Pollution Inspector. If anything, the record reflects that plaintiff did, in fact, display the unprofessional and insubordinate conduct of which defendant complaints, and that, as a result of this conduct, plaintiff and his supervisor, Ray Montalvo, had a strained working relationship. Eventually, Mr. Montalvo's dissatisfaction with plaintiff's continuing, inappropriate conduct led Mr. Montalvo to recommend plaintiff's termination. This is not a personality conflict, though even if it were, it would not establish a *§ 1981* claim or rebut defendant's legitimate, [*49] nondiscriminatory explanation for its conduct. See, e.g., *Regis v. Metro. Jewish Geriatric Ctr.,* 2000 U.S. Dist. LEXIS 2215, 2000 WL 264336, at *9 (E.D.N.Y. Jan. 11, 2000) (granting summary judgment to employer where the evidence established that a poor working relationship between plaintiff and her supervisor, but did not establish that this feud, or the resulting termination, was the result discriminatory animus); *Ticali v. Roman Catholic Archdiocese of Brooklyn,* 41 F. Supp. 2d 249, 263 (E.D.N.Y. 1999) (same). Plaintiff carries the burden of persuading a reasonable jury that the dispute between plaintiff and his supervisor was *driven by*

---

[9]   *HN16* This Circuit has described the burden of establishing a prima facie case as [2]minimal.[2] *Carlton v. Mystic Transp.,* 202 F.3d at 134. Plaintiff must merely present some evidence from which a reasonable fact finder could determine that the plaintiff's termination occurred under circumstances giving rise to an inference of discrimination. While this Court does not believe that plaintiff has met even that minimal burden, in light of the low threshold for establishing a prima facie case and the Court's obligation to draw all reasonable inferences in the light most favorable to the nonmoving party, the Court is willing to assume arguendo that plaintiff established a prima facie case.

discriminatory animus. [10] See *St. Mary's Honor Ctr.,* 509 U.S. at 518 (²[Plaintiff] must . . . demonstrate by competent evidence that the presumptively valid reasons for his rejection *were in fact a coverup for a racially discriminatory decision.*² (quoting *McDonnell Douglas,* 411 U.S. at 805). The evidence presented does not support such a finding.

[*50] Plaintiff appears to suggest that his status as an African American, coupled with his own conclusory allegations of discrimination, is sufficient for a reasonable jury to infer that defendant's proffered explanation is pretextual. [11] If this were true, summary judgment in discrimination cases would be rendered sterile, and all plaintiffs alleging violations of the civil rights laws would be entitled to a trial. ²Given the ease with which these suits may be brought and the energy and expense required to defend such actions,² the Court refuses to believe that this is what Congress intended. *Meiri,* 759 F.2d at 998.

[*51] On the record presented, the Court finds that no reasonable jury would ²undertake the suspension of disbelief necessary to credit the allegations made in [plaintiff's] complaint.² *Jeffreys v. City of New York,* 426 F.3d at 551 (2d Cir. Oct. 17, 2005). Since plaintiff failed to meet his burden of persuasion, and the Court finds that there are no genuine issues of material fact as to whether defendant terminated plaintiff on the basis of his race, plaintiff's *§ 1981* claim for disparate treatment is dismissed.

C. Hostile Work Environment

HN18 To establish a prima facie case of hostile work environment, plaintiff must demonstrate that: (1) his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) a specific basis exists for imputing the conduct that created the hostile work environment to the employer. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir. 1996) (internal quotation marks omitted)). ²The plaintiff must show that the workplace was so severely [*52] permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered.² *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir. 2002). The conduct alleged must be sufficiently severe and pervasive ²to create an environment that 'would be perceived, and is perceived, as hostile or abusive.'² *Schwapp,* 118 F.3d at 110 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). ²As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness.² *Alfano,* 294 F.3d at 374 (internal citations omitted). The inquiry is fact-specific and must be determined on a case-by-case basis. *Schwapp,* 118 F.3d at 110.

Plaintiff offers as evidence of a hostile work environment the same evidence that he offers to prove disparate treatment, particularly that his supervisors criticized and voided his violations more frequently than others and denied

[10] At oral argument, plaintiff's counsel urged that a plaintiff sufficiently establishes pretext at the summary judgment stage simply by challenging defendant's legitimate, non-discriminatory reason for its conduct. The plaintiff's ²say so² creates a genuine issue of fact that must go to the jury. But the Supreme Court made clear over a decade ago that such a showing is not enough. HN17 ²Once the defendant 'responds to plaintiff's proof by offering evidence of the reason for plaintiff's rejection, the fact finder must then decide' not . . . whether that evidence is credible, but 'whether the rejection was discriminatory within the meaning of the [statute].² *St. Mary's Honor Ctr.,* 509 U.S. at 518-19 (quoting *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 714-15, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)).

[11] In fact, at oral argument plaintiff's counsel queried: ²If it's not my client's performance, what else is it?² (Audiotape of Oral Argument, Dec. 1, 2005.) Plaintiff urges the Court to find both: (1) that plaintiff's own deposition testimony is sufficient to establish that plaintiff's own insufficient performance was not the real reason for plaintiff's termination, and (2) that a reasonable jury is permitted to infer, solely because plaintiff is African American, that the real reason for plaintiff's termination was his race. The Court cannot accept this unprecedented position.

him overtime opportunities that were afforded to [*53] white employees. But, there is no concrete factual evidence from which a reasonable fact finder could infer that this conduct, even if severe and pervasive enough to alter the conditions of plaintiff's work environment, was racially motivated. Plaintiff offers no examples of racist comments, slurs, or jokes uttered by any of his supervisors or fellow inspectors. Nor does plaintiff proffer evidence that non-African American inspectors were treated differently or that other African-American inspectors faced similarly inequitable treatment. Plaintiff cannot prevail on a claim of racially hostile work environment without presenting even a scintilla of evidence to support this claim.

Even if there were some evidence of racial enmity, and there is none, it would still fall well short of meeting the applicable standard. *HN19* Whether certain comments or conduct created a hostile work environment depends upon ²the quantity, frequently, and severity² of the conduct. *Id.* at 111 (internal quotation marks omitted). To amount to a hostile work environment, plaintiff must have suffered ²a steady barrage of opprobrious² conduct by his employer, not merely sporadic instances of undesirable [*54] conduct. *Id.* at 110. Plaintiff admits in his deposition that it is standard practice for senior inspectors to review violations written by junior inspectors. Thus, review of plaintiff's violations by senior staff can hardly be considered inappropriate or opprobrious conduct. Regardless, plaintiff remembers only ²six or five or four² instances in which his violations were voided by superiors, and a few additional instances in which his violation-writing skills were criticized. A few instances of criticism do not rise to the level of frequency required to establish a hostile work environment claim.

The same infirmities plague plaintiff's claim that his supervisors denied him overtime opportunities. Overtime opportunities within the DEP are limited, and assigning supervisors cannot accommodate every employee that desires overtime within a given month. As a result, the DEP regularly bumped inspectors, both black and white, from overtime lists. The evidence

clearly establishes that plaintiff was not the only inspector denied overtime and that plaintiff was given overtime opportunities on other occasions. Moreover, plaintiff was able to establish only one occasion in which [*55] he was bumped off an overtime list. This solitary denial neither constitutes unlawful or objectionable conduct nor rises to the level of pervasiveness required to establish a claim of hostile work environment.

The current record cannot sustain a claim of hostile work environment, as plaintiff does not lay any factual foundation from which a reasonable juror could find that plaintiff suffered a racially hostile work environment during his employment at the DEP. Accordingly, the Court grants summary judgment to defendant on this claim.

## IV. DUE PROCESS RIGHT TO A PRE-TERMINATION HEARING AND *42 U.S.C. § 1983*

Plaintiff also brings a claim pursuant to *42 U.S.C. § 1983*, alleging that the DEP's failure to provide plaintiff with a disciplinary hearing prior to his termination violated plaintiff's Fourteenth Amendment right to due process. But *HN20* Fourteenth Amendment due process applies only where the plaintiff has an identifiable liberty or property interest. U.S. Const., amend. XIV; *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 569, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). ²When protected interests are implicated, the right to some kind of prior hearing [*56] is paramount.² *Roth,* 408 U.S. at 569. But the range of protected interests is bounded, and an interest in one's continued employment is protected by the Fourteenth Amendment only in limited circumstances. Id.

In *Roth,* the Supreme Court held that *HN21* continued employment with a public entity is not a liberty interest protected by the Fourteenth Amendment, but may be a protected property interest if the plaintiff ²had already acquired [interests] in specific benefits.² *Id.* at 576. For example, the Court has held that a public college professor dismissed from a tenured position and public employees dismissed while under

contract both have interests in continued employment that are safeguarded by the Fourteenth Amendment. See *id.* at 576-77 (citing *Slochower v. Bd. of Educ.,* 350 U.S. 551, 76 S. Ct. 637, 100 L. Ed. 692 (1956) and *Wieman v. Updegraff,* 344 U.S. 183, 73 S. Ct. 215, 97 L. Ed. 216 (1952)); see also *Connell v. Higginbotham,* 403 U.S. 207, 208, 91 S. Ct. 1772, 29 L. Ed. 2d 418 (1971) (holding that a teaching recently hired without tenure or a formal contact, but with a clearly implied promise of continued employment, was entitled to a pre-deprivation hearing before [*57] being terminated). But a public employee without tenure, a formal contract, or any other promise-express or implied-of continued employment is not protected by the Fourteenth Amendment. The mere fact that plaintiff worked for a city agency is not sufficient to create a Fourteenth Amendment due process right protectible through a *§ 1983* action.

A. Provisional Employment and Property Rights in Employment

Plaintiff was a provisional employee, and therefore had no expectation of continued employment with the DEP. The New York Court of Appeals has expressly stated, **HN22** in the context of *Article 78* proceedings seeking reinstatement by terminated state employees, that ²provisional employees have no expectation of tenure and rights attendant thereto . . . and therefore may be terminated at any time without charges preferred, a statement of reasons given or a hearing held.² *Preddice v. Callanan,* 69 N.Y.2d 812, 813, 506 N.E.2d 529, 513 N.Y.S.2d 958 (1987) (internal citations omitted); accord *Mansell v. City of New York,* 304 A.D.2d 381, 381, 758 N.Y.S.2d 39 (1st Dep't 2003). Similarly, this Circuit has stated that ²the threshold issue is always whether plaintiff has a property or liberty interest protected [*58] by the Constitution.² *Narumanchi v. Bd. of Trustees of Connecticut State Univ.,*

850 F.2d 70, 72 (2d Cir. 1988). Only ²if a protected interest is identified² must the Court consider whether the defendant deprived the plaintiff of that interest without due process of law. Id. As a provisional employee, plaintiff had no expectation of tenure, no formal contract outlining the dates of his employment, and no clearly implied promise of continued employment. See *Roth,* 408 U.S. at 576-77. Accordingly, he identified no property interest protectible under the Fourteenth Amendment, and the Court does not need to engage the question of whether the City deprived plaintiff of procedural due process by terminating him without a formal disciplinary hearing.

Plaintiff counters that, even as a provisional employee, the grievance procedure set forth in his collective bargaining agreement created a protectible property right. This is a gross misstatement of the law. It is true that under the collective bargaining agreement covering civil service employees in scientific or technical positions, a provisional employee ²who has served for two years in the same or [*59] similar title or related occupational group in the same agency² is entitled to a grievance procedure that includes a conference between the agency and the employee and, potentially, an arbitration. [12] But violation of the grievance procedure set forth in a collective bargaining agreement is not a constitutional tort, and therefore does not give rise to a claim under the Fourteenth Amendment. While private contracts and collective bargaining agreements may create for an employee a right to a pre-termination hearing not automatically provided as a matter of law, these privately created rights are ²neither constitutional nor statutory.² See *Swartz v. Bd. of Educ.,* 146 A.D.2d 576, 577, 536 N.Y.S.2d 500 (2d Dep't 1989) (stating that a public school teacher's right to termination review, created by a collective bargaining agreement, was ²neither constitutional nor statutory²); accord *Corredor v. United Fed'n*

---

[12]   Plaintiff admits that he served as a Provisional Air Pollution inspector for less than two years, but alleges in a conclusory fashion that this job title was ²contiguous² with his earlier position as a Provisional Junior Engineering Work Study Trainee, and so he satisfies the agreement's two-year requirement. The Court does not agree that these two positions are contiguous, as one, as its title suggests, is a ²work study² position, while the other is an inspector position. Therefore, the Court is not convinced that plaintiff is even entitled to the grievance procedure set forth in the collective bargaining agreement.

of Teachers, 162 F.3d 1147, No. 97-7488, 1998 WL 639403, at **1 (2d Cir. Apr. 6, 1998); Frasier v. Bd. of Educ., 71 N.Y.2d 763, 767, 525 N.E.2d 725, 530 N.Y.S.2d 79 (1988). Plaintiff's collective bargaining agreement merely sets forth the a contractually agreed-upon procedure [*60] for grievances by employees. It does not create a procedural due process right, the violation of which is actionable under § 1983.

B. Postdeprivation Remedy - The Article 78 Proceeding

Even if plaintiff's collective bargaining agreement did create a Fourteenth Amendment property right, and the DEP violated that procedure by failing to follow the grievance procedure upon plaintiff's termination, [*61] plaintiff would not prevail. HN23 [2]The Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful postdeprivation remedy.[2] Hellenic Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 880 (2d Cir. 1996). This Circuit has also held that [2]an Article 78 proceeding is a perfectly adequate postdeprivation remedy,[2] because it provides a hearing and a means of redress for the petitioner and permits constitutional issues to be decided in the proceeding. Id. at 881. A terminated state or city employee may bring an Article 78 proceeding in New York state court to compel his reinstatement. See, e.g., Moccio v. New York State Office of Court Admin., 95 F.3d 195, 197-98 (2d Cir. 1996) (using Article 78 proceeding to challenge plaintiff's termination from New York State Office of Court Administration); Swartz, 146 A.D.2d at 576 (reviewing Article 78 proceeding in the context of probationary teacher's termination by Board of Education Chancellor); Frasier, 71 N.Y.2d at 765 (same); [*62]

Preddice, 69 N.Y.2d at 813 (using Article 78 proceeding to seek reinstatement to position as provisional employee with the State Division of Probation). Since this adequate postdeprivation remedy was readily available to plaintiff, no other predeprivation process was required in order to satisfy the Due Process Clause of the Fourteenth Amendment. Consequently, plaintiff's § 1983 claim, which alleges violation of the Fourteenth Amendment as a result of the defendant's failure to give plaintiff a full disciplinary hearing prior to his termination, is denied.

V. RACIAL DISCRIMINATION UNDER NEW YORK EXECUTIVE LAW § 296

HN24 In applying New York Executive Law § 296 to discrimination cases, both New York state and federal courts have looked to federal cases interpreting federal discrimination statutes for guidance. See Melnyk v. Adria Labs., 799 F. Supp. 301, 312 (S.D.N.Y. 1992) (citing Mastrangelo v. Kidder, Peabody and Co., 722 F. Supp. 1126 (S.D.N.Y. 1989)). Accordingly, the same McDonnell Douglas three-part, burden-shifting test applies to a claim of discrimination under New York [*63] law as under federal law. See Laverack & Haines, Inc. v. State Div. Human Rights, 88 N.Y.2d 734, 739, 673 N.E.2d 586, 650 N.Y.S.2d 76 (1996) (citing McDonnell Douglas as establishing the applicable standard for an action under New York Executive Law § 296); Miller Brewing Co. v. State Div. of Human Rights, 66 N.Y.2d 937, 939, 489 N.E.2d 745, 498 N.Y.S.2d 776 (1985) (same). It follows that for the same reasons that plaintiff fails to establish a claim for disparate treatment or hostile work environment under 42 U.S.C. § 1981, plaintiff's fails to establish a claim for race discrimination under the New York Executive Law. [13]

[*64] CONCLUSION

---

[13]   Defendant also argues that plaintiff's NY Executive Law § 296 claim should be dismissed due to plaintiff's failure to file a Notice of Claim with the City. Plaintiff does not respond to this argument in his opposition papers, nor does he submit proof that he filed a claim. Defendant cites two New York state cases and two S.D.N.Y. cases to support its position that a notice of claim is required before a plaintiff may filed a discrimination claim under the NY Executive Law. See Page v. New York City Off-Track Betting, 1993 U.S. Dist. LEXIS 14756, No. 90 Civ. 6367 (RWS), 1993 WL 426865, at *4-5 (S.D.N.Y. Oct. 22, 1993); Larry v. New York City Dep't of Sanitation, 1994 U.S. Dist. LEXIS 4231, No. 92 Civ. 0913 (RWS), 1994 WL 121816 (S.D.N.Y. Apr. 7, 1994); Mills v. County of Monroe, 59 N.Y.2d 307, 451 N.E.2d 456, 464 N.Y.S.2d 709 (1983); Summers v. County of Mon-

2005 U.S. Dist. LEXIS 34376, *64

In sum, plaintiff has failed to establish that there was a City sanctioned policy or custom of discrimination. Further, analysis of plaintiff's discrimination claims reveals that plaintiff fails to proffer sufficient evidence from which a reasonable jury could find that plaintiff was terminated, or otherwise discriminated against, on account of his race under applicable federal and New York statutes. Plaintiff has also failed to establish that the DEP's decision to terminate plaintiff without an administrative hearing violated plaintiff's Fourteenth Amendment right to due process.

Since there are no genuine issues of material fact that must be presented to a jury, defen-dant's motion for summary judgment is GRANTED in full. The Clerk of the Court is directed to enter judgment and close out this file.

SO ORDERED

PAUL A. CROTTY

United States District Judge

Dated: New York, New York

December 16, 2005

---

roe, 147 A.D.2d 949, 950, 537 N.Y.S.2d 703 (4th Dep't 1989); see also Sussman v. New York City Health & Hosps. Corp., 1997 U.S. Dist. LEXIS 8531, No. 94 Civ. 8461 (DBS), 1997 WL 334964, at *14 (S.D.N.Y. June 16, 1997) (listing cases that have dismissed discrimination claims under the Executive Law for failure to timely file a notice of claim). While these cases do appear to stand for the proposition that discrimination claims filed under the New York State Human Rights Laws are subject to the notice of claim requirement, other judges of this District disagree. See, e.g., Sussman v. New York City Health & Hosps. Corp., 1997 U.S. Dist. LEXIS 8531, No. 94 Civ. 8461 (DBS), 1997 WL 334964, at *14 (S.D.N.Y. June 16, 1997) (finding that neither General Municipal Law § 50-e nor Unconsolidated Law § 7-402(2), its City equivalent, applies to discrimination cases brought under the NY Executive Law); Dimonda v. New York City Police Dep't, 1996 U.S. Dist. LEXIS 5286, No. 94 Civ. 0840, 1996 WL 194325, at *6 (S.D.N.Y. Apr. 22, 1996) (observing that ²the most recent case law from the Appellate Division of the New York State Supreme Court . . . hold[s] that the notice of claim provisions in §§ 50-e and 50-I are not applicable to claims of discrimination brought pursuant to Executive Law § 296²); Peart v. City of New York, 1991 U.S. Dist. LEXIS 13582, No. 87 Civ. 4932, 1991 WL 206315 (S.D.N.Y. Sept. 27, 1991). Given that plaintiff fails to make out a case on the merits, it is unnecessary for the Court to decide its position in this case.

SCOTT WEISS





Cited
As of: June 25, 2013 4:23 PM EDT

## Hasemann v. UPS of Am.

United States District Court for the District of Connecticut
February 26, 2013, Decided; February 26, 2013, Filed
CIVIL ACTION NO. 3:11-cv-554 (VLB)

**Reporter:** 2013 U.S. Dist. LEXIS 25704

HANS HASEMANN, Plaintiff, v. UNITED PARCEL SERVICE OF AMERICA, INC., Defendant.

---

**Core Terms**

terminate, alcohol, stray, wine, discriminatory, bias, age discrimination, summary judgment, decision to terminate, reasonable juror, replace, employment action, consume, pretext, wheeler, recommend, pension, cat's, older, paw, employment decision, younger worker, non-alcoholic, remote, prima facie case, decision-maker, proffered, daughter, but-for, glass

**Counsel:** [*1] For Hans Hasemann, Plaintiff: Tara Lindsay Shaw, LEAD ATTORNEY, Secor, Cassidy & McPartland, PC - Wtby, Waterbury, CT; Thomas G. Parisot, LEAD ATTORNEY, Secor, Cassidy & McPartland, P.C., Waterbury, CT.

For United Parcel Svc of Amer Inc, Defendant: Barry J. Waters, LEAD ATTORNEY, Murtha Cullina LLP, New Haven, CT; Colleen M O'Neill, LEAD ATTORNEY, Murtha Cullina-Htfd, Hartford, CT.

**Judges:** Hon. Vanessa L. Bryant, United States District Judge.

**Opinion by:** Vanessa L. Bryant

---

**Opinion**

MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. #27]

Before the Court is a motion for summary judgment filed by the Defendant, the United Parcel Service of America, Inc., ("UPS"). The Plaintiff, Hans Hasemann ("Hasemann") brought this suit alleging that he was terminated because of his age in violation of both the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. § 621 et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), *Conn. Gen. Stat. § 46a-60(a) et seq.* each depriving him of his pension benefits in violation of the Employee Retirement Income Security Act ("ERISA"). For the reasons stated hereafter, Defendant's motion for summary judgment is GRANTED.

Facts

The following facts are undisputed [*2] unless otherwise noted. UPS employed Hasemann as an operations supervisor in its Watertown facility for nearly twenty-five years from February 1985 to January 12, 2010. [Dkt. #29, Def. *Local Rule 56(a)(1)* Statement, ¶1]. On December 24, 2009, Hasemann went to UPS's Watertown facility to assist a co-worker, Nelson Irizarry ("Irizarry"), with closing the facility. *Id.* at ¶3. Irizarry and Hasemann came to the facility with Irizarry's wife and daughter. [Dkt.

#28, Ex.G]. Irizarry's wife waited in the car while his daughter helped to collect keys from vehicles. *Id.* Irizarry's daughter is neither a UPS employee nor yard-safety certified to enter the yard and collect keys. [Dkt. #28, Def. Ex. G and Dkt. #29, ¶21].

While closing the facility, Hasemann and Irizarry encountered UPS's Security Supervisor John Pinchbeck (²Pinchbeck²). *Id.* at ¶4. Pinchbeck reported that Hasemann and Irizarry appeared to be intoxicated. *Id.* at ¶5. In a report dated December 28, 2009, Pinchbeck related that he encountered ²Nelson Irizarry and Hans Hasemann who were about to be finished with the lock up of the facility. Both appeared to be extremely jovial and boisterous. There [sic] behavior was uncharacteristic from [*3] what I have seen in a work environment. I immediately suspected that they had both been drinking. I asked Nelson if he had and he replied yes. I never asked Hans directly if he had been drinking. Nelson invited me over to his house for cocktails after we were finished. I declined by telling him that I just wanted to go home ... While we were at the door [of a truck] Hans came over to show me that he had removed all the keys from all the package cars that were parked outside. He then proceeded to dump all of the keys on the floor.² [Dkt. #28, Def. Ex. F]. Pinchbeck further reported that when they got to the ²door at the end of primary rear unload door 10, Hans said that I will show you that it is secure by running into it.² *Id.*

In response to Pinchbeck's report, USP's District Security Manager, Christopher Wheeler (²Wheeler²) conducted an investigation. *Id.* at ¶6. As part of the investigation, Wheeler interviewed Hasemann on December 29, 2009 and obtained a written statement from him. [Dkt. #28, Def. Ex. G]. Wheeler's notes from the interview indicate that when Hasemann was ²asked if he drank before coming to assist with the lock up he stated yes, and he had no excuses.² *Id.* Hasemann's [*4] written statement dated 12/29/2009 provided that on 12/24/2009 ²I was at Nelson Irizarry house and he had told me he had to close ... I wanted to assist my partner to close the Building to get him back to his family in a timely fashion. Prior to going to the Building I had a glass of wine with my meal. I know this was wrong and I will never do that again.² [Dkt. #28, Def. Ex. A].

Hasemann contends that when he met with Wheeler to discuss the incident Wheeler said to him ²Just take down this statement. I'll tell you what to say. This thing will go away. You know, just write down — I remember something along these lines — it will never happen again, and once this is done, we could forget it like a bad memory and move on, get past this and move on.² [Dkt. #37,Pl. Ex. A, Hasemann Dep., p. 29]. Prior to the interview on December 29, 2012, Wheeler and Hasemann had never met. [Dkt. #29, Def. *Local Rule 56(a)(1)* Statement, ¶10].

UPS has a published Alcohol Policy which provides that employees are not permitted to start or remain at work if they are using an alcoholic beverage, regardless of its alcoholic content. *Id.* at ¶11. The policy states that these ²regulations also contain prohibitions [*5] against the use of alcoholic beverages by employees before they start work.² [Dkt. #28, Def. Ex. J].

On January 12, 2010, UPS terminated Hasemann's employment. [Dkt. #29, Def. *Local Rule 56(a)(1)* Statement, ¶14]. UPS informed Hasemann that he was terminated because he violated the Alcohol Policy and engaged in conduct unbecoming of a supervisor. *Id.* at ¶15. UPS's Human Resource Manager for the Southern New England District, Dennis Ray (²Ray²), reviewed Wheeler's investigation and made the decision to terminate Hasemann's employment. *Id.* at ¶16. Ray testified that he was the ²primary person responsible for making² the decision to terminate Hasemann's employment after conferring with Hasemann's division manager, Christopher Walsh, and others such as Wheeler. [Dkt. #28, Def. Ex. I, Ray Dep., p. 16]. Walsh recommended to Ray that Hasemann be terminated. *Id.* at 41. In coming to his determination, Ray reviewed a packet of information on the incident, including Pinchbeck's report as well as Hasemann's written statement in which he admitted that he had consumed a glass of wine. *Id.* at 22, 24-

2013 U.S. Dist. LEXIS 25704, *5

25. Ray explained that the primary issue that led to his decision was Hasemann's admitted violation [*6] of the alcohol policy. Ray also noted that Hasemann had also made some "poor decision making by a supervisory standard." *Id.* at 46.

Ray further testified that in coming to his decision to terminate Hasemann he was focused on Hasemann's violation of the alcohol policy. *Id.* at 40. Ray explained that the policy does "not focus on the level of toxicity in an employee" and so the question was not "whether or not he was intoxicated or not, but the employee did so identify that he had a glass of wine prior to report[ing] for work or showing up on property." *Id.* at 30. Ray further testified that he considered the packet of information he received regarding the incident and UPS's alcohol policy "independently of any recommendation" he received from Walsh, Wheeler or anyone else. *Id.* at 56.

In reaching the decision to terminate Hasemann, Ray did not consider who Hasemann's replacement would be and played no part in the decision as to who would replace Hasemann and to this day does not know who did so. [Dkt. #29, Def. *Local Rule 56(a)(1)* Statement, ¶30]. UPS filled Hasemann's position with a previously-employed, twenty-six year old supervisor, James Burnette. *Id.* at ¶31. UPS did not hire or promote [*7] Burnette to fill Hasemann's position but instead transferred Burnette from another supervisory position to Hasemann's position which was closer to Burnette's home. *Id.* at ¶¶33-34.

Ray did not supervise Hasemann nor had he ever met him prior to the incident on December 24. *Id.* at ¶25. At the time UPS terminated Hasemann, Hasemann was forty-four years old, Ray was forty-six years old, Wheeler was also forty-six years, and Walsh was forty-five years old. *Id.* at ¶¶23-24. The parties dispute whether Ray was aware of Hasemann's age when he made the decision to terminate Hasemann's employment. Ray claims he was not aware of his age while Hasemann points out that Ray had access to, yet does not allege that he did access, records which indicated Hasemann's age. [Dkt. #29, Def. *Local Rule 56(a)(1)* Statement, ¶23].

Following his termination, Hasemann availed himself of UPS's employee dispute resolution ("EDR") process pursuant to which an employee may appeal an adverse employment decision. *Id.* at ¶37. On January 12, 2010, Hasemann submitted an EDR peer review request form. [Dkt. #28, Def. Ex. N]. In the form, Hasemann admitted that he violated the alcohol policy, by stating that during dinner on [*8] December 24, 2009 "I consumed one glass of red wine" and "was not intoxicated while on the property." *Id.* He also stated that Pinchbeck was "upset and angry that he had to return to work because he had not been able to reach Nelson [Irizarry] to confirm he was in fact closing the facility for the holiday" and that he believed that he had been "victimized by a disgruntled employee who filed a patently false statement against" him. *Id.*

In July 2010, Hasemann filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). [Dkt. #29, Def. *Local Rule 56(a)(1)* Statement, ¶53]. In his CHRO complaint, Hasemann denied having consumed alcohol before returning to work on December 24, 2009. *Id.* When asked why he admitted on numerous occasions that he consumed alcohol on the night of December 24,2009, Hasemann testified that Irizarry's wife informed him at some point after his employment had been terminated that the wine had been nonalcoholic. *Id.* at ¶54. Hasemann testified that about "a month later after I got terminated or something I was having dinner at Nelson's house, somewhere around that time. Could have been two weeks. I don't know. I had dinner at Nelson's [*9] house, and his wife poured me a glass of wine. I asked her what type of wine it was. She said, It's the only wine that I drink. And, you now, at that point in time I asked her, Was that the wine that you had poured me the night that were — had Christmas Eve? She said, Yes." [Dkt. #28, Def. Ex. E, Hasemann Dep., 85-86]. He further testified that he wasn't sure exactly when he found out that the wine was non-alcoholic, he stated it "could have been February. I know it was the

SCOTT WEISS

Case 2:12-cv-05506-JFB-GRB   Document 51-2   Filed 01/24/14   Page 42 of 142 PageID #: 583

Page 4 of 13
2013 U.S. Dist. LEXIS 25704, *9

wintertime, somewhere along the lines.[2] *Id.* at 86. Hasemann further testified that he did not tell anyone at UPS when he first learned about the non-alcoholic wine. *Id.* He wasn't sure if he learned about it during the EDR process. *Id.* Hasemann testified that prior to filing his affidavit with the CHRO, the only people besides his attorney that knew he had been served a non-alcoholic glass of wine were Irizarry and Irizarry's wife. *Id.* at 106. On the contrary, in an affidavit dated August 13, 2012, Hasemann contradicts his deposition testimony stating that before his EDR hearing he was informed by Irizarry's wife about the non-alcoholic wine and that he presented this information verbally [2] and in the form of the empty **[*10]** non-alcoholic wine bottle at my EDR hearing.[2] [Dkt. #37, Pl. Ex. D, ¶¶12-13].

In support of his age claim, Hasemann asserts that two of his superiors made ageist comments towards him. Hasemann stated in an affidavit dated November 12, 2010 that [2][i]n the months leading up to my termination, a superior of mine, specifically James Marciano, asked on more than one occasion 'Are you getting to old to perform this job?'[2] [Dkt. #28, Def. Ex. Q, Hasemann Aff., ¶3]. Hasemann could not recall exactly when Marciano made those comments or how many times he made such a comment. [Dkt. #29, Def. *Local Rule 56(a)(1)* Statement, ¶¶45-46]. Marciano was fifty one years old at the time of Hasemann's termination. *Id.* at ¶24. Hasemann also attested that [2][i]n the months leading up to my termination, a superior of mine, specifically Chris Walsh, told me 'the young guns are kicking your butt.'[2] [Dkt. #28, Def. Ex. Q, Hasemann Aff., ¶4].

Hasemann further attests in that he had [2]no control over the accompaniment of Mr. Irizarry's daughter to the UPS facility on that night. Mr. Irizarry invited her to [sic] in the car with us. I was dropped at the front door of the facility and Mr. Irizarry and his daughter drover **[*11]** [sic] off to the check the perimeter of the facility. I did not see Mr. Irizarry's daughter again until she was inside the facility with her father. It was common practice for UPS managers to bring their children to the facility during

business.[2] [Dkt. #28, Def. Ex. Q, Hasemann Aff., ¶¶7-9].

Hasemann also asserts that the UPS benefit plan has changed from a pension to a 401(k) match program. [Dkt. #36, Pl. *Local Rule 56(a)(2)* Statement, Disputed Issues of Material Fact,¶19].

## Legal Standard

Summary judgment should be granted [2]if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'[2] *Fed.R.Civ.P. 56(a)*. The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010). [2]In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.[2] *Id.,* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). **[*12]** [2]If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied.[2] *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315-16 (2d Cir.2006) (internal quotation marks and citation omitted).

[2]A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.[2] *Welch—Rubin v. Sandals Corp.,* No.3:03cv481, 2004 U.S. Dist. LEXIS 22112, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut ,* 817 F. Supp. 2d 28, 2011 WL 4396704 at *6 (D.

Conn. 2011). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further [*13] support in the record, summary judgment may lie. Fincher v. Depository Trust and Clearance Co., 604 F.3d 712 (2d Cir. 2010).

Analysis

I. ADEA claim

Hasemann alleges that UPS unlawfully discriminated against him on the basis of his age. Under the ADEA, claims of discriminatory treatment are analyzed using the burden-shifting framework set forth in McDonnell Douglas Corp., v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Nieves v. Angelo, Gordon & Co., 341 Fed.Appx. 676, (2d Cir. 2009). [1] Under the McDonnell Douglas framework, [2]the plaintiff bears the initial burden to establish a prima facie case of age discrimination by showing [2](1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that the action occurred under circumstances giving rise to an inference of discrimination.[2] Attard v. City of New York, 451 Fed. Appx. 21, 23 (2d Cir. 2011) (internal quotation marks and citation omitted). [2]If the plaintiff succeeds in making out a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action. Upon the employer's proffer of such a reason, [*14] the presumption of discrimination 'drops from the picture' and the plaintiff must

come forward with evidence that the proffered reason is a mere pretext for discrimination. In order to satisfy [his] burden at the final stage, the plaintiff must prove, by a preponderance of the evidence, that age discrimination was the 'but-for' cause of the challenged adverse action.[2] Id. (citations omitted). [2]

Here, Hasemann has established the first three elements of his prima facie case. It is undisputed that Hasemann was within the protected age group and experienced an adverse employment action. Although, neither Hasemann nor UPS have directly presented evidence that Hasemann was qualified for his position, it is undisputed that Hasemann was employed for UPS for nearly twenty-five years when he terminated which suggests he was qualified for his position. Considering that the burden to establish a prima facie case is [2]minimal[2] or [2]de minimis,[2] the Court therefore finds this element to be satisfied. Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005). However, the parties dispute whether Hasemann can establish that his termination occurred under circumstances giving rise to an inference of discrimination. Hasemann [*16] argues that an inference of discrimination is demonstrated by the ageist comments made by his two superiors and the fact that he was replaced by a much younger worker. UPS argues that those comments are nothing more than stray remarks and that it did not hire a much younger worker to replace Hasemann but simply transferred an already employed worker to fulfill the position.

Typically [2]an employer's decision to replace an older worker with a significantly younger one can support an inference of intentional age discrimination even when both persons are

[1] The Supreme Court has recently noted that it [2]had not definitively decided whether the evidentiary framework of McDonnell Douglas ... is appropriate in the ADEA context,[2] Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 129 S. Ct. 2343, 2349 n. 2, 174 L. Ed. 2d 119 (2009). Nonetheless, the Second Circuit has concluded that post-Gross the McDonnell Douglas framework is still applicable to ADEA claims. Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010) (finding post-Gross that [2]we remain bound by, and indeed see no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit[2]); Hrisinko v. N.Y.C. Dep't of Educ., 369 F.App'x. 232, 234 (2d Cir. 2010) (finding that employees must now prove that [2]age was the 'but-for' cause behind the employer's adverse decision, [*15] and not merely one of the motivating factors.[2])

[2] The Supreme Court in Gross recently altered the McDonnell Douglas formulation applicable to ADEA claims by [2]eliminating the mixed-motive analysis that circuit courts had brought into the ADEA from Title VII cases[2] and requiring evidence that age was the but-for cause of the adverse employment action. Gorzynski, 596 F.3d at 106.

SCOTT WEISS

2013 U.S. Dist. LEXIS 25704, *16

ADEA class member.[2] *O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312-13, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996)*. However, the Second Circuit has instructed that [2]an ADEA plaintiff who is replaced by a significantly younger worker must offer some evidence of a defendant's knowledge as to the significant age discrepancy to support a *prima facie* inference of discriminatory intent.[2] *Woodman, 411 F.3d at 90*. In viewing the facts in the light most favorable to the plaintiff, the Court will assume that the transfer of a younger worker into Hasemann's position is equivalent to being replaced by a younger worker. However, despite the fact that Ray had access to records [*17] which listed Hasemann's age, Hasemann cannot prove Ray had knowledge of the significant age discrepancy in light of the undisputed facts that Ray did not consider who Hasemann's replacement would be, played no part in the decision as to who would replace Hasemann and to this day does not know who did so. Because Ray played no part in deciding who replaced Hasemann, no reasonable juror could conclude that the fact that he was ultimately replaced by a younger worker supports an inference that Ray fired Hasemann because of unlawful age discrimination.

Besides the fact that Hasemann was replaced by a younger worker, his only other evidence of age-related bias are the allegedly ageist comments made by two of his superiors in the months leading up to his termination. First, Marciano asked Hasemann allegedly on more than one occasion [2]are you getting too old to perform this job?[2] [Dkt. #28, Def. Ex. Q, Hasemann Aff., ¶3]. Second, Walsh once told Hasemann that [2]the young guns are kicking your butt.[2] *Id.* at ¶4. Defendant argues that these comments are stray remarks and are not probative of discriminatory intent.

[2]Verbal comments constitute evidence of discriminatory motivation when a plaintiff [*18] demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff.[2] *Silver v. N. Shore Univ. Hops., 490 F.Supp.2d 354, 362 (S.D.N.Y. 2007)*. [2]Often, however, an employer will argue that a pur-

portedly discriminatory comment is a mere 'stray remark' that does not constitute evidence of discrimination.[2] *Id.* [2]Although courts have often used the term 'stray remark' to refer to comments that do not evince a discriminatory motive, the Second Circuit has found that the term 'stray remark' 'represented an attempt-perhaps by oversimplified generalization-to explain that the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.'[2] *Galimore v. City University of New York Bronx Community College, 641 F.Supp.2d 269, 284 (S.D.N.Y. 2009)* (quoting *Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007))*.

[2]Accordingly, the task is not to categorize remarks 'either as stray or not stray,' and 'disregard [remarks] if they fall into the stray category,' but rather to assess the remarks' 'tendency to show that the decision-maker [*19] was motivated by assumptions or attitudes relating to the protected class.'[2] *Id.* (citation omitted). Courts have found the following factors relevant to such a determination: [2](1) who made the remark, *i.e.,* a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.,* whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.,* whether it was related to the decision making process.[2] *Silver, 490 F.Supp.2d at 363* (citations omitted). [2]In the absence of a clearly demonstrated nexus to an adverse employment action, stray workplace remarks are insufficient to defeat a summary judgment motion.[2] *Almonord v. Kingsbrook Jewish Medical Center, No.04-CV-4071(NGG), 2007 U.S. Dist. LEXIS 58529, 2007 WL 2324961, at *9 (E.D.N.Y. Aug. 10, 2007)* (citing *Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d. Cir. 1998))*.

It is well established that [2]the stray remarks [even] of a decision-maker, without more, cannot prove a claim of employment discrimination.[2] *Abdu-Brisson v. Delta Airlines, Inc., 239 F.3d 456, 468 (2d Cir. 2001); see also Ezold*

2013 U.S. Dist. LEXIS 25704, *19

*v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 545 (3d Cir.1992) [*20] (²Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.²).

Although Marciano's comments could be viewed as discriminatory by a reasonable juror, the comments were not made in relation to the employment decision at issue and were not related to the decision making process. Moreover, there is no evidence that Marciano played any role in the decision to terminate Hasemann. Courts have routinely held that ²stray remarks by [] non-decisionmakers are insufficient, without other evidence, to raise an inference of discrimination.² *Adam v. Glen Cove School* , No.06-CV-1200(JFB), 2008 U.S. Dist. LEXIS 13039, 2008 WL 508689, at *8 (E.D.N.Y. Feb. 21, 2008); *Beshty v. GM,* 327 F.Supp.2d 208, 213 (W.D.N.Y. 2004) (²alleged remark was made by someone who had no involvement in plaintiff's termination, months before the termination occurred. That is not enough to give rise to a genuine issue of material fact.²); *Georgy v. O'Neill,* No. 00 Civ. 0660(FB), 2002 U.S. Dist. LEXIS 4825, 2002 WL 449723, at *6 (E.D.N.Y. Mar. 25, 2002) (finding that reference to national origin by non -decisionmaker six months prior to termination [*21] was ²the kind of isolated stray remark insufficient, without more, to raise an inference of discrimination and defeat summary judgment². This Court agrees that Marciano's comments qualify as stray remarks as there is no discernible nexus between Marciano's comments and Ray's decision to terminate Hasemann for violating the UPS alcohol policy and engaging in conduct unbecoming of a supervisor months later. No reasonable juror could conclude on the basis of Marciano's isolated comments that Hasemann's termination by Ray occurred under circumstances giving rise to an inference of discrimination.

While Walsh's ²young guns² comment could also be viewed as discriminatory by a reasonable juror when viewed in the light most favorable to the plaintiff, the comment was neither made in relation to the employment decision at issue nor was it related to the decision making process. Further, Walsh made this comment months prior to the December 24, 2009 incident which led to Hasemann's termination. Comments too remote in time and context cannot support an inference of discriminatory intent. *See,e.g., Almonord* , 2007 U.S. Dist. LEXIS 58529, 2007 WL 2324961, at *9 (holding that comment made at least five months before plaintiff's [*22] termination was ²not sufficient to create an inference of discrimination²); *Buckman v. Caylon Secs. (USA) Inc.* , 817 F.Supp.2d 322, 336 (S.D.N.Y. 2011) (finding that ²[a]lthough a reasonable juror could find that the remark itself was discriminatory,² a remark made in isolation five months before plaintiff's discharge was ²too remote in time and context to support a reasonable inference² that discharge was a result of race discrimination); *Legendre v. Chase Manhattan Bank,* No 94 CIV. 2911(JES), 1996 U.S. Dist. LEXIS 13221, 1996 WL 514874, at *1, 6 (S.D.N.Y. Sept. 10, 1996) (finding that remark ²[i]f you don't like it here, why don't you go back to Ethiopia² eight months before plaintiff's termination ²too remote in time and place² to create rational inference of employer's discriminatory intent)*; Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 434-35 (5th Cir.1995) (single use of explicit, offensive sexual term directed to terminated female employee, made years before the termination, ²is stray remark too remote in time to support an inference of sex discrimination.²).

Although Ray did ask Walsh for his opinion on whether Hasemann's termination was warranted, there is no evidence that Ray's decision to terminate Hasemann [*23] was overly influenced by Walsh's recommendation and not the product of Ray's independent assessment and conclusions regarding the December 24, 2009 incident as will be further discussed below. Even assuming that Walsh could be considered a decision-maker in Hasemann's termination, his ²young guns² comment was too remote in time and context to support a reasonable inference that his termination was the result of age discrimination. In the absence of a nexus between the time, place and context of

Walsh's remark and Ray's ultimate decision to terminate Hasemann for violating UPS's alcohol policy, Walsh's comment can only be considered a stray remark.

Bolstering this conclusion is the [2]well-recognized inference against discrimination ... where the person who participated in the allegedly adverse decision is also a member of the same protected class.[2] *Drummond v. IPC Intern., Inc.*, 400 F.Supp.2d 521, 532 (E.D.N.Y. 2005). Consequently [2]if a decision maker is in same protected class as plaintiff, claims of discrimination become less plausible.[2] *Id.* (citing *Toliver v. Community Action Comm'n to Help the Economy, Inc., CACHE,* 613 F.Supp. 1070, 1074 (S.D.N.Y.1985)); *Williams v. Brooklyn Union Gas Co.,* 819 F.Supp. 214, 225 (E.D.N.Y.1993) [*24] (dismissing age discrimination claims where the employees responsible for the plaintiff's termination were older than plaintiff or approximately the same age); *Pisana v. Merril Lynch & Co., Inc.,* No.93Civ.4541(LMM), 1995 U.S. Dist. LEXIS 10296, 1995 WL 438715, at *5 (S.D.N.Y. July 24, 1995) (finding that fact that decision makers were close to plaintiffs age or older [2]weakens any suggestion of age discrimination.[2]); *Browne v. CNN Am., Inc.,* No. 98 Civ. 1768, 1999 U.S. Dist. LEXIS 17699, 1999 WL 1084236, at *4 (S.D.N.Y. Dec. 1, 1999) ([2]The fact that ... the ultimate decision maker[ ] was a member of the [same] protected class [as Plaintiff] enhances the inference that age discrimination was not the motive behind ... [the] termination of [Plaintiff].[2]) (internal quotation marks and citation omitted). At the time of Hasemann's termination, Walsh was actually one year older than Hasemann. Indeed all of the individuals who played any role in Hasemann's termination were older than Hasemann. Both Ray and Wheeler were forty-six years old and Walsh was forty-five years old. Indeed, Marciano who played no role whatsoever in the decision to terminate Hasemann was fifty-one years old. The fact that both Walsh and Marciano were older than Hasemann fatally [*25] undermines any inference of discrimination that could possibly be drawn by the mere fact that the comments could be viewed as discriminatory by a reasonable juror when

viewed in the light most favorable to the plaintiff.

In view of the facts that no inference of discrimination can be drawn by the replacement of Hasemann by a younger worker, Marciano and Walsh's comments qualify as stray remarks, and the inference against discriminatory intent on basis that all of the decision-makers are in the same protected class as the plaintiff, no reasonable juror could conclude that Hasemann's termination occurred under circumstances giving rise to an inference of discrimination.

Even assuming arguendo that Hasemann had established his prima facie case, UPS has articulated a legitimate, non-nondiscriminatory reason for terminating Hasemann's employment due to his violation of the alcohol policy and for engaging in conduct unbecoming a supervisor by permitting Irizarry's daughter to help close the facility. For the same reasons that Hasemann failed to establish an inference of discrimination, he fails to demonstrate that UPS's proffered reason is a mere pretext for discrimination and that age discrimination [*26] was the [2]but-for[2] cause of his termination. Considering that stray remarks cannot support an inference of discrimination to establish a prima facie case, it is not surprising that stray remarks are also insufficient to demonstrate that an employer's legitimate, non-nondiscriminatory reason for its action is pretext for discrimination. *See,e.g., Jones v. Carolina Freight Carriers Corp.,* No. Civ.3:94CV2095(AHN), 1997 U.S. Dist. LEXIS 22892, 1997 WL 911827, at *6 (D. Conn. Mar. 24, 1997) ( holding that [2]isolated remark is, without more, insufficient proof of pretext in the face of an employer's well-documented non-discriminatory reasons for its employment decisions.[2]); *Windover v. Sprague Tech.,* 834 F.Supp. 560, 567 (D.Conn.1993) (statements referring to older employees as [2]old boys[2] insufficient to prove pretext in ADEA case) (citing cases); *Getschmann v. James River Paper Co.,* 822 F. Supp. 75, 78 (D.Conn. 1993) (supervisor's remark that [2]it sometimes is difficult to teach an old dog new tricks,[2] [2]too slender a reed to carry the weight of the charge[2] in ADEA case where employer pre-

2013 U.S. Dist. LEXIS 25704, *26

sented evidence of non-discriminatory reason), *aff'd*, _7 F.3d 221 (2d Cir.1993)_; _O'Connor v. Viacom Inc. / Viacome Intern. Inc. , No.93Civ.2399(LMM), 1996 U.S. Dist. LEXIS 5289, 1996 WL 194299, at *5 (S.D.N.Y. April 23, 1996)_ [*27] (holding that [2]three isolated remarks, the only proffered evidence of national origin discrimination are insufficient to establish pretext.[2]). No reasonable juror could conclude on the basis of Marciano or Walsh's stray remarks, that UPS's reasons for terminated Hasemann were a pretext for age discrimination.

Hasemann devotes a significant portion of his brief in opposition to summary judgment and his _Local Rule 56(a)(2)_ statement arguing in essence that Ray's conclusion that Hasemann violated UPS's Alcohol Policy was erroneous. Hasemann argues that he did not violate the Alcohol Policy because he consumed non-alcoholic wine despite his initial belief to the contrary and argues that UPS's investigation of the incident was subjective relying on Pinchbeck's unsupported observations. [Dkt. #37, Mem. in opposition to Summary Judgment, p. 13 -18.]. The Parties dispute when Hasemann learned that he consumed nonalcoholic wine and when, if ever, he informed UPS. Even after crediting the Plaintiff's most favorable version of the facts, it is uncontroverted that Hasemann only informed UPS that he learned that he consumed non-alcoholic wine only after Ray made the decision to terminate his employment [*28] on January 12, 2010. Consequently, the fact that Hasemann only learned after the fact that he had not consumed alcohol cannot demonstrate that Ray's decision in January 12, 2010 was a pretext for age discrimination. Even assuming Hasemann had consumed non-alcoholic wine, he was unaware of this fact and did not inform UPS or it until after his termination. At the earliest, he informed UPS that he consumed nonalcoholic wine orally and demonstrably at his EDR hearing.

Even assuming he had done so, a reasonable jury would not believe that UPS's decision not to credit Hasemann's contradictory and self-serving statements evinced age discrimination. It is axiomatic that an [2]employer may fire

an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.[2] _Nix v. WLCY Radio/ Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984)_; _Hlinko v. Virgin Atlantic Airways, Ltd. , 205 F.3d 1323 (2d Cir. 1999)_. The majority of Hasemann's arguments boil down to the contention that UPS fired him either on the basis of erroneous facts or for no good reason at all. But the [2]ADEA does not make employers liable for [*29] doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age.[2] _Norton v. Sam's Club , 145 F. 3d 114, 120 (2d Cir. 1998)_; see also _Freeman v. Package Mach. Co., 865 F.2d 1331, 1341 (1st Cir.1988)_ ([2]ADEA does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision does not stem from the person's age.[2]); _Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir.1988)_ ([2]Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons. Thus, the reasons tendered need not be well-advised, but merely truthful.[2]) (citations omitted). Here, the record is devoid of sufficient evidence to support a reasonable fact finder's conclusion that UPS fired Hasemann because of his age. The fact that a younger employee transferred to fill Hasemann's position, the allegedly ageist remarks made months prior by Marciano and Walsh who were older than Hasemann, nor the fact that Hasemann later learned that he did not consume alcoholic wine are insufficient [*30] to establish pretext nevertheless demonstrate that age was the but-for cause of UPS's decision to terminate Hasemann's employment.

Lastly assuming arguendo that Walsh's comments were not stray remarks, Hasemann has failed to demonstrate the UPS should be held liable for employment discrimination based on the discriminatory animus of an employee who did not make the ultimate employment decision. Hasemann appears to argue that since Walsh was biased and recommended to Ray that he be terminated there is a genuine issue of ma-

terial fact in dispute over whether his termination was a pretext for age discrimination.

Although not raised by the parties, Hasemann appears to be advancing a cat's paw theory of liability. The cat's paw theory [3] of liability has been the subject of a recent Supreme Court decision which involved employment discrimination under the Uniformed Services and Reemployment Rights Act ([²]USERRA[²]). *Staub v. Proctor Hosp. ,* U.S. __, 131 S.Ct. 1186, 179 L. Ed. 2d 144 (2011). In *Staub*, the Supreme Court considered [²]the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate [*31] employment decision.[²] *131 S. Ct. at 1189*. In a [²]cat's paw[²] case, a plaintiff typically seeks to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision. The Supreme Court held that a plaintiff may establish [²]cat's paw[²] liability under USERRA [²]if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA.[²] *131 S.Ct. at 1194*. The Supreme Court explained that [²][p]roximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'[²] *Id.* at 1192 (quoting *Hemi Group LLC v. City of New York* , 559 U.S. 1, 130 S.Ct. 983, 989, 175 L.Ed.2d 943 (2010)).

The Supreme Court declined to [²]adopt a hard-and-fast rule[²] in cat's paw cases which would immunize an employer who performs an independent investigation and exercises judgment independent on the other hand from the allegedly biased supervisor. *Staub* , 131 S.Ct. at

1193. The Supreme Court explained that [²]if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action[²] then the employer will not be liable. *Id.* However, [²]the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.[²] *Id.* The Supreme Court further explained that its [*33] holding, contrary to the dissent's characterization, reflected the longstanding principle that an employer should only be liable when it had delegated part of the decision making power to the biased supervisor. *Id.* The Supreme Court reasoned that [²]if the independent investigation relies on facts provided by the biased supervisor — as is necessary in any case of cat's-paw liability — then the employer (either directly or through the ultimate decision maker) will have effectively delegated the fact finding portion of the investigation to the biased supervisor.[²] *Id.* Although the Supreme Court's decision involved USERRA, courts have applied Staub's holding to ADEA and Title VII cases. *See  Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Syst. , 862 F.Supp.2d 127, 149-50 (D. Conn. 2012).*

Although the Second Circuit has never formally recognized [²]cat's paw[²] or conduit liability, the Second Circuit and districts courts within the Circuit have recognized theories of attributive subordinate bias in employment discrimination cases. See  *Saviano* , 2011 U.S. Dist. LEXIS 112722, 2011 WL 4561184, at *7 n.15 (noting that while the Second Circuit has not formally recognized the [²]cat's paw[²] theory, it has [²]held that bias [*34] at any stage of a decision process can taint the ultimate decision in violation of Title VII[²]). Accordingly, the theory of liability that the [²]impermissible bias of a single individual can infect the entire group

---

[3]   The Supreme Court has explained that [²]term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by [Judge] Posner in 1990.[²] *Staub* , 131 S.Ct. at 1190 n. 1. In the [*32] fable, [²]a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat had done so, burning its paws in the process, the monkey leaves the cat with nothing.[²] *Id.* The Supreme Court explained that [²][a] coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.[²] *Id.*

of collective decision makers...at least when the decision makers are overly deferential to the biased individuals' recommendations[2] is one that is well accepted by courts within this Circuit. *Baron v. N.Y. City Dep't of Educ.*, No.06-CV-2816 (FB)(MDG), 2009 U.S. Dist. LEXIS 57515, 2009 WL 1938975, at *6, 8 (E.D.N.Y. 2009)* (finding in an ADEA action that since the evaluations made by allegedly biased subordinate made up only a portion of the plaintiff's file that negated [2]any inference that the committee that made the termination decision was tainted by [the subordinate's] alleged bias[2]) ; *see also*, *Fullard v. City of New York*, 274 F.Supp.2d 347, (S.D.N.Y. 2003)* ([2][T]he employer will be liable where the decision-maker 'rubber stamps' the recommendation of [biased] subordinates; in such cases, we say that the decision-maker acts as a conduit of the subordinates' improper motive.[2] (citations, internal quotation marks and citations omitted); *Britt v. Merrill Lynch & Co., Inc.*, No.08CV5356, 2011 U.S. Dist. LEXIS 96881, 2011WL 4000992, at *8 (Aug. 26, 2011)* [*35] (considering whether Plaintiff had alleged facts establishing a cat's paw theory of liability).

Assuming that Walsh was biased against older workers, there is no evidence that Walsh's recommendation was a causal factor in Ray's decision to terminate Hasemann as is necessary to establish cat's paw liability. Ray testified that he reviewed and considered the packet of information he received regarding the incident and UPS alcohol policy independently of any recommendation he received from Walsh, Wheeler or anyone else. Ray further testified that his decision was driven by Hasemann's written statement admitting that he consumed alcohol prior to starting work which in Ray's opinion constituted a violation of UPS's Alcohol Policy. No reasonable juror could conclude that Ray was overly deferential to or rubber-stamped Walsh's recommendation.

Moreover there is no indication that Ray's independent investigation relied on facts provided by Walsh. It is undisputed that the facts of the investigation that Ray independently assessed were provided by Pinchbeck and Wheeler who are not alleged to be biased against older work-

ers. Further, the record indicated that Pinchbeck wrote-up [*36] the incident describing Hasemann's conduct of his own volition and without any involvement by Walsh. Walsh provided neither impetus for Hasemann's termination nor did he provide facts concerning the incident which led to his termination to Ray. No reasonable juror could conclude that Ray delegated the fact finding portion of the investigation to Walsh. Although, Plaintiff argues that Ray testified it was possible that he discussed Hasemann's job performance with Walsh, Hasemann has presented no evidence that Ray's decision to terminate Hasemann was predicated on that discussion and Walsh's assessment of Hasemann's job performance. Even viewing the facts in the light most favorable to Hasemann, no reasonable juror could conclude that Walsh's recommendation to Ray was the proximate cause of Ray's decision to terminate Hasemann to establish cat's paw liability. For all the foregoing reasons, the Court grants UPS's motion for summary judgment on Hasemann's ADEA claim.

## II. CFEPA claim

CFEPA claims have traditionally proceeded under the same analysis as ADEA claims. *McInnis v. Town of Weston*, 375 F. Supp. 2d 70, 85 (D.Conn. 2005). However, it is unclear whether age discrimination claims under [*37] CFEPA should still proceed under the same standard as the ADEA in light of the Supreme Court's recent decision in *Gross* altering the standard. Although the Second Circuit has recently applied the [2]but-for[2] standard to a CFEPA claim, *see* *Timbie v. Eli Lilly & Co.*, 429 Fed. Appx. 20, 22 n. 1 (2d Cir.2011), at least one Connecticut court has determined that under CFEPA, a plaintiff is only required to prove that age discrimination was a contributing or motivating factor, rather than a [2]but-for[2] reason for the adverse employment action. *Wagner v. Bd. of Tr. for Connecticut State Univ.*, No. HHDCV085023775S, 2012 Conn. Super. LEXIS 316, 2012 WL 669544, at *12 (Conn.Super. Ct. Jan.30, 2012).

In addition, this Court has previously held that until Connecticut courts adopt a new stan-

dard, it will follow existing Connecticut court pronouncements on the appropriate standard to employ in applying Connecticut law and apply a contributing or motivating factor analysis to CFEPA claims. *See Herbert v. Nat'l Amusements, Inc.*, 833 F.Supp. 2d 192, (D. Conn. 2011); *see also Weber v. FujiFilm Medical Sys. U.S.A., Inc.* , 854 F.Supp. 2d 219, 231 n.7 (D. Conn. 2012). Therefore under CFEPA, once the defendant proffers a legitimate, nondiscriminatory **[*38]** reason for the adverse employment action, the plaintiff must only come forward with evidence that the proffered reason is a mere pretext for discrimination and does not have to demonstrate that his age was the [2]but-for[2] cause of the adverse action. For the same reasons that Hasemann's ADEA claim fails, his CFEPA claim likewise fails because he cannot establish an inference of discrimination for his prima facie case nor can he establish that UPS's proffered reason for terminating him was a mere pretext for unlawful age discrimination. The Court therefore grants UPS's motion for summary judgment on Hasemann's CFEPA claim.

## III. ERISA claim

 *Section 510 of ERISA* provides that [2][i]t shall be unlawful for any person to discharge ... a participant or beneficiary [of an employee benefit plan] ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan .....[2] *29 U.S.C. § 1140*. [2]Section 510 was designed primarily to prevent [2]unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights.[2] *Dister* , 859 F.2d at 1111. [2]To prevail on a claim under this statute, the plaintiff **[*39]** must show that her employer 'was at least in part motivated by the specific intent to engage in activity prohibited by § 510.'[2] *Zahler v. Empire Merchants* , LLC,No.11-cv-3163(JG), 2012 U.S. Dist. LEXIS 11367, 2012 WL 273698, at *10 (E.D.N.Y. Jan. 31, 2012) (quoting *Dister,* 859 F.2d at 1111). [2]On the other hand, '[n]o ERISA cause of action lies where the loss of pension benefits was a mere consequence of, but not a motivating factor be-

hind, a termination of employment.'[2] *Dister* , 859 F.2d at 1111 (quoting *Titsch v. Reliance Grp., Inc.,* 548 F.Supp. 983, 985 (S.D.N.Y.1982)). However, an employer's specific intent is [2]seldom the subject of direct proof[2]; [2][e]mployers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier.[2] *Id.* The Second Circuit therefore applies the familiar  *McDonnell Douglas* burden-shifting framework to Section 510 claims. *Id.*

[2]Where an employee's ERISA claim is based only on a claim that the employee has been deprived of the opportunity to accrue additional benefits through more years of employment, a prima facie case requires some additional evidence suggesting that pension interference might have been a motivating factor.[2] *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir.1997). **[*40]** The [2]Plaintiff is required to prove more than the single fact that his termination precluded him from vesting into the ... Plan; he must demonstrate [his employer's] unlawful purpose in firing him.[2] *Dister,* 859 F.2d at 1111.

Hasemann argues that to best of his knowledge he would have begun earning a pension at UPS at the age of fifty-five and because UPS terminated him it was [2]initiating a cost savings.[2] [Dkt. #37, p. 19]. Hasemann's argument is really an assertion that UPS must have violated ERISA because loss of pension benefits was a consequence of terminating his employment. Consequence and cause are not synonymous. A cause is a reason why something occurs and a consequence is the result of the occurrence. The fact that loss of pension benefits is a routine consequence of a termination does not ineluctably mean that the consequence was the reason for the termination and thus alone cannot support an ERISA cause of action. *Miller v. Nat'l Ass'n of Sec. Dealers, Inc.* , 703 F.Supp. 2d 230, 249 (E.D.N.Y. 2010) (plaintiff [2]has simply not come up with any circumstantial evidence at all that a reasonable fact-finder might rely upon to determine that his termination was in some part driven **[*41]** by his employer's intent to interfere with his enjoyment of his benefits. Rather, the record makes plain that

2013 U.S. Dist. LEXIS 25704, *41

the foreclosure of early retirement was merely an unfortunate consequence of, instead of a motivation behind, defendant's decision to fire plaintiff.[2]). Hasemann has presented no evidence that pension interference was a motivating factor in UPS's decision to terminate his employment. No reasonable juror could therefore conclude on the basis of the record before the Court that Hasemann's termination was really a scheme to deprive him of pension benefits. The Court therefore grants UPS's motion for summary judgment on Hasemann's _ERISA Section 510_ claim.

## Conclusion

For the foregoing reasons, the Court GRANTS UPS's [Dkt. #27] motion for summary judgment. The Clerk is directed to enter judgment in favor of Defendant UPS and close the case.

IT IS SO ORDERED.

/s/ Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: February 26, 2013

SCOTT WEISS



No *Shepard's Signal*™
*As of: January 21, 2014 3:53 PM EST*

## Humphreys v. Cablevision Sys. Corp.

United States Court of Appeals for the Second Circuit
January 17, 2014, Decided
No. 12-4431-cv

**Reporter:** 2014 U.S. App. LEXIS 924; 2014 WL 185010

JAMES HUMPHREYS, Plaintiff-Appellant, -v.- CABLEVISION SYSTEMS CORPORATION, Defendant-Appellee.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UN-PUBLISHED OPINIONS.

**Prior History:** **[*1]** Appeal from a judgment of the United States District Court for the Eastern District of New York (Feuerstein, J.).

---

**Core Terms**

---

judgment, employee, *discrimination*, compare, evidence, sex *discrimination*, claims, *inference*, similarly situated, burden, prima facie case, genuine dispute, material fact, protected, video

---

**Case Summary**

---

## Overview

HOLDINGS: [1]-A grant of summary judgment in favor of the employer in the employee's claim for sex *discrimination* in violation of the New York State Human Rights Law was proper because he did ***not*** deny that he flagrantly violated the employer's harassment policy by ***showing*** two of his colleagues a vulgar and offensive internet video. His argument that one of the two viewers, a human resources employee who later reported his conduct, was equally or more culpable because

she did ***not*** immediately prevent the employee from ***showing*** the video, yet was spared termination, bordered on the absurd. Audience members were ***not*** similarly situated comparators.

## Outcome
Judgment affirmed.

---

**LexisNexis® Headnotes**

---

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review
Evidence > *Inferences* & Presumptions > *Inferences*

***HN1*** A grant of summary judgment is reviewed de novo, with the appellate court drawing all reasonable ***inferences*** in the non-moving party's favor.

Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > General Overview

***HN2*** Summary judgment is appropriate if the record ***shows*** that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, *Fed. R. Civ. P. 56(a)*. A genuine dispute of material fact exists only where the evidence is such that a reasonable jury could decide in the non-movant's favor.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting
Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens

***HN3*** Courts typically treat Title VII and New

2014 U.S. App. LEXIS 924, *1

York State Human Rights Law _discrimination_ claims as analytically identical, applying the same standard of proof to both claims. In a Title VII sex _discrimination_ case, where there is no direct or overt evidence of discriminatory conduct, courts apply the three-part burden shifting framework of McDonnell Douglas to determine whether summary judgment is appropriate. First, the plaintiff must establish a prima facie case of _discrimination_ by _showing_ that: (1) he is a member of a protected class; (2) he is qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an _inference_ of _discrimination_. A _showing_ that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group is a recognized method of raising an _inference_ of _discrimination_ for purposes of making out a prima facie case. However, a plaintiff relying on such disparate treatment evidence must _show_ he was similarly situated in all material respects to the individuals with whom he seeks to compare himself.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens

**HN4** Generally speaking, a plaintiff's burden of establishing a prima facie case in the context of sex _discrimination_ for employment _discrimination_ law is minimal.

Labor & Employment Law > _Discrimination_ > Gender & Sex _Discrimination_ > General Overview

**HN5** With regard to claims for sex _discrimination_, the standard for comparing conduct with regard to sex _discrimination_ claims requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens

**HN6** In a mixed motives case involving sex _discrimination_, a plaintiff must initially proffer evidence that an impermissible criterion was in fact a motivating or substantial factor in the

employment decision. This burden is greater than the level of proof necessary to make out a McDonnell Douglas prima facie case.

**Counsel:** FOR PLAINTIFF-APPELLANT: MICHAEL B. SCHULMAN, Michael B. Schulman & Associates, P.C., Melville, NY.

FOR DEFENDANT-APPELLEE: RENE M. JOHNSON (Michelle Seldin Silverman, on the brief), Morgan, Lewis & Bockius LLP, Princeton, NJ.

**Judges:** PRESENT: DENNIS JACOBS, RAYMOND J. LOHIER, JR., CHRISTOPHER F. DRONEY, Circuit Judges.

---

| Opinion |
| --- |

## SUMMARY ORDER

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court be **AFFIRMED**.

James Humphreys appeals a judgment dismissing his claim against CSC Holdings LLC ([2]Cablevision[2]) for sex _discrimination_ in violation of New York State Human Rights Law ([2]NYHRL[2]). We assume the parties' familiarity with the underlying facts, the procedural history, and the issues on appeal.

**HN1** We review _de novo_ a grant of summary judgment, drawing all reasonable _inferences_ in the non-moving party's favor. See _Wrobel v. County of Erie_, 692 F.3d 22, 27 (2d Cir. 2012). **HN2** Summary judgment is appropriate if the record _shows_ that [2]there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[2] _Fed. R. Civ. P. 56(a)_. [*2] A genuine dispute of material fact exists only [2]where the evidence is such that a reasonable jury could decide in the non-movant's favor.[2] _Beyer v. County of Nassau_, 524 F.3d 160, 163 (2d Cir. 2008).

**HN3** [2]We typically treat Title VII and NYHRL

2014 U.S. App. LEXIS 924, *2

*discrimination* claims as analytically identical, applying the same standard of proof to both claims.[2] *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008). [2]In a Title VII sex *discrimination* case . . ., where there is no direct or overt evidence of discriminatory conduct, we apply the three-part burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to determine whether summary judgment is appropriate.[2] *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). [2]First, the plaintiff must establish a prima facie case of *discrimination* by *showing* that: (1) []he is a member of a protected class; (2) []he is qualified for [his] position; (3) []he suffered an adverse employment action; and (4) the circumstances give rise to an *inference* of *discrimination*.[2] Id. [2][A] *showing* that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group . . . is a recognized [*3] method of raising an *inference* of *discrimination* for purposes of making out a prima facie case.[2] *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks omitted). However, a plaintiff relying on such [2]disparate treatment evidence must *show* []he was similarly situated in all material respects to the individuals with whom []he seeks to compare [him]self.[2] Id. (internal quotation marks omitted).

*HN4* [2]Generally speaking, a plaintiff's burden of establishing a prima facie case in the context of employment *discrimination* law is 'minimal.'[2] *Collins v. N.Y. City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002) (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001)). However, as in Collins, Humphreys [2]has *not* met even this low threshold, because the circumstances of his termination do *not* give rise to or support an *inference* of *discrimination*.[2] Id.

Humphreys, a senior manager at a Cablevision facility, does *not* deny that he flagrantly violated Cablevision's Harassment Prevention Policy ([2]Policy[2]) by *showing* two of his colleagues a vulgar and offensive internet video. Humphreys' only response is that one of the two viewers, Dianne Yepes, a human resources [*4] employee who later reported his conduct, was equally or more culpable because she did *not* immediately prevent Humphreys from *showing* the video, yet was spared termination.

On this record, this argument borders on the absurd. To use Yepes as a comparator for a *showing* of disparate treatment, Humphreys must *show* that Yepes was [2]similarly situated,[2] i.e., [2]engaged in comparable conduct.[2] *Ruiz v. County of Rockland*, 609 F.3d 486, 493-94 (2d Cir. 2010) (internal quotation marks omitted); see also *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (*HN5* [2][T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases . . . .[2]). Humphreys introduced the video into the workplace and exhibited it to his co-workers. The Policy specifically prohibits [2]the *distribution* of sexually explicit or otherwise abusive or offensive . . . communications.[2] J.A. 77 (emphasis added). It was Humphreys who distributed the video; at most, Yepes failed to interrupt the video and protect Humphreys from his own poor judgment. The audience members are *not* similarly situated comparators. Cf. *Ruiz*, 609 F.3d at 494 (employee who observed [*5] and participated in inappropriate behavior could *not* use as comparator an employee who only observed behavior).

Moreover, Humphreys' two prior incidents involving alleged or proven violations of the Policy distinguish him from persons in the audience. Humphreys was specifically counseled on the Policy after both incidents and was therefore on clear notice that his conduct was inappropriate. His rebuttal—that Yepes breached a separate employee confidentiality provision *after* the relevant incident—is a non sequitur.

Humphreys also relies on the mixed-motive theory of *discrimination*. Regardless of whether Humphreys presented the theory in district court, he has failed to proffer the required evidence of *discrimination* and this additional theory therefore fails for substantially the same reasons. See *de la Cruz v. N.Y. City Human*

2014 U.S. App. LEXIS 924, *5

*Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 23 (2d Cir. 1996) (**HN6** [2]In a 'mixed motives' case, a plaintiff must initially proffer evidence that an impermissible criterion was *in fact* a 'motivating' or 'substantial' factor in the employment decision. This burden is *greater* than the level of proof necessary to make out a McDonnell Douglas prima facie case.[2] (second [*6] emphasis added) (citations omitted)).

Humphreys has **_not_** raised a genuine dispute of material fact on his sex **_discrimination_** claim. The district court properly granted summary judgment to Cablevision.[1]

We have considered all of Humphreys' remaining arguments and conclude that they are without merit. The judgment of the district court is hereby affirmed.

---

[1] Because we review the record and district court's judgment de novo and find no genuine dispute of material fact, we need not consider whether the district court ignored new fact statements Humphreys submitted in his objections to Magistrate Judge Brown's Report and Recommendation.

SCOTT WEISS




Positive
As of: January 19, 2014 5:58 PM EST

## Moore v. Kingsbrook Jewish Med. Ctr.

United States District Court for the Eastern District of New York
July 30, 2013, Decided; July 30, 2013, Filed
11-CV-3625 (MKB)

**Reporter:** 2013 U.S. Dist. LEXIS 107111; 2013 WL 3968748

KYRON MOORE, *Plaintiff*, v. KINGSBROOK JEWISH MEDICAL CENTER, Defendant.

**Core Terms**

employee, *discrimination*, terminate, evidence, protected activity, equipment, inference, protected, national origin, retaliate, claim, failed, clinic, race, decision, similarly situated, judgment, quoting, discriminatory, security, question, individual, engaged, prima facie case, class, adverse employment action, knowledge, motive, train, jury

**Case Summary**

**Overview**

HOLDINGS: [1]-Fired employee failed to establish a prima facie case of *discrimination* under Title VII based on race or national origin because he had not presented any evidence that the reason the employer failed to properly train him was the result of his race or national origin, co-workers who were not fired were not similarly situated, and, even if they were, they were of the same race and national origin as the employee, and decisionmakers were members of same protected class as the employee; [2]-He failed to establish prima facie case of retaliation, based on his mother having asked a question at the employer's diversity training regarding whether a claim of racism was actionable against a company under certain conditions, because he had no admissible proof that the question was asked by his mother, and, even if it was, he could not show that the employer was aware of the question.

**Outcome**

Motion granted.

**LexisNexis® Headnotes**

Civil Procedure > ... > Summary Judgments > Evidentiary Considerations > Scintilla Rule
Civil Procedure > Judgments > Summary Judgments > Evidentiary Considerations
Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > Appropriateness

*HN1* Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. The role of the court is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. A genuine issue of fact exists when there is sufficient evidence on which the jury could reasonably find for the *plaintiff*. The mere existence of a scintilla of evidence is not sufficient to defeat summary judgment; there must be evidence on which the jury could reasonably find for the *plaintiff*. The court's function is to decide whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party.

Labor & Employment Law > ... > Disparate Treat-

ment > Evidence > Circumstantial & *__Direct__* Evidence

**HN2** Where an employer acted with discriminatory intent, *__direct__* evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show *__discrimination__*.

Labor & Employment Law > ... > Title VII *__Discrimination__* > Scope & Definitions > General Overview

**HN3** Title VII of the Civil Rights Act of 1964, *__42 U.S.C.S. §§ 2000e et seq.__*, prohibits an employer from discharging or discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. *__42 U.S.C.S. § 2000e-2(a)(1)__*. Thus, an employment decision violates Title VII when it is based in whole or in part on *__discrimination__*.

Labor & Employment Law > ... > Evidence > *__Burdens__* of Proof > *__Burden__* Shifting

**HN4** Claims under Title VII of the Civil Rights Act of 1964, *__42 U.S.C.S. §§ 2000e et seq.__*, are assessed using the *__burden__*-shifting framework established by McDonnell Douglas Corp. v. Green. Under the framework, a *__plaintiff__* must first establish a prima facie case of *__discrimination__*. A *__plaintiff__*'s *__burden__* at this stage is ²minimal.² If the *__plaintiff__* satisfies this initial *__burden__*, the *__burden__* then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Defendant's *__burden__* is not a particularly steep hurdle. It is one of production, not persuasion; it can involve no credibility assessment. If the defendant offers a legitimate, nondiscriminatory explanation for its action, summary judgment must still be denied, however, if *__plaintiff__* can show that the evidence in *__plaintiff__*'s favor, when viewed in the light most favorable to the *__plaintiff__*, is sufficient to sustain a reasonable finding that [his] dismissal was motivated at least in part by race *__discrimination__*.

Labor & Employment Law > ... > Disparate Treatment > Evidence > *__Burdens__* of Proof

**HN5** In order to establish a prima facie case of employment *__discrimination__* under Title VII of the Civil Rights Act of 1964, *__42 U.S.C.S. §§ 2000e et seq.__*, a *__plaintiff__* must show that: (1) he belongs to a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.

Labor & Employment Law > ... > Disparate Treatment > Evidence > *__Burdens__* of Proof

Labor & Employment Law > ... > Disparate Treatment > Evidence > Circumstantial & *__Direct__* Evidence

**HN6** Inference of *__discrimination__* is a flexible standard that can be satisfied differently in differing factual scenarios. No one particular type of proof is required to show that the *__plaintiff__*'s termination occurred under circumstances giving rise to an inference of *__discrimination__*. An inference of *__discrimination__* can be drawn from circumstances such as the employer's continuing, after discharging the *__plaintiff__*, to seek applicants from persons of the *__plaintiff__*'s qualifications to fill that position; or the employer's criticism of the *__plaintiff__*'s performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the *__plaintiff__*'s discharge. A Title VII of the Civil Rights Act of 1964, *__42 U.S.C.S. §§ 2000e et seq.__*, *__plaintiff__* may establish an inference of discriminatory intent in a number of different ways depending on the specific facts of the case. A discriminatory race and/or color motive can be inferred if a *__plaintiff__* was treated differently than similarly situated white employees or if the defendants engaged in a pattern of discriminatory treatment of African-American employees. However, a *__plaintiff__*'s mere subjective belief that he was discriminated against because of his race does not sustain a race *__discrimination__* claim.

Labor & Employment Law > *__Discrimination__* > Actionable *__Discrimination__*

SCOTT WEISS

**HN7** Unfairness in the workplace that is not the result of _**discrimination**_ against a protected characteristic is simply not actionable.

Labor & Employment Law > ... > Employment Practices > Adverse Employment Actions > Discharges & Failures to Hire

**HN8** Personnel decisions that are based on subjective factors or that are incorrect do not support a federal claim unless they are tainted, at least in part, by illegal _**discrimination**_. An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.

Labor & Employment Law > ... > Disparate Treatment > Evidence > _**Burdens**_ of Proof
Labor & Employment Law > ... > Disparate Treatment > Evidence > Circumstantial & _**Direct**_ Evidence

**HN9** An inference of _**discrimination**_ can be raised by showing that an employer treated an employee less favorably than a similarly situated employee outside his protected group. Such a showing is a recognized method of raising an inference of _**discrimination**_ for the purposes of making out a prima facie case. The standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of _**plaintiff**_'s and comparator's cases, such that the comparator must be similarly situated to the _**plaintiff**_ in all material respects. Where a _**plaintiff**_ seeks to make out a case of _**discrimination**_ by pointing to the disparate treatment of a purportedly similarly situated employee, the _**plaintiff**_ must show that he shared sufficient employment characteristics with that comparator so that they could be considered similarly situated.

Labor & Employment Law > ... > Disparate Treatment > Evidence > _**Burdens**_ of Proof
Labor & Employment Law > ... > Disparate Treatment > Evidence > Circumstantial & _**Direct**_ Evidence

**HN10** An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct. To satisfy Shumway v. United Parcel Serv. ²all material respects² standard for being similarly situated, a _**plaintiff**_ must show that her co-employees were subject to the same performance evaluation and discipline standards. _**Plaintiff**_ must show that similarly situated employees who went undisciplined engaged in comparable conduct. Ordinarily, whether other employees are similarly situated is a factual issue that should be submitted to a jury, but this rule is not absolute and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.

Labor & Employment Law > ... > Disparate Treatment > Evidence > Circumstantial & _**Direct**_ Evidence

**HN11** Because it is often the case, for varied reasons, that temporary or part-time employees are treated differently than full-time or permanent employees, any similarly-situated group must be comprised of employees of the same employment level as _**plaintiff**_.

Labor & Employment Law > ... > Disparate Treatment > Evidence > Circumstantial & _**Direct**_ Evidence

**HN12** Where no evidence giving rise to an inference of _**discrimination**_ has been presented, the fact that a _**plaintiff**_ is replaced with an individual within his protected class undermines his attempt to establish a prima facie case of _**discrimination**_.

Civil Procedure > ... > Summary Judgments > Supporting Materials > Affidavits

**HN14** A party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.

Labor & Employment Law > _**Discrimination**_ > National Origin _**Discrimination**_ > Evidence
Labor & Employment Law > ... > Racial _**Discrimination**_ > Evidence > Circumstantial & _**Direct**_ Evidence

**HN13** An allegation that a decision is motivated by racial or national origin animus is weakened when the decisionmakers are mem-

bers of the protected class as the *__plaintiff__*.

Labor & Employment Law > ... > Employment Practices > Adverse Employment Actions > Discharges & Failures to Hire
Labor & Employment Law > ... > Disparate Treatment > Evidence > Circumstantial & *__Direct__* Evidence

**HN15** When the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.

Labor & Employment Law > *__Discrimination__* > Retaliation > *__Burdens__* of Proof

**HN16** Claims of retaliation for engaging in protected conduct under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. §§ 2000e et seq.*, are examined under the McDonnell Douglas *__burden__* shifting test. Under the test, first, the *__plaintiff__* must establish a prima facie case of retaliation. If the *__plaintiff__* succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the *__plaintiff__* alleges was retaliatory. If the employer succeeds at the second stage, then the presumption of retaliation dissipates, and the *__plaintiff__* must show that, but for the protected activity, he would not have been terminated. If the defendant articulates a legitimate, non-retaliatory reason], the *__plaintiff__* must offer proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

Labor & Employment Law > *__Discrimination__* > Retaliation > *__Burdens__* of Proof
Labor & Employment Law > ... > Retaliation > Elements > General Overview

**HN17** In order to establish a prima facie case of retaliation, a *__plaintiff__* must establish (1) participation in an activity protected by federal *__discrimination__* statute; (2) the defendant was aware of this activity; (3) an adverse employment action; and (4) a causal connection between the alleged adverse action and the protected activity. The *__burden__* at the summary

judgment stage for the *__plaintiff__* is minimal and de minimis, and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.

Labor & Employment Law > ... > Retaliation > Elements > Protected Activities

**HN18** Under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. §§ 2000e et seq.*, protected activity includes both opposing *__discrimination__* proscribed by the statute and participating in Title VII proceedings. Title VII prohibits an employer from taking materially adverse action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity. Title VII's antiretaliation provision is construed to cover a broad range of employer conduct, including terminating an individual for the protected activity of a close family member. Title VII's protection extends to retaliation against employees for protected activity engaged in by close third-parties such as spouses.

Labor & Employment Law > ... > Retaliation > Elements > Protected Activities

**HN19** Opposition to a violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. §§ 2000e et seq.*, need not rise to the level of a formal complaint in order to receive statutory protection, the notion of opposition includes activities such as making complaints to management, writing critical letters to customers, protesting against *__discrimination__* by industry or by society in general, and expressing support of co-workers who have filed formal charges.

Civil Procedure > ... > Summary Judgments > Supporting Materials > Affidavits

**HN20** Where a party relies on affidavits or deposition testimony to establish facts, the statements must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

SCOTT WEISS

2013 U.S. Dist. LEXIS 107111, *107111

*Fed. R. Civ. P. 56(c)(4).*

Civil Procedure > ... > Summary Judgments > **_Burdens_** of Proof > Nonmovant Persuasion & Proof

**HN21** The non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.

Labor & Employment Law > ... > Retaliation > Elements > Protected Activities

**HN22** In order to engage in protected activity, an individual must oppose an employment practice made unlawful under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. §§ 2000e et seq.*, or participate in any investigation, proceeding, or hearing under Title VII. Lodging informal complaints with supervisors or even certain third parties, such as a customer, may constitute protected activity; however, the key question is whether the individual opposed actions of the employer that she had a good faith, reasonable belief violated the law.

Labor & Employment Law > ... > Retaliation > Elements > Protected Activities

**HN23** To be considered protected activity, the employee's complaint must put the employer on notice that **_discrimination_** prohibited by Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. §§ 2000e et seq.*, is occurring.

Labor & Employment Law > ... > Retaliation > Elements > Protected Activities

**HN24** In order to satisfy the requirement of employer knowledge, an employee must have made it clear that she was opposing activity made illegal by Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. §§ 2000e et seq.* It is not necessary that the **_plaintiff_** prove that the specific actors knew of the protected activity as long as the **_plaintiff_** can demonstrate general corporate knowledge.

Labor & Employment Law > ... > Retaliation > Elements > Adverse Employment Actions

**HN25** Typical examples of actionable adverse

employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities.

Labor & Employment Law > ... > Retaliation > Elements > Causation

**HN26** A **_plaintiff_** can indirectly establish a causal connection to support a **_discrimination_** or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action. A close temporal relationship between a **_plaintiff_**'s participation in protected activity and an employer's adverse actions can be sufficient to establish causation. There is no brightline rule for how long after a **_plaintiff_** has engaged in the protected activity that the adverse action must have occurred to benefit from the inference but generally courts measure the time in months.

Labor & Employment Law > ... > Retaliation > Elements > Causation

**HN27** The U.S. Supreme Court has recently ruled that under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. §§ 2000e et seq.*, a **_plaintiff_** must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer. While temporal proximity alone may still be sufficient at the prima facie stage, it is not sufficient at the pretext stage.

**Counsel:** **[*1]** Kyron Moore, **_Plaintiff_**, Pro se, Brooklyn, NY.

For Kingsbrook Jewish Medical Center, Defendant: Barbara E. Hoey, Kelley Drye & Warren, LLP, New York, NY; Kristen Marie O'Connor, Michael P. Pappas, Michael P. Pappas, Littler Mendelson P.C., New York, NY.

**Judges:** MARGO K. BRODIE, United States District Judge.

**Opinion by:** MARGO K. BRODIE

| Opinion |
| --- |

**MEMORANDUM & ORDER**

MARGO K. BRODIE, United States District Judge:

**Plaintiff** Kyron Moore, appearing *pro se*, brings the above-captioned action against Defendant Kingsbrook Jewish Medical Center (²Kingsbrook²) alleging (1) **discrimination** based on **Plaintiff**'s race and national origin and (2) retaliation, in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. §§ 2000e et seq*. Defendant moves for summary judgment on both claims. The Court heard oral argument on May 13, 2013. For the reasons set forth below, Defendant's motion is granted.

**I. Background**

**a. _Plaintiff_'s Employment**

In March 2006, **Plaintiff**, a 27-year-old African American male from Trinidad and Tobago, was hired as a security guard by KHS Security Agency, LLC (²KHS²)[1] and assigned to work at Kingsbrook, a not-for-profit health care institution located in Brooklyn, New York. (Def. 56.1 ¶¶ 3-5, 12-19; Pl. Dep. 13:16-15:1, [*2] 52:10-53:10, 79:23-83:15.)[2] As of summer 2006, **Plaintiff** was assigned to work as a security guard at Kingsbrook's Pierre Toussaint Clinic (the ²Clinic²) four days a week — Mondays, Tuesdays, Wednesdays and Fridays. (Def. 56.1 ¶¶ 25, 27, 29; Pl. Dep. 89:14-90:18, 95:5-96:11, 97:4-98:15; 131:11-24.) The Clinic was open five days a week from approximately 8:00 a.m. to 5:00 p.m. and closed on weekends. (Def. 56.1 ¶¶ 28, 34; Pl. Dep. 97:4-98:15, 131:11-132:7.) Herbert Allen, another security guard, worked at the Clinic on Thursdays, and Calvin Douglas, a ²floating² security guard, was assigned to work at the Clinic on days when **Plaintiff** and Allen were unable to work. (Def. 51.1 ¶¶ 30, 31; Pl. Dep. at 97:4-98:15, 131:11-14; Culbert Decl. ¶ 14.) Accord-

---

[1] Although in its moving papers Defendant mentioned in a footnote that Plaintiff was employed by KHS, not Kingsbrook, and argued that Kingsbrook is not a proper party in this action, (Def. Mem. 1 n.1), Defendant conceded at oral argument that **[*3]** KHS is a wholly owned subsidiary of Kingsbrook, and therefore Kingsbrook is an employer under Title VII, and a proper party to this lawsuit.

[2] Plaintiff failed to submit a statement in opposition to Defendant's summary judgment motion pursuant to _Rule 56.1 of the Local Rules_ of the United States District Courts for the Southern and Eastern Districts of New York (²56.1 Statement²). Defendant argues that the facts as set forth in its 56.1 Statement should be deemed admitted. (Def. Reply Mem. 3.) ²Generally, a plaintiff['s] failure to respond or contest the facts set forth by the defendant[] in [its] _Rule 56.1_ statement as being undisputed constitutes an admission of those facts, and those facts are accepted as undisputed.² _Young v. Nassau Univ. Med. Ctr_ ., No. 10-CV-00649, 2011 U.S. Dist. LEXIS 147767, 2011 WL 6748500, at *1 n.2 (E.D.N.Y. Dec. 22, 2011) (quoting _Jessamy v. City of New Rochelle_ , 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003)) (internal quotation marks omitted); *see also* _Bank of America, N.A., v. Fischer_ , No. 11-CV-2044, 927 F. Supp. 2d 15, 2013 U.S. Dist. LEXIS 25450, 2013 WL 685614, at *2 (E.D.N.Y. Feb. 25, 2013) (court deemed admitted all material facts set forth in plaintiff's 56.1 Statement where pro se defendant failed to submit required response); **[*4]** _Wali v. One Source Co ._, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (if the moving party properly notified a pro se litigant of _Rule 56_ requirements pursuant to _Local Rule 56.2_, ²[p]ro se litigants are thus not excused from meeting the requirements of _Local Rule 56.1_²); _Local Rule 56.1(c)_ (²Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party².). However, ²[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.² _Holtz v. Rockefeller & Co ._, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also* _Liang v. Café Spice SB, Inc ._, 911 F. Supp. 2d 184, 2012 WL 5988766, at *1 n.1 (E.D.N.Y. 2012) (quoting _Holtz_ , 258 F.3d at 73). Because of Plaintiff's *pro se* status and in view of the fact that he has responded to and opposed Defendant's motion in writing and at the oral argument on May 15, 2013, the Court will review Plaintiff's opposition, deposition and supporting **[*5]** papers for factual disagreements with Defendant's 56.1 Statement. _Battle v. Day Care Council_ , No. 11-CV-4043, 2012 U.S. Dist. LEXIS 104560, 2012 WL 3055574, at *1 n.1 (S.D.N.Y. July 26, 2012) (²Where parties fail to file Rule 56.1 statements of fact, the court may choose to accept all factual allegations of the opposing parties as true for the purposes of deciding the motion for summary judgment, or may alternately 'opt to conduct an assiduous review of the record.'² (citation omitted)). The Court will only deem admitted those facts in Defendant's Local Rule 56.1 Statement that are supported by admissible evidence in the record. *See* _Liang_ , 911 F. Supp. 2d 184, 2012 WL 5988766, at *1 n.1; _Battle_ , 2012 U.S. Dist. LEXIS 104560, 2012 WL 3055574, at *1 n.1.

SCOTT WEISS

ing to *Plaintiff*, he was [2] an exemplary employee who consistently received compliments and praise from KHS and Clinic management.[2] (EEOC Charge of *Discrimination* App. A attached to Compl. ([2]App. A[2]) ¶ 7.)

The parties agree that the essential duties and responsibilities of a security guard at KHS included [2](i) preventing theft; (ii) securing buildings and grounds; (iii) reporting security incidents immediately to security management; (iv) ensuring only authorized personnel are admitted onto hospital property; (v) providing timely and accurate incident reports; and (vi) demonstrating professionalism,[2] as described in a document entitled [2]KHS Security, Security Guard Duties.[2] (Def. 56.1 ¶ 36; *see* Hoey Decl. Ex. 2, KHS [*6] Security, Security Guard Duties; Pl. Dep. 108:12-109:15.)

According to Defendant, [2]Kingsbrook's 'Incident Reporting' policy requires that all incidents that 'result in damage to property or involve missing articles' be promptly reported in writing to management, and states, *inter alia*, that in addition, 'All employees . . . are responsible to immediately report to his/her supervisor any Incident he/she has observed or otherwise identified.'[2] (Def. 56.1 ¶ 37 (quoting McKeon Decl. Ex. 1, Kingsbrook Incident Reporting Policy); *see also* McKeon Decl. ¶ 11.) *Plaintiff* claims that Defendant [2]never instructed or trained any of the security guards assigned to [the Clinic] to do a daily, weekly or monthly inventory of any of the equipment at the [C]linic,[2] and that [2]Defendant never kept an inventory of the equipment.[2] (Pl. Opp'n 1.) *Plaintiff* also claims that Defendant's security policies only required that security [2]monitor all packages that look unusual,[2] unless there was a heightened security alert. (Pl. Opp'n 2.) Therefore, it was [2]left to the security guard's judgment as to what packages should be checked; there was no clear directive as to the checking of packages.[2] (Pl. Opp'n 2.)

## b. Gemma  [*7] Moore

*Plaintiff*'s mother, Gemma Moore, was employed by Kingsbrook as the Director of Nursing Services at Rutland Nursing Home, a different Kingsbrook facility. (Def. 56.1 ¶ 61; Pl.

Dep. 59:7-17, 63:5-18.) According to *Plaintiff*, throughout Gemma Moore's employment at Kingsbrook, she [2]had a distinguished history of defending and speaking out in opposition on behalf of other African American employees at Kingsbrook who were subjected to *discrimination* by Kingsbrook, including but not limited to a claim filed with the EEOC by [another employee].[2] (App. A ¶ 9.)

*Plaintiff* claims that, following a diversity training hosted by Kingsbrook in or about May 2009, Gemma Moore asked the attorney who conducted the diversity training lecture whether [2]a claim of racism was actionable against a company that put white people into the highest positions of power, such as Vice President or Assistant Vice President, while at the same time excluding more qualified African American employees from those positions.[2] (*Id*. ¶ 10.) *Plaintiff* alleges that Earnest Liggins, Kingsbrook Human Resources Manager, overheard Gemma Moore's conversation with the attorney. (*Id*. ¶ 11.) According to *Plaintiff*, Rutland Nursing [*8] Home, Kingsbrook and KHS had one common Human Resources Department. (Pl. Opp'n 3.) *Plaintiff* asserts that KHS retaliated against him by terminating his employment because of this question by his mother. (*Id*. at 7-8.)

## c. Stolen Equipment

On or about June 5, 2009, optical equipment worth approximately $20,000 was discovered missing from the Clinic. (Def. 56.1 ¶ 41; Pl. Dep. 154:2-8.) The optical equipment was last seen at the Clinic in April or May of 2009 by Peter Scaminaci, Kingsbrook's Assistant Vice President of Clinical Operations. (Def. 56.1 ¶ 45; McKeon Decl. ¶¶ 6-7; Pl. Opp'n 2-3.) The size and weight of the missing optical equipment [2]was such that it could not have been easily concealed by someone leaving the Clinic.[2] (Def. 56.1 ¶ 42.) The Director of KHS, Joseph Culbert, was notified of the missing equipment on or about June 5, 2009. (Culbert Decl. ¶ 9.) KHS and Kingsbrook conducted an investigation regarding the missing optical equipment. (Def. 56.1 ¶ 46; Pl. Dep. 155:19-157:17, 161:6-12.)

#### d. Investigation

On or about June 19, 2009, John McKeon, the Vice President of Human Resources for Kingsbrook, interviewed Clinic Director, Patricia Haynes, regarding the missing equipment. [*9] (McKeon Decl. ¶ 8.) Haynes noticed that the equipment was missing in mid-May 2009, but did not report the missing equipment to her supervisor or anyone else in management at Kingsbrook. (*Id.* ¶ 9.) Haynes questioned **_Plaintiff_** about the equipment at the time she noticed it was missing and **_Plaintiff_** told her he ²did not know its whereabouts.² (*Id.* ¶ 10.) Culbert was concerned that **_Plaintiff_** had been made aware of the missing equipment but did not report it to KHS. (Culbert Decl. ¶ 13.)

According to **_Plaintiff_**, Haynes had not told him that the equipment was missing, and he was not aware of the missing equipment until he was told by Culbert. (Pl. Dep. 154:20-157:21; Pl. Opp'n 2-3; Docket Entry No. 30, September 10, 2012 Letter from **_Plaintiff_** (²Pl. PMC Response²) 2.) He did not fail to report the missing equipment since ²he did not know that the equipment was missing because no system was put in place to make the security guards knowledgeable of every piece of equipment that was present in the clinic.² (Pl. Opp'n 3.)

On or about June 22, 2009, Culbert and KHS Assistant Director Richard Perkins conducted interviews of the three security guards employed at the Clinic — **_Plaintiff_**, Allen and Douglas. [*10] (Def. 56.1 ¶¶ 51-53.) According to **_Plaintiff_**, he told Culbert and Perkins that he had no knowledge of the missing equipment. (Pl. Opp'n 4.) **_Plaintiff_** remembered seeing the equipment in the optical treatment room, but he had not been in the room for some time. (Culbert Decl. Ex. 2 (²KHS Investigation Memorandum²) at 1.)

According to the KHS Investigation Memorandum that was prepared as a result of the investigation, when **_Plaintiff_** was specifically asked whether he had heard anyone talking about the equipment, he stated that several weeks prior, Haynes had approached him and inquired as to whether he had seen anyone remove the equipment. (*Id.*) **_Plaintiff_** stated that he did not remember the exact date of his conversation with Haynes and that he did not notify anyone about the missing equipment because he did not believe it was important.³ (*Id.*) **_Plaintiff_** also told Culbert and Perkins that he did not make regular rounds of the Clinic and did not check large bags or packages leaving the Clinic. (*Id.*) He assisted Haynes by performing non-security related duties, such as answering telephone calls to the Clinic, unlike Allen and Douglas, both of whom refused Haynes's request to perform non-security [*11] related duties without supervisor permission, and both of whom searched large bags leaving the facility. (*Id.* at 1-3.)

Following the investigation, Culbert concluded that **_Plaintiff_** ²failed to observe certain basic security protocols by,² among other things, ²(i) failing to adhere to the practice of inspecting large bags and packages being removed from the Clinic; and (ii) failing to promptly report the missing equipment to his supervisors at the time Ms. Haynes first told him about it.² (Culbert Decl. ¶ 15.) Culbert concluded that **_Plaintiff_**'s ²neglect to follow appropriate security protocols could have directly contributed to the theft of the equipment, since his failure to inspect large packages could have allowed someone to remove the equipment undetected, and his delay in reporting the incident may have diminished the likelihood of recovering the equipment.² (*Id.*) Culbert was also concerned about **_Plaintiff_**'s attitude during the interview, as **_Plaintiff_** ²appeared detached and nonchalant, seemed [*12] unconcerned that thousands of dollars' worth of property had been stolen from the facility he was responsible for safeguarding, and refused to acknowledge any accountability whatsoever for the loss of property.² (*Id.* ¶ 16.)

**_Plaintiff_** disputes Defendant's characterization of his behavior during the interview. According

---

3   Plaintiff disputes this allegation as a ²blatant untruth, because as a security guard, the first thing one would report when it comes to his or her knowledge is missing items.² (Pl. Opp'n 5.)

to *Plaintiff*, during the interview he was in shock that Culbert [2]practically accused[2] him of [2]stealing equipment that he knew nothing about,[2] and therefore he was [2]unable to respond fluently[2] to Culbert's questions. (Pl. Opp'n 4.) Culbert was [2]intimidating,[2] but [2] *Plaintiff* was never disrespectful toward Mr. Culbert or Mr. Richard Perkins during their interrogation of him.[2] (*Id.*) *Plaintiff* also notes that despite his request, Defendant has failed to produce copies of all interview records and, therefore, there is no accurate summary of the investigation of the missing equipment that led to *Plaintiff*'s termination. (*Id.*)

**e. *Plaintiff*'s Termination**

On July 9, 2009, Culbert informed *Plaintiff* that he was being discharged effective immediately and provided him with written notice. (Culbert Decl. ¶ 18.) Kingsbrook terminated Haynes the same day. (*Id.*) During his deposition, *Plaintiff* [*13] testified that he believed Culbert, Perkins and Roan McFarlane, Security Department Manager of KHS, made the decision to terminate him, and that he did not know of anyone else who was involved in the decision. (Pl. Dep. 186:15-187:7; Culbert Decl. ¶ 3.) Culbert stated in his declaration that he made the decision to discharge *Plaintiff*, and that McFarlane and Perkins concurred with his decision. (Culbert Decl. ¶¶ 3, 20.) Both Perkins and McFarlane are African-American and of West Indian origin. (*Id.* ¶¶ 3, 5-6.)[4]

Following *Plaintiff*'s termination, his shifts were assigned to Allen and Douglas. (*Id.* ¶ 19.) *Plaintiff* asserts that he was wrongfully [*14] terminated due to his race and national origin, and in retaliation for his mother's inquiry at the training session. (Pl. Opp'n 1, 5, 7-8.) *Plaintiff* filed an EEOC charge against Kingsbrook on April 2, 2010, and received a right to sue letter on April 27, 2011. (EEOC

Charge of *Discrimination* attached to Compl.; Dismissal and Notice of Rights attached to Compl.)

**II. Discussion**

**a. Standard of Review**

*HN1* Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, [2]there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[2] *Fed. R. Civ. P. 56(a)*; *see also Kwong v. Bloomberg,   No. 12-CV-1578, 723   F.3d 160, 2013 U.S. App. LEXIS 13798, 2013 WL 3388446, at *4 (2d Cir. July 9, 2013)*; *Redd v. N.Y. Div. of Parole , 678 F.3d 166, 174 (2d Cir. 2012)*. The role of the court is not [2]to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.[2] *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ ., 444 F.3d 158, 162 (2d Cir. 2006)* (quoting *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))*. A genuine issue of fact exists when there is sufficient [2]evidence on which the jury could reasonably  [*15] find for the *plaintiff*.[2] *Anderson , 477 U.S. at 252*. The [2]mere existence of a scintilla of evidence[2] is not sufficient to defeat summary judgment; [2]there must be evidence on which the jury could reasonably find for the *plaintiff*.[2] *Id.* The court's function is to decide [2]whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party.[2] *Pinto v. Allstate Ins. Co ., 221 F.3d 394, 398 (2d Cir. 2000)*. The Second Circuit has [2]cautioned that '*HN2* [w]here an employer acted with discriminatory intent, *direct* evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show *discrimina-*

---

[4]   Plaintiff for the first time in his opposition to Defendant's summary judgment motion asserts that Culbert and McKeon were responsible for his termination, and that Perkins is merely a [2]pawn in the investigation[2] and was not involved in the discharge decision. (Pl. Opp'n 6-7.) There is no evidence, however, that McKeon was involved in the decision to terminate Plaintiff. To the contrary, the evidence before the Court is a declaration from McKeon that he was [2]advised[2] of Plaintiff's termination after it had already occurred. (McKeon Decl. ¶ 15.)

tion.'[2] *Taddeo v. L.M. Berry & Co* ., No. 12-CV-3591, 526 Fed. Appx. 121, 2013 U.S. App. LEXIS 9579, 2013 WL 1943274, at *1 (2d Cir. May 13, 2013) (quoting *Gorzynski v. JetBlue Airways Corp* ., 596 F .3d 93, 101 (2d Cir. 2010)).

**b.** *Plaintiff* 's Racial and National Origin *Discrimination* Claim

*Plaintiff* alleges that he was terminated due to his race and national origin. *HN3* Title VII prohibits an employer from discharging or discriminating [2]against any individual with respect to his compensation, [\*16] terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.[2] *42 U.S.C. § 2000e-2(a)(1)*. Thus, [2][a]n employment decision . . . violates Title VII when it is 'based in whole or in part on *discrimination*.'[2] *Holcomb v. Iona College* , 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Feingold v. New York* , 366 F.3d 138, 152 (2d Cir. 2004)).

*HN4* Title VII claims are assessed using the *burden*-shifting framework established by *McDonnell Douglas Corp. v. Green* , 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See e.g.*, *St. Mary's Honor Ctr. v. Hicks* , 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); *Texas Dep't of Cmty Affairs v. Burdine* , 450 U.S. 248, 253-55, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *Brown v. City of Syracuse* , 673 F.3d 141, 150 (2d Cir. 2012) (race claims are subject to *burden* shifting); *Ruiz v. Cnty. of Rockland* , 609 F.3d 486, 491-92 (2d Cir. 2010) (national origin claims are subject to *burden* shifting). Under the framework, a *plaintiff* must first establish a prima facie case of *discrimination*. *Hicks* , 509 U.S. at 506; *see also Ruiz* , 609 F.3d at 491-92. A *plaintiff* 's *burden* at this stage is [2]minimal.[2] *Holcomb* , 521 F.3d at 139 (quoting *Hicks* , 509 U.S. at 506). If the *plaintiff* satisfies this initial *burden*, the [\*17] *burden* then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Hicks* , 509 U.S. at 506-07; *Ruiz* , 609 F.3d at 492. Defendant's *burden* [2]is not a particularly steep hurdle.[2] *Hyek v. Field Support Servs* ., 702 F. Supp. 2d 84, 93 (E.D.N.Y.

2010). It [2]is one of production, not persuasion; it 'can involve no credibility assessment.'[2] *Reeves v. Sanderson Plumbing Prods., Inc* ., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting *St. Mary's Honor Ctr* ., 509 U.S. at 509)). If the defendant offers a legitimate, nondiscriminatory explanation for its action, summary judgment must still be denied, however, if *plaintiff* can show that [2]the evidence in *plaintiff* 's favor, when viewed in the light most favorable to the *plaintiff*, is sufficient to sustain a reasonable finding that [his] dismissal was motivated at least in part by [race] *discrimination*.[2] *Adamczyk v. N.Y. Dep't of Corr. Servs* ., 474 F. App'x 23, 25 (2d Cir. 2012) (alterations in original) (quoting *Tomassi v. Insignia Fin. Grp., Inc* ., 478 F.3d 111, 114 (2d Cir. 2007)).

**i. Prima Facie Case**

*HN5* In order to establish a prima facie case of employment *discrimination* under Title VII, a *plaintiff* must show that: (1) he belongs to [\*18] a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action; and (4) [2]the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.[2] *Brown* , 673 F.3d at 150 (quoting *Holcomb* , 521 F.3d at 138); *see Ruiz* , 609 F.3d at 491-92. Defendant does not dispute the first three elements of *Plaintiff* 's prima facie case. *Plaintiff* is African-American and is from Trinidad and Tobago, thus he is a member of two protected classes, race and national origin, satisfying the first element. *Smith v. City of New York* , No. 12-CV-3250, 2013 U.S. Dist. LEXIS 65798, 2013 WL 1903856, at *3 (S.D.N.Y. May 8, 2013) (*plaintiff* adequately pled [2]membership in a protected class based on national origin[2] as a [2]West Indian[2] of Jamaican descent); *Augustin v. Enlarged City Sch. Dist. of Newburgh* , 616 F. Supp. 2d 422, 439 (S.D.N.Y. 2009) ([2]There is no dispute that *plaintiff*, who is Haitian, belongs to a protected class.[2]); *Robinson v. Keyspan* , No. 03-CV-4796, 2005 U.S. Dist. LEXIS 27057, 2005 WL 3006687, at *4 (E.D.N.Y. Nov. 9,

2005) ( *plaintiff* who was [2]black and of Guyanese national origin[2] was part of a protected class for both race and national origin); *Halstead v. N.Y.C. Transit Auth.*, No. 99-CV-03450, 2002 U.S. Dist. LEXIS 26963, 2002 WL 34438897, at *67 (E.D.N.Y. Dec. 30, 2002) [*19] (as a West Indian, the *plaintiff* satisfied the national origin class), *aff'd*, *78 Fed. Appx. 750 (2d Cir. 2003)*. Defendant does not dispute that *Plaintiff* was qualified to be a security guard, satisfying the second element. *Plaintiff* was terminated on July 9, 2009, which constitutes an adverse employment action, satisfying the third element. *See Gladwin v. Pozzi*, 403 F. App'x 603, 606 (2d Cir. 2010) (an African-American woman who was terminated from her job satisfied the first and third elements of her prima facie case); *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) (discharge, refusal to promote, and reprimands are adverse employment actions). However, while *Plaintiff* satisfies the first three elements, and despite construing the evidence in the light most favorable to *Plaintiff*, *Plaintiff* cannot show that his termination occurred under circumstances giving rise to any inference of racial or national origin discriminatory intent and, therefore, cannot satisfy the final element necessary to establish a prima facie case of race or national origin *discrimination*.

*HN6* Inference of *discrimination* [2]is [*20] a 'flexible [standard] that can be satisfied differently in differing factual scenarios.[2] *Howard v. MTA Metro-N. Commuter R.R*., 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co*., 92 F.3d 81, 91 (2d Cir. 1996)). [2]No one particular type of proof is required to show that *Plaintiff*'s termination occurred under circumstances giving rise to an inference of *discrimination*.[2] *Ofoedu v. St. Francis Hosp. & Med. Ctr*., No. 04-CV-1707, 2006 U.S. Dist. LEXIS 68704, 2006 WL 2642415, at *14 (D. Conn. Sept. 13, 2006). An inference of *discrimination* can be drawn from circumstances such as:

the employer's continuing, after discharging the *plaintiff*, to seek appli-

cants from persons of the *plaintiff*'s qualifications to fill that position; or the employer's criticism of the *plaintiff*'s performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the *plaintiff*'s discharge.

*Abdu-Brisson v. Delta Air Lines, Inc* ., 239 F.3d 456, 468 (2d Cir. 2001) (quoting *Chambers v. TRM Copy Centers Corp* ., 43 F.3d 29, 37 (2d Cir. 1994)); *see Russell v. Cnty. of Nassau* , 696 F. Supp. 2d 213, 232 (E.D.N.Y. 2010) [*21] ([2]A Title VII *plaintiff* may establish an inference of discriminatory intent in a number of different ways depending on the specific facts of the case. For example, a discriminatory race and/or color motive can be inferred if a *plaintiff* was treated differently than similarly situated white employees or if the defendants engaged in a pattern of discriminatory treatment of African-American employees.[2] (citing *Abdu-Brisson* , 239 F.3d at 468; *Johnson v. Cnty. Of Nassau* , 480 F. Supp. 2d 581, 597 (E.D.N.Y. 2007))). However, a *plaintiff*'s [2]mere subjective belief that he was discriminated against because of his race does not sustain a race *discrimination* claim.'[2] *Gue v. Suleiman* , No. 10-CV-8958, 2012 U.S. Dist. LEXIS 141295, 2012 WL 4473283, at *8 (S.D.N.Y. Sept. 27, 2012) (quoting *Baptiste v. Cushman & Wakefield*, No. 03-CV-2102, 2007 U.S. Dist. LEXIS 19784, 2007 WL 747796, at *7 (S.D.N.Y. Mar. 7, 2007)); *see also Karim-Seidou v. Hosp. of St. Raphael* , No. 09 -CV-51, 2012 U.S. Dist. LEXIS 179292, 2012 WL 6628886, at *5 (D. Conn. Dec. 19, 2012) (the *plaintiff* 's own subjective beliefs[2] that he was discriminated against based on national origin and race were insufficient to survive summary judgment); *Ogindo v. DeFleur* , No. 07-CV-1322, 2010 U.S. Dist. LEXIS 6478, 2010

WL 410374, at *7 (N.D.N.Y. Jan. 27, 2010) [*22] (*²Plaintiff*'s subjective beliefs and unsubstantiated allegations of unlawful motive aside, there is insufficient evidence tending to suggest that ***Plaintiff***'s pursuit of his doctoral degree was inhibited because of his race or national origin.²); *Casciani v. Nesbitt*, 659 F. Supp. 2d 427, 463-64 (W.D.N.Y. 2009) (the *plaintiff*'s ²subjective beliefs, and naked allegations, unsupported by any facts² were insufficient to support a *discrimination* claim based on national origin), *aff'd*, *392 F. App'x 887 (2d Cir. 2010)*.

*Plaintiff*'s evidence of racial and national origin *discrimination* is that (1) he was unfairly held responsible for the missing equipment, and (2) the two individuals who were terminated in connection with the missing equipment were from Trinidad and Tobago.⁵ (Pl. Opp'n 5-7.) *Plaintiff* has not offered any evidence from which a jury could reasonably find that *Plaintiff* was the subject of racial or national origin *discrimination*. *Plaintiff* has pointed to no allegations that *anyone* made either ethnic or racist comments to or about him regarding his race or national origin, or that others not in either his race or national origin class were treated more favorably than *Plaintiff*. *See* [*23] *Tucker v. New York City, No. 05-CV-2804, 2008 U.S. Dist. LEXIS 76900, 2008 WL 4450271, at *5 (S.D.N.Y. Sept. 30, 2008)* (holding that *plaintiff* offered no evidence that would permit reasonable jurors to find that his employer's actions were motivated by racial animus where, among other things, he did ²not contend that anyone . . . treated him in a racially disparaging manner or showed any sign of racial bias or hostility²), *aff'd*, *376 F. App'x 100 (2d Cir. 2010)*.

## 1. Unfair Treatment

*Plaintiff* appears to challenge the factual basis for his termination and argues that it was unfair to terminate him under the circumstances.

*Plaintiff* argues that because he was never instructed or trained to perform a regular inventory of any of the equipment in the Clinic, never told what pieces of equipment were in the Clinic, and because there was no clear directive regarding the checking of packages leaving the Clinic, he should not be held responsible for the missing equipment. (Pl. Opp'n 1-3.) Nowhere in these complaints does *Plaintiff* [*24] allege that the lack of training and direction was based on his race or national origin. Only that Kingsbrook, or KHS, failed to properly train him, inform him of the equipment at the Clinic or *direct* him as to how to check packages leaving the Clinic.

Construing the facts in the light most favorable to *Plaintiff* and accepting *Plaintiff*'s allegations that he was not properly trained, never told what pieces of equipment were at the Clinic and was never given instructions as to which packages leaving the Clinic should be checked, there is still no evidence from which a jury could reasonably find that *Plaintiff* was terminated because of *discrimination* based on his race or national origin. *Plaintiff* has not presented any evidence that the reason Kingsbrook or KHS failed to properly train *Plaintiff*, identify existing equipment at the Clinic or give a directive to *Plaintiff* as to which packages to search, was as a result of *Plaintiff*'s race or national origin. That is, that Kingsbrook or KHS provided training, identified the equipment at the Clinic and gave directives to other security guards but not to *Plaintiff* or other guards that are of the same race or national origin as *Plaintiff*. Indeed, [*25] *Plaintiff* argues to the contrary, that Kingsbrook *never trained any of the security guards*. (Pl. Opp'n 1.) While *Plaintiff* may argue that it was unfair for Kingsbrook to terminate his employment under the circumstances, because *Plaintiff* cannot show that the basis for the ²unfairness² was discriminatory, *Plaintiff* cannot establish that his termination ²occurred under circumstances giving rise to an inference of discriminatory intent.² *See* *Gue v. Suleiman, No.*

---

⁵ Plaintiff also argues that the termination decision was made by McKeon and Culbert, two Caucasian supervisors. However, this assertion is not supported by the evidence in the record. *See supra* note 4.

10-CV-8958, 2012 U.S. Dist. LEXIS 141295, 2012 WL 4473283, at *8 (S.D.N.Y. Sept. 27, 2012) (²*HN7* [U]nfairness in the workplace that is not the result of *discrimination* against a protected characteristic is simply not actionable.² (quoting *Nakis v. Potter*, No. 01-CV-10047, 2004 U.S. Dist. LEXIS 25250, 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004)); *Williams v. City of Rochester*, No. 08-CV-6063, 2010 U.S. Dist. LEXIS 25668, 2010 WL 986484, at *5 (W.D.N.Y. Mar. 17, 2010) (same); *McCowan v. HSBC Bank USA, N.A .*, 689 F. Supp. 2d 390, 416 (E.D.N.Y. 2010) (same).

*Plaintiff* also argues that Kingsbrook and KHS erroneously concluded that he knew about the missing equipment and failed to report it to his supervisor, thereby making his termination unlawful. (Pl. Opp'n 2-3.) However, ²*HN8* [p]ersonnel decisions that are based on subjective [*26] factors or that are incorrect do not support a federal claim unless they are tainted, at least in part, by illegal *discrimination*.² *Nakis*, 2004 U.S. Dist. LEXIS 25250, 2004 WL 2903718, at *20 (citing *Bussa v. Alitalia Linee Aeree Italiane, S.P.A .*, No. 02-CV-10296, 2004 U.S. Dist. LEXIS 13895, 2004 WL 1637014, at *6, *9 (S.D.N.Y. July 21, 2004)); *see Delaney v. Bank of Am. Corp .*, 908 F. Supp. 2d 498, 518 (S.D.N.Y. 2012) (²The employer could terminate the *plaintiff* for a good reason, a bad reason, or no reason at all, so long as it was not a discriminatory reason.................. Moreover, it is not for the Court to second-guess the business judgment for a termination, so long as there is no evidence that the reason for the decision was a pretext for *discrimination*.² (quoting *Slatky v. Healthfirst, Inc .*, No. 02-CV-5182, 2003 U.S. Dist. LEXIS 20608, 2003 WL 22705123, at *5 (S.D.N.Y. Nov. 17, 2003))); *Robinson v. Zurich N. Am. Ins. Co .*, 892 F. Supp. 2d 409, 431 (E.D.N.Y. 2012) (²An 'employer may fire an employee for a good reason, a bad reason, a reason based on errone-

ous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'² (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984))). Therefore, even assuming as *Plaintiff* [*27] argues that Kingsbrook or KHS unfairly held him responsible for the missing equipment, or incorrectly concluded that he was responsible for and held him responsible for not reporting that the equipment was missing when he did not know it was missing, such unfair or mistaken treatment alone is not enough to support an inference of *discrimination*.

## 2. Individuals Similarly Situated

*Plaintiff* also appears to argue that he was treated differently from others similarly situated because of his national origin.[6] Specifically, *Plaintiff* alleges that Allen and Douglas, the other two security guards at the Clinic with equal access to the equipment, were not from Trinidad and Tobago and were not terminated. (Pl. Opp'n 6-7.) *Plaintiff* points to the fact that the only two people terminated in connection with the missing equipment, himself and Haynes — the Director of the Clinic — were both from Trinidad and Tobago, implying that the real reason they were terminated is because of their national origin.[7] (*Id.* at 6.) *HN9* An inference of *discrimination* can be raised by ²showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group.² *Abdul-Hakeem v. Parkinson*, No. 12-CV-748, 523 Fed. Appx. 19, 2013 U.S. App. LEXIS 12718, 2013 WL 3111300, at *1 (2d Cir. June 21, 2013) [*28] (summary order) (quoting *Ruiz*, 609 F.3d at 493); *see also Shlafer v. Wackenhut Corp .*, 837 F. Supp. 2d 20, 25 (D. Conn. 2011) (² *Plaintiff* must set forth factual circumstances from which discriminatory motivation may be inferred. Discriminatory motivation may be established by allegations of preferential

---

[6]   Plaintiff's argument here does not appear to be based on his race, only his national origin.

[7]   Plaintiff points to the termination of Haynes, who he maintains is also from Trinidad and Tobago, in support of his claim that he was discriminated against because of his national origin, but Plaintiff has provided no evidence to support his claim that the termination of Haynes was discriminatory. Moreover, Plaintiff testified during his deposition that he did not even recall Haynes' national origin. (Tr. 147:13-148:3.)

2013 U.S. Dist. LEXIS 107111, *28

treatment given to similarly situated individuals, or remarks conveying discriminatory animus.[2] (citations omitted)); *Mabry v. Neighborhood Defender Serv., 769 F. Supp. 2d 381, 392 (S.D.N.Y. 2011)* ([2]Allegations supporting motive may include preferential treatment given to similarly situated individuals or remarks that convey discriminatory animus.[2]). Such a showing [2]is a recognized method of raising an inference of *discrimination* for the purposes of making out a prima facie case.[2] *Ruiz, 609 F.3d at 493* (internal quotation marks omitted). [2]The 'standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of *plaintiff*'s and comparator's cases,' such that 'the comparator must be similarly situated to the *plaintiff* in all material respects.'[2] *Abdul-Hakeem, 2013 U.S. App. LEXIS 12718, 2013 WL 3111300, at *1* (quoting *Ruiz, 609 F.3d at 494*); *see also Drummond v. IPC Int'l, Inc., 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005)* [*29] ([2]Under Second Circuit law, where a *plaintiff* seeks to make out a case of *discrimination* 'by pointing to the disparate treatment of a purportedly similarly situated employee, the *plaintiff* must show that [ ]he shared sufficient employment characteristics with that comparator so that they could be considered similarly situated.'[2] (alteration in original) (quoting *Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)*)).

*HN10* [2]An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct.[2] *Abdul-Hakeem, 2013 U.S. App. LEXIS 12718, 2013 WL 3111300, at *1* (quoting *Ruiz, 609 F.3d at 493-94* [*30] (internal quotation marks omitted)); *see also Graham v. Long Island R.R., 230 F.3d 34, 39-40 (2d Cir. 2000)* ([2]We have said that to satisfy *Shumway*'s 'all material respects' standard for being similarly situated, a *plaintiff* must show that her co-employees were subject to the same performance evaluation and discipline standards. In addition, the standard we used in *Shum-*

*way* requires *plaintiff* to show that similarly situated employees who went undisciplined engaged in comparable conduct.[2] (citations omitted)). [2]Ordinarily, whether other employees are similarly situated is a factual issue that should be submitted to a jury, but '[t]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'[2] *Sweeney v. Leone, No. 05-CV-871, 2006 U.S. Dist. LEXIS 57358, 2006 WL 2246372, at *13 (D. Conn. July 31, 2006)* (quoting *Harlen Associates v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001))*; *see also Lugo v. City of New York, No. 12-CV-3565, 518 Fed. Appx. 28, 2013 U.S. App. LEXIS 8855, 2013 WL 1811271, at *2 (2d Cir. May 1, 2013)* (the *plaintiff* had not provided [2]any information from which a reasonable jury could conclude that the officers referenced were [*31] similarly situated to[2] the *plaintiff*).

*Plaintiff* has not shown that Allen and Douglas were similarly situated to him. *Plaintiff* was the only guard who worked four days a week and had primary responsibility for the security of the Clinic where the equipment went missing. (Pl. Dep. 95:5-96:11, 97:4-98:15, 131:11-24, 132:1-7, 134:13-20.) Allen worked one day each week and Douglas worked as a [2]floating[2] security guard when needed. *See Payne v. Huntington Union Free Sch. Dist., 219 F. Supp. 2d 273, 281 (E.D.N.Y. 2002)* (*HN11* because [2][i]t is often the case, for varied reasons, that temporary or part-time employees are treated differently than full-time or permanent employees,[2] any similarly-situated group must be comprised of employees of the same employment level as *plaintiff*). In addition, unlike Allen and Douglas, both of whom followed security protocol, *Plaintiff* admitted that he did not follow security protocol of inspecting large bags and packages that were removed from the premises. (Pl. Dep. 146:13-15, 170:9-14; Culbert Dec. ¶¶ 11, 13-15, Ex. 2.)[8] Based on these facts, *Plaintiff*, an employee who worked four of the five days the Clinic is open and who admit-

---

[8]   In addition, KHS was informed by Kingsbrook that the Clinic Director had told Plaintiff about the missing equipment several weeks earlier, but Plaintiff did not report the missing equipment to his supervisor. (Culbert Decl. ¶¶ 12-13; *see also* McKeon

ted that he did not inspect all **[*32]** large packages, is not similarly situated to Allen who worked one day each week, or Douglas who worked only when necessary to cover for ***Plaintiff*** or Allen when either was unavailable, both of whom followed security protocol and inspected large packages. *Sweeney*, 2006 U.S. Dist. LEXIS 57358, 2006 WL 2246372, at *13 (*plaintiff*-dispatcher who violated departmental policy regarding intercom usage, was not similarly situated to other employees where he [2]failed to produce evidence that other employees engaged in misconduct of comparable seriousness, or that defendants knew about and ignored other violations of the intercom policy[2]); *Bengard v. United Parcel Serv.*, No. 99-CV-8454, 2001 U.S. Dist. LEXIS 17649, 2001 WL 1328551, at *10-11 (E.D.N.Y. Aug. 22, 2001) (*plaintiff* fired for dishonesty was not similarly situated to employees who had not violated the company's dishonesty policy), *aff'd*, *48 F. App'x 350 (2d Cir. 2002)*.

Even assuming, however, that Allen and Douglas were similarly situated to ***Plaintiff***, ***Plaintiff***'s argument that his termination was a result of racial or national origin animus would be discredited because his alleged comparators, Allen and Douglas, are of the same race and national origin as ***Plaintiff*** and neither was terminated. Allen and Douglas are both African-Americans, both are of West Indian origin, and Douglas is from Trinidad and Tobago.[9] *See Turner v. Eastconn Reg'l Educ. Serv. Ctr*., No. 12-CV-788, 2013 U.S. Dist. LEXIS 35920, 2013 WL 1092907, at *8-9 (D. Conn. Mar. 15, 2013) (*plaintiff*'s allegation that a member of her same protected class [2]received favorable treatment would undermine any inference that the [d]efendants were motivated by [discriminatory] animus[2]); *Henny v. New York State*, 842 F. Supp. 2d 530, 555 n.24 (S.D.N.Y. 2012) **[*34]** (*plaintiff*'s argument that she was treated differently from other African-

American employees undermined any inference that she was terminated based on discriminatory animus against African-Americans); *Sookdeo-Ruiz v. GCI Grp*., No. 00-CV-3517, 2001 U.S. Dist. LEXIS 1209, 2001 WL 121942, at *4 (S.D.N.Y. Feb. 13, 2001) (*plaintiff* failed to establish her ***discrimination*** claim where she [2]failed to offer a shred of evidence that defendant had a discriminatory motive,[2] and defendant offered evidence that other members of ***plaintiff***'s protected class suffered no adverse employment actions), *aff'd*, *31 F. App'x 17 (2d Cir. 2002)*; *Adeniji v. Admin. for Children Servs., NYC*, 43 F. Supp. 2d 407, 426 n. 7 (S.D.N.Y. 1999) (collecting cases in which *plaintiffs* failed to establish an inference of ***discrimination*** where they were treated less favorably than members of their own protected classes).

Moreover, the fact that ***Plaintiff*** was *replaced* by Allen and Douglas — both African-Americans of West Indian origin, Douglas from Trinidad and Tobago — undermines any inference of racial or national origin animus **[*35]** in ***Plaintiff***'s termination. *See, e.g. Fleming v. MaxMara USA, Inc*., 371 F. App'x 115, 117 (2d Cir. 2010) (the *plaintiff* failed to establish that the circumstances surrounding her termination gave rise to an inference of racial ***discrimination*** where *plaintiff* was replaced by another black female); *Gue v. Suleiman*, No. 10-CV-8958, 2012 U.S. Dist. LEXIS 141295, 2012 WL 4473283, *8 (S.D.N.Y. Sept. 27, 2012) ([2]Any inference of racial ***discrimination*** was further undermined by the fact that [*plaintiff*] was replaced by a Black Haitian [employee], also in the same protected class as [*plaintiff*].[2]); *Pearson v. Lynch*, No. 10-CV-5119, 2012 U.S. Dist. LEXIS 39456, 2012 WL 983546, at *8-9 (S.D.N.Y. Mar. 22, 2012) (the *plaintiff* who was replaced by two African-American employees failed to establish a prima facie case

---

Decl. ¶ 8.) There was no evidence that either Allen or Douglas had such prior    **[*33]** knowledge. Plaintiff maintains that he did not know about the missing equipment prior to being told by Culbert. (Pl. Dep. 154:20-157:21; Pl. Opp'n 2-3; Pl. PMC Response 2.) However, even assuming that Plaintiff did not know about the missing equipment in advance of being told by Culbert, Plaintiff still fails to demonstrate that he is similarly situated to Allen and Douglas as discussed above.

[9]   There is no evidence before the Court that Defendant distinguished between individuals from various countries in the West Indies.

of racial *discrimination* because ²[a]n inference of discriminatory intent does not exist when the *plaintiff* and his or her replacement are of the same protected category²; *Pearson v. The Unification Theological Seminary* , 785 F. Supp. 2d 141, 155 (S.D.N.Y. 2011) (²it is impossible for a reasonable jury to find that [defendant] took [an adverse employment action] as a result of [ *plaintiff* s] race² when *plaintiff* was replaced by an individual who [*36] was also African-American); *Catanzaro v. City of New York* , No. 10-CV-Case 1825, 2011 U.S. Dist. LEXIS 9623, 2011 WL 335648, at *5 (S.D.N.Y. Jan. 25, 2011) (any suggestion of *discrimination* in failing to hire *plaintiff* was ²undermined by the fact that the individual hired was himself a member of the protected class²), aff'd, *486 F. App'x 899 (2d Cir. 2012)*; *DeJesus v. Dist. One Cmty. Educ. Council* , No. 08-CV-10666, 2010 U.S. Dist. LEXIS 98236, 2010 WL 3959624, at *4 (S.D.N.Y. Sept. 14, 2010) (²The fact that *plaintiff* s immediate replacement is of the same protected classes

effectively precludes *plaintiff* from establishing that her termination occurred under the requisite circumstances giving rise to an inference of *discrimination*²); *Fleming v. MaxMara USA, Inc* ., No. 06-CV-6357, 2010 U.S. Dist. LEXIS 39108, 2010 WL 1629705, at *9 (E.D.N.Y. Apr. 21, 2010) ( *plaintiff* s *discrimination* claim was ²clearly meritless² where *plaintiff* was replaced by a member of her own protected class and failed to present ²other facts from which the inference' of *discrimination* could be drawn²); *Pilgrim v. McGraw-Hill Companies, Inc* ., 599 F. Supp. 2d 462, 480 (S.D.N.Y. 2009) (²HN12 Where no evidence giving rise to an inference of *discrimination* has been presented, the fact that a *plaintiff* is replaced [*37] with an individual within his protected class undermines his attempt to establish a prima facie case of *discrimination*.² (quoting *Randolph v. CIBC World Mkts* ., No. 01-CV-11589, 2005 U.S. Dist. LEXIS 4839, 2005 WL 704804, at *12 (S.D.N.Y. Mar. 29, 2005))).[10]

## 3. Additional Considerations

---

[10]   Recognizing that his replacements are of the same racial group, Plaintiff argues instead that they are not the same national origin. (Pl. Opp'n 7.) Plaintiff does not dispute that Allen and Douglas are of West Indian origin. Plaintiff argues that they are not from his specific country of origin, Trinidad and Tobago, and, therefore, they are not the same national origin as Plaintiff. Plaintiff's argument is factually incorrect as to Douglas, and is not supported by the law. Defendant presented the sworn statement of Culbert, Director of Security at KHS, that Douglas, one of the two security guards who Plaintiff uses as a comparator and who replaced Plaintiff, is from Trinidad and Tobago, the same country as Plaintiff. (Culbert Decl. ¶ 6.) Indeed, Plaintiff admitted during his deposition and at oral argument that he does not know Douglas's country of origin. (Pl. Dep. 147:5-12.) There is no contradictory evidence from which a jury could reasonably find otherwise. [*38] Therefore, Plaintiff was replaced by someone of the same race and national origin class. In addition, many courts in this Circuit have recognized individuals of West Indian origin as being of the same national origin class. *See, e.g.*, *Robinson v. Gucci Am* ., No. 11-CV-3742, 2012 U.S. Dist. LEXIS 10014, 2012 WL 259409, at *1 (S.D.N.Y. Jan. 27, 2012) (defining plaintiff's national origin as West Indian); *Lawson v. New York City Bd. of Educ* ., No. 09-CV-1335, 2011 U.S. Dist. LEXIS 127789, 2011 WL 5346091, at *1-2 (S.D.N.Y. Aug. 30, 2011) (comparing treatment of West Indian individuals and individuals of other national origins), *report and recommendation adopted*, No. 09-CV-1335, 2011 U.S. Dist. LEXIS 127676, 2011 WL 5346090 (S.D.N.Y. Nov. 4, 2011); *Cole v. Cent. Park Sys., Inc* ., No. 09-CV-3185, 2010 U.S. Dist. LEXIS 99173, 2010 WL 3747591, at * 3 (E.D.N.Y. Sept. 20, 2010) (defining plaintiff's national origin as West Indian); *Matthias v. Ready Workers Mgmt. Corp* ., No. 08-CV-7245, 2009 U.S. Dist. LEXIS 85677, 2009 WL 2985696, at *9 (S.D.N.Y. Sept. 18, 2009) (finding five other employees of West Indian background to be of the same national origin as plaintiff); *Nicholls v. Brookdale Univ. Hosp. & Med. Ctr* ., No. 03-CV-6233, 2005 U.S. Dist. LEXIS 12582, 2005 WL 1521239, at *1 (E.D.N.Y. June 22, 2005) (defining plaintiff's national origin as West Indian), aff'd, 205 F. App'x 858 (2d Cir. 2006); [*39] *Mark v. Brookdale Univ. Hosp* ., No. 04-CV-2497, 2005 U.S. Dist. LEXIS 12584, 2005 WL 1521185, at *26 (E.D.N.Y. June 22, 2005) (comparing plaintiff's treatment to that of non-black or non-West Indian employees). Thus, even though Allen is not from Trinidad and Tobago but because he is from another country in the West Indies, arguably, Allen can be considered of the same national origin as Plaintiff. *But see* *Emmons v. City Univ. of New York* , 715 F. Supp. 2d 394, 415 (E.D.N.Y. 2010) (distinguishing between plaintiff's Trinidadian national origin and her West Indian ethnicity). *See generally* *Shah v. Wilco Sys., Inc* ., No. 99-CV-12054, 2001 U.S. Dist. LEXIS 13393, 2001 WL 1006722, at *3 (S.D.N.Y. Aug. 31, 2001) (²In *Espinoza v. Farah Mfg. Co* ., 414 U.S. 86, 88, 94 S. Ct. 334, 38 L. 2d 287 (1973), the Supreme Court held that, in the context of Title VII, '[t]he term national origin on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came.' . . . the EEOC has adopted a broader definition, which prohibits ². . . the denial of equal employment opportunity because of an individual's, or his or her ancestor's place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national [*40] origin group.'² (internal quotation marks omitted) (citation omitted)), aff'd, 76 F. App'x 383 (2d Cir. 2003).

SCOTT WEISS

2013 U.S. Dist. LEXIS 107111, *37

Additional evidence in the record also demonstrates that *Plaintiff* cannot establish that *discrimination* played any role in his termination. The decision to terminate *Plaintiff* was made by Culbert with the consent of Perkins and McFarlane, both of whom are African-American and of West Indian origin.[11] (Culbert Decl. ¶¶ 3, 5-6.) Courts have recognized that *HN13* an allegation that a decision is motivated by racial or national origin animus is weakened when the decisionmakers are members of the protected class as the *plaintiff*. *See, e.g., Klings v. New York State Office of Court Admin.*, No. 04 -CV-3400, 2010 U.S. Dist. LEXIS 33434, 2010 WL 1292256, at *9 (E.D.N.Y. Apr. 5, 2010) (*plaintiff* failed to establish that defendant's decision to not promote her gave rise to an inference of *discrimination* where, among other things, supervisors who stated they would not have recommended *plaintiff* for promotion were of the same protected class as *plaintiff*); *Eder v. City of New York*, No. 06-CV-13013, 2009 U.S. Dist. LEXIS 11501, 2009 WL 362706, at *8 (S.D.N.Y. Feb. 12, 2009) (²any inference of *discrimination*, without additional [*41] evidence, is not warranted,² where *plaintiff* and *plaintiff*'s ²immediate supervisor who assessed [p]laintiff's performance and determined that it was lacking, are members of the same protected class²); *Tucker v. New York City*, No. 05-CV-2804, 2008 U.S. Dist. LEXIS 76900, 2008 WL 4450271, at *5 (S.D.N.Y. Sept. 30, 2008) (any inference of race *discrimination* is undermined by the fact that *plaintiff* worked for several individuals who were also African-American), *aff'd*, *376 F. App'x 100 (2d Cir. 2010)*; *White v. N.Y.C. Dep't of Educ.*, No. 05-CV-2064, 2008 U.S. Dist. LEXIS 79002, 2008 WL 4507614, *6 (E.D.N.Y. Sept. 30, 2008) (the fact that the denial of additional resources came from *plaintiff*'s own African-American supervisor, a female teacher in the same protected class as *plaintiff*, rendered *plaintiff*'s ²speculative and conclusory claims of racial, ethnic or gender prejudice even less plausible²); *Fosen v. N.Y. Times*, No. 03-CV-3785, 2006 U.S. Dist. LEXIS 75662, 2006 WL 2927611, at *5 (S.D.N.Y. Oct. 11, 2006) (any inference of *discrimination* was ²critically undermined² by the fact that the decisionmakers belonged to the same protected class as did the *plaintiff*); *Connell v. Consol. Edison Co.*, 109 F. Supp. 2d 202, 210 (S.D.N.Y. 2000) (*plaintiff* failed to demonstrate *discrimination* [*42] where decisionmakers were members of the same protected class (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991))).

In addition, *Plaintiff* was hired by the [*43] same individual who played a role in his termination and therefore, *Plaintiff*'s claim that his termination was a result of racial and national origin animus is even further undermined. *Plaintiff* was hired by Perkins, and Perkins was one of the two individuals who concurred in the decision to terminate *Plaintiff*. *See Filozof v. Monroe Cmty. Coll.*, 411 F. App'x 423, 427 (2d Cir. 2011) (²HN15 [W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.² (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997))); *Mastrolillo v. Conn.*, 352 F. App'x 472, 474 (2d Cir. 2009) (*plaintiff* failed to establish an inference of *discrimination* because ²she submitted no evidence indicating that she was treated differently than men or that men were given preferential treatment,² and, ²[m]oreover, the decision not to renew her contract was made by

---

[11] Plaintiff's argument in his opposition to the motion that Culbert and McKeon, both of whom are Caucasian, were responsible for his termination is directly contradicted by his deposition testimony and must be disregarded. *See Lam v. Sephora USA Inc.*, 488 F. App'x 487, 490 (2d Cir. 2012) (district court did not err in concluding that plaintiff's statement that contradicted his prior deposition testimony did not ²create a factual issue that was genuine²); *Jones v. N.Y.C. Health & Hosps. Corp.*, 102 F. App'x 223, 226 n.2 (2d Cir. 2004) (²It is well settled in this circuit that *HN14* a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.² (quoting *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987)); *Britt v. Merrill Lynch & Co., Inc.*, No. 08-CV-5356, 2011 U.S. Dist. LEXIS 96881, 2011 WL 4000992, at *9 (S.D.N.Y. Aug. 26, 2011) (plaintiff's argument that directly contradicted her deposition testimony and was unsupported by the record did not create a factual dispute).

SCOTT WEISS

the same individual who initially recommended that the college consider her for the teaching position[2]); *Kaplan v. Beth Israel Med. Ctr* ., No. 07-CV-8842, 2010 U.S. Dist. LEXIS 32200, 2010 WL 1253967, at *5 (S.D.N.Y. Mar. 31, 2010)  [*44] (the [2]same actor doctrine[2] negated any inference of age *discrimination* where the same individual who hired the *plaintiff* was also one of the two individuals involved in the *plaintiff* s termination).

Moreover, KHS continued to hire and employ individuals of West Indian Origin, further undermining *Plaintiff* s claim. (*See* Culbert Dec. ¶¶ 3, 6.) KHS's workforce is over 90% African-American, and a large proportion of KHS's African-American employees are of West Indian origin. (*Id.*) *See Wynn v. N.Y., Office of Children & Family Servs* ., 506 F. Supp. 2d 215, 220 (W.D.N.Y. 2007) ( *plaintiff* failed to establish an inference of racial *discrimination* where sixty percent of defendant's employees were African -American and there was no evidence that other African-American employees were receiving unsatisfactory annual performance reviews or suspensions); *Johnson v. N.Y.C. Board of Educ* ., No. 96-CV-4472, 2000 WL 1739308, at *6-7 (E.D.N.Y. 2000) (dismissing *plaintiff* s age and race-related *discrimination* claims based on [2]an excessively monitored environment[2] because *plaintiff* failed to offer any evidence that her employer's activity was motivated by illegal *discrimination*, did not allege any [2]instance [*45] of race or age-based animosity,[2] such as [2]remarks, gestures, or innuendoes based on race or age,[2] and the racial demographics of the workplace, which included a number of other African-American employees, all of whom were receiving satisfactory evaluations, did not imply *discrimination*). *Plaintiff* does not dispute that many of KHS's security guards are of West Indian origin. *Plaintiff* argues instead that they are not from Trinidad and Tobago and are therefore of a different national origin. Even if true, *Plaintiff* has presented no evidence from which a jury could reasonably conclude that *Plaintiff* s termination was as a result of *discrimination* because of *Plaintiff* s national origin as someone from Trinidad and Tobago, especially where, as

here, one of *Plaintiff* s replacements is from Trinidad and Tobago.

*Plaintiff* has failed to establish a prima facie case of *discrimination* based on race or national origin.

## ii. Pretext

Even assuming that *Plaintiff* could establish a prima facie case, *Plaintiff* cannot meet his *burden* of establishing pretext and his claim would nevertheless fail for this reason. Defendant presented evidence that *Plaintiff* was terminated because he was the full-time security  [*46] guard responsible for the Clinic, failed to follow proper security procedures, failed to report the loss of the equipment and was [2]detached and nonchalant[2] during the investigative interview. (Culbert Decl. ¶ 15-16; KHS Investigation Memorandum 1-3.) These are legitimate reasons for *Plaintiff* s termination, even if Defendant was erroneous in reaching its conclusion. *See Miller v. Nat'l Assoc. of Sec. Dealers, Inc* ., 703 F. Supp. 2d 230, 247 (E.D.N.Y. 2010) ([2]The relevant inquiry is not whether the performance-based justification for *plaintiff* s termination articulated by defendant is accurate or fair, but whether *plaintiff* can show any evidence that it was not the actual justification. *Plaintiff* cannot accomplish this by stating his disagreement with his supervisors' negative assessment of his performance, even [if he] has evidence that the decision was objectively incorrect.'[2] (alteration in original) (citations and internal quotations marks omitted)); *Oliveras v. Wilkins*, No. 06-CV- 3578, 2012 U.S. Dist. LEXIS 110908, 2012 WL 3245494, at *14 (S.D.N.Y. June 26, 2012) (holding that even if employer's conclusion that *plaintiff* was responsible for an argument was in error, [2]that error in and of itself would not allow  [*47] one to infer a gender-based discriminatory motive underlying the decision to terminate *plaintiff*[2]), *report and recommendation adopted*, *No. 06-CV-3578, 2012 2012 U.S. Dist. LEXIS 110938, WL 3245493 (S.D.N.Y. Aug. 3, 2012)*; *Coltin v. Corp. for Justice Mgmt., Inc* ., 542 F. Supp. 2d 197, 205 (D. Conn. 2008) (finding that, even if decisionmaker was incorrect in her understanding and imple-

mentation of defendant's policies, or even if _**plaintiff**_ implicitly had permission to engage in the allegedly improper conduct, there was no evidence that wrongful _**discrimination**_ played a role in _**plaintiff**_'s termination); _Sharpe v. Utica Mut. Ins. Co ., 756 F. Supp. 2d 230, 250 (N.D.N.Y. 2010)_ ([2][T]he fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.[2] (citing _Rodriguez v. City of New York , 644 F.Supp.2d 168, 187 (E.D.N.Y. 2008)))_; _Randall v. Potter , No. 01-CV-2097, 2004 U.S. Dist. LEXIS 3688, 2004 WL 439491, at *5 (S.D.N.Y. Mar. 9, 2004)_ (finding that even if defendant-employer terminated _**plaintiff**_ based [*48] on an incorrect belief that _**plaintiff**_ had engaged in improper conduct, that belief did not establish an inference of _**discrimination**_); _Williams v. McCauseland , No. 90 -CV-7563, 1995 U.S. Dist. LEXIS 13341, 1995 WL 548862, at * 13 (S.D.N.Y. Sept. 15, 1995)_ (explaining that failure to fulfill job responsibilities is a legitimate reason for termination and granting employer's motion for summary judgment).

To avoid summary judgment, _**Plaintiff**_ must offer evidence from which a reasonable jury could conclude by a preponderance of the evidence that racial or national origin _**discrimination**_ played a role in the adverse action taken by Defendant. _See Holcomb , 521 F.3d at 141._ A [2] _**plaintiff**_ is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.[2] _Id . at 138_ (quoting _Cronin v. Aetna Life Ins. Co ., 46 F.3d 196, 203 (2d Cir. 1995)); see also Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. , __, 133 S. Ct. 2517, 2526, 186 L. Ed. 2d 503 (June 24, 2013); Garcia v. Hartford Police Dep't , 706 F.3d 120, 127 (2d Cir. 2013)._ _**Plaintiff**_ asserts only factual challenges to [*49] Defendant's determinations which led to his termination —

he was never trained about proper security procedures, did not know about the missing equipment and therefore did not fail to report it, and was surprised at being attacked during the interview but was not detached and nonchalant. He states that since these reasons offered by Defendant are untrue, they were made simply to mask Defendant's discriminatory intent. However, the fact that an employee [2]disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.[2] _Grant v. Roche Diagnostics Corp ., No. 09-CV-1540, 2011 U.S. Dist. LEXIS 79994, 2011 WL 3040913, at *11 (E.D.N.Y. July 20, 2011)_ (quoting _Kalra v. HSBC Bank USA, N.A ., 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008)); see also Fleming , 371 F. App'x at 117-18_ ( _**plaintiff**_'s disagreement with her employer over whether her behavior was inappropriate was not enough to allow a rational factfinder to find that defendants' proffered reasons for _**plaintiff**_'s termination were pretextual); _Soderberg v. Gunther Int'l, Inc ., 124 F. App'x 30, 32 (2d Cir. 2005)_ [*50] ([2][I]t is not the function of a fact-finder to second-guess business decisions regarding what constitutes satisfactory work performance.[2] (internal quotation marks omitted)); _McNamee v. Starbucks Coffee Co ., 914 F. Supp. 2d 408, No. 10-CV-6508, 2012 WL 6628879, at *8 (W.D.N.Y. 2012)_ ([2]Where the employer's proffered reason is that the employee's job performance was unsatisfactory, the employee's opinion to the contrary, by itself, is insufficient to raise a triable issue of fact as to pretext.[2]).

Even if the decisions made by Defendant were incorrect and _**Plaintiff**_ had presented evidence such that a jury [2]could conclude that [D]efendant['s] stated reasons for firing [P]laintiff were pretextual,[2] summary judgment is still appropriate where, as here, [2][P]laintiff has not demonstrated that the asserted pretextual reasons were intended to mask . . . _**discrimination**_.[2] _Schnabel v. Abramson , 232 F.3d 83, 88 (2d Cir. 2000); see also Kennedy v. Related Mgmt ., 403 F. App'x 566, 568 (2d Cir. 2010)_

(²[E]ven if we were to assume that [defendant's] asserted reason [for rejecting ***plaintiffs***' application] was pretextual, there is no evidence in the record from which a reasonable jury could find that it was a pretext [*51] to hide a discriminatory motive.²); *Singh v. Air India Ltd ., 108 F. App'x 9, 10 (2d Cir. 2004)* (affirming dismissal of ***plaintiff***'s *discrimination* claim because, even if the evidence ²did demonstrate pretext,² ***plaintiff*** failed to ²present evidence that would permit a rational jury to conclude that this was a pretext for age ***discrimination***²).

***Plaintiff*** simply has not presented any evidence from which a jury could reasonably infer that ***Plaintiff***'s termination occurred under circumstances that gave rise to any inference of discriminatory intent. ***Plaintiff*** cannot establish that ***discrimination*** played any role in his termination because, among other things, ***Plaintiff*** was not similarly situated to Allen and Douglas, Allen and Douglas are of the same race and national origin as ***Plaintiff*** and ***Plaintiff*** was replaced by Allen and Douglas. Moreover, the decision to terminate ***Plaintiff*** was made with the consent of two decisionmakers of ***Plaintiff***'s same race and national origin, ***Plaintiff*** was hired by one of the individuals who played a role in his termination, and Defendant continued to hire and employ individuals of West Indian origin. ***Plaintiff*** therefore cannot establish ***discrimination*** based on [*52] his race or national origin. Defendant's motion for summary judgment as to ***Plaintiff***'s claim of racial and national origin ***discrimination*** is granted.

**c. *Plaintiff*'s Retaliation Claim**

***Plaintiff*** claims that he was terminated in retaliation for his mother Gemma Moore's ²protected activity² — allegedly asking a question at a Kingsbrook diversity training session in May 2009 regarding ²whether a claim of racism was actionable against a company that put white people into the highest positions of power . . . while at the same time excluding more qualified African American employees from those power positions.² (App. A ¶ 10.)

***Plaintiff*** alleges that his mother ²had a distinguished history of defending and speaking out on behalf of other African American employees at Kingsbrook who were subjected to ***discrimination*** by Kingsbrook.² (App. A ¶ 9.) For the reasons discussed below, ***Plaintiff*** has failed to establish that Defendant fired him in retaliation for his mother's action.

*HN16* Claims of retaliation for engaging in protected conduct under Title VII are examined under the *McDonnell Douglas **burden*** shifting test. *McDonnell Douglas Corp ., 411 U.S. at 802; see Summa v. Hofstra Univ ., 708 F.3d 115, 125 (2d Cir. 2013)* [*53] (²The ***burden***-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation claims under . . . Title VII².) Under the test, ²[f]irst, the ***plaintiff*** must establish a *prima facie* case of retaliation. If the ***plaintiff*** succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the ***plaintiff*** alleges was retaliatory.² *Fincher v. Depository Trust and Clearing Corp ., 604 F.3d 712, 720 (2d Cir. 2010)* (citations omitted); *see also Tepperwien v. Entergy Nuclear Operations, Inc ., 663 F.3d 556, 568 n.6 (2d Cir. 2011)* (discussing the ***burden*** shifting analysis in retaliation context); *Jute v. Hamilton Sundstrand Corp ., 420 F.3d 166, 173 (2d Cir. 2005)* (same). If the employer succeeds at the second stage, then the presumption of retaliation dissipates, and the ***plaintiff*** must show that, but for the protected activity, he would not have been terminated. *See Nassar , 570 U.S. at ___, 133 S. Ct. at 2534* (a ***plaintiff*** ²must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer²); *see also Brooks v. D.C. 9 Painters Union ,* No. 10-CV-7800, 2013 U.S. Dist. LEXIS 93028, 2013 WL 3328044, at *4 (S.D.N.Y. July 2, 2013) [*54] (²If the defendant [articulates a legitimate, non-retaliatory reason], the ***plaintiff*** must offer 'proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'² (quoting *Nassar, 570 U.S. at ___,* 133 S. Ct. at 2534)).

### i. Prima Facie Case

*HN17* In order to establish a prima facie case of retaliation, a **plaintiff** must establish (1) participation in an activity protected by federal **discrimination** statute; (2) the defendant was aware of this activity; (3) an adverse employment action; and (4) a causal connection between the alleged adverse action and the protected activity. *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C* ., 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (citing *Lore v. City of Syracuse* , 670 F.3d 127, 157 (2d Cir. 2012)); *Summa* , 708 F.3d at 125; *Schiano v. Quality Payroll Sys., Inc* ., 445 F.3d 597, 608 (2d Cir. 2006). The **burden** at the summary judgment stage for **Plaintiff** is [2]'minimal' and 'de minimis,'[2] and [2]the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory [*55] motive.[2] *Jute* , 420 F.3d at 173 (citations omitted). Defendant agrees that **Plaintiff** was terminated, thereby satisfying the adverse employment action element. Defendant disputes the first, second, and fourth elements. For the reasons set forth below, **Plaintiff** has failed to establish a prima facie case of retaliation.

### 1. Protected Activity

**Plaintiff** has failed to demonstrate that his mother engaged in protected activity. *HN18* Under Title VII, protected activity includes both [2]opposing **discrimination** proscribed by the statute and . . . participating in Title VII proceedings.[2] *Jute* , 420 F.3d at 173; *see also* *Tepperwien* , 663 F.3d at 567 ([2]Title VII . . . prohibits an employer from taking 'materially adverse' action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity.[2] (citations omitted)); *McMenemy v. City of Rochester* , 241 F.3d 279, 283 (2d Cir. 2001) ([2][Title VII] prohibits **discrimination** by an employer against an employee who 'has opposed any practice made an unlawful employment practice' by Title VII or who has 'participated in any manner in an investigation, proceeding, or hearing' under Title VII.[2] (cita-

tions [*56] omitted)). Title VII's antiretaliation provision is [2]construed to cover a broad range of employer conduct,[2] including terminating an individual for the protected activity of a close family member. *Thompson v. N. Am. Stainless, LP* , 562 U.S. ___, ___, 131 S. Ct. 863, 868, 178 L. Ed. 2d 694 (2011); *see also Secka v. Dentserve Mgmt. Servs., Inc* ., No. 12-CV-2560, 2013 U.S. Dist. LEXIS 21195, 2013 WL 563364, at *5 (S.D.N.Y. Feb. 11, 2013) (stating that Title VII [2]covers a broad range of employer conduct, prohibiting action that might 'dissuade[ ] a reasonable worker from making or supporting a charge of **discrimination**,' including retaliation against third parties if a reasonable worker would be dissuaded by such action[2] (citing *Burlington N. & Santa Fe Ry. Co. v. White* , 548 U.S. 53, 61, 126 S. Ct. 2405, 165 L. Ed. 2d 345; *Thompson*, 562 U.S. at ___, 131 S. Ct. at 867-69)); *Schwartz v. N.Y. State Ins. Fund* , No. 12-CV-1413, 2012 WL 5587604, at *10 (S.D.N.Y. Aug. 28, 2012) (stating that Title VII's protection[2]extends to retaliation against employees for protected activity engaged in by close third-parties such as spouses[2] (citing *Thomson* , 562 U.S. at ---, 131 S. Ct. at 868)), *report and recommendation adopted*, *No. 12-CV-1413, 2012 U.S. Dist. LEXIS 163850, 2012 WL 5675989 (S.D.N.Y. Nov. 15, 2012)*; *Rodriguez-Monguio v. Ohio State Univ* ., No. 08-CV-00139, 2011 U.S. Dist. LEXIS 8944, 2011 WL 335854, at *14-15 (S.D. Ohio Jan. 31, 2011) [*57] (noting that third-party retaliation claims were permitted under *Thompson* and allowing **plaintiff** to state a claim for third-party retaliation by relying on the protected activity of her significant other, but ultimately granting employer's motion for summary judgment as **plaintiff** failed to show a causal connection between the protected activity and the alleged adverse actions), *aff'd*, *499 F. App'x 455 (6th Cir. 2012)*.

**Plaintiff** has alleged that his mother opposed **discrimination**. (Pl. Opp'n 7-8.) In order to oppose **discrimination**, **Plaintiff** or his mother need not have filed a formal complaint as long as he or she complained of discriminatory conduct. *See Cruz v. Coach Stores, Inc* ., 202 F.3d

*560, 566 (2d Cir. 2000)* (²[T]he law is clear that *HN19* opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection, this notion of 'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against *discrimination* by industry or by society in general, and expressing support of co-workers who have filed formal charges.'² (quoting *Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)));* [*58] *see also Bennett v. Hofstra Univ., 842 F. Supp. 2d 489, 500 (E.D.N.Y. 2012)* (Title VII does not require a formal complaint.); *Martin v. State Univ. of N.Y., 704 F. Supp. 2d 202, 227 (E.D.N.Y. 2010)* (²It is clearly established that 'informal complaints to supervisors constitute protected activity under Title VII.'² (citations omitted)); *Russell v. County of Nassau, 696 F. Supp. 2d 213, 237 (E.D.N.Y. 2010)* (²Indeed, Title VII's protection against retaliation extends to an employee who speaks out about *discrimination* not on her own initiative, but in answering questions during an employer's internal investigation if for no other reason than . . . [w]hen an employee communicates to her employer a belief that the employer has engaged in a form of employment *discrimination*, that communication virtually always constitutes the employee's opposition to the activity.² (alterations in original) (quoting *Crawford v. Metro. Gov't of Nashville and Davidson Cnty. Tenn ., 555 U.S. 271, 276, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009))* (internal quotation marks omitted)).

According to *Plaintiff*, following a diversity training hosted by Kingsbrook in or around May 2009, his mother, Gemma Moore, asked the attorney who conducted the diversity [*59] training lecture whether ²a claim of racism was actionable against a company that put white people into the highest positions of power, such as Vice President or Assistant Vice President, while at the same time excluding more qualified African American employees from those positions.² (App A ¶ 10.) *Plaintiff* alleges that Earnest Liggins, Kingsbrook's Human Resources Manager, overheard Gemma Moore's conversation with the attorney. (*Id.*

¶ 11.) *Plaintiff* admits that the question ²did not specifically mention Kingsbrook.² (*Id.* ¶ 10)

*Plaintiff* has failed to prove that his mother engaged in protected activity. *Plaintiff* has testified that this question was asked by his mother and where it was asked, but he concedes that he was not present when the question was asked and has no personal knowledge of it being asked by his mother or the circumstances under which it was asked. (Pl. Dep. 193:9-194:6.) *See DiStiso v. Cook , 691 F.3d 226, 230 (2d Cir. 2012)* (²*HN20* [W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify [*60] on the matters stated.'² (quoting *Fed. R. Civ. P. 56(c)(4)*). *Plaintiff* has not presented any evidence that the question was asked by his mother or that the question was asked at a diversity training lecture. *See Billhofer v. Flamel Technologies, S.A ., No. 07-CV-9920, 2013 U.S. Dist. LEXIS 32495, 2013 WL 866778, at *3 (S.D.N.Y. Mar. 8, 2013)* (²*HN21* [T]he nonmoving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.² (quoting *Morris v. Lindau , 196 F.3d 102, 109 (2d Cir. 1999))).* Therefore, there is no admissible evidence that this question was in fact asked by *Plaintiff*'s mother or that it was asked at a diversity training program.

Even assuming that *Plaintiff* had admissible proof that the question was asked by his mother, the question, in and of itself, is not protected activity. *HN22* In order to engage in protected activity, an individual must ²oppos[e] an employment practice made unlawful under [Title VII],² *Jackson v. N.Y. Dep't of Labor , 709 F. Supp. 2d 218, 227 (S.D.N.Y. 2010),* or ²participate in any investigation, proceeding, or hearing under Title VII,² *Martin , 704 F. Supp. 2d at 227-28.* [*61] Lodging informal complaints with supervisors or even certain third parties, such as a customer, may constitute protected activity, *Cruz , 202 F.3d at 566 (2d Cir. 2000);*

however, the key question is whether the individual opposed actions of the employer that she had a [2]good faith, reasonable belief . . . violated the law.[2] *Wimmer v. Suffolk Cnty. Police Dep't , 176 F.3d 125, 134 (2d Cir. 1999)* (quoting *Manoharan , 842 F.2d at 593*). The question as represented by ***Plaintiff*** was posed to a third party and asked about an unidentified entity, and is therefore not a statement opposing *discrimination* as required by Title VII. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C ., 716 F.3d 10, 17 (2d Cir. 2013)* (no protected activity where [2]nothing in [***plaintiff***'s] behavior . . . would have allowed her employer to 'reasonably have understood[] that [***plaintiff***'s] opposition was ***directed*** at conduct prohibited by Title VII'[2]); *Manoharan v. Columbia Univ ., 842 F.2d 590, 594 (2d Cir. 1988) ( **plaintiff** did not engage in protected activity where he [2]neither pointed out *discrimination* against particular individuals nor discriminatory practices by [the employer][2]). ***Plaintiff*** has not established [*62] that his mother was engaged in protected activity when she asked a question about an unidentified company. *Exchange, Inc., v. Global Healthcare Exchange, LLC , 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007)* (*HN23* to be considered protected activity, the employee's complaint must put the employer on notice that *discrimination* prohibited by Title VII is occurring).

## 2. Defendant's Knowledge of the Protected Activity

Even assuming that the question asked by ***Plaintiff***'s mother about an unidentified company was protected activity, ***Plaintiff***'s retaliation claim nevertheless fails because ***Plaintiff*** cannot show that Defendant was aware of his mother's activity. [2]*HN24* In order to satisfy the requirement of employer knowledge, an employee must have made it clear that she was opposing activity made illegal by Title VII.[2] *Risco v. McHugh , 868 F. Supp. 2d 75, 2012 WL 2161115, at *20 (S.D.N.Y. 2012)* (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp ., 136 F.3d 276, 292 (2d Cir. 1998)).* It is

not necessary that ***Plaintiff*** prove that the specific actors knew of the protected activity as long as ***Plaintiff*** can demonstrate general corporate knowledge. *See Papelino v. Albany Coll of Pharmacy of Union Univ ., 633 F.3d 81, 92 (2d Cir. 2011)* [*63] ([2]Even if the [corporate defendant's] agents who carried out the adverse action did not know about the ***plaintiff***'s protected activity, the 'knowledge' requirement is met if the legal entity was on notice.[2]); *Gordon v. N.Y.C. Bd. of Educ ., 232 F.3d 111, 117 (2d Cir. 2000)* ([2]A jury, however, can find retaliation even if the agent denies ***direct*** knowledge of a ***plaintiff***'s protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge.[2]); *Trivedi v. N.Y. Unified Court Sys. Office of Court Admin ., 818 F. Supp. 2d 712, 736 (S.D.N.Y. 2011)* ([2]A ***plaintiff*** need not prove that the specific actors within an organization were aware that the ***plaintiff*** made allegations of retaliation to make out a *prima facie* retaliation claim; rather, 'general corporate knowledge that the ***plaintiff*** has engaged in a protected activity' is sufficient.[2] (citations omitted)).

***Plaintiff*** has not presented any evidence that Kingsbrook or KHS was aware of his mother's question. Although ***Plaintiff*** alleged in his Complaint that [*64] Liggins, Kingsbrook's Human Resources Manager, overheard his mother's conversation with the attorney, ***Plaintiff*** has not presented any evidence to support that allegation. As discussed above, ***Plaintiff*** has no personal knowledge of the circumstances under which his mother's question was purportedly asked. (Pl. Dep. 193:9-194:6.) Moreover, there is no evidence that anyone at Kingsbrook or KHS became aware of the question after the training session. ***Plaintiff*** testified during his deposition that between the date of the training session in May of 2009 and his termination, no one at KHS or Kingsbrook said anything to him about the fact that his mother had asked the question. (Pl. Dep. 196:20-197:1.) While [2]general corporate knowledge that

the *plaintiff* has engaged in a protected activity² is sufficient, there is no evidence that Kingsbrook or KHS had any knowledge of the question posed by *Plaintiff*'s mother. *See Vuona v. Merrill Lynch & Co., Inc* ., No. 10-CV-6529, 919 F. Supp. 2d 359, 2013 U.S. Dist. LEXIS 9690, 2013 WL 271745, at *18 (S.D.N.Y. Jan. 24, 2013) ( *plaintiff* failed to establish the knowledge requirement where she failed to ²adduce[] facts sufficient to establish [general corporate] knowledge,² and ²[t]he surrounding circumstances **[*65]** . . . [did] not 'evidence knowledge of the protected activities'²); *Stephan v. W. Irondequoit Cent. Sch. Dist* ., 769 F. Supp. 2d 104, 109 (W.D.N.Y. 2011) (dismissing *plaintiff*'s retaliation claim because she ²offer[ed] no evidence that the [defendant] had any knowledge of [her] protected activity before it made the decision to terminate her employment), aff'd, *450 F. App'x 77 (2d Cir. 2011)*; *Livingston v. ADECCO* , No. 03-CV-4871, 2005 U.S. Dist. LEXIS 43346, 2005 WL 2305007, at *15-16 (E.D.N.Y. Sept. 21, 2005) (dismissing *plaintiff*'s retaliation claim because she ²elicited no evidence in support of her claim that [defendant] had knowledge of her purported protected activity, and because knowledge cannot be shown by inferences alone² (internal quotation marks omitted)).

## 3. Adverse Employment Action

*Plaintiff* has satisfied the adverse employment action prong. *Plaintiff* was terminated at the conclusion of the investigation into the loss of the optical equipment from the Clinic. Being fired is an adverse employment action. *See San-chez v. Conn. Natural Gas Co* ., 421 F. App'x 33, 35 (2d Cir. 2011) (listing third element of prima facie case of retaliation as ²termination from employment or other adverse employment action²); **[*66]** *Miller v. Praxair, Inc* .,

408 F. App'x 408, 410 (2d Cir. 2010) (noting that ²HN25 typical examples of actionable adverse employment actions include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities'² (quoting *Galabya v. N.Y.C. Bd. of Educ* ., 202 F.3d 636, 640 (2d Cir. 2000))); *Feingold* , 366 F.3d at 156 (²[ *Plaintiff*] suffered an adverse employment action when he was fired.²); *Reynoso v. All Foods, Inc* ., 908 F. Supp. 2d 330, 342 (E.D.N.Y. 2012) (stating *plaintiff* 's ²termination clearly constitutes an adverse employment action²).

## 4. Causal Connection

Assuming that *Plaintiff* could establish that his mother engaged in protected activity and that Defendant was aware that she did, *Plaintiff* arguably show a causal connection between this alleged protected activity and his termination. ²HN26 [A] *plaintiff* can indirectly establish a causal connection to support a *discrimination* or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action.²[12] *Gorzynski* , 596 F.3d at 110-11 (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty* ., 252 F.3d 545, 554 (2d Cir. 2001)); **[*67]** *see also Feingold* , 366 F.3d at 156 (²[T]he requirement that [ *plaintiff*] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two.²); *Treglia v. Town of Manlius* , 313 F.3d 713, 720 (2d Cir. 2002) (²We have held that a close temporal relationship between a *plaintiff* 's participation in protected activity and an employer's adverse actions can be sufficient to establish causation.²). There

---

[12]   HN27 The Supreme Court has recently ruled that under Title VII, a plaintiff ²must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.² *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. , , 133 S.Ct. 2517, 2534, 186 L. Ed. 2d 503 (June 24, 2013). While temporal proximity alone may still be sufficient at the prima facie stage, it is not sufficient at the pretext stage. *Compare Rivera v. N.Y.C. Dep't of Correction* , No. 06-CV-862, 2013 U.S. Dist. LEXIS 92085, 2013 WL 3297597, at *4 (E.D.N.Y. June 28, 2013) (incorporating the ²but-for² causations standard into the prima facie case); *with Brooks v. D.C. 9 Painters Union* , No. 10-CV-7800, 2013 U.S. Dist. LEXIS 93028, 2013 WL 3328044, at *4 (S.D.N.Y. July 2, 2013) **[*69]** (stating that ²but for² causation must be proved if the defendant articulates a legitimate, non-retaliatory reason for the adverse employment action).

is no brightline rule for how long after a _**plaintiff**_ has engaged in the protected activity that the adverse action must have occurred to benefit from the inference but generally courts measure the time in months. *See, e.g.* _Gorzynski , 596 F.3d at 110-11_ ([2]Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship.[2]); _Smith v. Town of Hempstead Dept. of Sanitation Sanitary Dist. No. 2 , 798 F. Supp. 2d 443, 457 (E.D.N.Y. 2011)_ ([2]With regard to the establishment of a prima facie case through temporal proximity, the [*68] Second Circuit has not drawn a bright line as to how closely an adverse employment action must follow protected activity to imply that retaliation has taken place.[2] (citing _Espinal v. Goord , 558 F.3d 119, 129 (2d Cir. 2009)); Laudadio v. Johanns , 677 F. Supp. 2d 590, 614 (E.D.N.Y. 2010)_ ([2]There is no bright-line beyond which a temporal relationship is too attenuated to prove causation.[2] (citations omitted)). Here, _**Plaintiff**_ was terminated within two months of his mother's allegedly protected activity, thereby satisfying the temporal proximity requirement.

## ii. Pretext

Even if _**Plaintiff**_ could establish a prima facie case of retaliation, _**Plaintiff**_ cannot prove that but for the question posed by his mother, he would not have been terminated. As discussed above, Defendant has established a legitimate, non-retaliatory reason for _**Plaintiff**_'s termination. Under the recent Supreme Court decision in *University of Texas Southwestern Medical Center v. Nassar*, [2]Title VII retaliation claims must be proved according to traditional principles of *but-for* causation . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.[2] _570 U.S. at ,_ 133 S. Ct. at 2533. Therefore, during the final stage of the _**burden**_ shifting framework, the _**plaintiff**_ must show that retaliation was a but-for cause of the adverse employment action. *See* _Brooks , 2013 U.S. Dist. LEXIS 93028, 2013 WL 3328044, at *4 (S.D.N.Y. July 2, 2013)_ (stating that [2]but for[2] causation must be proved if the defendant articulates a legitimate, non-retaliatory reason for the adverse employment [*70] action).

In order to establish but-for causation, _**Plaintiff**_ would have to prove that his termination would not have occurred in the absence of a retaliatory motive. _**Plaintiff**_ has provided no evidence that his termination was motivated by retaliation. Instead, _**Plaintiff**_ asks the Court to infer that his termination was retaliatory based on the timing of his termination. He claims that because he had worked at the Clinic for approximately three years and no equipment ever went missing, it is [2]therefore questionable that an 'unused' equipment is suddenly identified as missing around the same time that _**plaintiff**_'s mother was challenging the discriminatory actions of the defendant.[2] (Pl. Opp'n 3.) _**Plaintiff**_ argues that, since he was [2]terminated without cause[2] less than two months after his mother asked the question at the training session, [2][i]t is plain for any pertinent person to see that the Defendant just zeroed in on the _**Plaintiff**_ during the investigation, [2]since he was their target for termination.[2] (*Id.* at 8.)[13] As discussed above, there is no evidence that _**Plaintiff**_'s mother asked a question at the training session or that Defendant was aware of it. _**Plaintiff**_ was terminated following [*71] an investigation into the theft of clinic equipment,

---

13   Even under the [2]motivating factor[2] standard that was in use in the Second Circuit prior to the Supreme Court's recent decision in _Nassar_, 570 U.S. , 133 S.Ct. 2517, 186 L. Ed. 2d 503, [2]temporal proximity — while enough to support a prima facie case — was insufficient to establish pretext.[2] _Ben-Levy v. Bloomberg, L.P ., No._ 12-CV-2795, 518 Fed. Appx. 17, 2013 U.S. App. LEXIS 8843, 2013 WL 1810953, at *2 (2d Cir. May 1, 2013) (summary order); *see also* _Govori v. Goat Fifty, L.L.C ., No._ 12-CV -00857, 519 Fed. Appx. 732, 2013 U.S. App. LEXIS 5967, 2013 WL 1197770, at *2 (2d Cir. Mar. 26, 2013) (summary order) ([2][W]hile temporal proximity between events may give rise to a *prima facie case* of discrimination, 'such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext.'[2] (quoting _El Sayed v. Hilton Hotels Corp ., 627 F.3d 931, 933 (2d Cir. 2010)))._

and **_Plaintiff_** has failed to establish that he would have kept his job notwithstanding his alleged responsibility for, and inadequate reaction to, the theft of that equipment. **_Plaintiff_** has failed to meet his **_burden_** of providing sufficient evidence that, but for his mother's participation in the alleged protected activity, he would not have been fired. *See Nassar*, 570 U.S. at ___, 133 S.Ct. at 2532-33.

### III.  [*72] Conclusion

For the reasons discussed above, Defendant's motion for summary judgment is granted in its entirety.

SO  ORDERED:

/s/ MKB

MARGO K. BRODIE

United States District Judge

Dated: July 30, 2013

Brooklyn, New York




Positive
As of: January 21, 2014 2:41 PM EST

## Ofoedu v. St. Francis Hosp. & Med. Ctr.

United States District Court for the District of Connecticut
September 13, 2006, Decided ; September 13, 2006, Filed
Case No: 3:04cv1707 (PCD)

**Reporter:** 2006 U.S. Dist. LEXIS 68704; 2006     WL 2642415

ERNEST AFAM OFOEDU, Plaintiff, v. ST. FRANCIS HOSPITAL AND MEDICAL CENTER, CATHERINE SZENCZY and CAROL SCHUSTER, Defendants.

**Subsequent History:** Affirmed in part and appeal dismissed in part by *Ofoedu v. St. Francis Hosp. & Med. Ctr., 2008 U.S. App. LEXIS 14023 (2d Cir., July 2, 2008)*

**Prior History:** *Ofoedu v. St. Francis Hosp. & Med. Ctr., 234 F.R.D. 26, 2006 U.S. Dist. LEXIS 9205 (D. Conn., 2006)*

---
**Core Terms**
---

terminate, no evidence, discriminatory, summary judgment, written warning, medical record, prima facie case, retaliate, deposition, pretext, suspension, proffer, national origin, protected activity, gender, email, memorandum, pretextual, personal knowledge, deadline, staff, adverse employment action, conclusory, female, notice, summary judgment motion, delinquency, genuine, qualification, proximity

**Counsel:** [*1] For Ernest Afam Ofoedu, Plaintiff: Anthony C. Emengo, Anthony C. Emengo, Esq., Holtsville, NY; Janice N. Mack, Johnson & Mack, Meriden, CT.

For St Francis Hosp & Med Ctr (CT), Catherine Szenczy, Carol Schuster, Defendants: James F. Shea, Margaret J. Strange, Jackson Lewis, Hartford, CT.

**Judges:** Peter C. Dorsey, U.S. District Judge.

**Opinion by:** Peter C. Dorsey

---
**Opinion**
---

## RULING ON MOTION FOR SUMMARY JUDGMENT & MOTION TO STRIKE

Plaintiff Ernest Afam Ofoedu initiated this action seeking redress for alleged employment ***discrimination*** on the basis of ***race***, color, sex, and national origin and for retaliatory discharge, in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* (²Title VII²) and *42 U.S.C. § 1981*. [1] Defendants now move, pursuant to *Rule 56 of the Federal Rules of Civil Procedure*, for summary judgment on all remaining counts of Plaintiff's Complaint on the basis that there are no genuine issues of material fact and they are en-

---

[1] Plaintiff's Title VII claims of race and color discrimination were dismissed in this Court's October 7, 2005 Ruling on Defendants' unopposed Motion to Dismiss, on the ground that Plaintiff had failed to exhaust administrative remedies with regard to those claims. ( *See* Ruling on Defs.' Mot. Dismiss, Oct. 7, 2005, Doc. No. 38.) Plaintiff's Title VII claims against the individual defendants Catherine Szenczy and Carol Schuster were also dismissed on the ground that Title VII does not provide for individual liability. ( *See id.*)

2006 U.S. Dist. LEXIS 68704, *3

titled to judgment as *a* matter of law. For the reasons stated herein, Defendants' Motion for Summary Judgment [Doc. No. 66] will be **[*2] granted.**

Defendants also move to strike portions of Plaintiff's Affidavit. For the following reasons, Defendants' Motion to Strike [Doc. No. 77] will be **granted in part** and **denied in part.**

## I. MOTION TO STRIKE

Defendants move to strike certain portions of Plaintiff's Affidavit [Doc. No. 83], arguing that the Affidavit purports to attest to information about which Plaintiff has no personal knowledge and consists of speculation, conjecture, and **[*3]** conclusory allegations. Plaintiff has *not* filed *an* Opposition to Defendants' Motion to Strike.

*Rule 56(e) of the Federal Rules of Civil Procedure* provides that [2][w]hen *a* motion for summary judgment is made . . . *an* adverse party may *not* rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is *a* genuine issue for trial.[2] It also states that [2]*supporting* and opposing affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.[2] The Second Circuit has repeatedly recognized that [2]under *Rule 56(e)*, only admissible evidence may be used to resist *a* motion for summary judgment.[2] *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 218 n.6 (2d. Cir. 2000); accord *Kader v. Paper Software, Inc.*, 111 F.3d 337, 342-43 (2d. Cir. 1997); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

It is well established **[*4]** that courts may strike testimony that is *not* made on the basis of personal knowledge from consideration on summary judgment. *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d. Cir. 1988); *Keene v. Hartford Hosp., et al.,* 208 F. Supp. 2d 238, 242-244 (D.Conn. 2002) (striking portions of affidavit in opposition to summary judgment where affiant failed to establish personal knowledge). It is also well-settled that the court may strike portions of *an* affidavit that make generalized and conclusory statements. See *Hollander v. American Cyanamid Co.,* 172 F.3d 192, 198 (2d. Cir. 1999).

Defendants argue that portions of Plaintiff's Affidavit are *not* made on the basis of personal knowledge and should be stricken from the record. Specifically, Defendants challenge paragraphs 18, 21, 23, 25, 27, 29, and 88 as based on nothing more than speculation and conjecture. ( See Defs.' Mem. Supp. Mot. Strike at 5.) In paragraphs 18, 21, 23, 25, 27, 29, and 88, Plaintiff attests to various treatment he received and asserts that none of the other managers who were white and/or women were subjected to this treatment. Defendants challenge these **[*5]** comparisons as *not* based on personal knowledge, *claiming* that [2]Plaintiff does *not* attest that he worked with any of these purported white, female managers[2] and [2]fails to provide any factual predicate suggesting that he has personal knowledge of their job duties, their hours of work, their eligibility for overtime wages, their job performance or any other relevant circumstances of their employment.[2] ( See Defs.' Mem. Supp. Mot. Strike at 4-5.) Defendants also assert that Plaintiff fails to identify those with whom he compares his treatment and fails to attest that he [2]personally witnessed[2] any of these employees perform *a* job function. Id.

This Court finds that Plaintiff's comparisons to other managers meet the requirements of *Rule 56(e)*. Unlike the statements challenged in the cases cited by Defendants, the comparisons challenged here do *not* contain hearsay, [2] are *not* inconsistent with deposition testi-

---

[2] See *Hollander,* 172 F.3d at 198 (affirming order which granted in part former employer's motion to strike portions of employee's affidavit which it found was [2]riddled with inadmissable hearsay, conclusory statements and arguments, and information clearly not made on the affiant's personal knowledge[2]); *Dorazio v. M.B. Foster Elec. Co. et al.,* 157 Conn. 226, 253 A.2d 22 (1968) (holding that evidence set forth in a counter-affidavit was inadmissible hearsay).

2006 U.S. Dist. LEXIS 68704, *5

mony, [3] and do _**not**_ constitute information of which the affiant ²clearly² would have no personal knowledge. [4] The comparisons themselves are neither conclusory statements nor arguments, [5] and Plaintiff alleges the ²specific, overt acts² [6] which form the basis of his comparisons. [**6**]  Plaintiff represents that these comparisons are based on his personal knowledge and the fact that Plaintiff worked at St. Francis for two years renders him competent to testify to the comparisons he makes. Defendants' arguments regarding the sufficiency of Plaintiff's evidence are better addressed in the context of the summary judgment ruling.

Consequently, much of the language contained in paragraphs 18, 21, 23, 25, 27, 29, and 88 is preserved; only those precise portions deemed by the court to be conclusory and/or clearly _**not**_ within Plaintiff's personal knowledge are stricken. With regard to paragraph 18, the phrase ²contrary to [sic] subsisting and unamended contract of employment,² and the words ²arbitrarily² and ²unilaterally² are stricken. Paragraph 21 is stricken only to the extent it states ²over and beyond my tasks and duties as provides in my contract with Defendant² and ²so as to over [sic] burden me with responsibility and thereby cause my primary responsibility to suffer to as to portray my work as unsatisfactory.² Paragraphs 25 and 27 are stricken only to the extent they use the phrase ²contrary to my employment contract.² Paragraph 88 is stricken [**8**] to the extent it uses the word ²unfounded.² Paragraphs 23 and 29 are preserved in full.

Defendants also move to strike paragraphs 11, 12, and 13 on the ground that they contain conclusory allegations of _**discrimination**_ without any factual predicate. According to Defendants, these paragraphs contain unsubstantiated speculation that does _**not**_ amount to competent evidence that could be considered as part of this Court's deliberative process. Id. As with the paragraphs discussed above, paragraphs 11 though 13 are stricken only to the extent that Plaintiff makes allegations that are conclusory and/or _**not**_ within his personal knowledge. In paragraph 11, the phrases ²deliberately and without justification² and ²contrary to the terms of my contract of employment² are stricken. In paragraph 12, the phrase ²simply to portray me as inefficient and create _**a**_ false and pretextual substandard outlook of my work² is stricken. In paragraph 13, the phrase ²because of my, [sic] national origin and gender² is stricken, as are the words ²unlawfully² and ²pretextual.²

Although the portions of Plaintiff's Affidavit that have been preserved may be subject to question _**a**_ later phase of litigation, it [**9**] is _**not**_ appropriate for the court to strike these statements on summary judgment. The Second Circuit has clearly established that ²credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury.² _McClellan v. Smith,_ 439 F.3d 137, 144 (2d Cir. 2006) (quoting _Fischl v. Armitage,_ 128 F.3d 50, 55 (2d Cir. 1997)). Accordingly, the remaining portions of Plaintiff's affidavit will be credited as evidence for purposes of summary judgment and will _**not**_ be stricken from the record.

## II. PLAINTIFF'S RULE 56(_**a**_)(2) STATEMENT

Defendants, in their Reply brief, argue that summary judgment should be granted in their favor in part because Plaintiff's Rule 56(_**a**_)(2) Statement failed to comply with Local Rule 56(_**a**_)(2). ( See Defs.' Reply I at 3-4.) _**A**_ failure to meet the requirements of Rule 56(_**a**_)(2)

---

[3]   See _Flair Broad. Corp. v. Powers,_ 733 F. Supp. 179 (S.D.N.Y. 1990) (striking a portion of an affidavit where subsequent deposition testimony indicated that it was not made on personal knowledge).

[4]   See _Hollander,_ 172 F.3d at 198;  see also _Schiess-Froriep Corp. v. S.S. Finnsailor,_ 574 F.2d 123 (2d Cir. 1978) (holding that affidavit of counsel failed to comply with _Rule 56(e)_ because it ²plainly² was not based on personal knowledge of the affiant).

[5]   See _Hollander,_ 172 F.3d at 198.

[6]   See _Kletschka v. Driver,_ 411 F.2d 436 (2d Cir. 1969) (affirming a portion of a summary judgment order where plaintiff lodged only general charges of conspiracy and alleged no overt acts).

2006 U.S. Dist. LEXIS 68704, *9

can be grounds for summary judgment. *Willis v. Anthem Blue Cross & Blue Shield,* 193 F. Supp. 2d 436, 438 (D. Conn. 2001) (²The purpose of *a* Rule [56(*a*)2] Statement is to make affirmative statements which will aid and inform the Court. Quite naturally, the complete failure to comply with **[*10]** the requirements of such *a* rule would be grounds for summary judgment in and of itself.²) ( citing, among others, *Dusanenko v. Maloney,* 726 F.2d 82, 84 (2d Cir. 1984); *Wyler v. United States,* 725 F.2d 156, 158 (2d Cir. 1983); *Nucifora v. Bridgeport Board of Education,* 188 F. Supp. 2d 197 (D. Conn. 2001)). In this case, however, in *an* effort to avoid prejudice to Plaintiff based on the deficiencies of his attorney, this Court ordered Plaintiff to file *a* revised Rule 56(*a*)(2) Statement in compliance with the Local Rules. Plaintiff filed *a* revised Rule 56(*a*)(2) Statement within the time specified in this Court's Order, and as such, the revised statement will be considered. Any denials *not* properly ***supported*** by citations to the record, however, are improper and the material facts asserted by Defendant in its corresponding paragraph will be deemed admitted.[7] See *SEC v. Global Telecom Servs. L.L.C.,* 325 F. Supp. 2d 94, 109 (D. Conn. 2004) (² *Fed. R. Civ. P. 56* does *not* impose *an* obligation on *a* district court to perform *an* independent review of the record to find proof of *a* factual dispute. **[*11]** ²); *Root v. Liston,* 363 F. Supp. 2d 190, 191 n.1 (D. Conn. 2005); *Martin v. Town of Westport,* 329 F. Supp. 2d 318, 323 n.1 (D. Conn. 2004).

Defendants also submitted *a* Reply Memorandum to Plaintiff's Amended Rule 56(*a*)(2) Statement, in which they argue that Plaintiff's Amended Statement suffers from additional deficiencies. Those arguments will be addressed, as necessary, in the following section.

## III. MOTION FOR SUMMARY JUDG-MENT

### *A.* Background

Plaintiff was hired by St. Francis Hospital (²St. Francis²) on July 17, 2001 as *a* part-time Coding Specialist in the Medical Records Department. ( See Defs.' *Rule 56( a)*1 Statement P 1.) [8] Plaintiff **[*12]** was hired by Faye Davis, *a* black female from Jamaica, who was then employed as the Coding Manager in the Medical Records Department. ( Id. P 2.) Effective April 28, 2002, Plaintiff was promoted to the position of Transcription and Record Processing Manager in the Medical Records Department. ( Id. P 3; Ofoedu Dep. I at 99:6-25, 108:9-19, Aug. 10, 2005.)

In his Managerial position, Plaintiff supervised the medical records clerks and the transcriptionists. The medical records clerks were responsible for processing the medical records of discharged patients. (Defs.' Rule 56(*a*)(1) Statement PP 3-4.) The transcriptionists were responsible for transcribing medical records dictated by physicians. (Defs.' Mem. Supp. Mot. Summ. J. (²Defs.' Mem. Supp.²) 3.) Plaintiff was responsible for correcting deficiencies in medical records files so that the files could be placed in permanent storage, as well **[*13]** as for minimizing the number of incomplete files because they negatively affected the hospital's Medicare reimbursements and were *a* factor in meeting accreditation requirements. (Defs.' Rule 56(*a*)(1) Statement PP 3-4.) Plaintiff was also responsible for calculating the medical record delinquency rate and for suspending the privileges of physicians to practice at St. Francis who did *not* sign off on their reports or correct other deficiencies in their medical records in *a* timely manner. [9] ( Id. P 5.)

**[*14]** On or about March 26, 2003, Carol Schuster became the Director of Medical Re-

---

[7]   Plaintiff did not support his denials with any citations to the record in paragraphs 19, 21, 23, 26, 38 through 41, and 44 of his Amended Rule 56(a)(2) Statement, and as such, the material facts asserted by Defendants in paragraphs 19, 21, 23, 26, 38 through 41, and 44 of their Rule 56(a)(1) Statement are deemed admitted.

[8]   With regard to facts taken from Defendants' Rule 56(a)(1) Statement, the facts are admitted unless otherwise noted.

[9]   According to Defendants, part of Plaintiff's job duties included determining physician delinquency and then sending a series

cords and began supervising Plaintiff and other Medical Records employees, including Joyce Downey and Faye Davis. ( See Defs.' Rule 56( _a_ )(1) Statement P 6.) Ms. Schuster met with Plaintiff on November 18, 2003 and presented him with his 2003 performance evaluation, in which she identified several areas in which Plaintiff's performance required improvement. ( Id. PP 7-8.) For example, in Section 2 of the evaluation, Ms. Schuster noted:

> With regard to the Processing/ Analysis staff, I have requested but have  _**not**_  seen productivity measures. One of [Plaintiff's] goals for the up-coming year is to establish those measures and report monthly ......... At this point it is difficult to assess whether or  _**not**_  there is adequate coverage in all areas.

( Id. P 8.) Ms. Schuster also raised concerns about Plaintiff's failure to meet deadlines, writing:

> As  _**a**_  new manager within the Department, [Plaintiff] has worked hard to make significant improvements within his sections. He is making progress, but still has opportunities for improvement. During the next year, I would like to see [Plaintiff]  **[*15]**  be more

considerate of the department as  _**a**_  whole. I encourage him to work more closely with his peers and seek additional  _**support**_  from myself. [Plaintiff] is often late when assigned tasks and sometimes struggles with producing the desired outcomes. He should strive to be more timely and seek further explanation if the instructions are  _**not**_  clear.

( Id. P 9; Schuster Aff., Ex.  _**A**_ .) Plaintiff was rated as having rendered  _**an**_  overall ²quality performance² for the 2003 evaluation period. (Schuster Aff., Ex.  _**A**_ .) The Performance Appraisal included  _**a**_  section for Plaintiff to comment on his review, however, he did  _**not**_  provide comments. (Defs.' Rule 56( _a_ )(1) Statement P 10.) Defendants contend that Ms. Schuster had discussed her concerns regarding Plaintiff's performance several times with him prior to their meeting for his annual review. (Defs.' Mem. Supp. 5 ( citing Schuster Aff. P 4.).)

Defendants assert that Plaintiff's responsiveness and timeliness failed to improve, and as  _**a**_  result, Ms. Schuster met with Plaintiff on January 23, 2004, at which time she placed him on  _**a**_  Performance Improvement Plan (²PIP²) and provided him with  _**a**_  Quarterly Review of his job performance outlining  **[*16]**  her concerns and expectations going forward. [10] ( Id. PP 11

---

of letters to delinquent physicians requesting completion of the records. If the physicians failed to complete their records by a certain date, Plaintiff was responsible for issuing suspension notifications. (Schuster Aff. P 8; Ex. B to Schuster Aff.; Ofoedu Dep. I at 121:22-25, Aug. 10, 2005.) Plaintiff argues that, in practice, he did not have the power to suspend any physician, but was required to bring the issue to the attention of the co-chairs of the Medical Records Committee, who would intervene and get the physicians to sign off on their charts. ( See Pl.'s Rule 56(a)(2) Statement P 5; Ofoedu Aff. P 50.) Plaintiff, however, admits in his Rule 56(a)(2) Statement that he performed the practice at times, and testified during his deposition that it was his ²responsibility to make the decisions regarding physician suspensions² and that Ms. Schuster later removed this responsibility in late 2003 or early 2004. (Pl.'s Rule 56(a)(2) Statement P 5; Ofoedu Dep. I at 121:22-25.) Accordingly, the facts set forth in paragraph 5 of Defendants' Rule 56(a)(1) Statement are deemed admitted.

[10]   Although Plaintiff denies Defendants' assertions in this regard and claims in his Affidavit that Ms. Schuster never discussed a PIP with him, (Pl.'s Rule 56(a)(2) Statement PP 11-12; Ofoedu Aff. P 16), his denial is contradicted by his testimony at his deposition, where he identified the Quarterly Review of Performance, testified that he received it and that Ms. Schuster provided him with a copy of it, and conceded that it contained a review of his performance. (Ofoedu Dep. I at 216:8-221:17; Ofoedu Dep. II at 43:10-44:18, Nov. 8, 2005.) The document itself states twice, in bold print, ²Performance Improvement Plan.² Plaintiff also admits in his Rule 56(a)(1) Statement that he refused to sign the Quarterly Review at his January 23, 2004 meeting with Ms. Schuster and did not read it until it was presented to him at his deposition. ( See Pl.'s Rule 56(a)(2) Statement P 18.) The fact that Plaintiff refused to read the document when it was presented to him does not change the situation. As such, Plaintiff's denials of paragraphs 11 and 12, so far as they are predicated on his assertion that he never saw the Quarterly Review of Performance until this litigation, are disregarded.

SCOTT WEISS

-12; _see also_ Quarterly Rev., Schuster Aff., Ex. B.) Plaintiff argues that he was being singled out by Ms. Schuster, and asserts that none of the white or female managers were given _**a**_ quarterly review in January. (Ofoedu Aff. P 14.) Moreover, Plaintiff alleges that the January quarterly review purported to evaluate his work for the entire quarter, including the subsequent months of February and March. ( Id. P 15.) Plaintiff also alleges that Ms. Schuster falsely stated at their meeting that she had evaluated all other managers. ( Id. P 16.)

 **[\*17]**  As outlined in the Quarterly Review, Ms. Schuster discussed with Plaintiff his failure to respond to requests for information or emails in _**a**_ timely manner, his inability to follow-through on assigned tasks and to meet deadlines, and his inconsistent application of the process associated with physician suspensions. ( See Defs.' _Rule 56( **a**)_1 Statement P 12-13; Quarterly Rev.) Defendants allege that Ms. Schuster informed Plaintiff that he would be expected to respond to all requests for information within forty-eight hours of the request and would be expected to comply with deadlines and completion dates. (Defs.' Mem. Supp. 5-6.) Plaintiff denies having had any such issues. ( See Pl.'s Rule 56( _**a**_)(2) Statement P 13.)

Ms. Schuster also determined that Plaintiff was utilizing _**an**_ incorrect formula to determine the physician delinquency rate and was _**not**_ utilizing standard data regarding the number of discharges furnished by the hospital's finance department to determine the delinquency rate. ( See Defs.' Rule 56( _**a**_)(1) Statement P 14.) Defendants allege that when Ms. Schuster reviewed the previous six months of Plaintiffs' delinquency reports, she found ²gross inaccuracies² in the reports, **[\*18]**  and learned that the formula had been altered in mid-2003 to include  _**an**_ inappropriate and incorrect multiplication factor. ( Id. P 15; Schuster Aff. P 9.) When Ms. Schuster raised these issues with Plaintiff, he could _**not**_ explain why he changed the formula, how the change occurred, why the multiplication factor had been added to the formula, or why he had _**not**_ been using the correct data from the finance department. (Schuster Aff. P 9; Ex. B to Schuster Aff.) Because of

this alleged problem, Ms. Schuster decided to manage the process of determining the delinquency information for members of the hospital's medical staff and accordingly, took this responsibility away from Plaintiff. (Schuster Aff. P 10; Ex. B to Schuster Aff.) She asked Plaintiff to continue to prepare the required suspension letters for delinquent physicians, but told him that she wanted to review any letters before they were sent. (Schuster Aff. P 10; Ex. B to Schuster Aff.)

Plaintiff, however, contends that this allegation was fabricated by Ms. Schuster in _**an**_ effort to deflect attention from the fact that her department was _**not**_ doing well and notes that she has _**not**_ produced one such inaccurate report. ( See Pl.'s Rule 56( _**a**_)(2) Statement PP 14 -15; Ofoedu Aff. P 51.) Plaintiff also contends that he did _**not**_ use incorrect data or _**an**_ incorrect formula, but only utilized officially-provided data. ( See Pl.'s Rule 56( _**a**_)(2) Statement P 17.)

Defendants also contend that Plaintiff failed to follow the hospital's procedures for suspending physicians. (Defs.' Mem. Supp. 7; Schuster Aff. P 11.) Ms. Schuster found that Plaintiff continually failed to send suspension notices in _**a**_ timely manner and that there were several months in which he failed to send any suspension notices at all. (Schuster Aff. P 11.) According to Ms. Schuster, this was _**an**_ inconsistent and arbitrary application of the physician suspension process. ( Id.) In _**an**_ effort to improve his performance with regard to the physician suspension process, Ms. Schuster directed Plaintiff to work with her to learn the proper method to calculate physician delinquencies and to develop _**a**_ process to consistently and timely apply the suspension rules to all physicians. ( Id. P 12.)

At their meeting, Plaintiff agreed to attempt to respond to emails within forty-eight hours and to develop _**a**_ standardized process for monthly suspensions, ( see **[\*20]**  Ofoedu Dep. I at 218:24-219:8, Aug. 10, 2005), however, he disagreed with Ms. Schuster's evaluation of his performance and refused to sign the Quarterly Review. (Schuster Aff. P 13.) Plaintiff also

refused to read the Quarterly Review until it was presented to him at his deposition. (Defs.' Rule 56(_a_)(2) Statement P 18.)

Plaintiff continued to have problems adhering to the physician suspension process, as evidenced by _an_ event occurring in March 2004. Ms. Schuster had asked Plaintiff to have suspension notices prepared and ready for her review on the morning of March 24, 2004. (Schuster Aff. P 14.) Ms. Schuster was on vacation on March 24, but came into work in order to review the suspension notices she had requested. ( Id.) When she arrived at work, the suspension notices were _not_ available for her review, and she emailed Plaintiff to express her displeasure. ( Id.; see also Ex. C to Schuster Aff.) Ms. Schuster later learned, however, that Plaintiff had printed the suspension notices and was mailing them contrary to her instructions. (Schuster Aff. P 15.) Ms. Schuster contacted Plaintiff and told him to stop the mailing process. ( Id.) She reviewed the notices he had prepared [*21] the next day and observed that Plaintiff had prepared the wrong form letter, and accordingly, the notices had to be prepared again. ( Id.) Plaintiff acknowledged that he failed to provide the letters for Ms. Schuster's review and that he began sending them to physicians against her instructions. (Defs.' Rule 56(_a_)(1) Statement P 22.) [11]

[*22] During this period of time, Ms. Schuster became increasingly concerned about Plaintiff's ability to cooperate and work well with his staff and colleagues both inside and outside the Medical Records Department. [12] ( Id. P 23.) Defendants cite, as _an_ example, the fact that in February 2004, Joyce Downey prepared _a_ memorandum detailing the problems she had with Plaintiff during _a_ meeting organized to discuss ways to improve the performance of the Medical Records Department. ( Id. P 24; see also Downey Mem., Ex. K to Schuster Aff.) [13] Plaintiff asserts that his meeting with Ms. Downey on February 24, 2004 was _a_ cordial one, and attaches _an_ email that he sent to Ms. Schuster that afternoon, which lays out the results of the meeting and does _not_ suggest any disagreement. ( See Ofoedu Aff. P 73; Ofoedu email, Feb. 24, 2004, Ex. R to Pl.'s Mem. Opp.) There is also evidence that Ms. Schuster received several complaints from Plaintiff's staff and other individuals outside the department regarding his lack of cooperation, rudeness, and other inappropriate conduct. (Schuster Aff. P 38; Davis Dep. 122:5-18, 126:10-128:16, Nov. 9, 2005.)

On May 7, 2004, Ms. Schuster met with Plaintiff and Denise Currier, from St. Francis' human resources department, to discuss Ms. Schuster's concerns about Plaintiff's performance. (Schuster Aff. P 16.) Plaintiff was presented with

[11]

In Plaintiff's deposition, he admitted that Ms. Schuster asked him to put the suspension notices on the table in her conference room for her review, and that he failed to do so and sent the suspension letters out without her review. He acknowledged that doing so was against her instructions, but testified that it was an oversight and I apologized to her. ( See Ofoedu Dep. I at 243:7-18.) Although Plaintiff's Affidavit relays a contradictory set of events, it is well-established in the Second Circuit that a party may not create material issues of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony. Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997) ( citing Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996)). Accordingly, Defendants' version of events--as supported by Plaintiff's deposition testimony--will be credited.

[12]    This problem was identified by Catherine Szenczy as early as September 2002, when she noted in Plaintiff's annual performance review that although Plaintiff is enthusiastic and hardworking, his enthusiasm sometimes leads him to initiate changes that have not been well coordinated with his peers and his manager. There has also been some tension between [Plaintiff] and one of his colleagues. In addition to his departmental goals, [Plaintiff] needs to improve his professional relationships with his colleagues and work as part of a team. (2002 Perf. Rev., Ex. 8 to Strange Aff.) Ms. Szenczy gave him an overall quality rating. ( Id.)
[13]

Plaintiff contends that Defendants' assertion that he had problems with Ms. Downey is false, and points out that the Downey memorandum submitted by Defendants is an unsigned, undated note with no indication as to its origin. ( See Pl.'s Rule 56(a)(2) Statement P 24; Ofoedu Aff. P 73.) Because the memorandum has not been properly authenticated, it is not admissible evidence and therefore, has no probative value here. See Fed. R. Evid. 901; Fed. R. Civ. P. 56(e); Rohman, 215 F.3d at 218 n.6 (only admissible evidence may be used to support or resist a motion for summary judgment.)

SCOTT WEISS

*a* Final Written. Warning at that time, however, before Ms. Schuster and Ms. Currier could discuss the issues raised in the Final Written Warning with Plaintiff, he refused to meet with them **[*24]** and left the room. ( *Id.; see also* Final Written Warning, Ex. D to Schuster Aff.) Plaintiff did _**not**_ sign or read the Warning. (Ofoedu Dep. I at 270:19-272:4; see also Final Written Warning.) In the Warning, Ms. Schuster wrote that Plaintiff's performance did ² _**not**_ currently meet the expectation [sic] of Departmental Manager and fail[ed] to meet the established World Class Standards.² (Final Written Warning.) As examples of Plaintiff's poor performance, she noted that he had failed to: (1) ²follow directions from Director,² (2) ²respond timely to inquiries from the Director,² (3) ²plan, organize and complete tasks in the shortest [sic] most efficient manner or on time,² (4) ²take all positive steps to prevent recurrence of errors,² (5) ²apply all rules fairly,² (6) ²effectively handle concurrent assignments,² and (7) ²promote cooperative behavior within his staff or among the Medical Record Team.² (Final Written Warning.) She also raised two instances of insubordination by Plaintiff. (Final Written Warning.)

The first alleged instance of insubordination raised in the Final Written Warning occurred on March 9, 2004. (Schuster Aff. P 18; Final Written Warning.) Ms. Schuster, **[*25]** in the process of reviewing prior week's time sheets, discovered that Plaintiff had attempted to manipulate his vacation time by clocking into work shortly after midnight for *a* few hours and then taking the rest of the day off. Because he was _**an**_ exempt employee, Plaintiff's time sheet reflected that he had worked *a* full day. As *a* result, Plaintiff's time sheet for the week prior to March 9 indicated that he worked three days and took two vacation days even though he had taken three vacation days. (Schuster Aff. P 18; Final Written Warning.) Defendants contend that when Ms. Schuster raised this with Plaintiff, he began to argue with her and told her that he was going to investigate her. Ms. Schus-

ter immediately notified Ms. Szenczy of her conversation with Plaintiff. (Schuster Aff. P 18; Final Written Warning.)

The second alleged instance of insubordination raised in the Final Written Warning occurred in May 2004 when Plaintiff failed to arrange coverage for *a* third-shift employee who was on vacation for *a* two-week period beginning on May 9, 2004. (Schuster Aff. P 19; Final Written Warning.) Although Plaintiff had approved the employee's vacation request in March 2004, he had failed **[*26]** to arrange coverage for the shifts. [14] (Schuster Aff. P 19; Final Written Warning.) Plaintiff told Ms. Schuster *a* number of times that his department should be closed because he could _**not**_ find the necessary personnel to provide the coverage, however, Ms. Schuster told him that this was _**not an**_ option. (Schuster Aff. P 19; Final Written Warning.) In May 2004 Plaintiff had still _**not**_ found staff to cover the missing shifts and according to Defendants, attempted to force Paulette Moore, *a* part-time employee, to cover the shifts, which caused her to resign from her position. (Schuster Aff. P 19; Final Written Warning.) Ms. Schuster repeatedly told Plaintiff that he could _**not**_ require *a* part-time employee to cover extra shifts and that if he could _**not**_ find staff to do so, then he would have to cover the shift himself. Plaintiff, however, refused to do so, telling Ms. Schuster that he had already ²paid his dues.² (Schuster Aff. P 20; Final Written Warning.) Before the situation was resolved, Plaintiff commenced *a* medical leave of absence for ²stress² on May 10, 2004, as discussed below. (Schuster Aff. P 21; Ofoedu Dep. I at 291:14-292:17)

**[*27]** Defendants assert that another instance of insubordination-- _**not**_ raised in the Final Written Warning--occurred when Plaintiff was asked to attend *a* meeting with the gastrointestinal physicians at 6:30 *a*.m. on the morning of March 30, 2004 to discuss the untimely delivery of physician reports to doctors who had referred patients to the gasto-intestinal service for diagnostic tests. Defendants assert that Plain-

---

[14]  Defendants contend, and Plaintiff does not dispute, that Plaintiff was responsible for provided adequate staffing for his section of the Medical Records Department. (Defs.' Mem. Supp. 10.)

2006 U.S. Dist. LEXIS 68704, *27

tiff refused to attend the meeting, and Ms. Schuster had to attend in his place. (Schuster Aff. P 23.) [15] Plaintiff asserts that he was **_not_** supposed to be on duty at 6:30 _a_.m. and that Ms. Schuster had elected to attend the meeting herself rather than approve overtime pay for Plaintiff. (Pl.'s _Rule 56( a)_2 Statement P 28.)

[*28] Plaintiff complained to Catherine Szenczy, Senior Vice President and Chief Information Officer and Ms. Schuster's immediate supervisor, in March 2004 that Ms. Schuster's performance expectations were too demanding and alleged that Ms. Schuster had altered his time sheets. [16] (Defs.' Rule 56(_a_)(1) Statement P 46;  see also Ofoedu Dep. I at 256:4-258:20.) Plaintiff also **_claimed_**, in his deposition, that he wrote **_an_** email to Ms. Szenczy complaining that he was being treated unequally. ( See Ofoedu Dep. I at 258:8-20.) In **_an_** unsigned, undated document entitled ²Memo to Catherine,² attached as Plaintiff's Exhibit V, Plaintiff complains to Ms. Szenczy about his ²frustrations,² and the ²inconsistencies and clandestine approaches and selective applications of the hospital policies and procedures by [Ms. Schuster] toward [him] for more than seven months.........² ( See Ofoedu Memo. to Szenczy, Ex. V to Pl.'s Mem. Opp.) He writes that Ms. Schuster ²is overwhelming with work demands and deadlines that are clearly impossible to accomplish; all with _a_ purpose of proving to herself that I am 'incompetent' to do my job.² ( Id.) He discusses _a_ number of examples of her ²unreasonable [*29] demands.² For example, Plaintiff writes:

> By routinely including me in weekend activities she is purposely creating hardship in my personal life, because, as she knows, I spend the weekends with family in Boston. Besides, no other manager in the department is subjected to this type of abuse.

( Id.) Plaintiff also emphasizes, both in the memo and in his Rule 56(_a_)(2) Statement, the following incident:

> As _a_ credentialed staff, I need specific number of CEU's every two years to keep my accreditation. On May 2 and 3, there was _a_ seminar in Connecticut which I applied for and was denied by Carol. The reasons that she gave me were that ²the topics of the seminar are **_not_** related to your area.² . . . I even offered to pay for it myself, and she adamantly refused, saying ²can you afford to leave your areas?² I was appalled by this statement.

( Id.) Plaintiff concludes by saying that ²I am **_not_** quitting..... All I am asking is to be treated fairly by my supervisor, and for her to stop this harassment.² ( Id.)

[*30] On May 10, 2004, Ms. Schuster met with Plaintiff and provided him with _a_ memorandum in which she outlined three assignments that were overdue and one that was due to her by May 12, 2004. (Schuster Aff. P 23; Ex. F to Schuster Aff.) Ms. Schuster also outlined several deficiencies in Plaintiff's performance--i.e., _a_ backlog in analysis of inpatient records and persistent delays in the filing of transcribed reports--and asked Plaintiff to provide her with _a_ plan for addressing those issues. (Schuster Aff. P 23; Ex. F to Schuster Aff.) On that same day, Plaintiff began _a_ medical leave of absence for ²stress.² (Schuster Aff. PP 21, 24; Ofoedu Dep. I at 292:2-17)

Ms. Schuster believed that Plaintiff's areas of responsibility had continued to decline from acceptable standards. (Schuster Aff. P 25; Ex. F to Schuster Aff.) Specifically, Ms. Schuster determined that Plaintiff was well below the required performance standard in two areas: (1)

---

15   Defendants attach a note written by Ms. Schuster with regard to the March 30, 2004 meeting. In that note, she wrote that Plaintiff refused to attend the meeting and was ²unable to provide an acceptable reason.² She notes that she attended the meeting in his absence. (Ex. E to Schuster Aff.)

16   The parties do not dispute that Plaintiff complained to Ms. Szenczy, but they disagree as to whether the Complaint was oral or in writing, and as to the substance of the Complaint.

the analysis of inpatient record completion [17] and (2) the analysis of one-day stay and ambulatory surgery record completion. [18] (Schuster Aff. P 25; Ex. F to Schuster Aff.) Plaintiff contends that there was no backlog in the analysis of inpatient records, [*31] _see_ Ofoedu Affidavit at paragraph 67, and argues that Ms. Schuster's assertions are ²merely baseless allegation [sic].² [19] (Pl.'s _Rule 56( a)_2 Statement P 31.)

Faye Davis assisted Ms. Schuster in managing the areas that Ms. Schuster was concerned about during Plaintiff's leave of absence. (Schuster Aff. P 28.) In this role, Ms. Davis coordinated the work and developed and implemented _a_ plan that brought the department's performance back within acceptable standards. ( Id.) As _a_ result, Ms. Schuster placed Ms. Davis in charge of these areas and removed them from Plaintiff's duties. ( Id.) Plaintiff, however, contends that while he was out on leave, Ms. Schuster hired two new file clerks, approved overtime pay for all file clerks, and abandoned the ²shelf audit² that Plaintiff had been required to conduct. ( See Pl.'s Rule 56(_a_)(2) Statement P 32; Ofoedu Aff. P 68.) Plaintiff asserts that all of this is [*33] evidence that Ms. Schuster ²deliberately provided [him] with less than adequate materials to execute his functions.² (Pl.'s Rule 56(_a_)(2) Statement P 32.)

Plaintiff returned to work on or about May 25, 2004. (Schuster Aff. P 29.) Upon Plaintiff's return to work, Ms. Schuster announced _a_ restructuring of the Medical Records Department.

(Schuster Aff. P 32.) Ms. Davis was promoted to the position of Assistant Director, and assumed greater responsibility for the day-to-day managerial operations of the department and continued to perform her prior responsibilities, which included overseeing coding. ( Id.) According to Defendants, Ms. Schuster did _not_ consider Plaintiff for the Assistant Director position due to his past performance problems, his PIP, [20] and her own observations of his job performance. (Schuster Aff. P 33.) Ms. Schuster asserts that in her opinion, Ms. Davis was _a_ better performer than Plaintiff was, she had been employed with St. Francis for over twenty years and thus had more experience than Plaintiff in the Medical Records Department, and had outstanding performance evaluations throughout her employment with St. Francis. ( Id. P 33.) Plaintiff contends that he [*34] had no performance problems and asserts that it was contrary to St. Francis policy to create _a_ new position and fill it without advertising it first. (Pl.'s Rule 56(_a_)(2) Statement P 37.) Plaintiff, however, provides no evidence in _support_ of his _claim_ that St. Francis requires all open positions to be posted and there is evidence contradicting his _claim_. ( See Currier Dep. 66:16-21, Nov. 7, 2005) Plaintiff also asserts that he was more qualified than Ms. Davis and that Ms. Davis was _not_ qualified for the position in question. (Pl.'s Statement of Disputed Issues P 10.)

Upon Plaintiff's return to work, Ms. Schuster reviewed the work assignment memorandum with him and adjusted and reviewed his assignments and deadlines. (Schuster Aff. P 29.) Spe-

---

[17]   The departmental performance standards require that medical records for inpatients be made available for physicians to complete their charting and for signature within five days of the patient's discharge from the hospital, however, as of May 10, 2004, Ms. Schuster determined that eighty-three percent of the medical records of discharged patients did not meet this standard. (Schuster Aff. P 26; Ex. F to Schuster Aff.)

[18]   The departmental performance standards require that medical records for patients at the hospital for a one-day stay or for ambulatory surgery (²ODAs²) be made available for physicians to complete their charting and for signature within seven days of the patient's discharge from the hospital, however, as of May 10, 2004, Ms. Schuster determined that eighty-nine percent of the medical records of discharged patients did not meet this standard. Ms. Schuster estimated the backlog for ODAs to be approximately sixty -seven days. (Schuster Aff. P 27; Ex. F to Schuster Aff.)

[19]   Plaintiff denies Defendants' assertions regarding Ms. Schuster's conclusions in paragraph 31 of his Rule 56(a)(2) Statement, however, his denial is not based on personal knowledge. He cannot properly deny her observations / conclusions. As such, Defendants' assertions regarding Ms. Schuster's observations and conclusions are deemed admitted.

[20]   According to Ms. Schuster, St. Francis policy does not permit an employee to be promoted while on a PIP. (Schuster Aff. P 33.)

SCOTT WEISS

cifically, Ms. Schuster extended several dead-lines and notified Plaintiff that she had reassigned some of his duties to Ms. Davis. ( [*35] Id.) She again discussed with Plaintiff the delay in the filing of transcribed reports and gave him *a* revised deadline of June 9, 2004 to provide her with *a* plan to address this is-sue. ( Id.) Ms. Schuster also extended Plaintiff's deadline for providing her with *a* revised plan to conduct *a* shelf audit of the files in the Medi-cal Records Department to June 9, 2004. ( Id.) Plaintiff admits these facts, but contends that the only duty left for him upon his return to work was ²managing transcriptionists.² (Pl.'s *Rule 56( a)*2 Statement P 34.)

Another incident occurred on May 13, 2004, when Ms. Schuster was working with *a* clerk in the Medical Records Department and noticed that the clerk entered Plaintiff's username and password in order to access *an* online data-base containing confidential patient care infor-mation. (Schuster Aff. P 30.) When Ms. Schuster inquired about the username and pass-word, the clerk responded that Plaintiff had given her and several other individuals his user-name and password so that they could access the system, even though several of the individu-als had *not* been trained on the system and were *not* authorized to access confidential infor-mation. ( Id.) Ms. [*36] Schuster concluded that Plaintiff's conduct in this regard violated the HIPAA privacy requirements and counseled him about the matter and provided him with *a* Progressive Discipline Action Form at their May 25, 2004 meeting. ( Id.; Defs.' *Rule 56( a)*1 Statement P 35.)

Ms. Schuster met with Plaintiff again on June 3, 2004 and reviewed the expectations they had discussed on May 25, 2004. (Schuster Aff. P 34.) She outlined Plaintiff's remaining responsi-bilities, ²¹ discussed the outstanding tasks which he needed to address, and reviewed other deficiencies existing in his section of the de-partment. ( Id.; see also Ex. J to Schuster Aff.) As discussed above, Plaintiff was required to

submit *a* plan to improve the timeliness of fil-ing transcribed reports to Ms. Schuster by June 9, 2004, however, Plaintiff did *not* pro-duce the document until June 11, 2004. (Schus-ter Aff. P 35.) Plaintiff failed to inform Ms. Schuster that the plan would be late or request additional time to complete it. ( Id.) Plaintiff was also required to provide Ms. Schuster with *a* plan to conduct *a* shelf audit of medical re-cords files by June 9, 2004, however, he failed to do so. ( Id.)

[*37]   According to Defendants, as discussed with Plaintiff at his June 3, 2004 meeting with Ms. Schuster and as set forth in her memoran-dum of that date, Plaintiff was expected to in-form Ms. Schuster or Ms. Davis of any com-munications with physicians regarding the suspension process. ( Id. P 36;  see also Ex. J to Schuster Aff. (²All physician inquiries [regard-ing suspension notification letters] must be re-ferred to myself or Faye [Davis].²).) On June 9, 2004, Dr. Patrick Corcoran was scheduled to be added to the suspension list if he did *not* complete his records by 5:00 p.m. that day, how-ever, Plaintiff had received *an* email from Dr. Ronald Burt, Chief of Staff, at 3:55 p.m. that day requesting that Dr. Corcoran *not* be sus-pended because he had just returned from vaca-tion. (Schuster Aff. P 37.) Plaintiff did *not* no-tify Ms. Schuster or Ms. Davis of Dr. Burt's email, which Ms. Schuster learned about from Dr. Burt later that day. ( Id.) Defendants con-tend that Plaintiff's failure to communicate this information was *a* direct violation of Ms. Schuster's instructions to him. ( Id.) Plaintiff as-serts, however, that he had *not* accessed his email that day because he had been too [*38] busy with other work. (Ofoedu Aff. P 78.) When Ms. Schuster asked Plaintiff, at around 5:00 p.m. that day, why she had *not* been in-formed of the email, he asserts that he re-plied that Dr. Burt had *not* contacted him, hon-estly believing it to be true. ( Id.) Plaintiff *claims* that it was only then that he checked his email and discovered the email from Dr. Burt. ( Id.)

---

²¹   According to Defendants, Plaintiff's remaining duties included, *inter alia,* the Millennium database and the management of transcriptionists and transcription services. (Defs.' Mem. Supp. 15.)

2006 U.S. Dist. LEXIS 68704, *38

Ms. Schuster decided, after consulting with St. Francis' human resources department, to terminate Plaintiff's employment. (Schuster Aff. P 39.) Ms. Schuster and Ms. Currier met with Plaintiff on June 15, 2005 and notified him that his employment with St. Francis was terminated. ( Id. P40.)

Plaintiff alleges that during his tenure at St. Francis, he received ²commendations² from the Chief Executive Officer of the hospital, Dr. David D'Eramo. As *an* example, Plaintiff discusses *a* January 27, 2004 management meeting conducted by Ms. Schuster, after which he *claims* that Dr. D'Eramo ²singled [him] out for commendation and stated to all present that from information reaching him, [Plaintiff is] *a* good example of commitment to one's chosen career and family.² (Ofoedu Aff. P 10.)

Plaintiff also *claims* that he was **[*39]** *a* non-exempt employee, and as such, was entitled to receive overtime pay for all hours worked over forty hours in *a* work week. ( See Pl.'s Statement of Disputed Issues PP 6, 24; St. Francis Employee Handbook at 13, Ex. F to Pl.'s Mem. Opp.) Plaintiff *claims* that he worked *a* ²minimum² of sixty-five hours per week in *a* typical work week without receiving overtime pay, however, the only time sheet he attached in *support* of this *claim* is for *a* week in which he worked only thirty-two hours. ( See Pl.'s Statement of Disputed Issues PP 6, 24; Mar. 7, 2004 Ofoedu Time Sheet, Ex. B to Pl.'s Mem. Opp.) Plaintiff also notes that female managers in the department were given pay raises, alleging that Joyce Downey was given *a* pay raise from grade 16 to grade 20 on April 15, 2004, and that Faye Davis was given *a* pay raise from grade 17 to grade 20 on April 4, 2004, and *a* pay raise from $ 36.06 per hour to $ 40.86 per hour on May 9, 2004. [22] ( See Pl.'s Statement of Disputed Issues PP 19, 20; Exs. T & U to Pl.'s Mem. Opp.)

**[*40]** On June 17, 2004, Plaintiff filed *an* administrative charge with the Equal Employment Opportunity Commission (²EEOC²), alleg-

ing that he was terminated from St. Francis based on his sex (male) and national origin (Nigerian). Plaintiff also *claimed* that he was retaliated against for complaining to his supervisor. St. Francis filed *a* response to Plaintiff's administrative charge and on June 12, 2004, the EEOC issued *a* finding of no probable cause and dismissed Plaintiff's administrative charge. The EEOC then issued its Dismissal and Notice of Rights, permitting Plaintiff to pursue his *claims* in federal court. Plaintiff filed the Complaint in this action on October 12, 2004, alleging violations of Title VII and *42 U.S.C. § 1981*.

**B. Standard of Review**

Summary judgment is appropriate only when ²the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to *a* judgment as *a* matter of law.² *Fed. R. Civ. P. 56(c)*. No genuine issue of material fact exists and summary judgment **[*41]** is therefore appropriate when ²the record taken as *a* whole could *not* lead *a* rational trier of fact to find for the non-moving party.² *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 69, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). *A* material fact is one which ²might affect the outcome of the suit under the governing law² and *an* issue is genuine when ²the evidence is such that *a* reasonable jury could return *a* verdict for the non-moving party.² *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Importantly, however, ²[c]onclusory allegations will *not* suffice to create *a* genuine issue.² *Delaware & H. R. Co. v. Conrail,* 902 F.2d 174, 178 (2d Cir. 1990).

The moving party bears the burden of establishing that summary judgment is appropriate, *Anderson,* 477 U.S. at 255, and the court should ²draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in mate-

---

[22]   Ms. Davis' second pay raise was implemented as part of her promotion to from Manager to Assistant Director of the Medical Records Department in May of 2004. ( See Ex. U to Pl.'s Mem. Opp.)

rials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion.² *Rodriguez v. City of N.Y.,* 72 F.3d 1051, 1060 (2d Cir. 1995) **[\*42]** (citations omitted). Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on *a* motion for summary judgment as such are within the sole province of the jury. *Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir. 1996). ²If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which *a* reasonable inference in the non-moving party's favor may be drawn, the moving party simply cannot obtain *a* summary judgment.² *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also *Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir. 2000) (²When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.²).

²At summary judgment in *an* employment *discrimination* case, *a* court should examine the record as *a* whole, just as *a* jury would, to determine whether *a* jury could reasonably find *an* invidious discriminatory purpose on the part of *an* **[\*43]** employer.² *Byrnie v. Town of Cromwell, Board of Education,* 243 F.3d 93, 102 (2d Cir. 2001). Although caution must be exercised before granting summary judgment to *an* employer in *an* employment *discrimination* case where discriminatory intent and state of mind are in dispute, see *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir. 2000), the Second Circuit has said that ²summary judgment may be appropriate even in the fact-intensive context of *discrimination* cases,² as ²[t]he salutary purposes of summary judgment --avoiding protracted, expensive and harassing trials--apply no less to *discrimination* cases than to . . . other areas of litigation.² *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456,

466 (2d Cir. 2001) ( citing *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985)).

## C. Discussion

### 1. Plaintiff's *Claims* of *Race*, Gender, and National Origin *Discrimination*

Plaintiff *claims* that he was discriminated against on the basis of his gender and national origin in violation of Title VII, and on the basis of his *race* in violation of *42 U.S.C. § 1981*.[23] *Claims* of employment *discrimination* **[\*44]** brought under both Title VII and *Section 1981* are governed by the evidentiary burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir. 2004); *Pierce v. Netzel,* 148 Fed. Appx. 47, 49 (2d Cir. 2005).

In order to survive *a* motion for summary judgment, *a* plaintiff must first make *a* prima facie case of *discrimination* by presenting evidence **[\*45]** sufficient to create *an* inference that the employer's decision was based on *an* illegally discriminatory criterion. *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 358, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977). If the plaintiff is able to make out *a* prima facie case of *discrimination*, the burden then shifts to the defendant to establish *a* legitimate, nondiscriminatory business reason for its action. See *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Although the McDonnell Douglas framework places the burden on the defendant of producing *an* explanation to rebut the plaintiff's prima facie case, it is important to remember that the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated on the basis of *an* impermissible factor remains at all

---

23    *Section 1981* prohibits discrimination on the basis of race, providing that:²[a]ll persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.² *42 U.S.C. § 1981*(a).

times with the plaintiff. [24] *Burdine,* 450 U.S. at 253. If the employer succeeds in articulating such *a* reason, the presumption of ***discrimination*** arising from the establishment of the prima facie case ²drops from the picture² and the burden shifts back to the plaintiff to show both that the employer's **[*46]** proffered reason was merely *a* pretext for impermissible ***discrimination*** and that the plaintiff's *race*, national origin, and/or gender was the actual motivating factor. See *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); *Abdu-Brisson,* 239 F.3d at 459.

*a*. *Plaintiff's Prima Facie Case*

To make out *a* prima facie case of employment ***discrimination*** under Title VII, Plaintiff must show that (1) he is *a* member of *a* protected **[*47]** class; (2) he is qualified for the job; (3) he suffered *an* adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to *an* inference of ***discrimination***. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *Fisher v. Vassar Coll.,* 114 F.3d 1332, 1335 (2d Cir.) (en banc), cert. denied, *522 U.S. 1075, 118 S. Ct. 851, 139 L. Ed. 2d 752 (1998)*; *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 311-12 (2d Cir. 1997); *Shumway v. United Parcel Serv.,* 118 F.3d 60, 64 (2d Cir. 1997). Plaintiff's burden at this stage is *not an* onerous one; he merely has to present facts sufficient to give rise to *a* presumption of ***discrimination***. See *Burdine,* 450 U.S. at 254; *Abdu-Brisson,* 239 F.3d at 467 (²*A* plaintiff's burden of establishing *a* prima facie case is de minimis.²).

To prevail on his *§ 1981* *claim* of racial ***discrimination***, Plaintiff must also prove that (1) De-

fendants intentionally discriminated against him, i.e., that they discriminated against him because of his *race* and (2) the **[*48]** ***discrimination*** concerned one of the statute's enumerated activities, including ²to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property.² [25] *42 U.S.C. § 1981*; *Brown v. City of Oneonta,* 221 F.3d 329, 339 (2d Cir. 2000); *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir. 1993); see also *Calderon v. Dinan & Dinan PC,* 2006 U.S. Dist. LEXIS 39024, *10-11 (D. Conn. June 14, 2006).

Defendants do ***not*** dispute that Plaintiff has met the first three prongs of his prima facie case and accordingly, **[*49]** only the fourth prong will be addressed here. Defendants argue that Plaintiff cannot, under the fourth prong of the analysis, show that his employment contract was terminated under circumstances giving rise to *an* inference of discriminatory intent. ( See Defs.' Mem. Supp. 22-26.)

No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to *an* inference of ***discrimination***. See *Abdu-Brisson,* 239 F.3d at 466-68; *Burdine,* 450 U.S. at 253-54 & n.6; *McDonnell Douglas,* 411 U.S. at 802 n.13. Plaintiff could show that Defendants ²subjected him to disparate treatment, that is, treated him less favorably than *a* similarly situated employee outside his protected group.² *Graham v. Long Island R.R.,* 230 F.3d 34, 38-40 (2d Cir. 2000). *A* showing of disparate treatment is ***not*** the only way to establish *an* inference of discriminatory intent; such *an* inference can be drawn in other circumstances as well, including, *inter alia:*

---

[24]   The presumption operates, in this regard, like all other presumptions, as described in *Federal Rule of Evidence 301:* ²In all civil actions and proceedings . . . a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.²

[25]   For purposes of *section 1981,* the term ²make and enforce contracts² includes ²the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.² *42 U.S.C. § 1981(b).*

Case 2:12-cv-05506-JFB-GRB   Document 51-2   Filed 01/24/14   Page 96 of 142 PageID #: 637

Page 15 of 25
2006 U.S. Dist. LEXIS 68704, *49

the employer's continuing, after dis-charging the plaintiff, to seek appli-cants from persons of the plaintiff's qualifications to fill **[*50]** that posi-tion; or the employer's criticism of the plaintiff's performance in ethni-cally degrading terms; or its invidi-ous comments about others in the employee's protected group; or the more favorable treatment of employ-ees **not** in the protected group; or the sequence of events leading to the plaintiff's discharge.

*Abdu-Brisson,* 239 F.3d at 468 (_quoting *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir. 1994)).

Plaintiff argues that there were **_a_** number of fac-tors that gave rise to **_an_** inference of discrimi-natory intent. Specifically, he asserts that the fact that Ms. Schuster created **_a_** position of Assistant Director and filled the position without ad-vertising the opening is evidence of discrimi-natory intent. (Pl.'s Mem. Opp. 10.) Plaintiff believes that Ms. Schuster wanted to make sure that Plaintiff was excluded from applying for the position. (_Id._) Plaintiff, however, pro-vides no evidence in **_support_** of his **_claim_** that St. Francis requires all open positions to be posted and there is evidence contradicting his **_claim_**. (_See Currier Dep. 66:16-21, Nov. 7, 2005 (testifying that there is no requirement that **_a_** position be posted before **[*51]** it is filled).) Moreover, Plaintiff provides no evidence in **_sup-port_** of his assertion that Ms. Schuster in-tended to exclude him from applying for the po-sition. To the extent that Plaintiff was denied the ability to apply for the position because it was **_not_** posted, so too were the white, female, American managers in Plaintiff's department. (Pl.'s Disputed Issues of Material Fact P 9.)

Plaintiff also argues that the fact that his com-plaint to Ms. Szenczy was never investigated gives rise to **_an_** inference of discriminatory in-tent. (Pl.'s Mem. Opp. 10.) According to both Plaintiff and Defendants, however, Ms. Szenczy denied ever receiving his complaint, and Plaintiff provides no evidence that the docu-

ment was ever sent by him or received by Ms. Szenczy. The human resources department did **_not_** have the complaint on file, and Ms. Cur-rier denied any knowledge of the complaint. (_See id._ at 10-11 (_citing Currier Dep. 76-80).) Defendants assert that Plaintiff failed to dis-close this document in response to Defen-dants' First Set of Requests for Production. (Defs.' Reply II at 7 n.4.) Plaintiff did produce the document at the deposition of Ms. Szenczy, however, Defendants **_claim_** that they **[*52]** did **_not_** possess the document at that time and had **_not_** seen it prior to Ms. Szenczy's de-position. (_Id._) In his Opposition brief, Plain-tiff does **_not_** address his failure to produce this document initially or to testify to this memo-randum at his deposition. Plaintiff cannot argue that the failure to investigate his complaint was discriminatory when there is no evidence that Defendants had any knowledge of the com-plaint. _See *Shumway,* 118 F.3d at 64-65 (hold-ing that [2][i]t is impossible to demonstrate that [the employer] treated similarly situated [non-protected employees] differently[2] when the plaintiff had presented no evidence that the em-ployer had knowledge of any other viola-tions of the rule that the plaintiff was termi-nated for violating).

Finally, Plaintiff **_claims_** that upon his termina-tion, he was [2]hastily replaced[2] with **_a_** woman. (Pl.'s Mem. Opp. 11.) **_A_** prima facie case may, in some cases, be established if the plain-tiff can show that after he was terminated, his position was filled by **_a_** person outside of his protected class. _See McDonnell Douglas (finding **_an_** inference of **_discrimination_** when **_a_** qualified black applicant was rejected and the employer continued **[*53]** to seek ap-plicants with no better qualifications); *Burdine,* 450 U.S. at 254 n.6 (finding **_an_** infer-ence of **_discrimination_** where **_a_** qualified woman was rejected and after several months, the position was filled by **_a_** male who had been under her supervision); *Schnabel v. Abram-son,* 232 F.3d 83, 87 (2000) (finding **_an_** infer-ence of age **_discrimination_** when the plaintiff was fired and replaced by **_a_** younger person). Plaintiff, however, presents no evidence in **_sup-_**

*port* of this *claim*.[26] Moreover, the fact that the position was filled by *a* person outside of the plaintiff's protected class will *not* suffice in every situation to establish *a* prima facie case; the Court must examine the precise facts in each case, rather than just conducting *a* rote repetition of the four factors, to determine whether *a* prima facie case, sufficient to *support* *an* inference of *discrimination* and thus to permit *a* finding of liability, has been presented. *Fisher,* 114 F.3d at 1367. Even if the Court was to credit Plaintiff's assertion in this regard and find that he has made his prima facie case, he has *not* presented sufficient evidence of pretext, as discussed below.

**[*54]**  b. *Defendant's Legitimate, Nondiscriminatory Reasons for Termination*

Defendants, asserting that Plaintiff was terminated due to his poor job performance and his failure to improve, have met their burden of articulating *a* legitimate, non-discriminatory reason for Plaintiff's termination. They have presented evidence showing that Plaintiff's performance was substandard. Specifically, Defendants have provided documentation consisting of Plaintiff's work evaluations, his PIP, the Quarterly Review of his job performance, the Final Written Warning, Ms. Schuster's May 10, 2004 and June 3, 2004 memoranda to Plaintiff, and Ms. Schuster's notes of her February 24, 2004 meeting with Plaintiff. The memoranda and evaluations submitted by Defendants detail *a* long list of issues with Plaintiff's performance, including, *inter alia,* his lack of consideration for and problems working well with staff and colleagues, his inability to deliver timely responses to requests for information, his use of *an* incorrect formula and data for calculating physician delinquency rates, his failure to follow hospital procedures for suspending physicians, the fact that he mailed suspension notices contrary to **[*55]** Ms. Schuster's instructions, his failure to arrange coverage for *a* third-shift employee who was on vaca-

tion, his refusal to attend *a* morning meeting, his overdue assignments, the backlog in his analysis of inpatient records, and his persistent delays in filing transcribed reports. The evidence submitted by Defendants amply *supports* their proffered *race*-neutral reason for discharging Plaintiff, namely, his failure to perform his job to their satisfaction and his failure to improve after repeated warnings and reviews. The submission of evaluations of Plaintiff's performance, memoranda, and the written warnings constitutes permissible *support* for Defendants' proffered explanation. *See Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir. 1985) ([2]In determining whether *an* employee's job performance is satisfactory, courts may --as they often must--rely on the evaluations rendered by supervisors.[2]).

c. *Plaintiff's Evidence of Pretext*

i. Pretext

Even if Plaintiff had been able to establish *a* prima facie case,[27] he is unable to defeat summary judgment. Because Defendants have met their burden, the burden shifts back to Plaintiff to come forward with evidence that Defendants' **[*56]** proffered legitimate, nondiscriminatory reason is pretextual, thus *supporting* *an* inference that the true reason for Plaintiff's termination was discriminatory. To establish pretext, Plaintiff must show either that [2] *a* discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence.[2] *Burdine,* 450 U.S. at 256.

In this case, Plaintiff has presented no evidence that would lead *a* reasonable jury to conclude that Defendants' proffered reason for his termination is pretextual or that Defendants discriminated against him. Although Plaintiff alleges that Ms. Schuster's performance requirements were too demanding-- *claiming* that she set deadlines that were designed to ensure that

---

[26]  Plaintiff makes this claim for the first time in his Opposition Brief. He did not make this claim in his deposition or his Affidavit, and presents no other evidence to support his assertion. He also fails to identify the woman who allegedly replaced him.

[27]  The Court assumes, *arguendo,* that Plaintiff has met his prima facie case. The evidence presented, however, is not sufficient for the Court to find that Plaintiff has done so.

Plaintiff's performance would be unsatisfactory, failed to provide him with **[*57]** sufficient _**support**_ staff, and tried to make him work on weekends when he was unavailable--he presents no evidence in _**support**_ of his _**claims**_. Notably, there is no evidence as to what ²normal² requirements and expectations associated with Plaintiff's job should have been, and no specific factual basis for his conclusory _**claim**_ that Ms. Schuster created performance requirements designed to ensure that his performance was unsatisfactory. The evidence presented shows that Plaintiff was initially able to meet his employer's expectations. Plaintiff received _**an**_ overall ²quality² rating from Ms. Schuster in his work evaluation for the period of August 1, 2003 through September 30, 2003, ( see Ex. _A_ to Schuster Aff.), and _**a**_ ²quality² rating from Ms. Szenczy in his work evaluation dated September 19, 2002, ( see Ex. 8 to Strange Aff.). The problems that Ms. Schuster had with Plaintiff's work continued even after she decreased his responsibilities in May 2004.

Plaintiff also points to the two work evaluations in evidence as raising _**a**_ disputed issue of fact regarding the legitimacy of Defendants' explanation for his termination. The fact that Plaintiff received prior positive evaluations cannot, **[*58]** in itself, demonstrate that his later negative evaluations, and the concomitant proffered explanation, are unworthy of credence. See, e.g., _Billet v. CIGNA Corp.,_ 940 F.2d 812, 826 (3d Cir. 1991) (²Prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual²); _Jensen v. Garlock, Inc.,_ 4 F. Supp. 2d 219, 223 (W.D.N.Y. 1998) (²While _**a**_ lengthy period of satisfactory performance may raise _**an**_ inference of _**discrimination**_ for purposes of establishing _**a**_ prima facie case, by itself, such _**a**_ factor is insufficient to suggest that _**an**_ employer's amply _**supported**_ reasons for terminating _**an**_ employee are pretextual²). Moreover, even drawing all inferences in Plaintiff's favor, the evaluations--even though they assigned Plaintiff _**an**_ overall ²quality² rating--cannot be considered perfect, or ²glowing,² reviews. Both evaluations recognized some of the same problems that were later identified as grounds for Plaintiff's termi-

nation. For example, in his work evaluation for the period of August 1, 2003 through September 30, 2003, Ms. Schuster raised concerns about Plaintiff's failure to meet deadlines, writing:

> As _**a**_ new manager **[*59]** within the Department, [Plaintiff] has worked hard to make significant improvements within his sections. He is making progress, but still has opportunities for improvement. During the next year, I would like to see [Plaintiff] be more considerate of the department as _**a**_ whole. I encourage him to work more closely with his peers and seek additional _**support**_ from myself. [Plaintiff] is often late when assigned tasks and sometimes struggles with producing the desired outcomes. He should strive to be more timely and seek further explanation if the instructions are _**not**_ clear.

(Ex. _A_ to Schuster Aff.) Moreover, in his evaluation dated September 19, 2002, Ms. Szenczy wrote that Plaintiff ²sometimes . . . initiate[s] changes that have _**not**_ been well coordinated with his peers and his manager,² and notes that ²[t]here has also been some tension between [Plaintiff] and one of colleagues.² (Ex. 8 to Strange Aff.) Her evaluation concludes by saying, ²[i]n addition to the departmental goals, [Plaintiff] needs to improve his professional relationships with his colleagues and work as part of _**a**_ team.² ( Id.) Finally, Plaintiff's ²quality² rating was the third level on _**a**_ scale **[*60]** of one to five, ranging from ²unacceptable² to ²role model.² These ²average² performance reviews, combined with the reviewers' stated concerns about Plaintiff's performance and ability to work well with other members of the department, are _**not**_ sufficient to raise _**an**_ issue of fact with regard to the legitimacy of Defendants' proffered explanation for Plaintiff's termination. The suggestion that Plaintiff was _**a**_ borderline performer for some time does _**not**_ go to show that Defendants' reason for his ter-

SCOTT WEISS

mination is pretextual or that his termination was discriminatory.

The majority of Plaintiff's arguments with regard to pretext are his own opinions of his qualifications and performance, and his disagreement with Defendants' assessment of his performance. Plaintiff's personal disagreement with Ms. Schuster's evaluation of his skills and job performance are insufficient, as *a* matter of law, to preclude summary judgment. See *Byrnie,* 73 F. Supp. 2d 204 at 214 (finding that the plaintiff's own opinions, offered through affidavit and deposition testimony, about his qualifications [2]fall short of establishing *a* dispute about the genuineness of the [defendant's] assessment of his [*61] qualifications[2]) (citing *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1317 (10th Cir. 1999) (holding that the plaintiff's [2]own opinions about her qualifications d[id] *not* give rise to *a* material fact dispute[2]). Plaintiff also presents, however, the deposition testimony of Garfield Gordon, *a* fellow employee in the Medical Records Department at St. Francis. He painted *a* slightly different picture of Plaintiff's behavior in the department, asserting that Plaintiff was [2]very cordial to everyone he associates himself with,[2] [2]very knowledgeable in the area he was responsible for,[2] and [2] *a* very nice person.[2] (Gordon Dep. 18:21-19:3.) He testified that, from what he observed, Plaintiff was [2][v]ery friendly[2] when he interacted with doctors, was *not* insubordinate, and was *not* argumentative. (Id. 19:4-12.) The fact that one employee had *a* different view of Plaintiff's personality and conduct, however, is *not* sufficient to create *an* issue of fact as to whether Defendants' proffered explanation for his termination was pretextual. At most, Plaintiff has shown that Mr. Gordon and Ms. Schuster may have had *a* difference of opinion with regard to Plaintiff's conduct. [*62] There is no evidence, however, that Ms. Schuster's, Ms. Szenczy's, and/or the other employees' negative views of Plaintiff's personality and performance came from *a* discriminatory animus. *A* difference of opinion is *not a* legitimate basis for *a* finding of *discrimination*.

Plaintiff's attempt to rebut Defendant's proffered explanation by detailing certain incidents, disputing Ms. Schuster's assessments, and providing his own contrary appraisal of his work and the situations at issue, is also unavailing. Plaintiff's affidavit and memorandum in opposition to summary judgment may raise issues concerning the reasons why he failed to perform his job--e.g., why he failed to respond to Dr. Burt's email, whether he actually had problems with other employees, why physician delinquency rates were *not* being calculated properly, or why he was *not* meeting deadlines. This evidence, however, does *not* raise *an* issue of fact regarding the overall legitimacy of Defendant's proffered explanation.

Plaintiff does *not* dispute that these incidents actually occurred and even if he can show that Defendant's criticism of him was undeserved, [2]faulting others for, or otherwise rationalizing, problems legitimately [*63] perceived by [his] employer does *not* establish pretext.[2] *Taylor v. Polygram Records,* 1999 U.S. Dist. LEXIS 2583, *27 (S.D.N.Y. Mar. 5, 1999) (citing *McLee v. Chrysler Corp.,* 109 F.3d 130, 135 (2d Cir. 1997) (plaintiff's rationalizations for his deficiencies did *not* serve to demonstrate any triable issue of material fact regarding his employer's explanation that he was fired for unsatisfactory performance; his excuses served to confirm the validity of the employer's criticisms)). Like the plaintiff in *Taylor,* 1999 U.S. Dist. LEXIS 2583, at *27-28, Plaintiff's disagreement with the conclusions his supervisors drew from incidents that are admitted to have occurred is *not* evidence that the supervisor's appraisals are pretext, designed to mask *discrimination*. *Billet,* 940 F.2d at 825 ([2]The fact that *an* employee disagrees with *an* employer's evaluation of him does *not* prove pretext.[2]). Employers are entitled to make *subjective* determinations of their employees' performance [2]without the intrusion of third-party hindsight.[2] *Taylor,* 1999 U.S. Dist. LEXIS 2583, at *29. It is *not* the role [*64] of the Court to review or second guess the fairness or merit of Defendant's personnel and business decisions. *Scaria v. Rubin,* 117 F.3d 652, 655 (2d Cir. 1997); see also *Simms v. Oklahoma ex*

*rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1330 (10th Cir.) (²Our role is to prevent unlawful hiring practices, *not* to act as *a* 'super personnel department' that second guesses employers' business judgments.²) (citations omitted), cert. denied, *528 U.S. 815, 145 L. Ed. 2d 46, 120 S. Ct. 53 (1999)*; *Fischbach v. District of Columbia Dep't of Corrections,* 318 U.S. App. D.C. 186, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (concluding that relevant issue was whether the employer honestly believed in the reasons it offered for *not* promoting plaintiff, and *not* whether those reasons were the correct or desirable); *Sanchez v. Philip Morris Inc.,* 992 F.2d 244, 247 (10th Cir. 1993) (²Title VII is *not* violated by the exercise of erroneous or even illogical business judgment.²). Accordingly, it is found that Plaintiff has *not* presented sufficient evidence to demonstrate pretext.

## ii. Inference of *Discrimination*

Even if Plaintiff's [*65] evidence had been sufficient to create *an* issue of fact as to whether Defendants' proffered explanation was pretextual, he still could *not* withstand summary judgment. *A* plaintiff in *a discrimination* case must do more than merely raise *an* issue of fact regarding the validity of the employer's proffered explanation. In *Schnabel,* 232 F.3d 83, the Second Circuit held, in light of the Supreme Court's decision in *Reeves,* 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105, that *a* court may grant *a* defendant's motion for summary judgment in *a discrimination* case ²when *a* plaintiff has offered only *a* prima facie case along with evidence that the defendant's stated nondiscriminatory reasons for *an* adverse employment action are pretextual.² In order to defeat summary judgment, *a* plaintiff must also present ²evidence that would permit *a* rational factfinder to infer that the discharge was actually motivated, in whole or in part, by *dis-*

*crimination* on the basis of [*race,* gender, and/or national origin].² *Grady v. Affiliated Cent.,* 130 F.3d 553, 561 (2d Cir. 1997).

Plaintiff has presented some evidence purporting to show that the real reason for Defendants' actions was *race-,* gender-, [*66] or national origin-based *discrimination*.[28] As discussed earlier, circumstances contributing to *an* inference of discriminatory intent may include *an* employer's criticism of either Plaintiff's or other employees' work ²in ethnically degrading terms,² ²invidious comments² about Plaintiff or other members of the protected classes to which Plaintiff belongs, and/or evidence that other, similarly situated employees *not* in *a* protected class were treated more favorably than Plaintiff. *Chambers,* 43 F.3d at 37. Plaintiff has, however, presented no evidence that Ms. Schuster made comments evincing *a* discriminatory animus toward Plaintiff or that Defendants held discriminatory attitudes toward male, black, and/or Nigerian persons or him in particular. Nor is there any legitimate evidence that Plaintiff's *race,* gender, and/or national origin were ever raised in conversations or mentioned in discussions relating to his job performance and/or termination.

[*67] First, to *support* his *claim* that he was terminated for discriminatory reasons, Plaintiff relies on *a* statement allegedly made by Ms. Schuster in response to his request to attend *an* off-site training seminar. According to Plaintiff, when he first approached her about the seminar, she told him that he could *not* go, reasoning that ²the topics of the seminar are *not* related to your area.² (See Ofoedu Memo. to Szenczy, Ex. V to Pl.'s Mem. Opp.) Plaintiff then states that he offered to pay for the seminar, at which point Ms. Schuster asked him, ²can you afford to leave your areas?² (Id.) He states that he was ²appalled² by her statement. (Id.) With no basis other than his own intu-

---

[28]  In *Schnabel,* 232 F.3d 83, the Second Circuit held, in light of *Reeves,* 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105, that a court may grant a defendant's motion for summary judgment in a discrimination case ²when a plaintiff has offered only a prima facie case along with evidence that the defendant's stated nondiscriminatory reasons for an adverse employment action are pretextual.² In order to defeat summary judgment, a plaintiff must also present ²evidence that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination on the basis of [race, gender, and/or national origin].² *Grady,* 130 F.3d at 561.

ition, Plaintiff asserts that this was *a* racially de-rogative remark which constitutes direct evidence of *discrimination*. (Pl.'s Mem. Opp. 47.) Plaintiff offers several different interpretations of Ms. Schuster's remark. For example, Plaintiff *claims* that Ms. Schuster really meant that [2] *a* slave is only at home in his immediate environment which is the cotton farm.[2] (Ofoedu Aff. P 36.) He also interpreted her remark as meaning, [2]you farm slave what business would [you] have with house slaves.[2] ( **[*68]** Id. P 82.) Plaintiff's attorney assigned *a* slightly different meaning to the remark, asserting that Ms. Schuster really meant, [2]can *a* farm slave co-mingle with house slaves.[2] (Pl.'s Mem. Op. 47.) Plaintiff's several different interpretations are baseless and add nothing to the analysis. Regardless of the different meanings Plaintiff attempts to assign to her remark, the statement makes no reference to *race*, is *not* racially derogatory in any sense, and is *not* connected to Plaintiff's *race*. [2][Plaintiff]'s *belief*, based on no evidence other than gut instinct, that [Ms. Schuster] treated [him] with hostility because of [his] *race*, cannot justifiably *support an* inference of *discrimination* when nothing in the record remotely links [Ms. Schuster's] treatment of [him] to [his] *race*.[2] *Taylor v. Polygram Records,* 1999 U.S. Dist. LEXIS 2583, *45-47 (S.D.N.Y. Mar. 5, 1999) (citing *Moorer v. Grumman Aerospace,* 964 F. Supp. 665, 674 (E.D.N.Y. 1997) (plaintiff's unsupported [2] *subjective* feeling of 'racial tension'[2] from his supervisor failed to raise inference of *discrimination*), aff'd without published opinion, *162 F.3d 1148 (2d Cir. 1998))*; **[*69]** see also *Shabat v. Blue Cross Blue Shield,* 925 F. Supp. 977, 988 (W.D.N.Y. 1996) ([2]It is more than well-settled that *an* employee's *subjective belief* that he suffered *an* adverse employment action as *a* result of *discrimination*, without more, is *not* enough to survive *a* summary judgment motion, in the face of proof showing *an* adequate non-discriminatory reason.[2]) ( *quoting Douglass v. United Servs. Auto. Ass'n,* 65 F.3d 452, 459 (5th Cir. 1995)); *Simmons v. AT&T, Inc.,* 1998 U.S. Dist. LEXIS 16904, *27 (S.D.N.Y. Oct. 28, 1998) ([2]Although [plaintiff] alleges discriminatory animus, she provides no evidence of differential treatment during the relevant time

period Plaintiff's *subjective belief* is *not* enough.[2]);  cf. *Grady,* 130 F.3d at 561 (finding the plaintiff's allegation that her supervisor [2]smiled at her less approvingly[2] insufficient to infer age *discrimination*).

In *an* effort to show circumstances at St. Francis suggestive of discriminatory attitudes in general and/or *a* hostile work environment, Plaintiff submitted the deposition testimony of three different people. Dr. Subrata Basu, the physician **[*70]** who diagnosed Plaintiff with [2]stress[2] and advised him to rest for two weeks, prompting his two-week medical leave, is--according to Plaintiff-- *a* male foreigner who speaks English with *a* foreign accent. In his deposition, Dr. Basu--who did *not* work at St. Francis--testified that he was once held at gun point in the St. Francis parking lot in the daytime and that he wrote ten letters to complain, but never received *a* response. (Basu Dep. 37:22-38:11, Sept. 27, 2005.) Both Plaintiff and Dr. Basu *claim* that he would have received *a* response if he had been *a* white woman. This evidence is irrelevant to Plaintiff's *discrimination claim*. There is no evidence as to Dr. Basu's *race* or national origin, no evidence as to who disregarded his complaint, no evidence as to the motivation for disregarding his complaint, and no evidence that the person responsible for responding to his complaint knew his *race*, gender, or national origin.

Plaintiff also presents the deposition testimony of two St. Francis employees. Barnaby Jara, *an* employee in the Medical Records Department at St. Francis, testified that he believed he was [2]talked down on[2] because of his gender and *race*, saying that [2]I feel that Carol **[*71]** [Schuster], the way that she treats me, at least it's *not* the same way that she treats the other Caucasian employees. She treats me in *a* way that . . . is *not* the same as she treats the other employees.[2] (Jara Dep. 68:2-69:2, Nov. 9, 2005.) Garfield Gordon, *an* African American male who worked as *a* medical records clerk for St. Francis, testified that he believed *discrimination* was practiced at St. Francis, saying that [2]being *a* black man, if you

have **_an_** opinion and you express yourself, it doesn't sit well with the white ones. It's like, one, they probably think you're getting upset or, two, they expect you to turn and walk away, **_not_** to respond to anything at all.² (Gordon Dep. 10:7-13.) Mr. Gordon testified that he had **_a_** ²personal feeling² that things were **_not_** handled ²properly² at certain times because he is **_a_** black man, ( _Id._ at 10:14-23), and believes that **_a_** complaint that he made to his manager about **_a_** ²terrible noise coming through the inter-com² was **_not_** investigated because he was **_a_** black man. ( _Id._ at 11:1-17.) Mr. Gordon makes **_a_** vague **_claim_** that he was retaliated against for his complaint to the CEO of St. Francis about the noise coming through the intercom. He alleges **[\*72]** that another employee, **_a_** woman, was making the noise. He **_claims_** that she falsely told Ms. Schuster and Ms. Downey that she was afraid of him and that they issued him **_a_** Final Written Warning, saying that if an-other employee makes **_a_** complaint about him, his employment could be terminated. ( _See_ Gordon Dep. 25:19-34:15.) Mr. Gordon also discussed **_an_** incident in which **_a_** sexual harass-ment complaint against him (alleging that he referred to women as ²hon, babe, sweetie,² etc.), made by **_a_** group of women he identified as Puerto Rican, was investigated. He testified that these things would be permitted if **_a_** white per-son had said them. The charges, however, seem to have been dropped, as Mr. Gordon as-serted that if the charges had been substanti-ated, he would have been fired. ( _Id._ at 15:4-16:21.) Mr. Gordon asserts that he believes that he has remained **_a_** clerk--the position he was hired to fill--for his entire seventeen years with St. Francis because he is **_not_** **_a_** white person, ( _Id._ at 11:20-13:4), however, he does **_not_** **_claim_** that he applied for and/or was denied any other position within the department. Finally, Mr. Gordon testified that at one time, he feared going to work because he **[\*73]** ²didn't know exactly what to expect on any given day,² and as **_a_** result, took **_a_** month off for ²stress.² (Gordon Dep. 38:8-22.)

Both Mr. Jara and Mr. Gordon testified that there were no other black men in managerial po-sitions. (Jara Dep. 69:7-25; Gordon Dep. 18:6 -14.) According to Mr. Jara, there are two fe-male black managers now and there was one other female black manager there when Plain-tiff was employed at St. Francis. (Jara Dep. 69:7 -23.) Both Mr. Jara and Mr. Gordon remain em-ployed at St. Francis.

The testimony of these two employees is also **_not_** probative of discriminatory animus. Plain-tiff has presented no evidence as to the **_race_** or national origin or Mr. Jara. The two employ-ees present nothing other than their own specu-lation to **_support_** their **_claims_** that they were discriminated against on the basis of their **_race_**. They cite no comments evincing **_a_** discrimina-tory motive on the part of Ms. Schuster and/or Ms. Szenczy, and produce no evidence showing that **_discrimination_** was involved in any way.

Finally, there is no evidence of **_a_** similarly situ-ated non-black, female, and/or American em-ployee being treated better than Plaintiff. He dis-cusses the fact that Faye Davis and Joyce Downey **[\*74]** received pay increases during the course of their employment, however, Plain-tiff also received **_a_** pay increase during the course of his employment. ( _See_ Defs.' Reply II at 5 n.3; _see also_ Ofoedu Dep. I at 99:6-25, 108:9-19 (Plaintiff admits that effective April 28, 2002, he was promoted to the position of Transcription and Record Processing Man-ager in the Medical Records Department and re-ceived **_a_** **_an_** increase in pay).) His conclusory **_claim_** that ²other employees,² including ²white and/or female manager[s] [and] employee[s]² were treated better than him, ( _see_ Ofoedu Aff. P 88), lacks any factual basis. Plaintiff does **_not_** allege **_a_** single alleged comparator by name, does **_not_** allege that any co-employee en-gaged in conduct of ²comparable seriousness,² and does **_not_** otherwise attempt to establish that any alleged comparator was similarly situ-ated to him. ²⁹ See _Iuorno v. DuPont Pharms._

---

For such evidence to defeat summary judgment, Plaintiff must demonstrate that he was ²similarly situated in all material re-

Co., 129 Fed. Appx. 637, 641 (2005) (finding that the plaintiff had *not* raised *an* inference of *discrimination* when she relied on conclusory allegations comparing herself to other ²unidentified employees²); Shumway, 118 F.3d at 64-65 (plaintiff failed to allege [*75] that other, non-protected employees engaged in the same misconduct as she, and thus, the Second Circuit held that she failed to prove her prima facie case of gender *discrimination*).

Plaintiff also asserts that the fact that Faye Davis was promoted to the role of Assistant Director instead of him is indicative of discriminatory animus. [30] Plaintiff makes the conclusory *claim* that he is [*76] ²more qualified² than Ms. Davis, however, he presents no evidence *supporting* this *claim*. Defendants, on the other hand, assert that Ms. Davis was promoted because Ms. Schuster had observed her to be *a* better performer, she had more experience in the Medical Records Department, having been employed there for over twenty years, she had outstanding performance evaluations throughout her tenure at St. Francis, and she was able to bring Plaintiff's department back within acceptable performance standards while he was out on medical leave. The Second Circuit places *a* high burden on plaintiffs to show that *a* discrepancy in qualifications *supports* the inference of discriminatory intent:

> When *a* plaintiff seeks to prevent summary judgment on the strength of *a* discrepancy in qualifications ignored by *an* employer, that discrepancy must bear the entire burden of allowing *a* reasonable trier of fact to *not* only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful *discrimination*. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person

selected for the job that ²no reasonable person, in the exercise of impartial [*77] judgment, could have chosen the candidate selected over the plaintiff for the job in question.²

Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 104 (2d Cir. 2001) (quoting Deines v. Tex. Dep't of Protective & Regulatory Servs., 164 F.3d 277, 280-81 (5th Cir. 1999)); see also Holt v. KMI-Continental, 95 F.3d 123, 130 (2d Cir. 1996) (plaintiff's ²personal *belief* that she was the most qualified person for the various positions² failed to show pretext where the facts indicated that the promotions which plaintiff had sought were given to people with greater experience than plaintiff). Plaintiff has *not* shown here that he was more qualified that Ms. Davis, or that ²no reasonable person² could have chosen Ms. Davis over Plaintiff for the Assistant Director position.

[*78] Like the plaintiff in Montana v. First Federal Sav. & Loan Asso., 869 F.2d 100, 107 (2d Cir. 1989), Plaintiff ²presents no evidence, statistical or circumstantial, to justify *an* inference that [St. Francis] made [gender, *race*, and/or national origin] *a* factor in its termination decision.² Specifically, Plaintiff presents no evidence that female, non-black, and/or American employees were treated more favorably than he was, and presents no evidence that Defendants held discriminatory attitudes toward male, black, and/or Nigerian persons or him in particular. Although the Court on summary judgment draws all reasonable inferences in favor of Plaintiff, as the party opposing summary judgment, he ²may *not* rest upon the mere allegations of denials of the adverse party's pleading,² Fed. R. Civ. P. 56(e), and ²some metaphysical doubt as to the material facts² is in-

---

spects² to the individuals to whom he compared himself, including a showing that these co-employees were subject to the ²same performance evaluation and discipline standards.² See Graham, 230 F.3d at 39-40. Moreover, Plaintiff must show that similarly situated employees who went undisciplined engaged in conduct of ²comparable seriousness.² Id. at 40 (quoting McDonnell Douglas, 411 U.S. at 804). Plaintiff's allegations in this regard are insufficient.

[30]   Ms. Davis is a black, Jamaican female, and therefore it is assumed that Plaintiff is asserting that her promotion over him was due to discrimination on the basis of gender and/or his Nigerian national origin.

sufficient.[2] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citations omitted);  see also *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 456 (1999) ( *a* plaintiff's [2]feelings and  **[\*79]**  perceptions of being discriminated against are *not* evidence of *discrimination*[2]) (internal brackets, quotations, and citations omitted). Even if there were some evidence indicating that Defendants' asserted reasons were pretextual, Plaintiff has presented no evidence that he was discriminated against because of his *race*, gender, or national origin. Accordingly, Defendants are entitled to judgment on Plaintiff's *discrimination  claims*.

## 2.  Plaintiff's Retaliation  *Claim*

Title VII prohibits retaliation against  *an* individual who has opposed  *a* discriminatory employment practice. *42 U.S.C. § 2000e-3( a).* Likewise,  *42  U.S.C. § 1981* prohibits retaliation against  *an* individual who has asserted rights protected by  *§ 1981. Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684, 693 (2d Cir. 1998).  *Claims* of retaliation brought under Title VII and  *§ 1981* are analyzed under the three-part burden shifting analysis set forth in  McDonnell Douglas. See *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir. 1995) ( *Title VII); Cook v. CBS, Inc.,* 47 Fed. Appx. 594 (2d Cir. 2002) ( *§ 1981*).

To make *a* prima facie case of retaliation,  **[\*80]**  Plaintiff must show by *a* preponderance of the evidence (1) that he participated in *a* protected activity known to Defendants; (2) the existence of *an* adverse employment action; and (3)  *a* causal connection between the protected activity and the adverse employment action. *Slattery v. Swiss Reins. America Corp.,* 248 F.3d 87, 94 (2d Cir. 2001). Again, *a* plaintiff's burden at this stage is de minimus.  Id. Once Plaintiff has established *a* prima facie case, the burden shifts to Defendants to show that they had *a* legitimate, non-discriminatory reason for the adverse employment action. *Id.* at

94-95. If Defendants are able to make this showing, then the burden shifts back to Plaintiff to prove that the proffered reason is merely *a* pretext for unlawful retaliation.  *Id.* at 95. If Plaintiff can demonstrate that retaliation played *a* motivating part in *an* employment decision, the burden shifts back to the employer to demonstrate that it would have made the same decision based upon legitimate factors alone.  See  *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir. 1993) (citing  *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244-45, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)). **[\*81]**

It cannot be questioned that Plaintiff has established the second element of *a* prima facie case; Plaintiff's termination clearly constituted *an* adverse employment action. The issues that remain are (1) whether Plaintiff has made out the first element, i.e., whether he can show that he engaged in *a* protected employment action, and (2) whether he has made out the third element, i.e., whether he can show *a* causal nexus between the alleged protected employment action and Defendants' adverse employment action.

### *a. Protected Employment Action*

Defendants first argue that there is no evidence that Plaintiff has engaged in any protected activity. (Defs.' Mem. Supp. 30.) To prove that he engaged in *a* [2]protected activity[2] for purposes of his retaliation *claim*, Plaintiff must show that he engaged in [2]protected participation or opposition[2] to *a* discriminatory employment practice made unlawful under Title VII or *Section 1981. Sumner v. United States Postal Service,* 899 F.2d 203, 208 (2d Cir. 1990) ( *Title VII); Hawkins,* 163 F.2d at 693 ( *§ 1981*);  see also *42 U.S.C. § 2000e-3( a).*[31]

 **[\*82]**  Although the memo from Plaintiff to Ms. Szenczy is *an* unsigned, undated note, Plaintiff's testimony that he sent the complaint to Ms. Szenczy is sufficient to authenticate the memo. Defendants argue that Ms. Szenczy

---

[31]   *42 U.S.C. § 2000e-3(a)* provides, in pertinent part, that: [2]It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this title [ *42 USCS §§ 2000e-2000e-17*]........ [2]

never received this memorandum and assert that Plaintiff failed to disclose this document in response to Defendants' First Set of Requests for Production, but produced it in time for him to mark it at the deposition of Ms. Szenczy. Defendants did **_not_** possess the document at that time and had **_not_** seen it prior to Ms. Szenczy's deposition. In his Opposition brief, Plaintiff does **_not_** address his failure to testify to this memorandum at his deposition or his failure to otherwise identify any protected activity in **_support_** of his retaliation **_claim_**. Giving Plaintiff the benefit of the doubt and construing the evidence in his favor, the Court will assume that the memo is **_a_** valid document and that Plaintiff sent it to Ms. Szenczy in March 2004.

To constitute protected activity, Plaintiff's memorandum to Ms. Szenczy must include **_a_** complaint of **_discrimination_**. See *Sumner,* 899 F.2d at 208 (to satisfy the requirements of the prima facie case, the plaintiff must show  [*83]  that he engaged in [2]protected participation or opposition under Title VII[2]); *Hawkins,* 163 F.2d at 693 (to be actionable under *§ 1981,* the alleged retaliation must have been in response to the assertion of rights protected by *§ 1981*). Although the Court finds that Plaintiff made some form of general complaint to Ms. Szenczy in March 2004, Defendants assert that the evidence does **_not_** show that he specifically complained to Ms. Szenczy or Ms. Currier that Ms. Schuster discriminated against him. ( See Defs.' Rule 56(**_a_**)(1) Statement P 47.) Plaintiff, in his deposition, stated that he complained to Ms. Szenczy that he was being treated unequally, but **_not_** specifically that Ms. Schuster discriminated against him on the basis of **_race_**, gender, and/or national origin. ( See Ofoedu Dep. I at 258:8-20.) He testified that in March 2004, he complained to Ms. Szenczy that Ms. Schuster was [2]dumping[2] him and that she [2]expected 24 and 48 hour turnaround.[2] ( Id. at 256:11-12.) He complained that Ms. Schuster's demands [2]made it very impossible for me to travel and see my family during the weekend.[2] ( Id. at 256:22-24.) Plaintiff further complained to Ms. Szenczy that Ms.  [*84]  Schuster [2]had altered my time sheets. . . .[2] ( Id. at 257:4-25.) Plaintiff asserts several

times in his Affidavit that he complained to Ms. Szenczy of **_discrimination_**, (Ofoedu Aff. PP 40, 81, 83), however, there is no evidence, in the memorandum or in his deposition, of **_a_** complaint of **_discrimination_**.

With regard to the [2]protected activity[2] element of **_a_** Title VII or *§ 1981* retaliation **_claim_**, the plaintiff need only [2]have had **_a_** good faith, reasonable **_belief_** that he was opposing **_an_** employment practice made unlawful by Title VII [or *§ 1981*].[2] *McMenemy v. City of Rochester,* 241 F.3d 279, 285 (2d Cir. 2001). Construing the evidence in Plaintiff's favor, the Court will assume that Plaintiff's assertion that he complained about being treated [2]unequally[2] constituted protected activity under Title VII and *§ 1981*.

b. *Causal Connection between Protected Employment Action and Termination*

To establish his prima facie case, Plaintiff finally must establish the existence of **_a_** causal connection between his protected activity and his termination. Plaintiff can demonstrate **_a_** causal connection [2]indirectly by showing that the protected activity was followed closely by discriminatory [*85]  treatment,[2] [2]through other evidence such as disparate treatment of fellow employees who engaged in similar conduct,[2] or [2]directly through evidence of retaliatory animus directed against **_a_** plaintiff by the defendant.[2] *De Cintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted). Although temporal proximity may be sufficient to demonstrate **_a_** causal nexus, [2][w]here timing is the only basis for **_a_** **_claim_** of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, **_an_** inference of retaliation does **_not_** arise.[2] *Slattery,* 248 F.3d at 95.

Plaintiff asserts that his memorandum of complaint was submitted to Ms. Szenczy on May 5, 2004 and that the Final Written Warning was given to him two days later. He argues that the temporal proximity between the two events is evidence that the Final Written Warning was issued in retaliation for his complaint. (Pl.'s Mem. Opp. 38.) Plaintiff's employ-

ment, however, was _**not**_ actually terminated until June 15, 2005, over thirteen months later. Although Plaintiff has demonstrated close temporal proximity between the **[\*86]** complaint and the Final Written Warning, the adverse employment action at issue here is his termination. Plaintiff has _**not**_ shown _**a**_ causal connection between his complaint and his termination and thus is unable to establish _**a**_ prima facie case of retaliation.  See _Clark County Sch. Dist. v. Breeden,_ 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (holding that although temporal proximity alone may show causation, the proximity must be very close; twenty months between the protected activity and the adverse action is too long); _Hollander v. American Cyanamid Co.,_ 895 F.2d 80, 85-86 (2d Cir. 1990) (_**a**_ three and one-half month interval between the protected activity and the alleged retaliation was insufficient to establish _**a**_ causal connection).

c. _Evidence of Pretext_

Even if the Court had found that Plaintiff had met his de minimus burden of establishing his prima facie case, he is unable to show that Defendants' legitimate, nondiscriminatory reasons for his discharge--i.e., Plaintiff's poor job performance and failure to improve--were merely _**a**_ pretext for retaliation.  See _Reeves,_ 530 U.S. at 143; _Slattery,_ 248 F.3d at 95. **[\*87]** As set forth above, with regard to Plaintiff's _**discrimination claim**_, there is no genuine issue of material fact with regard to Defendants' reasons for firing Plaintiff. Defendants' concerns about Plaintiff's performance issues are well-documented. Plaintiff has _**not**_ established the existence of _**a**_ genuine issue of material fact as to Defendants' proffered reasons for his termina-

tions, nor has he shown that retaliation was _**a**_ motivating factor in Defendants' decision to terminate his employment. Although there was close temporal proximity between Plaintiff's complaint and the issuance of his Final Written Warning, more evidence is necessary to establish pretext.  See _Simpson v. N.Y. State Dep't of Civ. Servs.,_ 166 Fed. Appx. 500, 502 (2d Cir. 2006) (**²**While the temporal proximity of these events gives rise to _**an**_ inference of retaliation for the purposes of appellant's prima facie case, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.**²**); _Quinn v. Green Tree Credit Corp.,_ 159 F.3d 759, 770 (2d Cir. 1998) (holding that _**a**_ strong temporal connection between the plaintiff's complaint **[\*88]** _along with_ other circumstantial evidence is sufficient to raise _**an**_ issue with respect to pretext). Accordingly, Defendants are entitled to judgment on Plaintiff's retaliation _**claim**_.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 66] is **granted** and Defendants' Motion to Strike [Doc. No. 77] is **granted in part** and **denied in part.**

The Clerk shall close the case.

SO ORDERED.

Dated at New Haven, Connecticut, September 13, 2006.

Peter C. Dorsey, U.S. District Judge

District of Connecticut



No *Shepard's Signal*™
*As of: January 23, 2014 3:51 PM EST*

# Pacheco v. Comprehensive Pharm. Servs.

United States District Court for the Southern District of New York
***November19***, ***2013***, Decided; ***November19***, ***2013***, Filed
***12Civ***. ***1606*** (***AJN***)

**Reporter:** 2013 U.S. Dist. LEXIS 164581; 2013 WL 6087382

ANNA PACHECO, Plaintiff, -v- COMPREHENSIVE PHARMACY SERVICES, et al., Defendants.

**Core Terms**

discrimination, employee, staff, claims, pharmacy, investigation, national origin, inference, evidence, administrative leave, summary judgment, terminate, burden, performance, retaliate, adverse, pharmacist, statements, quoting, adverse employment action, material, gender, email, party, standard, meeting, treated, facie, resign, prima

**Counsel:** **[*1]** For Anna Pacheco, Plaintiff: Bennitta Lisa Joseph, LEAD ATTORNEY, Boris Kogan & Associates (277B'way), New York, NY; Abby Helaine Natelson, Michael John Borrelli, Law Offices of Borrelli & Associates, Great Neck, NY.

For Comprehensive Pharmacy Services (Check), Reid Toda, Individually, Defendants: Elizabeth Rolande Gorman, LEAD ATTORNEY, Milber, Makris, Plousadis & Seiden, LLP(W'bry), Woodbury, NY; Kerri Monyak Hoffman, LEAD ATTORNEY, Milber Makris Plousadis & Seiden, LLP, New York, NY.

**Judges:** ALISON J. NATHAN, United States District Judge.

**Opinion by:** ALISON J. NATHAN

**Opinion**

## OPINION & ORDER

ALISON J. NATHAN, District Judge:

This case arises from Plaintiff Anna Pacheco's employment by Defendant Comprehensive Pharmacy Services (²CPS²). In addition to CPS, Plaintiff brings claims against her former supervisor, Reid Toda. Plaintiff alleges that Defendants discriminated against her on the basis of her national origin in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et seq* .; the New York State Human Rights Law (²NYSHRL²), *N.Y. Exec. Law § 295, et seq*.; and the New York City Human Rights Law (²NYCHRL²), N.Y.C. Admin. Code *§ 8-107*. Plaintiff also alleges retaliation in violation of Title VII, **[*2]** NYSHRL, and NY-CHRL; and gender and gender-plus discrimination and harassment in violation of NYSHRL and NYCHRL.

Defendants filed this motion for summary judgment on January 2, ***2013***. Dkt. No. 40. For the reasons that follow, the motion is granted in its entirety.

## I. LEGAL STANDARD

²Summary judgment is properly granted when, after reviewing the evidence in the light most favorable to the non-moving party, 'there is no genuine issue as to any material fact' and 'the moving party is entitled to a judgment as a matter of law.'² *Anyanwu v. City of New York* , No. 10-cv-8498, ***2013*** U.S. Dist. LEXIS 132138, ***2013*** WL 5193990, at *1 ( ***S.D.N.Y.***

Sept. 16, *2013*) (quoting *Fed. R. Civ.* P. 56(a); *Nabisco, Inc. v. Warner-Lambert Co .,* 220 F.3d 43, 45 (2d Cir. 2000)). For purposes of summary judgment, there is a genuine issue of material fact if a reasonable factfinder could decide in the non-moving party's favor. *Nabisco ,* 220 F.3d at 45.

The burden is generally on the moving party to demonstrate that there is no genuine issue of any material fact. *See  Gallo v. Prudential Residential Servs., L.P .,* 22 F.3d 1219, 1223 (2d Cir. 1994). When the burden of proof at trial would fall on the non-moving party, however, the moving party may meet its [*3] burden by 'point[ing] to a lack of evidence. . . on an essential element' of the non-moving party's claim. *Cordiano v. Metacon Gun Club, Inc .,* 575 F.3d 199, 204 (2d Cir. 2009).

If the moving party shows that there is no genuine issue of material fact, the non-moving party 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.' *Brown v. Eli Lilly & Co .,* 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted) (quoting *Celotex Corp. v. Catrett ,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In doing so, the non-moving party ''must do more than simply show that there is some metaphysical doubt as to the material facts' and 'may not rely on conclusory allegations or unsubstantiated speculation.'' *Id.* (citations omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp .,* 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); and *FDIC v. Great Am. Ins. Co .,* 607 F.3d 288, 292 (2d Cir. 2010)).

## II. BACKGROUND

Unless otherwise indicated, the following facts are undisputed or taken the in light most favorable to Plaintiff.

Plaintiff is a woman of Dominican national origin. Def. 56.1 Statement ¶ 4; Am. Compl., Gorman Decl., Ex. A, ¶ 7, at 3. She is a licensed pharmacist in New York. Def. [*4] 56.1 Statement ¶ 4; Gorman Decl., Ex. C, at *12*-1.

Defendant CPS is an independent pharmacy services provider that manages pharmacies throughout the United States and Puerto Rico on a contractual basis. Def. 56.1 Statement ¶ 1; Am. Compl., Gorman Decl., Ex. A, ¶ 9, at 3. In or around September 2008, CPS was hired to manage the pharmacy at the New York State Psychiatric Institute ('NYSPI'), and on October 8, 2008, Plaintiff was hired by Edward Fingers, CPS's Regional Director of Operations, and David Lowenthal, the Clinical Director of NYSPl, to be the Director of Pharmacy at NYSPl. Def. 56.1 Statement ¶¶ 3-4; Gorman Decl., Ex. F, at 10, *12*; Gorman Decl., Ex. E, at 20, 30. At the time Plaintiff was hired, Mr. Fingers was her direct supervisor at CPS; and Dr. Lowenthal was Plaintiff's on-site supervisor at NYSPl. Def. 56.1 Statement ¶ 5; Gorman Decl., Ex. C, at 45-46; Gorman Decl., Ex. F, at 56-57.

As Director of Pharmacy at NYSPI, Plaintiff's job duties included supervising and evaluating staff pharmacists. Def. 56.1 Statement ¶ 6; Gorman Decl., Ex. C., at 42, 44. As of June 2009, the staff pharmacists included Sandra Takami (an Asian woman of Japanese national origin), Juana Costigan [*5] (a Hispanic woman of Dominican national origin), Michael Ahimari (an African American man), Siam Wright (an African American woman), Rosa Basas (a woman of Cuban national origin), Elsa Correa (a Hispanic woman of Dominican national origin); and Pelaggia Skalvounos (a woman of Columbian and Greek national origin). Def. 56.1 Statement ¶ 8; Gorman Decl., Ex. C., at 54-56. At some later point, Robert Jung, a man of Korean national origin, joined the staff at NYSPl. *See* Def. 56.1 Statement ¶ 21(5).

In June 2009, while Plaintiff was on vacation, staff pharmacists held a meeting with Dr. Lowenthal to complain about Plaintiff's performance as manager. Def. 56.1 Statement ¶ 9; Gorman Decl., Ex. C, at 66. At the meeting, the staff complained that Plaintiff spoke negatively about staff pharmacists behind their backs, and that Plaintiff was not helpful. *See* Def. 56.1 Statement ¶ 9; Gorman Decl., Ex. F, at 43-45; Ex. C, at 69. Dr. Lowenthal told Plaintiff about

the meeting and the complaints when she returned from vacation. Gorman Decl., Ex. C, at 69. Plaintiff does not dispute that the meeting took place, but she does object that the assertions regarding the content of the staff complaints are [*6] hearsay. Pl. 56.1 Statement ¶ 9(b), at 2-3.

In *November* 2009, Mr. Fingers gave Plaintiff 3.4 out of 5 on her annual performance review, where 3 indicated ²Proficient² and 4 indicated ²Exceeds Standards.² Def. 56.1 Statement ¶ 10; Gorman Decl., Ex. O. Plaintiff received scores of ²4² for ²[p]romot[ing] teamwork among staff, peers, physicians, and others² and ²[p]romot[ing] multidisciplinary teamwork in order to meet the organization's goals and standards.² Pl. 56.1 Statement ¶ 10(b); Gorman Decl., Ex. O. In the comments section, it was noted that Plaintiff should ²[c]ontinue to work on the improvement of services to the customers (patients, nursing staff, administration) by implementing programs and maintaining good relationships with the pharmacy and hospital staff and administration.² Def. 56.1 Statement ¶ 10; Gorman Decl., Ex. O. Mr. Fingers described Plaintiff's overall score of 3.4 as a ²good score,² Pl. 56.1 Statement ¶ 10; Borelli Decl., Ex. B, at 46, and this score should have qualified Plaintiff for a raise, which she did not receive, Pl. 56.1 Statement ¶ 10; Borelli Decl., Ex. C, at 78-79.

Plaintiff became pregnant in May 2010, and she informed her staff and supervisors shortly [*7] thereafter. Def. 56.1 Statement ¶ 11; Gorman Decl., Ex. C, at 79-84. Defendant Toda, who was at that time Regional Director of Behavioral Health at CPS, learned of Plaintiff's pregnancy when he visited NYSPI in June or July 2010. Pl. 56.1 Statement ¶ 11; Gorman Decl., Ex. D, at 83. This was the second time Plaintiff met Defendant Toda. Def. 56.1 Statement ¶ 11; Gorman Decl., Ex. C., at 79.

In July 2010, Plaintiff, Dr. Lowenthal, and Mr. Fingers discussed overstaffing issues at NYSPI, ultimately deciding to reserve the issue for future resolution. Def. 56.1 Statement ¶ *12*; Gorman Decl., Ex. C., at 97-100. Despite instructions to keep these discussions confiden-

tial, Plaintiff discussed the overstaffing issue with Janelle Greenhill, an administrator at the non-party Research Foundation and Mental Health, suggesting the pharmacy was overstaffed by one person. Pl. 56.1 Statement ¶ *12*; Borelli Decl., Ex. D, at 97-98. On July 10, 2010, Mr. Fingers issued Plaintiff a letter of reprimand for circumventing her chain of command by discussing the overstaffing issues with Janelle Greenhill. Def. 56.1 Statement ¶ 13; Gorman Decl, Ex. C, at 97-100; Ex. I. In her response to the letter of reprimand, [*8] Plaintiff admitted that she had spoken with Ms. Greenhill, but maintained ²that the contents of [her] actions were [not] wrong² because she felt the recommendation related to her duties as Pharmacy Director. Pl. 56.1 Statement ¶ 13(d); Gorman Decl., Ex. P.

In October 2010, Mr. Fingers gave Plaintiff 2.6 out of 5 on her second annual performance evaluation, where a score of ²2² indicated ²below standards² performance. Def. 56.1 Statement ¶ 15; Pl. 56.1 Statement ¶ 15 (disputing only the characterization of the performance evaluation as a ²further deterioration²); Gorman Decl., Ex. Q. In the employer comments section, Mr. Fingers indicated that Plaintiff's ²goals for the next evaluation period² included ²leading by example gaining the respect of other pharmacy members and other hospital departments,² and Plaintiff was warned that failure to improve ²could lead to further disciplinary action.² Def. 56.1 Statement ¶ 15; Gorman Decl., Ex. Q.

Plaintiff submitted her request to begin her maternity leave on December 20 or 22 in October 2010. Pl. 56.1 Statement ¶ 16(a); Borelli Decl., Ex. D, at 131. In *November*, Mr. Fingers expressed dismay when he learned that Plaintiff would be going on leave [*9] earlier than she anticipated, and Plaintiff was forced to use her vacation days to accommodate her early delivery. Pl. 56.1 Statement ¶ 16(b)-(c); Borelli Decl., Ex. D, at 130, 137. Plaintiff delivered her baby on December 23, 2010, and she returned to work between March 14 and March 16, 2011, Pl. 56.1 after taking her full twelve weeks of FMLA leave and approximately one week of accumulated paid time off. Def.

2013 U.S. Dist. LEXIS 164581, *9

56.1 Statement ¶ 16; Pl. 56.1 Statement ¶ 16(c) Gorman Decl., Ex. C, at 145; Borelli Decl., Ex. D, at 138.

Defendant Toda became Plaintiff's immediate supervisor in March 2011. Def. 56.1 Statement ¶ 17; Gorman Decl., Ex. C, at 173. Plaintiff had not seen Defendant Toda since June 2010, and she did not communicate with him at all during her pregnancy leave. *Id.* During the time that he was Plaintiff's direct supervisor, Defendant Toda visited the NYSPI pharmacy approximately five or six times. *See* Def. 56.1 Statement ¶ 21; Pl. 56.1 Statement ¶ 21 ("Undisputed."). Plaintiff felt that Defendant Toda respected staff pharmacists Sandra Takami and Robert Jung, who are both, like Defendant Toda, of Asian descent, more than he respected her. Def. 56.1 Statement ¶ 21; Gorman Decl., Ex. [*10] C, at 199-200, 202. Defendant Toda allegedly called Plaintiff "cocky," referred to her work as mediocre, and "spoke to her like she was a dog and/or child." Def. 56.1 Statement ¶ 21; Gorman Decl, Ex. C, at 188, 192, 195. On one or two occasions, Defendant Toda mistook Plaintiff for Puerto Rican; when corrected, he responded, "Oh that's right, you are not Puerto Rican, *they* are very nice people." Pl. Opp. 5; Borelli Decl., Ex. E, at 189.

In July 2011, Defendant Toda was prompted to visit NYSPI after two dispensing errors were made by Ms. Takami, a female staff pharmacist of Japanese national origin supervised by Plaintiff. Def. 56.1 Statement ¶ 17; Gorman Decl., Ex. D, at 132-33, 155. Following these errors, the entire pharmacy staff was counseled about dispensing errors and made to follow new procedures. Pl. 56.1 Statement ¶ 18; Borelli Decl., Ex. F, at 164-65. Defendant Toda initially attributed the errors to "the system" and Plaintiff's management, and he was reluctant to blame Ms. Takami. Pl. Opp. 5; Borelli Decl., Ex. C, at 179. In the end, however, Defendant Toda was persuaded to issue Ms. Takami an "Employee Warning Notice" for the errors. Pl. Opp. 5; Gorman Decl., Ex. I.

On August [*11] 11, 2011, Ms. Takami resigned from her position as staff pharmacist in a brief email sent to Mr. Fingers, Defendant Toda, and Plaintiff. Def. 56.1 Statement ¶ 23; Gorman Decl., Ex. W. In addition to offering her resignation, Ms. Takami's email mentioned that she had informed Defendant Toda of her intention to resign the day before. Pl. Opp. 5; Gorman Decl., Ex. W. Later on August 11, 2011, Dr. Lowenthal replied to Ms. Takami's email to express surprise at "the manner in which [she was] resigning" and observe that she was "in effect leaving without any notice." Def. 56.1 Statement ¶ 23; Gorman Decl., Ex. X. He suggested that either "something [had] happened recently that was disturbing to [Ms. Takami]," or "[she] had in fact been looking [for a new job] and found something and [was] pressed to start right away." *Id.*

Ms. Takami responded to Dr. Lowenthal's suggestions on August 14, 2011, explaining that she was leaving because she felt "very uncomfortable at the pharmacy." Def. 56.1 Statement ¶ 24; Gorman Decl., Ex. X; *see also* Pl. 56.1 Statement ¶ 24 (not disputing the contents of the email). The bulk of Ms. Takami's complaints concerned Plaintiff, whom she characterized as suffering [*12] from "paranoia and [the] belief that everyone is out to get her." Gorman Decl., Ex. X. According to Ms. Takami's email, Plaintiff sowed discord within the pharmacy by badmouthing staff members, shifting around blame for staff mistakes, and spreading malicious rumors. *Id.* Ms. Takami, for example, noted that Plaintiff was suspicious of her relationship with Defendant Toda and Robert Jung, because "we are all Asian, and [Defendant Toda] happens to get along with us." *Id.* Ultimately, Ms. Takami claimed that Plaintiff's management left her feeling as if she were "walking on a tightrope with no support." *Id.* Ms. Takami, however, also emphasized that her problems with Plaintiff were "not regarding [Plaintiff's] work capabilities." *Id.*

Later that same day, August 11, 2011, Defendant Toda forwarded the email containing Ms. Takami's complaints to Karen Clawson and Stephanie Wesala in the CPS Human Resources Department. Def. 56.1 Statement ¶ 25; Gorman Decl., Ex. X. In his email, Defendant Toda wrote, "This is very disturbing. Please advise next steps with Anna." Gorman Decl.,

Ex. X. CPS Human Resources officer Stephanie Wesala responded to Toda's email by initiating an investigation of Plaintiff [*13] on August 15, 2011, and placing Plaintiff on administrative leave the same day. Pl. 56.1 Statement ¶ 26 (stating that the human resources investigation was prompted by Toda's email); Def. 56.1 Statement ¶ 26; Gorman Decl., Ex. C, at 206; Ex. J, at 88, 90; Ex. N.

On August 16, 2011, Plaintiff emailed CPS Human Resources to file a complaint of national origin-based discrimination against Defendant Toda. Def. 56.1 Statement ¶ 27; Gorman Decl., Ex. AA; Ex. C. at 222-23; Ex. J, at 112. In the same email, Plaintiff notified CPS Human Resources of her intention to file discrimination complaints with New York State and New York City as well. Defendant 56.1 Statement ¶ 27; Gorman Decl., Ex. AA. On August 22, 2011, Plaintiff filed a complaint of national origin discrimination with the New York State Division of Human Rights ("NYS-DHR").[1] Gorman Decl., Ex. HH.

CPS retained a local attorney named David Tango to separately investigate Plaintiff's discrimination claims. Def. 56.1 Statement ¶ 27; Gorman Decl., Ex. C at 229. Plaintiff, however, expressed doubt that she would be able to participate in Mr. Tango's investigation because she was not sure whether she was permitted to while her NYSDHR complaint was pending. Pl. 56.1 Statement ¶ 27(e); Borelli Decl., Ex. C, at 136-37. Unlike Plaintiff, Defendant Toda was not placed on administrative leave during the pendency of the investigation against him. Pl. 56.1 Statement ¶ 26(b).

Meanwhile, Ms. Wesala in CPS Human Resources continued her investigation into Ms. Takami's complaint. In the course of that investigation, Ms. Wesala interviewed nine individuals who were managed by Plaintiff. Def. 56.1 Statement ¶ 28. According to the report that was prepared, those interviews revealed

definite examples of instances of not only. . . harassing but discriminatory [*15] treatment" by Plaintiff. Def. 56.1 Statement ¶ 29; Gorman Decl., Ex. J, at 117; Gorman Decl., Ex. GG. The resulting investigative report found that Plaintiff "[was] guilty of making disparaging comments about employees," Def. 56.1 Statement ¶ 29; Gorman Decl., Ex. GG. Two of the interviewed employees told investigators that Plaintiff's conduct had improved since the June 2009 meeting with Dr. Lowenthal. Gorman Decl., Ex. GG. The remaining employees, however, reported that Plaintiff "ma[de] a lot of remarks," for example calling Ms. Takami a "dumb blonde" and "ditzy," describing another employee as "Spongebob because her shape is square," and referring to staff pharmacists by their ethnicities. Id. Plaintiff denies making these statements, but she does not deny that CPS received numerous reports that she made such statements. See Pl. 56.1 Statement ¶ 29 (denying that she made such statements, but not denying that the statements were reported to the investigator).

On August 18, 2011, Ms. Wesala provided written copies of her initial investigative report to Plaintiff, asked Plaintiff to respond to the claims, and informed Plaintiff that she would remain on administrative leave until the [*16] investigation was completed. Def. 56.1 Statement ¶ 31; Gorman Decl., Ex. CC. The initial report detailed evidence that Plaintiff "[t]alk[ed] about employees behind their backs," "[t]r[ied] to get employees into trouble," created an "[u]ncomfortable workplace," engaged in "[m]alicious behavior," and generally failed to "interact with the staff" on the pharmacy floor. Gorman Decl., Ex. CC. Plaintiff did not deny that employees had previously complained about her talking about them behind their backs, but rather emphasized that the meeting was held with Dr. Lowenthal, her on-site supervisor at NYSPI, and not her supervisor at CPS. Id. Plaintiff, however, expressed incredulity at the allegation

---

[1]   There is some confusion in the record regarding the agency with which the August 24, 2011, discrimination complaint was filed. See Pl. 56.1 Statement ¶ 27(c) (stating that Plaintiff filed a complaint with the NYCCHR). But see Gorman Decl., Exh. C, at 253 (stating that Plaintiff had filed a complaint with the NYSDHR); Exh. HH (Verified Complaint [*14] filed by Plaintiff with NYSDHR). The Court assumes that the relevant complaint was filed in the NYSDHR, but also notes that, wherever the complaint was filed, it constituted protected activity for purposes of retaliation under Title VII, NYSHRL, and NYCHRL.

that she ²[t]r[ied] to get employees into trouble² and claimed to be ²dumbfounded² by the allegation that she created an uncomfortable workplace. *Id.* As an example of her helpfulness, Plaintiff recalled an incident in which one staff pharmacist called her to complain ²that she was not getting any work to do because [another pharmacist] was taking it all.² *Id.* She also defended herself by explaining that, far from the uncomfortable environment described in the report, she had always ²tr[ied] to create **[\*17]** a familial environment² at the pharmacy, such as by setting up a collection drive to enable a staff pharmacist to travel to the Dominican Republic for a family funeral, and by hosting a lavish catered holiday party for staff out of her own pocket. *Id.* She concluded: ²it is very hard to believe that the staff that went to visit my son at the hospital and at home when he had surgery was the same staff that said the frivolous comments mentioned in the investigation.² *Id.*

On August 28, 2011, Dr. Lowenthal, who was Plaintiff's on-site supervisor at NYSPI, also responded to Ms. Wesala's initial investigative report with his own observations about Plaintiff's conduct as manager. *See* Def. 56.1 Statement ¶ 32; Gorman Decl., Ex. DD. The email recounted the June 2009 meeting at which the staff pharmacists complained about Plaintiff's ²[t]alking about employees behind their back,² as well as the incident in which Plaintiff circumvented the chain of command to recommend reducing the pharmacy staff. Gorman Decl., Ex. DD. Dr. Lowenthal described Plaintiff as ²ha[ving] done a good job in certain areas, and in [his] opinion, a poor job in others,² notably ²interpersonal and supervisory skills.² *Id.* **[\*18]** In particular, Dr. Lowenthal expressed ²strong doubt that [Plaintiff would] be able to improve² her interpersonal skills and indicated that ²[his] own strong feeling [was] that [Plaintiff] [would] not be an effective head of [NYSPI's] Pharmacy going forward.² *Id.* In other words, NYSPI informed CPS that it did not want Plaintiff back as manager of their pharmacy, and bringing Plaintiff back to work as Director of Pharmacy at NYPSI would have required CPS to ²stake[] their reputation on it.² Pl. 56.1 Statement ¶ 34.

Ms. Wesala completed her investigation of Ms. Takami's allegations against Plaintiff on September 2, 2011. Def. 56.1 Statement ¶ 33; Gorman Decl., Ex. GG. Meanwhile, Mr. Tango completed his independent investigation of Plaintiff's complaint that Defendant Toda had discriminated against her, delivering his report to Ms. Wesala on September 27, 2011. Def. 56.1 Statement ¶ 35; Gorman Decl., Ex. J, at 120-21. Ms. Wesala testified that Mr. Tango's investigation not only exonerated Defendant Toda, but actually uncovered further evidence of discriminatory and harassing conduct by Plaintiff. Def. 56.1 Statement ¶ 35; Gorman Decl., Ex. J, at 142, 147; *see also* Pl. 56.1 Statement ¶ **[\*19]** 35 (objecting that this is hearsay but not disputing the assertion).

Ms. Wesala initially believed that Plaintiff's misconduct might be remedied through coaching and counseling, consistent with the CPS Corrective Action Policy. Pl. 56.1 Statement ¶ 33; Borelli Decl., Ex. C, at 119. That policy provides: ²[w]hen an employee's actions are inappropriate for our work environment, interfere with performance, violate Company policy, or job performance is below standards, the Company may decide, in its sole discretion, to use progressive discipline designed to help the employee improve job performance and/or ensure full and immediate correction of inappropriate behavior.² Gorman Decl., Ex. N, at 3. The policy contemplates the following forms of discipline, from least to most severe: verbal warning, written warning, final written warning, and termination. *Id.* The policy also provides that ²[m]anagers shall consult with an HR Manager when an employee's performance. . . may warrant an investigation,² and that, ²[i]f the situation or circumstance warrants, an employee may be placed on administrative leave during an investigation.² *Id.*

At some point after learning of NYSPI's opposition to Plaintiff **[\*20]** and receiving the results of Mr. Tango's investigation of Plaintiff's complaint against Defendant Toda, Ms. Weseala changed her mind and decided to recommend that Plaintiff be removed from her position as Director of Pharmacy. *See* Pl. 56.1 Statement ¶¶ 30 (Ms. Wesala's decision was

based on Mr. Tango's investigation), 38 (Ms. Wesala's decision was based on Dr. Lowenthal's opposition). On September 28, 2011, Plaintiff was offered the option of either resigning or being terminated. Def. 56.1 Statement ¶ 38; Gorman Decl., Ex. J, at 117, 121; Ex. C, at 247. Plaintiff refused to resign and was terminated. Pl. 56.1 Statement ¶ 38(d); Borelli Decl., Ex. C, at 126. Following Plaintiff's departure from CPS, Robert Jung was promoted to be Director of Pharmacy at NYSPI in her place. Def. 56.1 Statement ¶ 39; Gorman Decl., Ex. F, at 101.

## III. DISCRIMINATION CLAIMS

### A. Individual liability under Title VII.

Before proceeding to analyze the merits of Plaintiff's claims against Defendants, the Court notes that individuals are not subject to liability under Title VII. See *Anyanwu , 2013* U.S. Dist. LEXIS 132138, *2013* WL 5193990, at *9; *Mandell v. Cnty. of Suffolk* , 316 F.3d 368, 377 (2d Cir. 2003). Individual Defendant Toda is therefore [*21] entitled to summary judgment on the Title VII claims against him. NYSHRL and NYCHRL discrimination claims, by contrast, may be brought against individual defendants. See *Anyanwu* , *2013* U.S. Dist. LEXIS 132138, *2013* WL 5193990, at *10 (citing *Alexander v. Westbury Union Free Sch. Dist .*, 829 F.Supp.2d 89, 113 (E.D.N.Y.2011)). The Court will consider the individual liability of Defendant Toda under the NYSHRL and NYCHRL after it determines whether those claims survive summary judgment as against CPS.

### B. Hearsay

Plaintiff objects that various statements asserting that pharmacy staff complained about her interpersonal skills constitute inadmissible hearsay. See, e.g. Pl. 56.1 Statement ¶¶ 9, 29, 36. Plaintiff, for example, objects to Dr. Lowenthal's statements asserting that pharmacy staff complained to him about Plaintiff talking about them behind their backs, saying negative and malicious things, and being unhelpful. See Pl. 56.1 Statement ¶ 9. Although the statements

to which Plaintiff objects are indeed out-of-court statements, [2][o]ut-of-court statements are not hearsay if offered to show the context within which parties were acting, or to show a party's motive or intent for behavior.[2] *Arista Records LLC v. Lime Group LLC* , 784 F. Supp. 2d 398, 420-21 ( *S.D.N.Y*. 2011) [*22] (citing 6 Weinstein's Federal Evidence, § 801.11 [5]). Thus, to the extent that such statements are offered to demonstrate Defendant's motive in investigating and eventually terminating Plaintiff, and not to prove that Plaintiff actually made such remarks, they constitute admissible non-hearsay and can be considered by the Court.

### C. National origin discrimination

#### 1. Legal standard

Plaintiff alleges that she was discriminated against on the basis of her national origin in violation of Title VII, NYSHRL, and NYCHRL. The Court analyzes these claims under the familiar three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green* , 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See *Dawson v. Bumble & Bumble* , 398 F.3d 211, 216-17 (2d Cir. 2005) (analyzing Title VII, NYSHRL, and NYCHRL under the *McDonnell* framework). Under that framework, it is initially a plaintiff's burden to establish a *prima facie* case of intentional discrimination. Although the precise elements of this *prima facie* claim may vary depending on the factual circumstances involved, *see McDonnell Douglas* , 411 U.S. at 802 n.13, a plaintiff may ordinarily meet her burden by showing: [2](1) [s]he belonged to a protected class; (2) [s]he [*23] was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.[2] *Terry v. Ashcroft* , 336 F.3d 128, 138 (2d Cir. 2003). At summary judgment, a plaintiff's initial burden is [2]minimal.[2] *Graham v. Long Island R.R* ., 230 F.3d 34, 38 (2d Cir. 2000).

If a plaintiff successfully establishes a *prima facie* case of intentional discrimination, a presumption of unlawful discrimination arises, and

the burden shifts to the defendant to [2] come forward with admissible evidence of legitimate nondiscriminatory reasons for its adverse actions toward the plaintiff.[2] *Mandell v. Cnty. Of Suffolk* , 316 F.3d at 380; *see also McDonnell Douglas* , 411 U.S. at 802.

Once both parties have satisfied their initial burdens, [2] the plaintiff's ultimate burden of persuasion is the burden she bore from the outset—to persuade the trier of fact that she was the subject of illegal discrimination.[2] *Holtz v. Rockefeller & Co., Inc* , 258 F.3d 62, 81 (2d Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods* ., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *Tex. Dept. of Community Affairs v. Burdine* , 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). [*24] A plaintiff may accomplish this [2] by showing that the defendant's proffered reasons were pretextual or were not the only reasons and that the prohibited factor was at least one of the motivating factors.[2] *Anyanwu* , *2013* U.S. Dist. LEXIS 132138, *2013* WL 5193990, at *11 (citing *Nolley v. Swiss Reinsurance Am. Corp* ., 857 F. Supp. 2d 441, 455 ( *S.D.N.Y.* 2012) (internal quotation marks omitted)).

### 2. Placement on administrative leave

Plaintiff alleges that she was unlawfully discriminated against on the basis of national origin when CPS placed her on administrative leave following a complaint by staff pharmacist Sandra Takami. Am. Compl., Gorman Decl., Ex. ¶¶ 41, 51, at 8, 10; Pl. Opp. 9. In order to establish a *prima facie* case of unlawful discrimination and meet her burden under the first step of *McDonnell Douglas* , Plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action when she was placed on administrative leave; and (4) that adverse action occurred under circumstances giving rise to an inference of discriminatory intent. *See Terry v. Ashcroft* , 336 F.3d at 138 (2d Cir. 2003). Defendants do not contest that Plaintiff is able [*25] to satisfy the first three elements of the test. *See* Def. Br. 6-8. This leaves only the question of whether Plaintiff's placement on administrative

leave occurred under circumstances giving rise to an inference of discrimination.

[2] In general, an inference of discrimination may be drawn from various circumstances, including direct evidence of 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group.'[2] *Anyanwu* , *2013* U.S. Dist. LEXIS 132138, *2013* WL 5193990, at *10 (quoting *Chambers v. TRM Copy Ctrs. Corp* ., 43 F.3d 29, 37 (2d Cir.1994) (citations omitted)). Because [2] [d]irect evidence of discrimination, 'a smoking gun,' is typically unavailable[2] in the employment discrimination context, a plaintiff may also rely on indirect, circumstantial evidence to prove her case. *Holcomb v. Iona Coll* ., 521 F.3d 130, 141 (2d Cir. 2008) (quoting *Rosen v. Thornburgh* , 928 F.2d 528, 533 (2d Cir. 1991)).

### i. Instigation of complaint

Plaintiff argues that the events leading up to the adverse employment action, her placement on administrative leave, give rise to an inference of discriminatory intent. Pl. Opp. 9. Specifically, Plaintiff argues [*26] that Defendant Toda, who is of Japanese national origin, and whom Plaintiff alleges to harbor national-origin based animus, [2] encouraged[2] Ms. Takami, who is also of Japanese national origin, [2] to make allegations against Plaintiff as a pretense for his discriminatory treatment of Plaintiff.[2] Pl. Opp. 9-10.

The record, however, reveals no evidence that Defendant Toda [2] encouraged[2] Ms. Takami to make her complaint. As Plaintiff concedes and the record plainly shows, it was not Defendant Toda but Dr. Lowenthal who prompted Ms. Takami to explain her reasons for resigning, and it was not national origin-based bias, but concern about staffing the pharmacy on short notice, which motivated his inquiry. *See* Pl. 56.1 Statement ¶ 24 ([2] The August 14, 2011 e-mail written by Takami [containing her complaint about Plaintiff], *is the response that she wrote to Lowenthal's further inquiry* as to why she decided to resign so abruptly before a replacement was found.[2]). Even viewing the evi-

dence in the light most favorable to Plaintiff, the allegation that Defendant Toda forwarded Ms. Takami's complaint to human resources *after* it had already been elicited by Dr. Lowenthal offers no support for Plaintiff's [*27] argument that Defendant Toda ²encouraged² Ms. Takami to act as she did, and no reasonable factfinder could find that it raises an inference of discrimination. Def. 56.1 Statement ¶ 25 (indicating that Defendant Toda forwarded Ms. Takami's email to human services); Pl. 56.1 Statement ¶ 25 (²Undisputed for purposes of this motion.²).

Nor does the fact that Ms. Takami apparently informed Defendant Toda of her intention to resign the day before informing Plaintiff and Dr. Lowenthal raise any inference of discrimination. Nothing in the record permits the inference that Defendant Toda encouraged Ms. Takami to make any allegations against Plaintiff in this prior conversation, and the Court will not speculate that any such encouragement took place. *See* *Brown*, 654 F.3d at 358 (nonmoving party ²may not rely on conclusory allegations or unsubstantiated speculation² to defeat summary judgment) (internal citation omitted). Indeed, Ms. Takami did not make any allegations against Plaintiff after discussing her intent to resign with Defendant Toda. As discussed, it was only after *Dr. Lowenthal* inquired that Ms. Takami's complaints surfaced.

Accordingly, the sequence of events leading up to Plaintiff's [*28] placement on administrative leave does not raise an inference of discrimination.

ii. Rudeness

Plaintiff also argues that an inference of discrimination may be drawn from the allegations that ²Defendant Toda was frequently rude to [her].² Pl. Opp. 10. At the outset, the allegations that Defendant Toda referred to Plaintiff as ²[c]ocky,² spoke to Plaintiff ²in a condescending manner,² ordered Plaintiff to sit down ²as if he were expressing a command to a dog,² and was generally ²rude² bear no relation to Plaintiff's national origin and raise no inference of discrimination. *Cf.* *Ford v. New York City*

*Dep't of Health and Mental Hygiene*, 545 F. Supp. 2d 377, 389 (*S.D.N.Y.* 2008) (finding that ²abusive comments—like 'fat fish' and 'stupid fish²' provided no evidence of genderbased discrimination). Such ²rude and unprofessional² conduct ²merely indicates personal enmity rather than discrimination.² *Wilson v. Family Dollar Stores of New York, Inc*., No. 06 -cv-639, 2008 U.S. Dist. LEXIS 73452, 2008 WL 4426957, at *8 (E.D.N.Y. Sept. 25, 2008).

Only one of Defendant Toda's alleged derogatory statements actually invokes Plaintiff's national origin. In June or July of 2011, Defendant Toda allegedly mistook Plaintiff's national [*29] origin as Puerto Rican ²once or twice² and implied that people of her national origin, Dominican, were not ²very nice.² Def. 56.1 Statement ¶ 21; Am. Compl., Gorman Decl., Ex. A, ¶¶ 34-37, at 7. Specifically, Plaintiff alleges that, when she informed Defendant Toda that she was Dominican and not Puerto Rican, he responded, ²[O]h, that's right, you are not Puerto Rican, *they* are very nice people.² Am. Compl., Gorman Decl., Ex. A, ¶¶ 34-37, at 7 (emphasis in original).

When determining the significance of this kind of ²isolated and stray remark,² courts examine the context in which the remark occurred, paying particular attention to the strength of the relationship between the remark and the alleged adverse action. *Campbell v. Alliance Nat. Inc*., 107 F. Supp. 2d 234, 247 (*S.D.N.Y.* 2000) (finding a single racially discriminatory remark made by a non-decisionmaker one year before the adverse action insufficient to generate an inference of discrimination). Under this rubric, the significance of the remarks is immediately undercut by the extremely limited role Defendant Toda played in the decision to place Plaintiff on administrative leave. Even reading the record in the light most favorable [*30] to Plaintiff, Defendant Toda at most ²instigated² the investigation of Plaintiff by forwarding Ms. Takami's complaint to CPS Human Resources—nothing in the record indicates that he encouraged or otherwise participated in the decision to place Plaintiff on leave during the investigation of that complaint.

SCOTT WEISS

But even if Defendant Toda had played a role in the decision to place Plaintiff on administrative leave, the derogatory statements are too isolated, remote, and benign to give rise to an inference of discrimination. The derogatory statements regarding Plaintiff's national origin were made only ²once or twice² in the one or two months immediately preceding the challenged adverse action, which occurred on August 15, 2011, and they were not part of a larger ²pattern of derogatory statements.² *See* Def. 56.1 Statement ¶ 21(2); Pl. 56.1 Statement ¶ 21; Gorman Decl., Ex. C, at 188-89. This stands in stark contrast with, for example, the ²pattern of derogatory statements² that were found to support an inference of discrimination in *Abdu-Brisson v. Delta Air Lines, Inc*., 239 F.3d 456 (2d Cir. 2001), where a decisionmaking manager ²made numerous comments about the age of the [employees], referring [*31] to them as 'contaminated' and 'Bad Apples,²' and the comments occurred ²against the background of [the employer's] all-consuming interest in the age and projected retirement rates of the [employees].² *239 F.3d at 468*. Under these circumstances, Defendant Toda's statements about Puerto Ricans constitute, at most, ²the stray remarks of a decision-maker,² and ²without more, [they] cannot prove a claim of discrimination.² *Id*.

### iii. Disparate treatment

Plaintiff further argues that an inference of discrimination is raised by Defendant Toda's ²treat[ing Plaintiff] in a discriminatory manner, different from how he treated the other two staff pharmacists of Asian Descent at the NYSPI,² Mr. Jung and Ms. Takami. Pl. Opp. 10. Again, the force of this argument is severely undermined by the absence in the record of any evidence indicating that Defendant Toda participated in the decision to place Plaintiff on administrative leave, other than by forwarding Ms. Takami's complaint to Human Resources. Even if he had, these allegations would raise no inference of discrimination because Plaintiff was not similarly situated to Ms. Takami or Mr. Jung, who were Plaintiff's subordinates, and who were not alleged [*32] to have engaged in comparable conduct.

²A showing of disparate treatment—that is, a showing that an employer treated plaintiff 'less favorably than a *similarly situated* employee outside his protected group'—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case.² *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (quoting *Mandell*, 316 F.3d at 379) (emphasis added). ²An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'² *Id*. at 493-94 (quoting *Graham v. Long Island R.R*., 230 F.3d at 40); *see also Anyanwu*, *2013* U.S. Dist. LEXIS 132138, *2013* WL 5193990, at *14 (disparate treatment requires ²a showing that the more favorably treated employees were 'similarly situated' to the plaintiff in all material respects²) (citing *Shumway v. United Parcel Serv., Inc*., 118 F.3d 60, 64 (2d Cir. 1997); *Ruiz v. Cnty. Of Rockland*, 609 F.3d at 494-95; *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-55 (2d Cir. 2001)).

Ms. Takami and Mr. Jung meet neither of these requirements and cannot serve as comparators for purposes of generating an inference of [*33] discrimination. Ms. Takami and Mr. Jung were not subject to the same performance evaluation and discipline standards as Plaintiff—indeed, Plaintiff was their supervisor. Def. 56.1 Statement ¶ 6. Nor did Ms. Takami or Mr. Jung engage in comparable conduct. Conduct is ²comparable² if there is a ²reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases,² although does not need to be ²a showing that both cases are identical.² *Ruiz*, 609 F.3d at 494 (quoting *Graham v. Long Island R.R*., 230 F.3d at 40). Mr. Jung is not alleged to have engaged in any misconduct at all, and Ms. Takami resigned after making ²two errors in dispensing medication.² Pl. Opp. 5. Plaintiff, by contrast, was placed on administrative leave for creating ²an uncomfortable work environment² for her subordinates. Def. 56.1 ¶¶ 24-26. Far from the ²reasonably close resemblance of the facts and circumstances² required to show that two people are similarly situated for purposes of disparate treatment analysis, Plain-

tiff's, Ms. Takami's, and Mr. Jung's respective cases bear no resemblance at all. Consequently, the alleged disparity in the way in which they were treated by Defendant Toda [*34] raises no inference of discrimination.

Plaintiff has failed to raise an inference of discrimination sufficient to make a *prima facie* case under the *McDonnell-Douglas* framework. Accordingly, defendants' motion for summary judgment is granted on Plaintiff's Title VII, NY-SHRL, and NYCHRL claims of national origin discrimination.

### C. Retaliation under Title VII and NYSHRL

Plaintiff alleges that Defendants unlawfully terminated her in retaliation for filing a complaint of discrimination with the New York State Division of Human Rights (²NYSDHR²) and the Equal Employment Opportunity Commission (²EEOC²)² in violation of Title VII, NY-SHRL, and NYCHRL. The Court begins by considering Plaintiff's NYSHRL and Title VII together, as they are analyzed ²in the same manner;² retaliation claims brought under NY-CHRL are analyzed ²more liberally² and must be considered separately. *See Mingguo Cho v. City of New York* , No. 11-cv-1658, 2012 U.S. Dist. LEXIS 137677, 2012 WL 4376047, at *10 ( *S.D.N.Y* . July 25, 2012) (citing *Dressier v. N.Y.C. Dep't of Educ* ., 2012 U.S. Dist. LEXIS 44249, 2012 WL 1038600, at * *12* ( *S.D.N.Y* . Mar. 29, 2012); *Loeffler v. Staten Island Univ. Hosp* ., 582 F.3d 268, 278 (2d Cir. 2009)).

The burden-shifting *McDonnell Douglas* framework governs retaliation claims as well as discrimination claims. *See Summa v. Hofstra Univ* ., 708 F.3d 115, 125 (2d Cir. *2013*). Under this framework, Plaintiff initially bears the burden of making out a *prima facie* case of retaliation. If she succeeds, the burden shifts to Defendants to produce a legitimate, nondiscriminatory reason for the adverse action. If Defendant produces such a reason, the

burden shifts back to plaintiff to establish, through either direct or circumstantial evidence, that the employer's proffered reason is pretextual, and the action did in fact have an improper retaliatory purpose. *See id*.

### 1. Prima facie case

²To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that [*36] the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action.² *Holtz v. Rockefeller & Co., Inc* ., 258 F.3d at 79 (internal citation omitted). It is undisputed that Plaintiff has satisfied the first three prongs of this test: (1) she engaged in protected activity by complaining to CPS Human Resources that she was the victim of national origin and gender discrimination and subsequently filing a complaint of discrimination with the NYSDH; (2) Defendants were aware of that activity, *see* Def. Br. 15; and (3) Plaintiff suffered an adverse employment action when she was terminated, *see* Def Br. 15. Only the fourth prong—whether Plaintiff has sufficiently shown a ²causal connection² between her NYSDHR complaint and her termination—is contested. *See* Def. Br. 16-17.

Plaintiff argues that the timeline and sequence of events sufficiently establishes the ²causal connection² between the protected activity and the adverse action. Plaintiff filed a complaint with NYSDHR on August 22, 2011, Gorman Decl., Ex.II, and CPS was informed of this complaint on August 24, 2011, Borelli [*37] Decl., Ex. C at 136-38; Ex. E at 289. Approximately one month later, on September 28, 2011, CPS human resources officer Stephanie Wesala informed Plaintiff that, if she did not voluntarily resign, she would be terminated. Borelli Decl., Ex. E at 257. According to Plain-

---

2    As previously discussed, is some confusion in the record regarding    [*35] the agency with which the August 24, 2011, discrimination complaint was filed. *See supra n. 1*. The Court assumes that the relevant complaint was filed in the NYSDH and EEOC, but also notes that, wherever the complaint was filed, it constituted protected activity for purposes of retaliation under Title VII, NYSHRL, and NYCHRL.

SCOTT WEISS

tiff, the relatively close proximity between the August 22, 2011, filing of the discrimination complaint and the September 28, 2011 termination provides enough evidence of a causal connection between the two to survive summary judgment.

Defendants counter that Plaintiff's placement on administrative leave over a week before she filed her complaint with the NYSDHR undermines whatever causal connection is established by the sequence of events. *See* Def. Br. 16; Def. 56.1 Statement §§ 24-27. In support of their argument, Defendants draw on cases finding no causal connection where [2] gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity.[2] *Deebs v. Alstom Transp. Inc ., 346 Fed. Appx. 654, 657-58 (2d Cir. 2009)* (quoting *Slattery v. Swiss Reinsurance America Corp ., 248 F.3d 87, 95 (2d Cir.2001))*. Those cases are inapposite. In *Slattery*, for example, the pattern of gradual adverse **[*38]** job actions leading to the plaintiff's termination began five months before the plaintiff filed charges with the EEOC. *See 248 F.3d at 95*. Here, by contrast, the initial adverse employment action, Plaintiff's placement on administrative leave, occurred just one day before Plaintiff first complained to CPS that she was the victim of unlawful discrimination. *See* Def. Br. 16. Plaintiff's placement on administrative leave is, moreover, the very adverse action that underlies her complaint of discrimination. It would be illogical to penalize Plaintiff for failing to complain of the discriminatory nature of that action before it had even taken place.

Plaintiff has sufficiently established a causal connection to make a *prima facie* case of unlawful retaliation. [2] In [the Second] Circuit, 'a plaintiff can indirectly establish a causal connection to support a retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action.' *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty ., 252 F.3d 545, 554 (2d Cir. 2001)* (second alteration in original) (quoting *Reed v. A. W. Lawrence & Co ., 95 F.3d 1170, 1178 (2d Cir. 1996))*. The relatively **[*39]** close proximity between the Au-

gust 22, 2011, filing of the discrimination complaint and the September 28, 2011, termination provides enough evidence of a causal connection between the two to survive summary judgment. *Cf. Henderson v. Center for Community Alternatives , 911 F. Supp. 689, 702 ( S.D.N.Y. 1996)* (finding that six-week lapse between the protected activity and the adverse action [2] could lead a reasonable finder of fact to infer a causal connection[2]).

## 2. Legitimate, non-discriminatory reasons

Because Plaintiff has made a *prima facie* case of retaliation, the burden shifts to Defendants to articulate legitimate, non-discriminatory reasons for the adverse employment action. *See Holtz v. Rockefeller & Co., Inc ., 258 F.3d at 81*. Defendants have met their burden by attributing the termination to staff complaints regarding Plaintiff's poor interpersonal skills, the poor performance review Plaintiff received in October 2010, the July 2010 letter of reprimand, the results of the investigations of Ms. Takami's complaint against Plaintiff, and Plaintiff's complaint against Defendant Toda, and NYSPI's stated preference that Plaintiff be removed from her position as Director of Pharmacy. Def. **[*40]** Br. 15-16; Def. Reply 8-9.

## 3. Pretext

Once a defendant satisfies its burden to articulate legitimate, non-discriminatory reasons for the adverse employment action, the burden shifts back to [2] persuade the trier of fact that she was the subject of illegal discrimination,[2] *Holtz , 258 F.3d at 81* (citing *Reeves v. Sanderson Plumbing Prods ., 530 U.S. at 143*), which may be accomplished by a showing that the Defendant's articulated reasons is false or pretextual, in combination with an evaluation of the underlying strength of Plaintiff's *prima facie* case, *see Reeves , 530 U.S. at 147-48*. Plaintiff has not met her burden, and no reasonable factfinder could find that CPS's proffered reasons for terminating Plaintiff are pretextual.

Plaintiff is unable to raise substantial factual questions regarding the legitimacy of CPS's

SCOTT WEISS

proffered reasons for the adverse action, *i.e.* the history of staff complaints regarding Plaintiff's interpersonal skills, the poor performance review Plaintiff received in 2010, the letter of reprimand Plaintiff received in 2010, and NYSPI's stated preference that Plaintiff be removed from her position as Director of Pharmacy. *See* Def. Br. 16-17. It is undisputed that Plaintiff [*41] was reprimanded for circumventing the chain of command to discuss staff reductions with outside managers in July 2010, Pl. 56.1 Statement ¶ 13(a), and that Plaintiff received a poor performance review in October 2010, *see* Pl. 56.1 Statement ¶ 15 (disputing only the characterization of the poor performance review as a [2]further deteriorat[ion][2] and raising a question as to whether Defendant Toda participated in its authorship). And while Plaintiff denies the allegations that she in fact possesses poor interpersonal skills, she does not dispute that her interpersonal skills were the subject of multiple staff complaints, including the June 2009 incident in which the entire pharmacy staff met with Plaintiff's on-site supervisor at NYSPI to complain about Plaintiff's interpersonal skills, *see* Gorman Decl., Ex. F, at 43-45; Ex. C, at 69; Pl. 56.1 Statement ¶ 9(b), at 2-3, and the August 2011 email from Ms. Takami, *see* Pl. 56.1 Statement ¶ 24 (not disputing that Ms. Takami's email claimed that her resignation [2]was prompted by Plaintiff's creation of an uncomfortable work environment[2]).

Perhaps most significantly, Plaintiff does not contest that NYSPI specifically requested that Plaintiff be [*42] removed from her position as Director of Pharmacy, and she does not allege that NYSPI's opposition to her was motivated by discriminatory animus or retaliatory intent. *See* Pl. 56.1 Statement ¶ 34. That retaining Plaintiff as the Director of Pharmacy at the NYSPI site would, as Plaintiff points out in her 56.1 Counterstatement of Facts, have required CPS to [2]stake[] their reputation[2] on Plaintiff tends to *confirm* rather than undermine the legitimacy of CPS's decision. *Id.* Even viewing the record in the light most favorable to Plaintiff, no reasonable factfinder could find that it shows CPS's decision to terminate Plaintiff to be pretextual.

Also unpersuasive is Plaintiff's argument that CPS's failure to follow their progressive discipline policy demonstrates pretext. Pl.Opp. 13. Plaintiff's claim that she was terminated without first having been [2]issued a verbal nor written warning concerning talking behind people's backs, or calling people names,[2] *id.*, totally elides the undisputed fact that, in June 2009, the entire staff of the pharmacy met with Dr. Lowenthal to complain that Plaintiff talked about them behind their backs and called them names, and that *Dr. Lowenthal discussed his* [*43] *concerns with Plaintiff afterwards.* Def. Exh. C, at 66-70. In light of this June 2009 meeting with her NYSPI on-site supervisor, the absence of a written warning from CPS human services cannot show, as Plaintiff alleges, that she was [2]terminate[d]. . . with no prior corrective action.[2] Pl. Opp. 14.

Nor does the fact that CPS failed to place Defendant Toda on administrative leave following Plaintiff's complaint against him raise a sufficient inference of pretext to defeat summary judgment. In this context, the Court understands Plaintiff to be making a kind of [2]disparate treatment[2] argument, *i.e.*, Plaintiff argues that, during the pendency of the investigation against her, CPS treated her less favorably than it treated Defendant Toda, which suggests that her treatment had an improper retaliatory purpose. *See, e.g.,* Barney v. Consolidated Edison Co. of N.Y ., 391 Fed. Appx. 993, 996 (2d Cir. 2010) (addressing Plaintiff's argument that [2]disparate treatment is probative that [employer's] articulated non-retaliatory reason for her termination was pretextual[2]). As in the discrimination context, however, a showing of disparate treatment suggests improper motive only when the Plaintiff is [2]similarly [*44] situated[2] to the comparator. *See id.* Cf. Ruiz v. Cnty. of Rockland , 609 F.3d at 493. [2]An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'[2] Ruiz , 609 F.3d at 493-94 (quoting Graham v. Long Island R.R ., 230 F.3d at 40).

Plaintiff and Defendant Toda were not similarly situated: they were not subject to the same

performance evaluation and discipline stan-dards, nor were they investigated for [2]compa-rable conduct.[2] While it is true that both were in-vestigated for allegedly mistreating their subordinates, the allegations against Plaintiff were significantly different in that they in-volved subordinates she directly supervised in the course of their daily work responsibili-ties, with whom she would inevitably interact during the pendency of the investigation. *Cf.* Def. 56.1 Statement ¶ 6 (Plaintiff's job du-ties) *with id.* ¶ 5 (Plaintiff's CPS supervisor's job duties). Defendant Toda, by contrast, en-countered Plaintiff relatively infrequently in the course of his ordinary work—they met a to-tal of five or six times during the period in which he was her supervisor. Def. 56.1 [*45] Statement ¶ 21. That Plaintiff had al-ready been placed on administrative leave, moreover, guaranteed that Defendant Toda would not interact with her during the pen-dency of the investigation against him. Def. Re-ply 4. Because Plaintiff and Defendant Toda were not similarly situated, the differences in their treatment while under investigation do not constitute evidence that CPS's proffered rea-sons for terminating Plaintiff are pretextual.

Plaintiff has failed to show that a reasonable factfinder could find that she was the subject of unlawful retaliation, and Defendants' motion for summary judgment is granted with respect to her Title VII and NYSHRL retaliation claims.

### D. Retaliation under NYCHRL

Like claims brought under Title VII and NY-SHRL, retaliation claims brought under NY-CHRL are evaluated according to the three-step burden-shifting framework established in *McDonnell Douglas. See White v. Pacifica Found ., 2013* U.S. Dist. LEXIS 134117, *2013* WL 5288851, at *17 ( *S.D.N.Y.* Sept. *19, 2013*). The standard for establishing unlawful retalia-tion under NYCHRL is, however, broader than under Title VII or NYSHRL in that [2]a plain-tiff need not establish that an adverse action was materially adverse. She need only establish [*46] that the action was 'reasonably likely to deter a person from engaging in a protected ac-

tivity.'[2] *Costello v. N. Y. State Nurses Ass'n , 783 F.Supp.2d 656, 676 ( S.D.N.Y.* 2011) (quot-ing *Williams v. N.Y.C. Hous. Auth ., 61 A.D.3d 62, 70-71, 872 N.Y.S.2d 27, 34 (1st Dep't 2009)).* Under these circumstances, however, the broader NYCHRL standard makes no differ-ence. Plaintiff's Title VII and NYSHRL retalia-tion claims failed because Plaintiff was un-able to establish pretext under the *McDonnell Douglas* standard, not because she was unable to show that she suffered a sufficiently material adverse action. Accordingly, Defendants' mo-tion for summary judgment as to plaintiff's re-taliation claims under the NYCHRL is granted.

### E. Gender and gender-plus discrimination and harassment under NYSHRL and NYCHRL

Plaintiff alleges that she was subjected to gen-der and gender-plus discrimination, presum-ably on the basis of her status as a pregnant woman, in violation of NYSHRL and NY-CHRL, as well as gender-based harassment in violation of NYCHRL. Am. Compl, Gorman Decl., Ex. A ¶¶ 69-75, 76-82, 83-89, 90-96. The standard for evaluating NYSHRL discrimi-nation claims is the same as that for Title VII. *See Dawson v. Bumble & Bumble , 398 F.3d at 217.* [*47] For NYCHRL claims, [2]the pri-mary issue for a trier of fact in [both discrimi-nation and harassment claims] is whether the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her gender.[2] *Williams v. N.Y.C. Housing Authority , 61 A.D.3d 62, 872 N.Y.S.2d 27, 39 (N.Y. App. Div. 2009).*

The record, however, is utterly devoid of evi-dence that Plaintiff was discriminated against on the basis of her gender or her pregnancy. Plain-tiff was permitted to take her full twelve weeks of FMLA leave, and she was thereafter permitted to return to her position as Director of Pharmacy. Def. 56.1 Statement ¶ 22. As Plain-tiff herself testified, neither Defendant Toda nor any other CPS employee ever made any de-rogatory comments regarding her sex or gen-der. Def. Br. 8; Gorman Decl., Ex. C, at 228, 281. Plaintiff's allegations that [2]Defendant

Toda treated Plaintiff in a derogatory manner, and treated the staff pharmacists which were of Asian descent better than he treated her[2] are irrelevant to her claim of pregnancy and sex-based discrimination and create no issue of material of fact on this point. *See* Pl. Opp. 20; Pl. 56.1 Statement ¶ 22. In fact, Plaintiff's [*48] allegation that Defendant Toda treated Ms. Takami better than he treated Plaintiff tends to disprove rather than prove Plaintiff's claim of gender discrimination, as Ms. Takami is also a woman.

Plaintiff, moreover, cannot allege that she suffered an adverse employment action on account of her gender or her pregnancy that was sufficiently material to state a claim under NYSHRL. For purposes of NYSHRL (like Title VII), [2][a] plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment.[2] *Anyanwu , 2013* U.S. Dist. LEXIS 132138, *2013* WL 5193990, at *20 (quoting *Galabya v. N.Y. City Bd. Of Educ ., 202 F.3d 636, 640 (2d Cir. 2000))*. A materially adverse change must be [2]more disruptive than a mere inconvenience or an alteration of job responsibilities.[2] *Id*. The allegation that Plaintiff's then-supervisor, Mr. Fingers, [2]expressed dismay toward Plaintiff' when he learned that she would be taking her pregnancy leave earlier than anticipated does not constitute an adverse employment action under this standard; nor does the fact that Plaintiff was forced to [2]use her vacation days in order to accommodate the few days leading up to her delivery date.[2] [*49] Pl. Opp. 18.

While the NYCHRL does not require plaintiffs to show that they were subject to a material adverse employment action, it is not intended to constitute a [2]general civility code.[2] *Williams , 872 N.Y.S.2d at 40-41* (quoting *Oncale v. Sundowner Offshore Servs ., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998))*. Defendants are thus provided with an [2]affirmative defense whereby [they] can avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'[2] *Id . at*

41. That standard being easily met in this case, no reasonable finder of fact could find that Plaintiff has made a *prima facie* case of gender or gender-plus discrimination or harassment under NYCHRL.

Having failed to show that she was treated [2]less well[2] than other employees [2]because of her gender[2] or pregnancy—let alone that she was the subject of a materially adverse employment action because of her gender or pregnancy—Plaintiff has failed to make a *prima facie* case of gender discrimination under either NYSHRL or NYCHRL. *Williams , 872 N.Y.S.2d at 39*. Accordingly, the motion for summary judgment is granted with respect to [*50] Plaintiff's gender and gender-plus discrimination claims brought under NYSHRL and NYCHRL.

### F. Individual liability under NYSHRL. NYCHRL

Having granted Defendant's motion for summary judgment on all Plaintiff's national origin, gender, and gender-plus discrimination and retaliation claims brought under NYSHRL and NYCHRL, the question of Defendant Toda's individual liability need not be reached. But even if Plaintiff's NYSHRL and NYCHRL claims had survived summary judgment, individual liability would be inappropriate in this case. Under NYSHRL, [2]an individual may be liable for discrimination if [he] was an 'employer,' but only 'individuals with ownership interest or supervisors, who themselves, have the authority to hire and fire employees' are considered employers.[2] *Anyanwu , 2013* U.S. Dist. LEXIS 132138, *2013* WL 5193990, at *22 (quoting *Malena v. Victoria's Secret Direct, LLC , 886 F. Supp. 2d 349, 365-66 ( S.D.N.Y.* 2012) (Oetken, J.)). In addition, an individual employee may be liable under the [2]aiding-and-abetting provision[2] of *NYSHRL § 296(6)* and NYCHRL [2]if he or she 'actually participate[d] in the conduct giving rise to the discrimination.'[2] *Id*. (quoting *Feingold v. New York , 366 F.3d 138, 157 (2d Cir. 2004))* (alteration [*51] in original).

There is no evidence in the record that Defendant Toda had the hiring-and-firing authority

2013 U.S. Dist. LEXIS 164581, *51

or personal ownership stake necessary to meet the definition of ²employer² under NY-SHRL. Nor is there any evidence in the record that Defendant Toda participated directly in the decision to place Plaintiff on administrative leave, *see supra* § III.C.2, or the decision to terminate her, *see* Def. 56.1 Statement ¶ 38; Pl. 56.1 Statement ¶ 56.1(b) (failing to dispute the assertion that Defendant Toda had no role in the decision to terminate plaintiff). Thus, even if Plaintiff had been able to show that those actions were discriminatory in nature, Defendant Toda would not be individually liable under NYSHRL or NYCHRL.

**CONCLUSION**

For the foregoing reasons, summary judgment is GRANTED on Plaintiff's Title VII, NY-SHRL, and NYCHRL claims against Defendants. The Clerk of Court is requested to terminate this case.

SO ORDERED.

Dated: **_November19_**, **_2013_**

New York, New York

/s/ Alison J. Nathan

ALISON J. NATHAN

United States District Judge

SCOTT WEISS



No *Shepard's Signal*™
*As of: January 21, 2014 5:10 PM EST*

## Perretti v. Alma Bank

United States District Court for the Eastern District of New York
June 26, 2012, Decided; June 27, 2012, Filed
11 Civ. 3925 (BMC)

**Reporter:** 2012 U.S. Dist. LEXIS 89409; 2012    WL 2458137

DEBORAH PERRETTI, Plaintiff, - against - ALMA BANK AND RICHARD FERRANTI, RENO CORTIDIS, BILL KATSANEVAS, individually and in their official capacities as aiders and abettors, Defendants.

---

**Core Terms**

---

terminate, teller, summary judgment, prima facie, adverse employment action, similarly situated, discriminatory, protected class, prima facie case, national origin, non-discriminatory, discipline, customer, hire, plaintiff's claim, district court, federal claim, replace, no evidence, non-moving, ethnicity, genuine, pretext, salary, circumstantial, retaliate, diminish, hispanic, train

---

**Case Summary**

---

### Overview

The court found that at most, the employee's theory of shared responsibility meant that she was made a scapegoat for an incident that occurred under and on her watch because it was an embarrassment to the bank. But her evidence did not support a conclusion that she was made a scapegoat because of her national origin or ethnicity. To show that she could have experienced something more than an unreasonable boss, the employee had to point to some circumstances upon which a jury could reasonably reach a conclusion that her race or ethnicity was a substantial factor in her termination.

### Outcome

The motion for summary judgment was granted.

---

**LexisNexis® Headnotes**

---

Civil Procedure > ... > Summary Judgments > Burdens of Proof > General Overview
Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > General Overview

***HN1*** Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. A genuine issue of material fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. The court must construe the facts in the light most favorable to the non-moving party, and draw all reasonable inferences and resolve any ambiguities against the moving party. However, a party may not defeat a motion for summary judgment solely through ²unsupported assertions² or conjecture. A nonmoving party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. Rather, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. The non-moving party must offer some hard evidence that its version of the events is not wholly fanciful.

Civil Procedure > ... > Summary Judgments > Entitlement as Matter of Law > General Overview

**HN2** District courts must be cautious about granting summary judgment when discriminatory intent is at issue since a victim of discrimination is seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence. However, the summary judgment rule would be rendered sterile if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. The salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to other areas of litigation. Thus, it is now *__beyondcavil__* that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

**HN3** The framework for analyzing discrimination claims under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, is venerable. Under McDonnell *__Douglas__* Corp , v. Green., a plaintiff asserting a claim for employment discrimination bears the initial burden of establishing a prima facie case of discrimination. To establish a prima facie case, a plaintiff must demonstrate: (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. The burden of demonstrating a prima facie case is de minimis.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting
Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof

**HN4** A plaintiff may seek to raise an inference of discrimination by showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group. A plaintiff must be similarly situated in all material respects to the individuals whom she seeks to compare herself with. Ordi-

narily, the question whether two employees are similarly situated is a question of fact for the jury. However a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting
Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof

**HN5** If a plaintiff successfully establishes a prima facie case of discrimination, the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action. Upon the defendant's articulation of such a non-discriminatory reason, the presumption of discrimination arising with the establishment of the prima facie case drops from the picture. The burden then shifts back to the plaintiff to come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination.

Labor & Employment Law > ... > Employment Practices > Adverse Employment Actions > Demotions & Promotions
Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting
Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof

**HN6** The law is well-settled that to establish a prima facie case for a claim of failure to promote, a plaintiff must show that she applied for an available position for which she was qualified, but was rejected under circumstances giving rise to an inference of unlawful discrimination. The requirement that an employee apply for and be rejected for a specific position ensures that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens of Proof

**HN7** An arguably racially-insensitive management remark that bears some relationship to an adverse employment action can be evidence

SCOTT WEISS

of discriminatory animus. However, when an isolated statement does not factually relate to the context of a plaintiff's claim, especially when it is not particularly degrading to a plaintiff's national origin, ethnicity, or other protected class, it is usually considered a ²stray remark² that carries little weight in determining the existence of a prima facie case.

Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof

**HN8** The United States Court of Appeals for the Second Circuit holds that the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, analysis.

Labor & Employment Law > ... > Employment Practices > Adverse Employment Actions > Discharges & Failures to Hire

**HN9** A defendant must only produce sufficient evidence for a trier of fact to conclude that the plaintiff was fired for a legitimate, non-discriminatory reason, and the court cannot undertake a credibility evaluation.

Labor & Employment Law > ... > Employment Practices > Adverse Employment Actions > General Overview

**HN10** A member of a protected class is no more entitled to protection from bosses of limited perspective or sagacity, or lack of empathy, than anyone else in the workforce. An abusive workplace, without more, is not actionable under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting
Labor & Employment Law > ... > Discrimination > Retaliation > Burdens of Proof
Labor & Employment Law > ... > Retaliation > Statutory Application > Family & Medical Leave Act

**HN11** The McDonnell-*Douglas* test applies to retaliation claims under the Family Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > General Overview

**HN12** Although the judicial code gives district courts the option of dismissing state law claims when all federal claims have been dismissed, *28 U.S.C.S. § 1367(c)(3)*, a federal court's discretion is not boundless. Rather, in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine will point toward declining to exercise jurisdiction over the remaining state-law claims. Absent exceptional circumstances, the United States Court of Appeals for the Second Circuit instructs courts to abstain from exercising pendent jurisdiction over state claims where federal claims have been dismissed on summary judgment. For this reason, district courts within the Second Circuit frequently decline to exercise supplemental jurisdiction over a plaintiff's state law claims arising from the same acts as her federal discrimination claims.

**Counsel:**  [*1] For Debora Perretti, Plaintiff: Matthew Scott Porges, LEAD ATTORNEY, Brooklyn, NY.

For Alma Bank, Richard Ferranti, Reno Cortidis, Bill Katsanevas, individually and in their official capacities and as aiders and abettors, Defendants: Danielle M. Dandrige, LEAD ATTORNEY, Hoey King Toker & Epstein, New York, NY; Rhonda L. Epstein, Hoey, King, Toker and Epstein, New York, NY.

For Luis Rebatta, Defendant: Jeffrey L. Liddle, LEAD ATTORNEY, Matthew James McDonald, Michael Evan Grenert, Liddle & Robinson, LLP, New York, NY.

**Judges:** Brian M. Cogan, U.S.D.J.

**Opinion by:** Brian M. Cogan

| Opinion |
| --- |

## MEMORANDUM DECISION AND OR-DER

**COGAN**, District Judge.

Plaintiff brings this action under Title VII and corresponding state and local law, claiming that she never received a promised promotion or a raise, and then suffered termination, all because of her race (Hispanic) and national origin (Argentine). She also claims that defendants retaliated against her for exercising her right to take family leave by diminishing her work responsibilities. Defendants have moved for summary judgment.

Viewing the record in a light most favorable to plaintiff, it is arguable as to whether she was dealt with somewhat harshly following a series of errors in [*2] the performance of her job. However, there is no evidence at all upon which a reasonable jury could find that her treatment was the result of her race, national origin, or in response to her having taken family leave. Defendants' motion is accordingly granted.

## BACKGROUND

Plaintiff was hired to work at defendant bank in 2006 by the bank's president, Luis Rebatta, who is also Hispanic and of Peruvian national origin. Plaintiff was given the position of ²Head Teller² based on her eight years of experience in banking; no other employees held that title. She received an annual salary of $40,000 per year. Plaintiff was sent to Alabama for an outside training session in the bank's computer systems, and she was accompanied by another teller, Erica Hinojosa, and Richard Ferranti, the Chief Operating Officer of the bank, who is Italian-American. Plaintiff has a Spanish accent, and Ferranti, Rebatta, and other management-level employees knew plaintiff's ethnicity and national origin at or shortly after the time she joined the bank in 2006.

When plaintiff was hired, she had a conversation with defendant Reno Kourtides, who at the time was the Business Developer of the bank, and is now the bank's [*3] Chief Planning Officer and the Secretary of the Board of Directors. Kourtides told plaintiff that he would make her the Training Coordinator for new employees. However, it is undisputed that the bank never created the position of Training Coordinator and that plaintiff never received a promotion, although she subsequently made a general request for one from her Branch Manager, Bill Katsanevas. Katsanevas responded that she would be promoted when a position became available.

The bank was in its start-up phase when plaintiff began in 2006, and it did not open its doors to customers until September 2007. It made a particular effort to target the Greek and Greek-American community for its market base. Eight of the nine directors of the bank are Greek or Greek-American, and a good portion of its clientele is Greek-American. The main branch is in Astoria, Queens, and it had at least one branch in Brooklyn. Plaintiff worked in Astoria except for one brief period described below.

From the outset of her employment, plaintiff and Katsanevas did not get along. He would berate her and yell at her in front of the tellers she was supervising. She did not observe him treating any of the Greek-American [*4] employees this way. Plaintiff complained about the way Katsanevas treated her to Human Resources and to Ferranti. She told Ferranti that she believed Katsanevas was discriminating against her because of her race or national origin. Ferranti discussed her complaints with Katsanevas, but no one at the bank took action against him.

Plaintiff's annual performance evaluations indicated an overall performance of ²Good.² ²Good² equates to a ²C² grade on the bank's evaluation scale. Her 2007 evaluation noted that she ²needs to improve on her relationship with coworkers and supervisors.² Her 2008 evaluation stated that she ²needs to concentrate and effectively lead her staff — must avoid errors and help overall improve her performance.² The evaluations were made by Katsanevas, al-

though he consulted with the Assistant Branch Manager, Krisanthi Lilaj, on the 2008 evaluation. Plaintiff never received a raise during her tenure at the bank. Although it is the usual practice of the bank to give employees some annual raise, there is no evidence that any of the tellers working under Katsanevas ever received one.

In January, 2008, plaintiff was temporarily transferred to the Brooklyn branch for an indefinite [*5] period because there was only one full-time teller at that branch. Other tellers from Astoria were also transferred to Brooklyn on a rotating basis. Plaintiff agreed to the temporary transfer because, according to her, she is a ²team player.² At the Brooklyn branch, she had somewhat less responsibility, as she only supervised one teller, as opposed to the two or three she supervised in Astoria. Plaintiff worked there for three weeks, after which time she complained that the daily 3-hour round-trip commute was too stressful for her, and that the bank had given the other Astoria tellers a shorter rotation in Brooklyn. The bank complied with her request to resume her responsibilities in Astoria and she returned to that branch by February 4, 2008.

Plaintiff took two months' paid and one month unpaid maternity leave beginning in August 2008. She believed that Rosemerys Perez from the bank's human resources department had told her that she would be paid for three months, but the bank's policy only allowed for two. When she returned in November 2008, she found that her duties of filing and reviewing Cash Transaction Reports (²CTRs²) had been transferred to the bank's compliance department, [*6] where they were performed by an auditor named Joseph Minchul-Song. However, the initial preparation of CTRs, and the daily ²proving² of transactions to ensure that they were generated, remained with plaintiff and every other teller. In other words, each teller, including plaintiff, had to prepare a CTR when he or she processed a transaction involving $10,000 or more in cash.

Plaintiff was cited and written up for several procedural violations committed in the course of performing her duties, the last of which, defendants contend, resulted in her termination. In August 2008, she gave a client $2,000 upon presentation of a check for $200. Fortunately, the client returned the money after plaintiff and/or Lilaj called and requested that he do so.¹ In April 2009, plaintiff received a cash deposit that included currency that was rejected by the bank's cash dispenser. However, because the cash did not turn black when plaintiff tested it with a counterfeit pen, plaintiff passed it to another teller, who, not knowing the counterfeit nature of the currency, distributed it to a customer. Fortunately, again, the customer returned the funds to the bank. In her write-ups for each of these incidents, [*7] plaintiff was advised that she could be terminated if she continued to make mistakes.

The action which defendants contend, together with her prior infractions, resulted in her termination occurred on May 4, 2009, when she processed a cash transaction involving $11,200 without inputting the data necessary to generate a CTR. Plaintiff acknowledges that she deliberately hit the ²override² button to avoid generation of the report, but contends that this was necessary because the customer was a new client that had not yet been entered into the bank's databases, so a report could not be generated. However, it is undisputed that plaintiff then failed to adequately ²prove² her transactions that day, which would have uncovered the absence of the CTR. Minchul-Song, as part of his compliance review, caught the error in early June 2009, and the bank had to report the error to the federal authorities, as required by law, although no action was taken against it.

Plaintiff was terminated on June 11, 2009, which was almost immediately following Minchul-Song's discovery [*8] of the missing CTR She received her salary through June 15, 2009. Ferranti made the decision to terminate her in consultation with the bank's human

---

¹ Plaintiff testified quite clearly that she called the customer. However, Lilaj's report on the incident says that she called the customer.

SCOTT WEISS

resources department. Plaintiff was advised of her termination in a meeting with Ferranti, Perez, and Lilaj. Ferranti told plaintiff that he was terminating her because she had failed to generate the CTR, and he had to show the auditors that he was taking strong action for that lapse. He acknowledged in his deposition that he did not consider disciplinary measures short of termination. According to plaintiff, Lilaj told her that she did not agree with the decision to fire her. Katsanevas had no input into the decision; he had been transferred out of plaintiff's department and no longer had supervisory responsibility over her at the time of the CTR incident.

Plaintiff's position remained open for nearly a year after her termination. In May 2010, the bank hired a new Head Teller named Demetra Bakopoulos, who is Greek or Greek-American. She was given a salary about 15% less than plaintiff had received four years earlier ($34,000 v. $40,000). She received a 5% salary increase after a year, which still left her with about $5,000 less than plaintiff [*9] had earned when she was hired.

## DISCUSSION

*HN1* Summary judgment is appropriate where [2]the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see also Fed. R. Civ. P. 56(a)*. A genuine issue of material fact exists where [2]the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The court must construe the facts in the light most favorable to the non-moving party, and draw all reasonable inferences and resolve any ambiguities against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 326 (2d Cir. 2011).

However, a party may not defeat a motion for summary judgment solely through [2]unsupported assertions[2] or conjecture. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) [*10] (nonmoving party may not [2]rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment[2]). Rather, the non-moving party [2]must come forward with specific facts showing that there is a genuine issue for trial.[2] *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348 (emphasis deleted); *see also D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (the non-moving party [2]must offer some hard evidence that its version of the events is not wholly fanciful[2]).

*HN2* District courts must be cautious about granting summary judgment when discriminatory intent is at issue since [2]a victim of discrimination . . . is seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence.[2] *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). However, [2][t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.[2] *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). [2][T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less [*11] to discrimination cases than to other areas of litigation.[2] *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (internal quotation marks and alteration omitted). Thus, [2][i]t is now **beyond cavil** that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.[2] *Abdu-Brisson v. Delta Air Lines. Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

## I. Plaintiff's Claim of Discrimination

*HN3* The framework for analyzing discrimination claims under Title VII is venerable. Under *McDonnell Douglas* Corp. v. Green., 411 U.S. 792, 93 S. Ct 1817, 36 L. Ed. 2d 668

2012 U.S. Dist. LEXIS 89409, *11

(1973), a plaintiff asserting a claim for employment discrimination bears the initial burden of establishing a *prima facie* case of discrimination. See *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142,120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). To establish a *prima facie* case, a plaintiff must demonstrate: [2](1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.[2] *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)). [*12] The burden of demonstrating a *prima facie* case is *de minimis*. *Abdu-Brisson*, 239 F.3d at 467.

As to the fourth element, *HN4* a plaintiff may seek to raise an inference of discrimination by [2]showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group.[2] *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks omitted). A plaintiff must be similarly situated [2]in all material respects to the individuals whom [she] seeks to compare [her]self with.[2] (quoting *Graham v. LIRR*, 230 F.3d 34, 39 (2d Cir. 2000)). [2]Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury.[2] *Id.* However [2]a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.[2] *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (citing *Cruz v. Coach Stores*, 202 F.3d 560, 568 (2d Cir.2000)); see also *Shumway v. UPS*, 118 F.3d 60, 64 (2d Cir. 1997) (affirming grant of summary judgment because coworkers were not similarly situated).

*HN5* If a plaintiff successfully establishes a *prima facie* case of discrimination, [*13] [2]the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action.[2] *Weinstock*, 224 F.3d at 42. [2]Upon the defendant's articulation of such a non-discriminatory reason, the presumption of discrimination arising with the estab-

lishment of the *prima facie* case drops from the picture.[2] *Id.* The burden then shifts back to plaintiff to [2]come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination.[2] *Id.*

## A. Plaintiff's *prima facie* case

Plaintiff alleges that she suffered discrimination by way of three adverse employment actions: 1) her lack of a promotion; 2) her lack of a raise; and 3) her termination. Beginning first with her claim for lack of promotion, plaintiff offers in support the fact that she made a general request for a promotion to Katsanevas, but never received one throughout her employment. Additionally, Kourtides promised her when she was hired that he would create and appoint her to the position of Training Coordinator, but he never did so. Plaintiff has failed to establish that her lack of a promotion amounts to an adverse employment action, and therefore has [*14] failed to make out a prima *facie* case of failure to promote.

*HN6* The law is well-settled that to establish a *prima facie* case for such a claim, a plaintiff must show that [2]she applied for an available position for which she was qualified, but was rejected under circumstances giving rise to an inference of unlawful discrimination.[2] *Brown v. Coach Stores*, 163 F.3d 706, 710 (2d Cir. 1998) (internal quotation marks omitted). The requirement that an employee apply for and be rejected for a specific position [2]ensures that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer.[2] *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004). However, in this case, plaintiff has put forth no evidence that she applied for any position at all. Rather, she only expressed a general interest to Katsanevas that she be promoted. Additionally, it is undisputed that the position of Training Coordinator was never created, and therefore she was never rejected for that job. Accordingly, her failure to promote claim is foreclosed by *Brown* and *Petrosino* . See also *Cruz*, 202 F.3d at 565-66 (af-

firming *Rule 12(b)(6)* dismissal of **[*15]** failure to promote claim in part because the plaintiff failed to put forth facts showing that defendant created the promised position); *Holt v. KMI-Continental*, 95 F.3d 123, 129 (2d Cir. 1996) (holding that with regard to one position, [2]plaintiff cannot make out a prima facie case [of failure to promote] because defendant did not seek applicants to fill the position[2]); *Breland-Starling v. Disney Publ'g Worldwide*, 166 F. Supp. 2d 826, 830 (S.D.N.Y. 2001) ([2]because the position never existed and was never occupied by anyone, plaintiff cannot, as a matter of law, establish her *prima facie* case[2]).[2]

On the other hand, plaintiff's termination and lack of a raise do constitute adverse employment actions, and thus the only element at issue regarding plaintiff's *prima facie* case as to these actions is the fourth element, *i.e.*, are there circumstances **[*17]** that could give rise to an inference of discrimination? I note at the outset that this is not a case where a *prima facie* showing can be made based on disparate treatment of plaintiff compared to other employees. Plaintiff acknowledges that she [2]was not really similarly-situated to anyone because she was the only Head Teller at the main branch of the Bank during the course of her employment.[2] Stated differently, as Head Teller, the bank might have expected a higher performance from plaintiff than it did from other tellers, and so discipline applied to her might not be relevant in comparison to discipline meted out to other tellers for similar conduct (and there is no evidence of similar conduct by other employees in this record). Of course, a plaintiff in a Title VII case is not required to offer comparables to satisfy the fourth *McDonell-Douglas* requirement; she can rely on any circumstantial evidence suggested by the record.

Viewing the facts in a light most favorable to plaintiff, there is evidence that plaintiff's termination was arbitrary and not very nice. On the other hand, it could be argued that it was, after all, plaintiff's responsibility in the first instance to generate **[*18]** the CTR and to catch it if she failed in that responsibility. Moreover, it could be argued that the termination was not arbitrary because of plaintiff's prior mistakes; certainly, it is not unreasonable to view a bank teller's negligent cashing of a check for ten times the face amount, or distribution of rejected counterfeit bills to a customer, as very serious matters, even if the bank does not lose any money or face regulatory consequences.

But the question is not whether plaintiff has raised a factual issue as to arbitrary or unfair termination. The issue she has a burden to raise is whether she was terminated because she is not Greek or Greek-American, or, conversely, whether she was terminated because she is Hispanic or Argentine. Plaintiff's *prima facie* case in this regard is minimal.

Plaintiff relies heavily on Rebatta's comment that she should try to reduce her Spanish accent, which she made prior to the bank's opening. Putting aside the fact that Rebatta is himself Hispanic (although with less of an accent), there is nothing in the record to suggest that he ever had any input into the terms or conditions of her employment after he hired her, nor in her supervision or evaluation, **[*19]** nor in the determination to fire her. He

---

2   Plaintiff identifies two district court decisions that have considered the failure to create a promised position as a potential adverse employment action. *See Williams v. R.H. Donnelley, Inc.*, 199 F. Supp. 2d 172, 178 (S.D.N.Y. 2002); *Brooks v. Hevesi*, No. 99 Civ. 3209, 1998 U.S. Dist. LEXIS 730, at *5-6 (S.D.N.Y. Jan. 29,1998). However, these decisions conflate the third and fourth elements of a Title VII discrimination claim, requiring a plaintiff to raise an inference of discriminatory intent (the fourth element of a claim for discrimination) as a prerequisite to finding that the failure **[*16]** to create the position amounted to an adverse employment action (the third element). These decisions dismiss the failure to promote claim on the ground that the plaintiff failed to raise such an inference. *See Williams*, 199 F. Supp. 2d at 178; *Brooks*, 1998 U.S. Dist. LEXIS 730, at *5-6; *see also Piccone v. Town of Webster*, No. 09-CV-6266,2011 U.S. Dist. Lexis 84574, at *23-27 (W.D.N.Y. Aug. 2, 2011) (not cited by plaintiff, but applying same standard and reaching same conclusion). Even if I were to accept the reasoning of these decisions and conclude that defendants' failure to create the position of Training Coordinator was an adverse employment action, plaintiff has still failed to establish a *prima facie* case because she has not pointed to any evidence that the position was not created because of plaintiff's ethnicity or national origin. *See Brooks*, 1998 U.S. Dist. LEXIS 730, at *5-6 (a mere broken promise does not suggest discrimination).

simply was not in her reporting line and there is no evidence to show that he ever talked to anyone about her. *HN7* An arguably racially-insensitive management remark that bears some relationship to an adverse employment action can be evidence of discriminatory animus.   See *Kirsch v. Fleet St., Ltd*., 148 F.3d 149, 162-63 (2d Cir. 1998) (finding evidence sufficient to support inference of discrimination where discriminatory statements were made by decisionmaker and could be interpreted as a "company threat"); *Thompson v. Am. Eagle Airlines, Inc*., No. 99 Civ. 4529, 2000 U.S. Dist. LEXIS 14932, at *15 (S.D.N. Y. Oct. 6, 2000) (finding *prima facie* case based on remark by supervisor who made decision to terminate because "a remark is not a 'stray remark' if it has a close nexus to an adverse employment decision"). However, when an isolated statement does not factually relate to the context of a plaintiff's claim, especially when it is not particularly degrading to a plaintiff's national origin, ethnicity, or other protected class, it is usually considered a "stray remark" that carries little weight in determining the existence of a *prima facie* case.  See  **[*20]** *Henry v. Wyeth Pharms., Inc*., 616 F.3d 134, 149-50 (2d Cir. 2010) (approving multi-factor analysis of whether statements is probative of discriminatory intent that includes who made the remark, when it was made in relation to employment decision, its content, and its context, i.e., whether it was related to adverse employment action); *Tomassi v. Insignia Fin. Group, Inc*., 478 F.3d 111, 115 (2d Cir. 2007) ("the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination"); *Slattery v. Swiss Reinsurance Am. Corp*., 248 F.3d 87, 94 (2d Cir. 2001) (finding that one statement by an executive is not enough to meet the plaintiff's burden of showing that the real reason he was fired was because of his age).

The other fact upon which plaintiff primarily relies is that she was replaced as Head Teller with a Greek-American, Bakopoulos, eleven months after she was fired. Plaintiff correctly points out that the *HN8* Second Circuit has held that "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage **[*21]** of the Title VII analysis.² *Zimmermann v. Assocs. First Capital Corp*., 251 F.3d 376, 381 (2d Cir. 2001).  *Zimmermann*, however, which was an appeal from a jury verdict in the plaintiff's favor, and district court cases relying on it, generally have had significantly more circumstantial evidence of discriminatory animus than plaintiff has put forward here, which somewhat diminishes the import of the reference to the "mere fact" of replacement with someone outside the protected class.  See, e.g., *Zimmermann*, 251 F.3d at 379 (executive claimed that he had fired plaintiff because she did not have a good relationship with her supervisor, but the supervisor testified that he had not spoken to the executive about plaintiff); *Berube v. Great Atlantic & Pacific Tea Co., Inc*., No. 3:06-cv-00197, 2010 U.S. Dist. LEXIS 76746, at *33-34 (D. Conn. July 29, 2010) (in disability discrimination case, not only was plaintiff replaced by non-disabled employees, but plaintiff was transferred, suspended, and then terminated shortly after multiple surgeries). Moreover, although Bakopoulos received the same title and responsibilities as plaintiff had, her hiring at a significantly reduced salary years after plaintiff **[*22]** first received that salary diminishes the inference of discrimination that plaintiff would have me draw.

Nevertheless, there is enough in the record to satisfy plaintiff's minimal burden with regard to her termination. The "mere fact" of Bakopoulos' hiring takes on added weight because it is not as if a woman was fired and replaced with a man; the replacement was a Greek-American, which bears directly on plaintiff's claim of favoritism.[3] In addition, Lilaj's alleged disagreement with the decision to fire

---

[3]   Plaintiff is entirely unclear as to whether she was discriminated against because she is Hispanic and/or Argentine, or because she is not Greek. They are not the same thing, but I am construing her theory to encompass both possibilities.

plaintiff, and the failure of Ferranti to consider disciplinary alternatives short of termination, are sufficient for the *de minimis* showing.

However, although plaintiff has made a *prima facie* showing as to her termination, plaintiff is unable to point to any evidence showing that she was not given a raise because she is Hispanic or Argentine. Her claim with regard to that action is accordingly dismissed.

## B. Defendants' professed reasons for plaintiff's [*23] termination

The second *McDonnell- Douglas* criterion — that defendants offer a legitimate, nondiscriminatory reason for the employment action — is readily satisfied here. Plaintiff had received two written warnings that additional mistakes could result in her termination, and she does not dispute that the failure to generate a CTR required the bank to report the lapse to federal regulatory authorities. Thus, plaintiff concedes her ²misstep,² but believes the failure to generate the CTR was compelled by the bank's computer system and therefore complied with bank policy. This argument is more properly considered under the third step of the McDonnell- *Douglas* analysis, as defendants have met their burden of production at step two by providing a business justification for plaintiff's termination. See *Reeves*, 530 U.S. at 142, 120 S. Ct. 2097 (*HN9* defendant must only produce sufficient evidence for a trier of fact to conclude that plaintiff was fired for a legitimate, non-discriminatory reason, and the court cannot undertake a credibility evaluation); *Tarshis v. Riese Org*., 211 F.3d 30, 36 (2d Cir. 2000) (²[a]ny stated reason is sufficient²); *Wentworth v. Hedson*, 493 F. Supp. 2d 559, 569 (E.D.N.Y. 2007) [*24] (noting that even though the plaintiff challenged the defendants' justification, the defendants had ²satisfied their minimal burden of proffering a nondiscriminatory reason for their actions²). I therefore address this point below.

## C. Evidence of pretext

With the presumption of discrimination from plaintiff's *prima facie* showing having dropped

out of the case, see *Weinstock*, 224 F.3d at 42, I cannot see how any rational jury could view plaintiff's termination as being based in substantial part on discriminatory animus. Plaintiff's evidence of pretext is laden with disconnects. Her primary contention is that since no other employee was disciplined for the failure to generate the required CTR, that issue was a ruse to justify her termination. As evidence of this, she points to the fact that Minchul-Song took nearly a month to find her error, and when he did, he was not disciplined. She also points to the fact that her Assistant Manager, Lilaj, was not disciplined for plaintiff's alleged error, and the head of compliance, John Pizzimanti (presumably Minchul-Song's boss), was also not disciplined.

The theory makes little sense. First, putting aside the conceded absence of similarly situated [*25] employees, plaintiff has made no showing that any of these employees that she says should have been disciplined (if she was going to be disciplined) were Greek or Greek-American, except perhaps for Lilaj, who was Albanian but spoke Greek. This means that plaintiff was singled out for some reason other than her race or ethnicity. The reason appears quite obvious; unlike the other employees as to whom she ascribes responsibility, plaintiff was in charge of generating the CTR for her own transaction, and had a history consisting of two prior errors. Moreover, if the title of Head Teller means anything, it is that she is supposed to be at least as skilled as other tellers. Yet she has offered no evidence, other than her belief, that another teller ever failed to generate a CTR in the relatively short existence of the bank. At most, plaintiff's theory of shared responsibility means that she was made a scapegoat for an incident that occurred under and on her watch because it was an embarrassment to the bank. But her evidence does not support a conclusion that she was made a scapegoat because of her national origin or ethnicity.

Plaintiff's view that under the bank's computer systems, a CTR [*26] cannot be generated when a transaction is undertaken by a new customer is another disconnect in her pretext theory. It would mean that plaintiff's incident

was the only time where a new customer of the bank engaged in a transaction for more than $10,000, as the record is clear that no other teller has been found to have failed to generate a CTR.[4] In addition, plaintiff's justification does not explain why, when she was ²proving² her own transactions, she did not note to someone that she had engaged in a transaction that needed to, but had not yet, generated a CTR, leaving it to Minchul-Song to catch in a compliance review almost one month later.

Plaintiff also considers it evidence of pretext [*27] that each of the errors or alleged errors that the bank claims led to her termination — cashing a check for an inflated amount, circulating counterfeit funds, and failing to generate a CTR — did not result in a monetary loss to the bank. Defendants, in turn, contend that the risk of reputational injury with its customers or its regulator justified her termination. However, the proportionality of the bank's response is not at issue here. Rather, the question is whether plaintiff has shown sufficient circumstantial evidence that would allow a rational factfinder to conclude that she was a victim of illegal discrimination.

The assumed fact that Ferranti was arbitrary, or unfair, or both, does not address, let alone meet plaintiff's burden on, this issue. *HN10* A member of a protected class is no more entitled to protection from bosses of limited perspective or sagacity, or lack of empathy, than anyone else in the workforce.  *See, e.g., Ogbo v. N.Y. State Dep't of Fin.*, 99 Civ. 9387, 2001 U.S. Dist. LEXIS 12920, at *24 (S.D.N.Y. Aug. 28, 2001) (²an abusive workplace, without more, is not actionable under Title VII²). To show that she may have experienced something more than an unreasonable

boss, [*28] plaintiff must point to some circumstances upon which a jury could reasonably reach a conclusion that plaintiff's race or ethnicity was a substantial factor in her termination. Plaintiff has failed to do that here.

## II. Plaintiff's Claim of Retaliation

*HN11* The *McDonnell-Douglas* test also applies to retaliation claims under the FMLA.  See *Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2d Cir. 2004). Plaintiff claims that upon her return from maternity leave, she learned that some of her responsibilities for CTRs had been moved to the bank's compliance department in retaliation for her having taken leave. Defendants dispute that any change was made to her responsibilities, but that even crediting plaintiff's version, it was not a material change in the terms and conditions of her employment.[5]

Plaintiff's testimony is extremely vague about what this alleged change was, other than that it had something to do with CTRs. Her brief refers to the task as ²filing and initially reviewing² the CTRs, and I will assume that is the case, although her testimony does not say that. Whatever this responsibility was, it was not only her role that was transferred to the compliance department, but Rosemerys Perez's involvement in it as well.

In any event, all this appears to be is the movement of a discrete administrative function from the front office to the back office where it probably logically belonged in the first place; there is no reason for bank tellers to be filing government reports if the bank has a back office containing a compliance department. It does not nearly amount to ²significantly diminished material responsibilities,² which is [*30] the only type of adverse employment ac-

---

[4]  Plaintiff objects to defendants' characterization of the method she used to avoid generating a CTR; i.e., that plaintiff ²overrode² the system. Plaintiff prefers Ferranti's description of what she did, which is essentially that she failed to complete certain data fields in the transaction's entry form that would have generated the CTR. They are saying the same thing in different words. Indeed, it was plaintiff herself who testified: ²So the only way I'm making the deposit is overriding the system.²

[5]  Plaintiff's brief is unclear as to whether she is pursuing the contention that her temporary assignment to Brooklyn was retaliatory. She describes the facts surrounding the transfer in her briefs factual summary, but never mentions them again in the argument, although she does cite a case holding that a transfer can be a material change in job responsibilities that gives rise to a retaliation claim. In any [*29] event, such a claim could not possibly succeed. Other tellers were transferred as well; her temporary transfer was months before she took leave; she consented to the transfer; and when it became burdensome, she asked to return, which request was promptly granted. There are no circumstances suggesting discriminatory animus motivated the transfer.

SCOTT WEISS

tion potentially applicable here.  See *Beyer v. County of Nassau*, 524 F.3d 160, 163-64 (2d Cir. 2008). Indeed, plaintiff's brief, although citing the proper legal standard, makes no argument at all as to why this transfer of responsibilities was a "material" or "significant" part of plaintiff's job, nor that it diminished her status or prestige at the bank in any way. Plaintiff therefore has failed to raise a factual issue that requires jury resolution.

## III. Plaintiff's Claims Under State and Local Law

Having dismissed plaintiff's federal law claims, the Court declines to exercise supplemental jurisdiction over plaintiff's state and local law claims in the interests of comity, convenience, judicial economy, and fairness.  See *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (discussing a district court's discretion in declining to exercise supplemental jurisdiction over state law issues where all federal claims have been dismissed prior to trial); *Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006). *HN12* Although the Judicial Code gives district courts the option of dismissing state law claims [*31] when all federal claims have been dismissed,  see *28 U.S.C. § 1367(c)(3)*, my discretion "is not boundless." See *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003). Rather, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988);  see also Birch v. Pioneer Credit Recovery. Inc., No. 06-CV-6497T, *2007 U.S. Dist. LEXIS 41834, at *15 (W.D.N.Y. June 8, 2007)* (noting that "absent exceptional circumstances,' the Second Circuit instructs courts to "abstain from exercising pendent jurisdiction" over state claims where federal claims have been dismissed on summary judgment) (quoting *Walker v. Time Life Films. Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)). For this reason, district courts within this circuit frequently decline to exercise supplemental jurisdiction over a plaintiff's state law claims arising from the same acts as her federal discrimination claims.  See, e.g., *Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 402 (S.D.N.Y. 2011);  [*32] *Burchette v. Abercrombie & Fitch Stores, Inc.*, No. 08 Civ. 8786, 2010 U.S. Dist. LEXIS 47043, at *36 (S.D.N.Y. May 10, 2010).

I see no reason to depart from this practice here, as none of the factors noted above support retaining jurisdiction. Some of the issues posed by these claims are distinct from plaintiff's federal claims, and at this stage in the litigation, there would be "no extraordinary inconvenience or inequity occasioned by permitting the claims to be refiled in state court where they will be afforded a 'surer-footed reading of applicable law.'" *Kolari*, 455 F.3d at 123 (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)).

## CONCLUSION

Defendants' motion for summary judgment is granted. Plaintiff's federal claims are dismissed with prejudice and plaintiff's state law claims are dismissed without prejudice.

**SO ORDERED**.

/s/ BMC

U.S.D.J.

Dated: Brooklyn, New York

June 26, 2012




Caution
As of: January 19, 2014 6:07 PM EST

## Tuccio v. U.S. Sec. Assocs.

United States District Court for the Eastern District of New York
February 27, 2013, Decided; February 27, 2013, Filed
CV 10-1714 (JFB) (GRB)

**Reporter:** 2013 U.S. Dist. LEXIS 42037; 2013 WL 1121356

SAMUEL L. TUCCIO, *Plaintiff*, -against- U.S. SECURITY ASSOCIATES, INC., Defendant.

**Subsequent History:** Adopted by, Summary judgment granted by *Tuccio v. U.S. Sec. Assocs., 2013 U.S. Dist. LEXIS 37135 (E.D.N.Y., Mar. 18, 2013)*

---

**Core Terms**

terminate, shore, security guard, summary judgment motion, summary judgment, northern, adverse employment action, start time, disciplinary action, discriminatory, recommend, internal quotation, prima facie case, set forth, pro se, harassment, tardiness, guard, rebut, woman

**Counsel:** [*1] Samuel Tuccio, *Plaintiff*, Pro se, Hicksville, NY.

For U.S. Security Associates Inc., Defendant: Elana Gilaad, Philip K Davidoff, LEAD ATTORNEY, Ford & Harrison LLP, New York, NY.

**Judges:** GARY R. BROWN, United States Magistrate Judge.

**Opinion by:** Gary R. Brown

---

**Opinion**

## REPORT AND RECOMMENDATION

### GARY R. BROWN, United States Magistrate Judge:

Samuel L. Tuccio (²*plaintiff*² or ²Tuccio²), proceeding *pro se*, brings this action against U.S. Security Associates, Inc. (²defendant² or ²USSA²), a security firm providing security services at facilities owned and operated by the North Shore-Long Island Jewish Health System (²North Shore LIJ Complex²), alleging race *discrimination* in violation of Title VII of the Civil Rights Act of 1964 (²Title VII²) and the New York State Human Rights Law (²NY-SHRL²), *N.Y. Exec. L. § 290 et seq*.

*Plaintiff*, a white male and former USSA security guard at the North Shore LIJ Complex, asserts that he was the victim of ²advanced racism² (a term he apparently coined[1] administered by USSA's North Shore LIJ Com-

---

[1] Tuccio asserts that his concept of ²advanced racism² is not based on treatment he endured while an employee of USSA, but rather on his observations of ²black skinned² and minority supervisors prior to his employment with USSA. *Id.* ¶¶ 12-13. Tuccio believes ²these things have happened before where a minority manager blatantly pretty much out in the open discriminates against white people. This has happened before and I guess it has to stop somewhere.² *Id.* ¶ 13. Tuccio argues that a ²black-skinned² supervisor will always support his ²brother² in a conflict between a ²black-skinned² and ²white-skinned² employee. *Id.* ¶ 16. Tuccio asserts that it is a ²well known strategy among minority supervisors that the best way to terminate a white employee who is being discriminated against (without risking a lawsuit) is to put the employee in an undesirable assignment [and] have a supervisor drop in unannounced every day in hope of finding an excuse to fire him.² Pl's Stmt. ¶ 21. Such falderal is both irrelevant and of-

2013 U.S. Dist. LEXIS 42037, *3

plex ²Site Supervisor,² Bobby L. Davis (²Davis'), an African American. Tuccio claims discriminatory treatment based upon alleged: (1) favoritism in work assignments; (2) disparity of disciplinary actions; **[*2]** and (3) partiality in disputes. *See* Complaint (²Compl.²), Docket Entry (²DE²) [1].

Defendant now moves for summary judgment on the following grounds: (1) _**plaintiff**_ cannot establish **[*3]** a prima facie case that defendant discriminated against him on the basis of race; and (2) even if _**plaintiff**_ could establish a prima facie case of _**discrimination**_, he cannot rebut, as pretextual, USSA's stated non-discriminatory reason underlying the adverse employment action in issue. The motion has been referred to the undersigned by Judge _**Bianco**_ for a Report and Recommendation. *See* DE [98]. For the reasons set forth herein, I strongly recommend that defendant's motion for summary judgment be GRANTED in its entirety and the complaint dismissed.

## FACTUAL BACKGROUND

An examination of the parties' Rule 56.1 statements reveals that few facts are contested, and none of the challenged facts create a genuine dispute. *See, generally*, Defendant's Statement of Undisputed Material Facts (²Def's Stmt.²), DE [92] and _**Plaintiff**_'s Responsive Statement of Material Facts (²Pl's Resp.²), DE [93]. In fact, _**plaintiff**_ responded to only sixteen of the one hundred and nineteen paragraphs of facts put forth by defendant in its 56.1 statement.

### Tuccio's Employment History with USSA

Tuccio was hired by Davis in 2006 to work as a security guard for USSA at its client, North Shore LIJ Complex, and was assigned to a **[*4]** post at 400 Lakeville Road, New Hyde Park, NY (²400 Lakeville Road²). Def's Stmt. ¶¶ 1-3. Tuccio was hired to work the ²third shift² (variously referred to as ²third shift,² or ²overnight shift²) which initially was from 11:00 PM to 7:00 AM and later changed to 12:00

midnight to 8:00 AM. *Id.* ¶ 31. Tuccio never objected to working the overnight shift and there is no difference in pay, benefits or job responsibilities and promotional opportunities resulting from working a particular shift. *Id.* ¶¶ 32, 35.

### Incidents During Tuccio's Employment with USSA

In November 2008, Tuccio accused a fellow security guard, Robert Brown (²Brown²), who worked the ²second shift² at the 400 Lakeville Road post of ²harassing him² in a letter to the Lake Success Police Department in Great Neck, NY. *Id.* ¶¶ 86-89. Brown, like Tuccio, is Caucasian. *Id.* Tuccio asked the police department to ²follow when he leaves work and see what he does in order to catch him.² *Id.* ¶ 88. Tuccio never reported his complaint about Brown's harassment to Davis. *Id.* ¶ 90. In fact, Davis and USSA were first made aware of the harassment complaint by North Shore LIJ's President's Office. *Id.* ¶¶ 89-90. In response to Tuccio's complaint, **[*5]** Davis determined that Tuccio and Brown should be assigned to separate work sites where they would have no interaction. *Id.* ¶ 92. Initially, Brown was moved from 400 Lakeville Road to the 825 Northern Boulevard, Great Neck, NY (²825 Northern Boulevard²) post, while Tuccio remained at his overnight post at 400 Lakeville Road. *Id.* ¶ 93. Approximately two weeks later, due to business needs, Brown was transferred back to his ²second shift² post at 400 Lakeville Road and Tuccio replaced Brown on the ²second shift² (3:00 PM — 11:00 PM) at 825 Northern Boulevard, which was a ²lateral move² with no loss of pay, benefits, suspension or discipline of any kind. *Id.* ¶¶ 48-49, 94, 96. At no time following his assignment to 825 Northern Boulevard did Tuccio advise or complain to Davis, or anyone else at USSA, that he did not wish to be assigned there or that the location was an ²undesirable² one. *Id.* ¶ 50. Without offering any evidentiary support, Tuccio opines that Brown was transferred away from 825 Northern Boulevard not due to business needs, but because ²[n]o one wanted to work

fensive.

SCOTT WEISS

there and I heard people say that he complained about the horrible assignment.[2] Pl's Resp. ¶¶ 94-95.

On January 2, 2009, [*6] Tuccio was late for work and a [2]Disciplinary Action Report[2] noting his lateness was placed in his file but Tuccio suffered no consequences as a result, and this was the only write-up ever placed in his file. Id. ¶¶ 52-54. Tuccio does not dispute that he was late but believes it was unfair to write him up for his lateness and that the write-up was [2]extreme.[2] Id. ¶ 55. However, Tuccio was not privy to disciplinary actions taken against any of his co-workers by Davis during his employment with USSA. Id. ¶ 8. Tuccio asserts, again without any evidentiary support that co-workers he describes as [2]black skinned . . . get away with a lot of things,[2] though he claims that [2]other people, like Renell Demoss and this guy Tim Anderson, they came in over an hour late and are not written up.[2] Id.

Defendant has a policy of writing up guards for reporting late, irrespective of race. Id. ¶ 58. By way of example, Tim Anderson, an African American guard assigned to work at 400 Lakeville Road was written up for his tardiness on several occasions. Id. Further, Renell Demoss ([2]Demoss[2]), an African American woman hired by USSA as security guard, had recurring attendance and tardiness issues while employed at [*7] USSA due to disabilities, car troubles and child care responsibilities. Id. ¶¶ 59, 66. Demoss was disciplined for her attendance issues via verbal counseling, numerous disciplinary reports placed in her file and other disciplinary action, including suspension, was permanently removed by Davis from the North Shore LIJ Complex and ultimately her employment with USSA was terminated. Id. ¶¶ 66-67.

In March 2007, prior to Demoss's termination, Demoss was reading a newspaper which included an article about the termination of radio personality Don Imus for the use of racial slurs in reference to members of the Rutgers Women's Basketball team. Id. ¶ 61. In the margin, Tuccio wrote [2]only black people do this, why is that?[2] Id. Tuccio told Demoss that [2]it seemed like an innocent statement[2] and he

[2]could not see why anybody would lose their job for that.[2] Id. ¶ 62. Subsequently, Demoss complained to Davis that Tuccio was harassing her. Id. ¶ 63. In response to the complaint, Davis told Tuccio that he must treat Demoss respectfully or his employment with USSA would be terminated. Id. ¶ 64. However, no formal disciplinary action was taken and no record of Demoss's complaint was placed in Tuccio's [*8] file. Id. ¶ 65.

*Plaintiff* asserts that [2]first shift[2] — a day shift from 7:00 AM to 3:00 PM (or 8:00 AM to 4:00 PM) — is the most desirable and that Davis preferred black employees for that shift. Pl's Stmt. ¶¶ 7, 20. At no time did Tuccio ever request to be assigned to a [2]first shift[2] assignment. Def's Stmt. ¶ 36. Tuccio claims that he refrained from asking for this assignement because he believed that he was [2]out of favor[2] with Davis following his talk with Davis regarding Demoss's racial harassment complaint against him. Id. ¶¶ 37-38. Notwithstanding Tuccio's claim, Davis assigned several white security guards, including Norman Leon, Pasquale Perna and Brown, to first shift assignments at the North Shore LIJ Complex. Id. ¶¶ 39, 46, 97. Conversely, Davis assigned African American security guards to the second and third shifts, assignments that Tuccio designates as [2]undesirable[2] shifts. Id. ¶¶ 41, 59, 73.

In the fall of 2008, Davis decided to stagger the shift start times at certain posts due to a shortage in manpower, thus, the start time of all of the 400 Lakeville Road shifts were moved back one hour. Id. ¶¶ 77-78. Tuccio, who worked the third shift at 400 Lakeville Road was unhappy [*9] with the change and asked Davis if he would consider moving his start time back to 11:00 PM rather than 12:00 midnight, to spare him the [2]inconvenience[2] due to the new schedule's incompatibility with Tuccio's bus schedule. Id. ¶ 81. At Tuccio's request, Davis temporarily changed Tuccio's start time back to 11:00 PM, but for only three days, at which time he decided that the one hour change in shift start times would be permanently reinstated. Id. ¶¶ 83-34. The alteration in the start times at the site was not disciplinary in nature as to any employee, including Tuccio, and did not re-

sult in a reduction of pay, benefits, or a change in job responsibilities for any security guard. *Id*. ¶ 82.

Tuccio's employment with USSA was terminated as a result of a complaint lodged against him on February 2, 2009 by the Office Manager of Orthopedic Associates, a tenant at 825 Northern Boulevard, the post to which Tuccio was then assigned. *Id*. ¶¶ 100, 107, 109. On February 2, 2009, a female patient visiting one of the medical offices at that location apparently parked her car improperly in the building's parking garage causing a disruption in the normal flow of traffic. *Id*. ¶ 101. Tuccio, described **[*10]** the situation as ²a nightmare² and a ²very unusual² and ²difficult² situation. *Id*. ¶ 102.

While leaving work that evening, Andrew Montaruli (²Montaruli²), a billing clerk at Orthopedic Associates, observed a woman in a confrontation of sorts with Tuccio. *Id*. ¶ 103. Montaruli testified that he saw the woman advise Tuccio that ²she did not like the way the security guard was talking to her² and asked him to ²back away.² *Id*. ¶ 104. Montaruli further testified that he observed Tuccio calling the woman ²stupid,² a ²fucking moron² and ²retarded.² *Id*. ¶105.

Following the incident, Montaruli returned to the office and notified his Office Manager Linda Geffner (²Geffner²), that he was unhappy with what he witnessed and he thought they should ²write a report² of the incident to Tuccio's employer. *Id*. ¶¶ 107-108. Geffner notified Davis that the security guard on duty at 825 Northern Boulevard at 5:00 PM was observed using foul language and berating a patient. *Id*. ¶ 109.

After receiving the complaint, Davis determined that the complaint warranted the removal of Tuccio from the North Shore LIJ Complex and advised Tuccio that he was to report to USSA's Long Island administrative office. *Id*. ¶¶ 110-111. **[*11]** Davis did not terminate Tuccio, nor did he have the authority to do so. *Id*. ¶¶ 115-116. Tuccio was advised of his termination of employment by USSA administra-

tive employee Marlyn Alfonso who also rejected Tuccio's request to transfer to a different location. *Id*. ¶ 117.

## DISCUSSION

### Summary Judgment Standard in Employment *Discrimination* Cases

Courts considering motions for summary judgment in *discrimination* cases ²are obliged to exercise particular caution . . . because *direct* evidence of an employer's discriminatory intent is rare and 'must often be inferred from circumstantial evidence.'² *Serby v. New York City Dep't of Educ*., 2012 U.S. Dist. LEXIS 36841, 2012 WL 928194, at *5 (E.D.N.Y. Mar. 19, 2012)* (quoting *Schiano v. Quality Payroll Sys., Inc*., 445 F.3d 597, 603 (2d Cir. 2006) (quotation marks and citation omitted)). It is, however, ²beyond cavil that summary judgment may be appropriate even in the fact-intensive context of *discrimination* cases.² *Abdu-Brisson v. Delta Air Lines, Inc*., 239 F.3d 456, 466 (2d Cir. 2001)*. Thus, a *plaintiff* ²must provide more than conclusory allegations of *discrimination* to defeat a motion for summary judgment.² *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)* **[*12]** (*plaintiff* ²may not rely on conclusory allegations or unsubstantiated speculation²). ²If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted.² *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

The Second Circuit has held that:

> In *discrimination* cases, the inquiry into whether the *plaintiff*'s sex (or race, etc.) caused the conduct at issue often requires an assessment of individuals' motivations and state of mind, matters that call for a sparing use of the summary judgment device because of juries' special advantages over judges in this area. Nonetheless, an employment *discrimina-*

2013 U.S. Dist. LEXIS 42037, *12

*tion* *plaintiff* faced with a properly supported summary judgment motion must do more than simply show that there is some metaphysical doubt as to the material facts. She must come forth with evidence sufficient to allow a reasonable jury to find in her favor.

*Brown v. Henderson*, 257 F.3d 246, 251-252 (2d Cir. 2001) (citations and internal quotations omitted). Moreover, as the Court of Appeals recently reiterated:

To withstand a summary judgment motion on a Title VII *discrimination* claim, the *plaintiff* must first show [*13] that: (1) he is a member of a protected class; (2) he is qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of *discrimination*. This *burden* is minimal. If the *plaintiff* satisfies his minimal *burden* of establishing a prima facie case of *discrimination*, the *burden* shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. If the defendant does so, then the *plaintiff* must prove that the articulated justification is in fact a pretext for *discrimination*.

*Desir v. Board of Coop. Educ. Servs. (BOCES) Nassau County*, 469 Fed. Appx. 66, 2012 WL 1674289, at *1 (2d Cir. 2012) (citations and internal quotations omitted).

When considering a dispositive motion made by or against a *pro se* litigant, the Court is [2]mindful that a *pro se* party's pleadings must be 'liberally construed' in favor of that party and are held to 'less stringent standards than formal pleadings drafted by lawyers.'[2] *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980) (citing *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)). [2]We liberally construe pleadings and briefs submitted by *pro se* litigants, read-

ing such submissions to raise the strongest arguments [*14] they suggest.[2] *Bertin v. United States*, 478 F.3d 489 (2d Cir. 2007) (construing return of property motion by *pro se* *plaintiff*) (internal citations omitted).

To rebut the articulated justification for the adverse action, [2]the *plaintiff* must show both that the reason was false, and that *discrimination* was the real reason.[2] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 n.4, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (internal quotations omitted). This *burden*-shifting analysis informs the ultimate determination of whether the evidence reasonably supports an inference of the facts *plaintiff* must prove. *James v. New York Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

As is routine in this Circuit, the court treats *plaintiff*'s claims under Title VII and the New York State Human Rights Law [2]as analytically identical, applying the same standard of proof to both claims.[2] *Dauer v. Verizon Communs. Inc.*, 613 F. Supp. 2d 446 (S.D.N.Y. 2009) (quoting *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008) (considering sex *discrimination* claims)); *see also Schiano*, 445 F.3d at 609 (hostile work environment and retaliation claims subject to same standards under federal and New York state law).

Also important to [*15] the resolution of the instant motion is *plaintiff*'s failure to contest the lion's share of the assertions contained in defendant's Rule 56.1 statement. As the Second Circuit has observed:

*Local Rule 56.1* was adopted to aid the courts in deciding summary judgment motions by quickly identifying disputed material facts. The Rule requires that any motion for summary judgment be accompanied by a list of the [2]material facts as to which the moving party contends there is no genuine issue to be tried.[2] *Local Civil Rule 56.1(a)*. The requirement is strict; failure to submit a Rule 56.1 statement with a motion

SCOTT WEISS

for summary judgment may result in the motion's denial. Id. Should the nonmoving party wish to contest the assertions contained within a Rule 56.1 statement, the nonmoving party must respond to each of the statement's paragraphs and include, if necessary, a statement of the additional material facts that demonstrate a genuine issue for trial. *Local Civil Rule 56.1(b)*. A nonmoving party's failure to respond to a Rule 56. 1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible. In the typical case, failure to respond results in a grant [*16] of summary judgment once the court assures itself that Rule 56's other requirements have been met.

*T.Y. v. New York City Dep't of Educ .*, *584 F.3d 412, 417-418 (2d Cir. 2009)*. Significantly, this is not a case in which the *plaintiff* failed to file a responsive statement; rather, as noted above, the *plaintiff* filed a 56.1 statement which selectively responds to a handful of the assertions. After searching the record, I find that, based upon the evidence submitted by both parties, the 56.1 statements present an accurate summary of the undisputable facts; in other words, the *plaintiff*'s failure to contest many assertions does not appear to be an oversight — in the main, he did not dispute these issues because he simply could not.

**Application to the Instant Case**

**A. Prima Facie Case**

Without question, *plaintiff* has established the first, second and third factors set forth in *McDonnell Douglas Corp. v. Green* , *411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. He is a member of a protected class, who was qualified and who was terminated from his position. The parties have focused the argument on the fourth factor, namely an infer-

ence of *discrimination*.

The question is whether Tuccio can establish that there was an inference [*17] of *discrimination*. *Plaintiff* relies exclusively on his unsupported notion that [2]desirable[2] posts and shifts were assigned to [2]black-skinned[2] workers. *Plaintiff* alleges that differential treatment gives rise to an inference of racial *discrimination*. Even drawing all inferences in favor of *plaintiff* on this motion, it is difficult to imagine that a trier of fact could reasonably find that this outcome gives rise to an inference of race *discrimination*.

The *plaintiff* asserts that [2]first shift[2] — a day shift from 7:00 AM to 3:00 PM — is the most desirable and that Davis preferred black employees for that shift. Compl., EEOC Charge at 6. However, Tuccio never asked Davis to be considered for a [2]first shift[2] assignment, yet complains that he was not considered by Davis for such an assignment. Compl., EEOC Charge at 11. Further, *plaintiff* complains about the change in shift start times, but the change did not apply only to Tuccio, but applied to all USSA guards assigned to those posts, regardless of race. Def's Stmt. ¶¶ 81-82. Finally, *plaintiff* believes that he was assigned [2]undesirable[2] posts while black employees were given preference. Pl's Stmt. ¶¶ 7, 14.

[2]A *plaintiff* sustains an adverse [*18] employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment.[2] *Galabya v. New York City Bd. of Educ .*, *202 F.3d 636, 640 (2d Cir.2000)*. [2]An 'adverse employment action' is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.[2] *Terry v. Ashcroft* , *336 F.3d 128, 138 (2d Cir. 2003)* (internal quotations and citation omitted). [2]Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.[2] *Id*. (internal quotations, alterations, and citation omitted).

Courts have repeatedly held that an unfavorable work schedule does not constitute an adverse employment action. *See e.g., Nicholls v. Brookdale Univ. Hops. & Med. Cnter ., No. 03 -CV-6233, 2005 U.S. Dist. LEXIS 12582 (E.D.N.Y. June 22, 2005)*, aff'd, *205 F. App'x 858 (2d Cir. 2006); Valenti v. Massapequa Union Free Sch. Dist ., No. 09-CV-977, 2012 U.S. Dist. LEXIS 43279, at *41 (E.D.N.Y. Mar. 28, 2012)* (not receiving a requested or desired [*19] assignment is not an adverse employment action). Under Title VII, subjective preferences with regard to shifts and posts are insufficient to establish that an employee has suffered an adverse employment action. *Castro v. N.Y. City Bd. Of Educ ., No. 96 Civ. 6314, 1998 U.S. Dist. LEXIS 2863, at *21 (S.D.N.Y. 1998)* (noting ²not everything that makes an employee unhappy is an actionable adverse action²).

Tuccio acknowledges that there is no difference in compensation, benefits, job duties and the like attached to assignment to any particular shift or post at the North Shore LIJ Complex. Def's Stmt. ¶ 35. Additionally, because several Caucasian guards have been assigned to the so-called ²desirable² shifts and posts, and numerous African-American guards have been assigned to ²undesirable² shifts and posts, there is no reasonable basis upon which an inference of discriminatory animus can be drawn from.

*Plaintiff* also appears to assert that black and white employees are regularly subject to unequal discipline. *Plaintiff* contends that ²black -skinned² employees ²get away with a lot of things.² *Id*. ¶ 8. However, *plaintiff*'s argument falls short because Tuccio only incurred one ²Disciplinary [*20] Action Report² due to lateness during his employment with USSA and, suffered no consequences as a result. *Id*. ¶¶ 52-55. In fact, *plaintiff*'s former co-worker, Demoss, an African-American female, was written up numerous times for tardiness and attendance issues and was ultimately removed by Davis from the North Shore LIJ Complex and fired. *Id*. ¶¶ 66-67. *Plaintiff* admits that he was not terminated due to tardiness, attendance

or other similar issues and that he was not written up for other incidents of admitted tardiness. *Id*. ¶¶ 51, 56. He also acknowledges that the write-up did not result in a demotion, decrease in wage or salary, loss of title, benefits of responsibilities. *Id*. ¶ 54. Thus, *plaintiff*'s single ²Disciplinary Action report² does not constitute an adverse employment action as a matter of law. *Castro , 1998 U.S. Dist. LEXIS 2863, at *21* (²negative evaluations . . . that are unattended by a demotion, diminution of wages, or other tangible loss do not materially alter employment conditions²).

The only adverse employment action ever taken against Tuccio was Tuccio's removal from the North Shore LIJ Complex by Davis, after learning about what transpired between Tuccio and a woman [*21] in the parking lot of 825 Northern Boulevard on February 2, 2009. On the one hand, nothing about this incident suggests and kind of race-based discriminatory intent. Indeed, the complainants Montaruli and Geffner, who had never met Tuccio, are both white. Def's Stmt. ¶ 112. On the other hand, the undisputed evidence shows that Tuccio, while in defendant's employ, acted in a manner that was highly inappropriate, deeply offensive and foolish. In other words, there is no reason to believe that the termination was racially motivated.

In order to discredit a defendant's reason for taking action, a *plaintiff* cannot simply show that the defendant's decisions were wrong or mistaken. The inquiry is whether the defendant was motivated by discriminatory animus. *See Adam v. Glen Cove Sch ., No. 06-CV-1200, 2008 U.S. Dist. LEXIS 13039 (E.D.N.Y. Feb. 21, 2008)* (granting summary judgment where *plaintiff* had no evidence of racial *discrimination* in the termination decision, but brought the lawsuit simply because he disagreed with the employment decision). Here, *plaintiff* provides no evidence and does not dispute that his removal from the North Shore LIJ Complex was for any reason other than the February [*22] 2, 2009 parking lot incident which led to Geffner's complaint. Thus, *plaintiff* has failed show that the defendant was motivated by discriminatory animus.

2013 U.S. Dist. LEXIS 42037, *22

**B. USSA's Legitimate Reason for _Plaintiff_'s Termination and _Plaintiff_'s Failure to Rebut**

Even assuming that _**plaintiff**_ has established a *prima facie* case, USSA has offered a legitimate, unrebutted reason for _**plaintiff**_'s termination, to wit: _**plaintiff**_'s conduct during the February 2, 2009 parking lot incident. This clearly establishes a legitimate, non-pretextual basis for his termination. *See, e.g., Preacely v. Schulte Roth & Zabel , 17 Fed.Appx. 57, 58 (2d Cir. 2001)* (²Even if Preacely had established a prima facie case, Schulte has provided ample evidence of a legitimate non-discriminatory reason for discharging Preacely: his violent drawings and inappropriate sexual comments to co-workers²). As reflected above, _**plaintiff**_ does not dispute the facts underlying the proffered reason for his termination, or even that his conduct was the basis for his termination. The undisputed facts demonstrate that _**plaintiff**_'s conduct was outrageous and no rational person could question that this incident constitutes a legitimate basis for his termination. [*23] Thus, based on the undisputed facts, USSA had a legitimate reason to terminate _**plaintiff**_ and did so as part of a reasoned, measured process. ²Where a non-pretextual explanation is given, a _**discrimination**_ action will not lie.² *Mitchell v. New York Blood Ctr ., No. 99-9331, 2000 U.S. App. LEXIS 22196, 2000 WL 1210861, at *3 (2d Cir. Aug. 23, 2000).*

In attempting to rebut this reason, _**plaintiff**_ offers nothing other than the fact that Geffner could not remember whether she emailed or called Davis to advise him of the February 2, 2009 incident. Pl's Stmt. ¶ 109. Even construed in the most favorable light for _**plaintiff**_, it defies imagination to suggest that any of these allegations gives rise to an inference of _**discrimination**_. _**Plaintiff**_ has offered no relevant evidence to suggest that defendant's handling of _**plaintiff**_'s unwarranted behavior is anything less than appropriate, and _**plaintiff**_ cannot defeat this motion ²by offering purely conclusory allegations of _**discrimination**_.² *Meiri*

*v. Dacon ,759 F.2d 989, 998 (2d Cir. 1985).*

**CONCLUSION**

For all of the reasons set forth above, I find that there are no material issues of fact which are in dispute; that, based upon the record, and even assuming that _**plaintiff**_ has set forth [*24] a *prima facie* case of _**discrimination**_, USSA provided a legitimate, non-pretextual reason for _**plaintiff**_'s termination; and, that _**plaintiff**_ has failed to set forth any evidence to rebut defendant's basis for the termination. As such, I hereby recommend that USSA's motion for summary judgment be GRANTED in its entirety, and the complaint dismissed.

**OBJECTIONS**

Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report. *28 U.S.C. § 636(b)(1)*; FED. R. CIV. P. *6(a), 72(b)*. Any requests for an extension of time for filing objections must be *directed* to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. **Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or the Court of Appeals** . *Thomas v. Arn ,474 U.S. 140, 145, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985 )*(²a party shall file objections with the district court or else waive right to appeal²); *Caidor v. Onondaga County , 517 F.3d 601, 604 (2d Cir. 2008)* (²failure to object timely to a magistrate's report operates as a waiver of any [*25] further judicial review of the magistrate's decision²).

Dated: Central Islip, New York

February 27, 2013

/s/ Gary R. Brown

United States Magistrate Judge