UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF NEW YORK

SAMUEL TUCCIO,                          )
                                        )
                         *Plaintiff,*   )
                                        )
            v.                          )   Case No.  2:12 cv-12-05506-JFB-GRB
                                        )
FJC SECURITY SERVICES INC.,             )
                                        )
                         *Defendant.*   )

### Declaration of Scott A. Weiss, Esq.

***Scott A. Weiss, Esq.***, declares, pursuant to 28 U.S.C. §1746 (2013) under penalties of perjury as follows:

1. I am an attorney and counsel of record for Defendant FJC Security Services, Inc., Defendant in the above captioned matter.  I am a member-attorney of Weiss & Weiss LLC and of counsel to Ingber Law Firm, PLLC which represents Defendant.

2. I am licensed attorney admitted and authorized to practice before the States of New York, Connecticut and Illinois.  I am admitted to the Bar and authorized to practice before this Court.

3. I am familiar with proceedings had to date.

4. I submit this Declaration in Support of the Motion for Summary Judgment and Entry of Summary Judgment in Defendant FJC Security Services, Inc. in that there exists no genuine issues of material fact and Defendant is entitled Summary Judgment as a matter of law.

5. Attached hereto as Exhibit 1 is a true and correct copy of the Complaint filed in this mater (Dkt# 1).

1

6. Attached hereto as Exhibit 2 is a true and correct copy of the Answer to the Complaint filed in this matter by Defendant FJC Security Services Inc (Dkt # 13).

7. Attached hereto as Exhibit 3 is true and correct copies of excerpts of the Deposition of James Donohue taken on August 22, 2013.

8. Attached hereto as Exhibit 4 is true and correct copies of excerpts of the Deposition of Gloria Noel taken on December 9, 2013.

9. Attached hereto as Exhibit 5 is true and correct copies of excerpts of the Deposition of Efrain Santiago taken on September 12, 2013.

10. Attached hereto as Exhibit 6 is true and correct copies of excerpts of the Deposition of Samuel Tuccio taken on August 15, 2013.

11. Attached hereto as Exhibit 7 is true and correct copies of excerpts of the Deposition of Frances Velazquez taken on September 12, 2013.

12. Attached hereto as Exhibit 8 is a true and correct copy of a 6 page Affidavit that Plaintiff produced in the discovery phase of this action that was submitted to the United States Government National Labor Relations Board (Dated:  May 7, 2010).

*[Signature follows…]*

Dated: January 24, 2014

By: _Scott A. Weiss_ _____
Scott A. Weiss, Esq.


WEISS & WEISS LLC, Of Counsel
2000 Post Rd., LL 106
Fairfield, CT 06824
50 Main Street, 10th Floor
White Plains, New York 10606
 (866) 277-2707/Fax: (203) 254-2725
Scott@weissnweiss.com
(SW0431)

Of Counsel to:
INGBER LAW FIRM, PLLC
Clifford J. Ingber, Esq. (CJI 7476)
6 Stallion Trail
Greenwich, Connecticut 06831
(203) 629-6170/ Fax: (203) 629-3954
Cjingber@ingberlawfirm.com

**Attorneys for FJC Security Services Inc.**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

## CV 12 5506

Samuel Tuccio

_____

_____

**COMPLAINT**

NAME OF PLAINTIFF(S)

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

v.

FJC Security Services Inc.

_____

★   OCT 26 2012   ★

_____

_____

**LONG ISLAND OFFICE**
**BIANCO, J.**
BROWN, M. J.

NAME OF DEFENDANT(S)

This action is brought for discrimination in employment pursuant to (check only those that apply):

[✓]    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) (race, color, gender, religion, national origin).
**NOTE:** *In order to bring a suit in federal district court under Title VII, you must first obtain a right to sue letter from the Equal Employment Opportunity Commission.*

[ ]    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 - 634 (amended in 1984, 1990, and by the Age Discrimination in Employment Amendments of 1986, Pub. L. No. 92-592 , the Civil Rights Act of 1991, Pub. L. No. 102-166).
**NOTE:** *In order to bring a suit in federal district court under the Age Discrimination in Employment Act, you must first file charges with the Equal Employment Opportunity Commission.*

[ ]    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 - 12117 (amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325 and the Civil Rights Act of 1991, Pub. L. No. 102-166).
**NOTE:** *In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a right to sue letter from the Equal Employment Opportunity Commission.*

-1-

Jurisdiction is specifically conferred upon this United States District Court by the aforementioned statutes, as well as 28 U.S.C. §§ 1331, 1343. Jurisdiction may also be appropriate under 42 U.S.C. §§ 1981, 1983 and 1985(3), as amended by the Civil Rights Act of 1991, Pub. L. No. 102-166, and any related claims under New York law.

1.   Plaintiff resides at:

## 199 West Nicholai Street

Street Address

| Nassau | NY | 11801 | 516 938 4652 |
|---|---|---|---|
| County | State | Zip Code | Telephone Number |

2.   Defendant(s) resides at, or its business is located at:

## 275 Jericho Turnpike

Street Address

| Nassau | Floral Park | NY | 11001 |
|---|---|---|---|
| County | City | State | Zip Code |

3.   The address at which I sought employment or was employed by the defendant(s) is:

## JFK Cargo Center 75, Room 228

Street Address

| Queens | Jamaica | NY | 114430 |
|---|---|---|---|
| County | City | State | Zip Code |

4.   The discriminatory conduct of which I complain in this action includes
     *(check only those that apply).*

     ☐        Failure to hire.

     ☑        Termination of my employment.

     ☐        Failure to promote.

     ☐        Failure to accommodate my disability.

     ☑        Unequal terms and conditions of my employment.

     ☐        Retaliation

     ☑        Other acts *(specify)*: Assigned to 3 undrainable assignments in a row(2 graveyard shifts and all 3 were outdoors )  .

**NOTE:**      *Only those grounds raised in the charge filed with the Equal Employment*
               *Opportunity Commission can be considered by the federal district court.*

5.   It is my best recollection that the alleged discriminatory acts occurred on:
     January 20, 2010
     ─────────────────────────────────────── .
     Date(s)

6.   I believe that the defendant(s) *(check one)*

     ☐        is still committing these acts against me.

     ☑        is <u>not</u> still committing these acts against me.

7.   Defendant(s) discriminated against me based on my:
     *(check only those that apply and state the basis for discrimination, for example,*
     *what is your religion, if religious discrimination is alleged)*

     ☑   race _____   [ ]   color _____

     ☐   gender/sex _____   [ ]   religion _____

     ☑   national origin _____

     ☐   disability _____

     ☐   age.  If age is checked, answer the following:

     I was born in _____.  At the time(s) defendant(s) discriminated against me,
                              Year
     I was ☐ more ☐ less than 40 years old.  *(check one).*

-3-

**NOTE:**     *Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court.*

8.     The facts of my case are as follows:

## See attached document outlining the facts.

## See enclosed copy of my EEOC complaint.

*(Attach additional sheets as necessary)*

**NOTE:**     *As additional support for your claim, you may attach to this complaint a copy of the charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights, or the New York City Commission on Human Rights.*

9.     It is my best recollection that I filed a charge with the New York State Division of Human Rights or the New York City Commission on Human Rights regarding defendant's alleged discriminatory conduct on:     **February 3, 2010**
                                                                                          Date

10.     It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct on:     **April 4, 2012**
                                                                                          Date

-4-

**Only litigants alleging age discrimination must answer Question #11.**

11.    Since filing my charge of age discrimination with the Equal Employment Opportunity

Commission regarding defendant's alleged discriminatory conduct *(check one)*:

☐    60 days or more have elapsed.

☐    less than 60 days have elapsed.

12.    The Equal Employment Opportunity Commission *(check one)*:

☐    has not issued a Right to Sue letter.

☑    has issued a Right to Sue letter, which I
received on  August 1, 2012                              .
                                         Date

**NOTE:**    Attach a copy of the Right to Sue Letter from the Equal Employment Opportunity
Commission to this complaint.

WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate,
including injunctive orders, damages, costs, and attorney's fees.

*Samuel J. Tuccio*
PLAINTIFF'S SIGNATURE

Dated: **October 26, 2012**

**199 West Nicholai Street**
Address
Hicksville, NY  11801

**516 938 4652**
Phone Number

rev. 5/1/12

ComplaintUnderTitleVII,ADAorADEAEDNY.rev.5/1/12

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: **Samuel Tuccio**<br>**199 West Nicholai**<br>**Hicksville, NY 11801** | From: **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |
|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16G-2010-02241 | **Holly M. Woodyard,**<br>**Investigator** | **(212) 336-3643** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Kevin J. Berry,
District Director

July 30, 2012
(Date Mailed)

Enclosures(s)

cc:

**FJC SECURITY SERVICES INC.**
**JFK Cargo Center Bldg 75, Room 228**
**Attn: Director of Human Resources**
**Jamaica, NY 11430**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X

_____X

SAMUEL TUCCIO

     Plaintiff,

-against-                    STATEMENT OF FACTS
                             ( ATTCHED TO COMPLAINT)

FJC Security Services Inc.

     Defendant.

_____X

## I.)    **DISCRIMINATION IN JOB ASSIGNMENTS**

The Personnel department consisted of Hispanic employees.  I had over 10 years of experience as a security guard, passed the fire guard exam with a score of 93,  took an optional course so that I could drive a patrol car on the tarmac, got scores of 85 to 95  in my training class, was 66 years old, and a college graduate.  In my employment application, I stated that I wanted a day shift.  Yet I was given 3 outdoor assignments and 2 of them were on the graveyard shift:

    A.)    Security officer at Terminal 4, 11 PM – 7 AM.  [June 1, 2009 – August 8, 2009]  Listed below are the jobs at Terminal 4:

        Rover (driving a patrol car on the tarmac)

Bravo3 (inside)

Alpha3 (inside)

Romeo (inside)

Delta4 (inside)

Charlie1 (inside)

Charlie2 (inside)

Delta1 (outdoors on the second floor)

Charlie3 (outdoors)

Charlie4 (outdoors).


I was assigned to the last 3 positions which were
OUTDOOR ASSIGNMENTS).  After I complained to my
supervisors that it was unfair for them to assign newly
hired employees to the more desirable indoor assignments
when I always got the least desirable outdoor assignments,
in the middle of July, 2009, I finally got to work inside.

B.)   Security officer patrolling the <u>outside</u> of Building 20, 6 PM
      2 AM.  [August 10, 2009]  Assignment was refused.

C.)   Security officer for Avianca Airlines in Terminal 4 in the
      bag room, 5 AM – 9 AM.  [August 11, 2009 – January 20,
      2010.

STATEMENT OF FACTS - OCTOBER 27, 2012      2

Although "bag room" was not stated on the form which I

signed(Exhibit A in FJC's answer to my original complaint),

I was told by Human Resources that it was the bag room.

This meant that I watched the circular luggage handling

belts on the first floor near the Airbus 330 airplane itself.

The bag room had doors which were 40 feet wide and 50

feet high.  The doors were open most of the time

with  a 30 to 40 mile per hour wind blowing outside the

doors.  When I complained to the supervisors in the area

about the lack of heat in November, 2009, they told me

that the heat would not be turned on until after

Thanksgiving Day.  The "heat" turned out to be 2 large

space heaters hanging from the ceiling

I want to subpoena for a deposition other white employees

who experienced a similar fate:

1.)     Justin Avery.  He was in my training class and got

100 on every test.

2.)     Lowell Caraballo.

3.)     The woman who worked on the tarmac in

December 2009 – January 2010 (mentioned in
my original complaint to the EEOC).

4.)   Jenny (last name unknown) who worked for two or
three days in the bag room (one of the people who
were there temporarily for one day).

With the court's permission, I want to subpoena the names
of all the employees in my training class of May, 2009,
the scores they received on every test, and the first 3
assignments each employee received.

## II.)   DISCRIMINATION BY THE SUPERVISOR, ALBERTO CABANILLA

When I worked in the bag room, there were 3 or 4 temporary
employees there every day.  They told me that they had better  jobs
jobs at the airport but were there for one day only after they
requested overtime.  They told me that they would never settle for the
lousy job which I had.  They were nearly always black or Hispanic
and scoffed at the idea of being assigned to work on the tarmac
guarding the plane as they were too good for this job.

STATEMENT OF FACTS - OCTOBER 27, 2012       4

In December, 2009, it got severely cold and Alberto Cabanilla assigned me and a white woman to work on the tarmac. He took me out of my assignment in the bag room over my protestations and wanted me on the tarmac 2 or 3 days per week. Sometimes I refused to work there and he changed my assignment. Other times, he gave me a choice between working outside or going home. I always went home when given this choice. My complaint to the EEOC is about the specific dates that I was forced to work on the tarmac under extreme weather conditions.

I noticed that FJC's attorney neglected to name the WHITE woman who was forced against her will to work on the tarmac in extreme weather conditions while young, muscular Latino men and women hid inside where it was warm. I might add that young muscular black men and women hid inside where it was warm – even those who were there for one day only.

I noticed that FJC's attorney failed to name the tall black woman who worked at Avainaca as a security guard. For this reason, I want to subpoena the daily sign in sheets at the Avianca office for August 11, 2009 through January 20, 2010.

STATEMENT OF FACTS - OCTOBER 27, 2012      5

FJC's attorney refers to an Exhibit C.  This was a statement which I signed when I applied for employment.  I was never given a copy of this.  Since FJC's application process involves filling out about 30 or mores pages of forms, it is unreasonable for then to expect each new hire to remember the name and telephone number of the people to contact in case of employment discrimination.

I was never told any any time by anyone that seniority had anything to do with my assignments in Part I or Part II of this complaint until January 20, 2012 when the General Manager, James Donohue, brought it up.

Finally, I was terminated for standing up to employment discrimination and this should not be held against me.

Dated: October 26, 2012                    Respectfully submitted,

_Samuel J. Tuccio_
Samuel J. Tuccio

199 West Nicholai Street
Hicksville, New York  11801
(516) 938 4652   (voice or fax)

STATEMENT OF FACTS - OCTOBER 27, 2012       6

**CV 12 5506**

§JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Samuel Tuccio   FILED

## DEFENDANTS

FJC Security Svces., Inc.

**(b)** County of Residence of First Listed Plaintiff ___
(EXCEPT IN U.S. PLAINTIFF CASES)

IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 26 2012 ★

County of Residence of First Listed Defendant ___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

199 West Nicholai A.
Hicksville NY LONG ISLAND OFFICE

BIANCO, J.
Attorneys (If Known)
BROWN, M.J.

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☒ 442 Employment | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): Title VII

Brief description of cause: employment discrimination

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ ___

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE JFB-GRB   DOCKET NUMBER 10-CV-1714

DATE ___

SIGNATURE OF ATTORNEY OF RECORD ___

**FOR OFFICE USE ONLY**

RECEIPT # ___   AMOUNT ___   APPLYING IFP ___   JUDGE ___   MAG. JUDGE ___

# CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.10 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

I, _____ N|A _____, counsel for _____, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

☐   monetary damages sought are in excess of $150,000, exclusive of interest and costs,

☐   the complaint seeks injunctive relief,

☐   the matter is otherwise ineligible for the following reason

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:  N|A

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

## NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.)   Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County:_____ NO _____

2.)   If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County?_____ YES _____

b) Did the events of omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District?_____ YES _____

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County?_____
(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.
☐   Yes   N|A   ☐   No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?
☐   Yes   (If yes, please explain)   ☐   No

I certify the accuracy of all information provided above.

Signature:_____ N|A _____

# PRO SE CHECK SHEET

PRO SE NAME  *Samuel Tuccio*

_____  RANDOM SELECTION*

_____  LONG ISLAND DRUM

_____  BROOKLYN DRUM **CV 12 5506**

DIRECT ASSIGN TO  *JFB-GRB*

RELATED TO  *10-1714*

**BIANCO, J.**

**BROWN, M. J.**

*PLEASE DO NOT ASSIGN TO A SENIOR JUDGE.

PLEASE PROVIDE A COPY OF THE DOCKET TO CATHY AFTER THE CASE IS OPENED.

THANK YOU.

*Declaration of Scott A. Weiss*
EXHIBIT: **2**

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF NEW YORK

SAMUEL TUCCIO,                          )
                                        )
                        *Plaintiff,*    )
                                        )
            v.                          )    Case No. 2:12 cv-12-05506-JFB-GRB
                                        )
FJC SECURITY SERVICES INC.,             )
                                        )
                        *Defendant.*    )

### Answer and Affirmative Defenses
### Submitted By
### Defendant FJC Security Services Inc.

**Defendant**, FJC Security Services Inc., by its attorneys, as and for its Answer and Affirmative Defenses to Plaintiff's Complaint ("*Complaint*") in this action, alleges as follows:

1. Because the first paragraph of the Complaint alleges legal conclusions, no response is required, but Defendant denies liability.

2. As to the first paragraph on page 2 of 12 of the Complaint, Defendant admits that the court has federal subject matter jurisdiction and venue is proper, except to deny sufficient knowledge or information as to whether the Court has in personam jurisdiction over Defendant.

3. Defendant denies the allegations contained in Paragraph 1 of the Complaint, but states that Defendant is informed and believes that Plaintiff resides at 199 West Nicholai Street, Hicksville, New York 11801.

4. Defendant admits the allegations contained in Paragraph 2 of the Complaint.

5. Defendant denies sufficient knowledge or information to admit or deny the allegations alleged in Paragraph 3 of the Complaint, except to admit that Plaintiff was hired as a security guard on or about May 5, 2009, and his employment was terminated on or after January 20, 2010, when he refused an assignment in violation of Defendant's rules and regulations.

6. Defendant denies the allegations contained in Paragraph 4 of the Complaint.

7. Defendant denies the allegations contained in Paragraph 5 of the Complaint, except to admit that Plaintiff was terminated on or after January 20, 2010, when he refused an assignment in violation of Defendant's rules and regulations.

8. Defendant admits the allegations contained in Paragraph 6 of the Complaint and states further that at all times material hereto, it has been in full compliance of federal and state laws.

9. Defendant denies the allegations in Paragraph 7 of the Complaint.

10. Defendant denies sufficient knowledge or information to admit or deny the allegations contained in Paragraph 8 of the Complaint.

11. Defendant denies sufficient knowledge or information to admit or deny the allegations contained in Paragraph 9 of the Complaint.

12. Defendant denies sufficient knowledge or information to admit or deny the allegations contained in Paragraph 10 of the Complaint.

13. Defendant offers no response to Paragraph 11 of the Complaint as Plaintiff does not allege age discrimination in this matter.

14. Defendant denies sufficient knowledge or information sufficient to admit or deny the allegations contained in Paragraph 12 of the Complaint.

2

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

15. The Complaint fails to state a claim upon which relief may be granted.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE

16. The allegations upon which Plaintiff relies and the alleged conduct is caused by Plaintiff's culpable conduct, namely Plaintiff was terminated because he refused an assignment in violation of Defendant's rules and regulations.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

17. Plaintiff may have failed to mitigate damages.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

18. There exists a collective bargaining agreement between Defendant and the Allied International Union pursuant to which Plaintiff is required to submit a grievance and if not resolved, demand arbitration through his certified bargaining representative, the Union, and therefore this claim should be arbitrated, if at all.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

19. The Court may not have in personam jurisdiction over the Defendant because of insufficiency of service.

### AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

20. Defendant at all times material hereto has been in full and complete compliance with federal and state laws.

### AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

21. All or any part of Plaintiff's claim may be barred by the doctrine of waiver and/or estoppel.

### AS AND FOR A EIGHTH AFFIRMATIVE DEFENSE

22. Plaintiff's alleged claim may be barred because he failed to exhaust his administrative remedies, namely those remedies that may be available under a collective bargaining agreement.

3

**WHEREFORE,** Defendant FJC Security Services, Inc. prays that this Court enter an Order dismissing the Complaint with prejudice, awarding its reasonable attorneys' fees and disbursement of costs for defending this meritless claim, and such other and further relief as this Court deems appropriate.

**DATED:** Monday, December 31, 2012      Respectfully Submitted,

*Of Counsel* to:      **WEISS & WEISS LLC,** *Of Counsel*
INGBER LAW FIRM, PLLC
Clifford J. Ingber, Esq. (CJI 7160)      By:    /s/ Scott A. Weiss
6 Stallion Trail      *Counsel of Record for:*
Greenwich, Connecticut 06830      **FJC Security Services Inc., Defendant**
(203) 629-6129/ Fax: (203) 629-3950      2000 Post Rd., LL 106
Cji@ingberlawfirm.com      Fairfield, CT 06824
**FJC Security Services Inc.**      50 Main Street, 10th Floor
**-its Attorneys-**      White Plains, New York 10606
     (866) 277-2707/Fax: (203) 254-2725
     Scott@weissnweiss.com
     (SW0431)

4

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF NEW YORK

SAMUEL TUCCIO,                              )
                                            )
                          *Plaintiff,*      )
                                            )
              v.                            )     Case No. 2:12 cv-12-05506-JFB-GRB
                                            )
FJC SECURITY SERVICES INC.,                 )
                                            )
                          *Defendant.*      )

**Certificate of Service**

I, Scott A. Weiss, an attorney, certifies and affirms, under penalty of perjury, 28

U.S.C. §1746 (2012) that I caused to have this within *Answer and Affirmative Defenses*

*Submitted by FJC Security Services Inc.* to be served on the following by first class

mail, postage prepaid on Thursday, January 03, 2013:

Plaintiff:              Samuel Tuccio
                        199 West Nicholai Street
                        Hicksville, New York 11801

**DATED:** Thursday, January 03, 2013            Respectfully Submitted,

*Of Counsel* to:                                 **WEISS & WEISS LLC,** *Of Counsel*
INGBER LAW FIRM, PLLC
Clifford J. Ingber, Esq. (CJI 7160)              By:    /s/ Scott A. Weiss
6 Stallion Trail                                 *Counsel of Record for:*
Greenwich, Connecticut 06830                     **FJC Security Services Inc., Defendant**
(203) 629-6129/ Fax: (203) 629-3950              2000 Post Rd., LL 106
Cji@ingberlawfirm.com                            Fairfield, CT 06824
**FJC Security Services Inc.**                   50 Main Street, 10th Floor
**-its Attorneys-**                              White Plains, New York 10606
                                                  (866) 277-2707/Fax: (203) 254-2725
                                                 Scott@weissnweiss.com
                                                 (SW0431)

5

1

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

SAMUEL TUCCIO,

                    Plaintiff,
                    Case Number:
                    2:12 CV-12-05506-JFB-GRB

     -against-

FJC SECURITY SERVICES, INC.,

                    Defendant.
----------------------------------------X

                    225 Cadman Plaza
                    Brooklyn, New York

                    August 22, 2013
                    12:55 p.m.


      EXAMINATION BEFORE TRIAL of FJC

SECURITY SERVICES, INC., the Defendant

herein, by JAMES JOSEPH DONOHUE, taken by

adverse parties, pursuant to Notice, held

at the above-noted time and place, before

Kimberly R. Jones, a Notary Public of

the State of New York.

```
1                   JAMES JOSEPH DONOHUE

2   period of nine months.

3        Q.     When did you begin working for FJC

4   Security Services, Incorporated?

5        A.     I began in 1999 on a part-time basis

6   and became a full-time employee in 2001.

7        Q.     What was your position and location?

8               MR. WEISS:  Objection as to form.

9               You may answer.

10        Q.     What was your position and location?

11               MR. WEISS:  Are you saying his

12          initial position?

13               MR. TUCCIO:  Yes.

14        A.     My initial position when I began in

15   1999 was as a security officer, as a traffic

16   enforcement agent at Terminal 4 JFK.

17        Q.     And what was your next position after

18   that?

19        A.     In 2001, I was promoted to field

20   supervisor.

21        Q.     What was your next position?

22        A.     In 2002, I was promoted to project

23   manager.

24        Q.     What was your next position after

25   that?
```

6

```
 1                  JAMES JOSEPH DONOHUE

 2          A.    In 2004, I was promoted to general

 3     manager.

 4          Q.    Is that general manager at the

 5     airport?

 6          A.    General manager of aviation.

 7          Q.    Is that your present position?

 8          A.    No.

 9          Q.    What is the next job after 2004?

10          A.    In 2011, I was promoted to general

11     manager and senior director of aviation.

12          Q.    What was your next position after

13     that?

14          A.    In 2012, I was promoted to executive

15     director of aviation services.

16          Q.    Is that your present position?

17          A.    Yes.

18          Q.    Have any complaints been brought

19     against you at FJC Security Services?

20          A.    Yes.

21          Q.    Have any lawsuits been lodged against

22     you at FJC Security Services?

23                MR. WEISS:   I'll let him answer but

24          just out of curiosity, what's the relevance

25          of any other lawsuits other than burdening
```

```
 1                  JAMES JOSEPH DONOHUE

 2          A.    At that point, I had over 100 college

 3     credits in the area of management.  I underwent 40

 4     hours of classroom training in the field aviation

 5     security.  I underwent Port Authority SIDA

 6     training, Port Authority AOA driver training, New

 7     York State eight hour certificate for security

 8     officer, New York State 16 hour training as a

 9     security officer, F93 training for FDNY fireguard,

10     in addition to 2001.  At that time --

11          Q.    Just training as supervisor or

12     manager, not as security guard.

13                Do you have a college or university

14     degree?

15          A.    Yes, I do.

16          Q.    What is that?

17          A.    I have a Bachelor's degree in

18     business management from the College of

19     St. Francis in Brooklyn, New York.

20          Q.    Who appointed you or hired you to

21     your present position?

22          A.    Who promoted me, is that the

23     question?

24          Q.    Yes, who made you executive director?

25          A.    Former vice president Robert
```

1              JAMES JOSEPH DONOHUE

2         Q.    Next question.  How does the human

3    resources department test new employees?

4         A.    All new employees go through an

5    initial training period, which I believe that

6    there may be a test at the end of that.  I would

7    have to check with my training department, as well

8    as all new potential employees must undergo Port

9    Authority SIDA training, which a test is given at

10   the end of that.  I'm also pretty sure that all

11   employees must obtain a New York State security

12   guard license and prior to getting that, they must

13   go through an eight hour training course, which I

14   believe there is a test at the end of that.  Same

15   for the New York State 16 hour training course for

16   security officers.  Again, I'm going off the best

17   of my recollection and would have to fact check

18   that.

19             MR. TUCCIO:  Maybe this will help.

20             I'm going to make this Exhibit Number 1.  I

21             just made one full copy of it, which you're

22             going to get, but it's just for him to this

23             is the same thing I mailed you.  This is

24             just a cover sheet.  But in this training,

25             I put down the exhibit, the certificates

25

1          JAMES JOSEPH DONOHUE

2      Santiago.

3      A.    To answer your question, again, it

4  appears to be certificates of completion and parts

5  and pieces of certain training materials that

6  appear to be part of FJC's -- several different

7  FJC training curriculum.

8      Q.    The last thing you looked at was the

9  cargo screening, the first page of two booklets

10  that I received.

11      A.    The last two pages referencing cargo

12  security screener with the Delta Airlines logo, as

13  well as the last page being a photo of an

14  electronic trace detection machine, that training

15  is not conducted by FJC.  That training was

16  conducted by one of our clients at the time, that

17  being Delta Airlines.

18      Q.    How does the human resources

19  department determine which assignments to give to

20  new employees?

21      A.    All work assignments are drafted up

22  by myself without names on them.  At that point,

23  those blank work assignments are handed to the

24  personnel department who, in turn, then distribute

25  them to new hired employees based on first come,

```
 1                 JAMES JOSEPH DONOHUE

 2    first served after a turnaround time of the

 3    vetting of their credentials to make them eligible

 4    to work for FJC at an airport.

 5          Q.    Next question.  Is there any relation

 6    between the test scores and the training class

 7    given by the instructor Efrain Santiago and the

 8    first assignment given to a new employee?

 9          A.    No.

10          Q.    Is there any relation to the test

11    score of the fire exam and the first assignment

12    given to a new employee?

13          A.    No.

14          Q.    Is there any relation to the test

15    score of the exam given at the end of a course

16    taught by John Harding of Delta Airlines on the

17    cargo security screener using an explosives trace

18    detector and the first assignment given to a new

19    employee?

20          A.    No.

21          Q.    Is there any relation to the test

22    score of a four hour course given by the Port

23    Authority of New York and New Jersey and the first

24    assignment given to a new hire?

25          A.    Please be more specific.  The Port
```

1                    JAMES JOSEPH DONOHUE

2    Authority conducts several classes.

3         Q.     Is there any relation to the

4    scores -- there's a score given on one of the

5    certificates that I showed you.

6         A.     Which certificate would that be?

7         Q.     In Exhibit A, I believe the first

8    certificate has a score of 96 at the bottom.

9         A.     You're referencing the Port Authority

10   of New York and New Jersey Certificate of

11   Attendance for SIDA certification?

12        Q.     Correct.

13        A.     So, no, there is no correlation to

14   the score on the test in regards to employees'

15   work assignments.  But for the record, be known,

16   when it says there is no correlation to score, if

17   you fail any of the required courses, then you are

18   not eligible to work.  So that would be the only

19   correlation.

20        Q.     So if you fail any of the tests, then

21   you are not qualified to work?

22        A.     Only if you fail a SIDA course or if

23   you fail FJC's initial training course.  If

24   someone were to fail the fireguard exam, that

25   would not disqualify them from working, it would

1                    JAMES JOSEPH DONOHUE

2    just limit them to where they can work.  Same for

3    Port Authority AOA driver training.  If someone

4    fails the course, they are not eligible to drive

5    but that does not disqualify them from holding a

6    non-driving position and et cetera.

7         Q.    Is there any relation to the number

8    of years of experience that a security guard has

9    and the first assignment given to him as a new

10   employee?

11        A.    No.

12        Q.    Does the previous employment record

13   of an employee have any relation to the assignment

14   given to the new employee; for example, suppose

15   that employee was a former police officer?

16        A.    Depending on the position they're

17   applying for.  Of course their past experience and

18   their credentials would determine what they're

19   eligible to work.  For example, if I need an armed

20   security guard, someone who has law enforcement

21   background and is eligible to carry a firearm, of

22   course that would determine where they're eligible

23   and can work.  But for the average airport

24   security officer, which is the entry level

25   position, that the majority of employees are hired

1                    JAMES  JOSEPH  DONOHUE

2    for, the answer is no.

3         Q.    Is there any relation between

4    employee's educational record and the first

5    assignment given to a new employee?

6         A.    For which position?

7         Q.    Security guard.

8         A.    No.

9         Q.    So, I think maybe you answered this

10   one.  Who makes the decision on which assignment

11   to give a new employee?

12                MR. WEISS:   Objection.  Asked and

13            answered.

14                You may answer it.

15        A.    The schedules for new employees are

16   drafted up by myself without names or designation

17   to it.  From that point, it is issued to the

18   personnel department, who then issues it to the

19   new hires on a first come, first served basis,

20   based on the turnaround time of their background

21   investigation and achieving their credentials to

22   work in the airport for FJC.

23        Q.    Are you in charge of hiring

24   instructors or members of the human resources

25   department?

1                    JAMES JOSEPH DONOHUE

2          A.     Yes.  Currently, yes.

3          Q.     In 2009, were you in charge?

4          A.     All final decisions on employment for

5     non guard personnel was verified and approved by

6     the vice president at that time, John Pagnotta.

7          Q.     He verified and approved them but

8     were you in charge of hiring instructors or

9     members?

10         A.     Based on the fact that it had to be

11    approved and authorized by the vice president, he

12    makes the final decisions.  Again, when I

13    reference he, referring to the vice president

14    in 2009 who was John Pagnotta.

15         Q.     In 2009 to 2010, what was your

16    relationship to the people who worked in the

17    office at Suite 225 in Building 75 at the airport?

18                    MR. WEISS:  Objection as to form.

19                    But if you understand the question,

20         you may answer it.

21         A.     Under the direction of vice president

22    John Pagnotta, I had responsibility as the

23    immediate supervisor of all personnel in said

24    office.

25         Q.     Was it strictly professional?

1           JAMES JOSEPH DONOHUE

2           MR. WEISS:  Objection.  What does

3      that got to do with anything?  How is that

4      relevant?  Again, the scope of discovery,

5      while liberally construed, is based on what

6      is material and relevant under Rule 26.

7      What does his relationship, other than

8      professional in the office, got to do with

9      anything?  If you can tell me how that's

10     relevant, then I'll let him answer the

11     question.  I'm prepared to discuss it with

12     you informally off the record so we do not

13     burden the record.

14           MR. TUCCIO:  Let me go on to the next

15     question.

16     Q.    Did you go out together or socialize

17 at lunchtime with the employees in the office?

18           MR. WEISS:  That's not material or

19     relevant, either.

20           But you may answer it.

21     A.    I'm sure that sometime in my career,

22 yes, I did have lunch with my colleagues.

23     Q.    This is a copy of the letter you sent

24 me.

25           (Whereupon, the aforementioned

1             JAMES JOSEPH DONOHUE

2        Two-Page Document was marked as Plaintiff's

3        Exhibit 2 for identification as of this

4        date by the Reporter.)

5        Q.    This is the letter of termination

6   which I received --

7             MR. WEISS:  One moment.

8        A.    Can I have time to review, please?

9             MR. WEISS:  The only question I have

10       of you, Mr. Tuccio, is did you sign this

11       document?

12            MR. TUCCIO:  That's not my signature,

13       that's his signature.

14            MR. WEISS:  But it says Samuel Tuccio

15       on the right.  Did you sign this at any

16       time?

17            MR. TUCCIO:  No.

18            MR. WEISS:  I want to make sure it's

19       complete, that's all.

20            Okay, are you ready to go?

21            THE WITNESS:  Yes.

22            MR. WEISS:  Go ahead.

23       Q.    Do you recall speaking to me at

24   one p.m. on January 20, 2010?

25       A.    Based on Exhibit 2 presented before

```
 1              JAMES JOSEPH DONOHUE
 2   me, it indicates with my signature, yes, we did
 3   meet and have a discussion.
 4        Q.    What did you say to me?
 5        A.    I don't recall the substance of the
 6   conversation.
 7        Q.    Do you remember telling me that the
 8   incident at five a.m. that morning caused the
 9   alarms to go off, as stated in that letter?
10             MR. WEISS:  Objection as to form.
11        Which incident?
12             MR. TUCCIO:  The incident that's
13        mentioned in that letter of me going
14        through --
15             MR. WEISS:  Go ahead.
16             MR. TUCCIO:  -- the door of Avianca
17        Airlines.
18        A.    Based on the letter with my signature
19   on it dated January 20, 2010, it indicates we did
20   have a discussion about an incident that occurred
21   on same date as letter at, approximately, I
22   believe it mentions between the hours of four a.m.
23   and eight a.m.
24        Q.    Yes, okay.  January 20th, that was
25   daylight savings time, so that was about, I
```

34

1                JAMES JOSEPH DONOHUE

2  believe, five a.m.  Daylight savings time.

3                Which alarms went off?  You mentioned

4  several alarms; which alarms?

5        A.    To the best of my recollection, based

6  on the information provided in Exhibit 2, I

7  believe it was a restricted access door leading

8  from inside of Terminal 4 onto the aeronautical

9  area, acronym, AOA.

10       Q.    So, you're saying that one door alarm

11 went off?

12       A.    I don't know how many.  It doesn't

13 reference the amount of alarms in the letter.

14       Q.    It does say alarms went off.

15                To my knowledge, that was an isolated

16 area of the airport on the second floor of the

17 cargo building at Terminal 4.  Everything was

18 closed at that time of night.  It was just that

19 one alarm?

20                MR. WEISS:  Mr. Tuccio, I understand

21           you have a position but it's inappropriate

22           for you to be testifying on the record.

23           You had your opportunity last Thursday.  If

24           you have a question of this witness, please

25           ask it.

1           JAMES JOSEPH DONOHUE

2         Q.    Your answer is that just one alarm

3   went off, or many?

4               MR. WEISS:   That's not the testimony.

5               Go ahead, you can answer it again.

6         A.    I do not recall the amount of alarms.

7   But for the record, when an alarm is issued,

8   multiple lights and sirens do go off, so the

9   reference of plural in alarms may be pertaining to

10  that.   That's to the best of my recollection and

11  what was presented in the document before me in

12  Exhibit 2.

13        Q.    Did you tell me that the entire

14  building, that is all of Terminal 4, was

15  evacuated?

16        A.    Not that I recall.

17        Q.    Did you ever say that to any other

18  employee who you terminated?

19              MR. WEISS:   Objection.  Again, we're

20              bouncing up against relevance but if you

21              know, you may answer.

22        A.    Not that I recall.

23        Q.    Did you tell me that all flights were

24  either cancelled or postponed at Terminal 4?

25        A.    Not that I recall.

1               JAMES JOSEPH DONOHUE

2          MR. WEISS:  Off the record.

3          (Discussion held off the record.)

4      Q.    Did you ever say that to any other

5  employee who you terminated, that all flights were

6  either cancelled or postponed at Terminal 4?

7      A.    Not that I recall.

8      Q.    I just want to let you know, again,

9  you are under oath.  So if I find out that you

10  have committed perjury, I will bring this to the

11  attention of the U.S. attorney.

12      A.    I'm aware of my legal obligation.

13          MR. WEISS:  The witness has been

14          sworn.  I ask you to refrain from veiled

15          threats because that's inappropriate on the

16          record.  So please continue.

17          MR. TUCCIO:  I don't think that's

18          inappropriate at all.

19          MR. WEISS:  Please continue.

20          MR. TUCCIO:  I don't think that's

21          inappropriate at all.

22      Q.    Did you tell me that the Port

23  Authority of New York and New Jersey policemen

24  would issue a warrant for my arrest?

25      A.    Not that I recall.

37

1                    JAMES JOSEPH DONOHUE

2          Q.    Not that I recall; is that a no?

3          A.    It means I do not remember the

4    substance of the conversation that we allegedly

5    had as outlined in Exhibit 2 before me.

6          Q.    Now, following that answer to the

7    last question, did you ever say that to any other

8    employee who you terminated?

9              MR. WEISS:  Say what?

10         Q.    That the Port Authority of New York

11   and New Jersey would issue a warrant for their

12   arrest.

13         A.    Not that I recall.

14         Q.    On or about February 9, 2010, the

15   union rep, Al Dooley, telephoned me --

16             MR. WEISS:  Mr. Tuccio, you're not

17         permitted to testify.  You had your chance.

18         Is there a question?

19             MR. TUCCIO:  Yes, there is a

20         question.

21             MR. WEISS:  I'm trying to be patient

22         with you on these points but you have to

23         ask a question.

24             MR. TUCCIO:  Yes, there will be a

25         question.  That's what I'm getting to.  I'm

```
 1                    JAMES JOSEPH DONOHUE

 2                    Now, at Terminal 4, all the guards go

 3      to one room in the beginning of the shift, all the

 4      FJC security guards.  So, that contract is between

 5      FJC and who?

 6                    MR. WEISS:  There's a question

 7              pending.  I may let you answer that.  Let

 8              me talk to you for a minute.

 9                    Off the record for a second.

10                    (Discussion held off the record.)

11              Read back the last question.

12                    MR. WEISS:  Read back the last

13              question.

14                    (The requested portion of the record

15              was read back by the reporter.)

16                    MR. WEISS:  You may answer.

17              A.    The majority is between FJC Security

18      Services and JFK IAT LLC.

19              Q.    And is there a space between the T

20      and the LLC; it's IAT space LLC?

21              A.    LLC means limited liability company.

22                    MR. WEISS:  I'm assuming IAT and New

23              York law requires that they use the LLC to

24              signal they were a limited liability

25              company.
```

1               JAMES JOSEPH DONOHUE

2        Q.    The IAT, that stands for?

3        A.    International Arrivals Terminal.

4        Q.    Let me go back one minute.  On the

5   assignment of jobs, you claim that you were the

6   one who was in charge of assigning security guards

7   to their first assignment.  After the security

8   guard works at the first assignment, let's say, in

9   my case, at Terminal 4, we're taken off of that

10  and put on another assignment.  Who assigns

11  security guards to the second assignment?

12       A.    I do.

13       Q.    And how about the third assignment?

14       A.    I do.

15       Q.    Now, returning to the security guards

16  log books.  Where are the supervised security log

17  books secured?

18       A.    For which account?

19       Q.    I'm talking about the ones for JFK

20  IAT LLC.

21       A.    Depending on how old and from what

22  year, they can either be in our office on site.

23  They could be in a storage closet within the

24  terminal.  They could be in a storage closet at my

25  office at Building 75.  They could be in a storage

```
 1                    JAMES JOSEPH DONOHUE

 2    stored?

 3         A.    No.

 4         Q.    What happens to the test scores from

 5    the exam from the cargo security screening given

 6    by Delta Airlines?

 7              MR. WEISS:  That is, also, objection

 8         as to form.

 9              You may answer.

10         A.    I believe that's proprietary to

11    Delta.  I'm not sure.

12         Q.    As I recall, they were graded by

13    Efrain Santiago in May 2009.

14         A.    Just because he grades them doesn't

15    mean he's responsible for what's done with them

16    afterwards.

17              MR. WEISS:  There was no question but

18         go ahead.

19         Q.    So you do not know?

20         A.    I believe they are proprietary

21    property of Delta Airlines but I am not sure.

22         Q.    What happens to the test scores from

23    the driving class for the designation on your

24    badge of DR 1 or EV given by Efrain Santiago?

25              MR. WEISS:  That's the same objection
```

1                   JAMES JOSEPH DONOHUE

2      the four day training period of Efrain Santiago's

3      basic security guard training, do you pay the

4      employees for that period?

5            A.     That would fall under New York State

6      required training for a security officer.  And as

7      far as I'm aware, the employer is not required to

8      pay for that because it is a state licensing class

9      in which the employee can transfer to their

10     employment anyplace else.

11           Q.     So, you are saying that that is not a

12     violation of the federal labor law and it's not a

13     violation of the state labor law?

14           A.     I'm not familiar with the labor laws.

15     I am not a lawyer, I am not familiar to the word

16     of the labor laws.

17           Q.     I was not paid for the training that

18     I underwent for the driving of a vehicle on the

19     tarmac that was given for one day by Efrain

20     Santiago.  Do you generally pay people for that

21     period?

22           A.     No, because that is a transferrable

23     certification that an employee can utilize and

24     take with them with future employment with other

25     companies.

1               JAMES JOSEPH DONOHUE

2          Q.    The training by the Port Authority of

3    New York and New Jersey, four hours of training

4    which results in a certificate that was given to

5    me, in Part A of Exhibit Number 1.  Do you

6    generally pay employees for that?

7          A.    No, it is a transferrable

8    certification to benefit the employee that can be

9    transferred to other employment within another

10   corporation or company.

11         Q.    You know, you can say that about any

12   training in a way.

13              MR. WEISS:  That's not a question.

14         That's an argument.

15              MR. TUCCIO:  That's an argument,

16         well, we'll see.

17              MR. WEISS:  Please proceed.

18         Q.    You answered the question.

19              MR. WEISS:  What question?

20         Q.    You answered the question.

21              MR. WEISS:  Okay.

22         Q.    The training that I got, the cargo

23   screening training given by Delta instructor John

24   Harding, I was not paid for that.  Should I have

25   been paid for that?

1                    JAMES JOSEPH DONOHUE

2          A.    I would have to check records, I do

3    not know.

4          Q.    I had to go to Brooklyn to the

5    Metrotech Center and get an F93 fireguard license,

6    and that was a few hours.  I did that at the

7    request of your personnel department.  Should I

8    have been paid for my time?

9          A.    It's a transferrable certification

10   but we do reimburse our employees the $25 fee for

11   the testing, which is not a requirement, it is a

12   generosity, a perk, I don't know the proper word

13   to use, that we give back to our employees for

14   getting that certification.

15         Q.    In that exhibit, doesn't it say it's

16   only good at FJC?  I don't see that it's

17   transferrable to another employee at all.  On the

18   badge.

19         A.    What is the question?

20         Q.    The badge specifies FJC, it's for

21   FJC.

22               MR. WEISS:  Which tab?

23         Q.    Which would suggest it's not

24   transferrable to any other company.

25               MR. WEISS:  Well, the document --

57

1                    JAMES JOSEPH DONOHUE

2          A.    What is the question?

3          Q.    I believe the badge says that it's

4    for FJC's use.  Our request, it's not

5    transferrable to another employer.

6          A.    What is the question?

7          Q.    Is this badge transferrable to

8    another employer?

9          A.    Yes.  With your new employer, you

10   would take a letter from that employer, bring it

11   to the Metrotech Center and they would change the

12   name over, without charging you or retesting you

13   as long as the license was still valid.

14         Q.    Supervisor Alberto Cabanilla took me

15   off my assignment in the bag room on December 3,

16   2009 and ordered me to work on the tarmac for

17   three and a half hours during heavy rain, cold

18   weather and about a 25 mile hour wind.  Why didn't

19   FJC Security Services provide me with a vehicle

20   such as a Ford Escape or a Jeep Liberty for this

21   job?  U.S. Security Associates, for example, does

22   that for its guards.

23              MR. WEISS:  What's the question?  Can

24         you read back the question?  I'm not even

25         sure what the question is.

58

```
 1                  JAMES JOSEPH DONOHUE

 2                  (The requested portion of the record

 3            was read back by the reporter.)

 4                  MR. WEISS:  If you can answer the

 5            question.

 6            A.    I can't speak on behalf of why U.S.

 7     Security Associates does what they do, as I'm not

 8     an employee of them.  And in your particular

 9     situation, the post did not require a vehicle.

10            Q.    Do you believe that it is reasonable

11     for the management of FJC Security Services to put

12     the health and personal safety of a security guard

13     at risk by assigning Gloria Noel, a white female,

14     or myself, an old white man, to stand on the

15     tarmac completely exposed to the elements at

16     five a.m. during heavy rain, extreme cold and a

17     35 to 40 mile hour wind for up to four hours

18     repeatedly?  The question, again --

19                  MR. WEISS:  Listen.  I object to the

20            improper hypotheticals.  You're assuming

21            all sorts of facts in evidence to see if

22            you can pin down this witness on your

23            version of the arguments.

24                  You can answer that question, you're

25            free to do so, but I object to that
```

1                JAMES JOSEPH DONOHUE

2          MR. TUCCIO:  Yes.

3          MR. WEISS:  Have you completed your

4     question?

5     Q.    The thing is, did you claim in your

6  termination letter to me and your discussion with

7  me at one p.m. on January 20, 2010, that the

8  assignments were based on seniority?

9          MR. WEISS:  I'm going to object to

10         the argument that was the large majority of

11         that question.  It assumes facts not in

12         evidence, the document is the document, it

13         speaks for itself.  And it also assumes

14         certain other facts that you're so

15         indicating is argument.

16         But if you can answer that question,

17         you may.

18    A.    I don't recall the conversation that

19  you and I had on January 20th of 2010, so I cannot

20  answer that question.  However, if the document

21  indicates that that was stated and that document

22  has my signature on it, then I will accept that as

23  fact.

24    Q.    Did Alberto Cabanilla look up the

25  date of hire of every employee, both permanent and

1                JAMES JOSEPH DONOHUE

2    rephrase it, please.

3         Q.    How would Mr. Cabanilla be able to

4    judge the seniority of these people who were there

5    temporarily for one or two days, whether they

6    were --

7         A.    Mr. Cabanilla did not make those

8    assignments.  Someone volunteered for overtime,

9    those assignments are made through my dispatching

10   office.  Granted, that if facts can prove any of

11   the persons being referenced on specific days were

12   actually on overtime or not.

13              MR. WEISS:  Off the record.

14              (Discussion held off the record.)

15        Q.    So that was the reason why I asked

16   about how Mr. Cabanilla would know the start date

17   of --

18              MR. WEISS:  Go on to your next

19        question.

20        Q.    The answer there was kind of

21   unsatisfactory because it says the bag room but I

22   would be taken out of the bag room and told to

23   work -- see, that's changing my assignment.

24              Would Mr. Cabanilla know what the

25   regular jobs of these temporary people were; is

```
 1                  JAMES JOSEPH DONOHUE
 2    time.  The assignments there at Avianca Airlines
 3    on that morning shift, were they given out on the
 4    basis of seniority by your security guard company?
 5              MR. WEISS:  You're referencing the
 6         exhibit, Exhibit 4?
 7         Q.   The assignments, yeah, at Avianca
 8    Airlines, in the mornings from five a.m. to
 9    nine a.m., were those assignments assigned on the
10    basis of seniority; was I assigned to the bag room
11    based on seniority?
12         A.   As far as I'm aware and as stipulated
13    in Exhibit 2, yes.
14              MR. WEISS:  You had two questions in
15         there.  Which question do you want him to
16         answer?
17         Q.   Answer that one.
18              MR. WEISS:  Which one?  I think you
19         answered the first one.  I think that's the
20         next question.
21         Q.   The question being, was Mr. Tuccio
22    assigned to the bag room based upon seniority.
23              (The requested portion of the record
24         was read back by the reporter.)
25         A.   As far as I'm aware and as stipulated
```

73

```
 1                    JAMES JOSEPH DONOHUE
 2   in Exhibit 2, yes.
 3        Q.     Okay, I have never heard of
 4   assignments given on the basis of seniority in any
 5   security guard company.  Is this done extensively
 6   at FJC or was this just a one time thing, on the
 7   morning shift at Avianca Airlines?
 8        A.     What's the question?
 9               MR. WEISS:  Hold on.  Move to strike
10          the argument.
11               But if you know the answer.
12        A.     I don't know what the question is.
13               MR. TUCCIO:  Read the question.
14               (The requested portion of the record
15          was read back by the reporter.)
16        A.     As far as I'm aware, FJC does not do
17   things as a one time thing; we follow policies,
18   protocols and procedures.  So as far as I'm aware
19   and based on -- depending on union CBA's and other
20   documents, as far as I'm aware, yes, most
21   assignments and requests are based on seniority in
22   most cases.
23        Q.     Did any other employee charge Alberto
24   Cabanilla with racial or ethnic discrimination?
25               MR. WEISS:  To your knowledge.
```

1                    JAMES JOSEPH DONOHUE

2          A.     To my knowledge, no.

3          Q.     Was Alberto Cabanilla terminated?

4                 MR. WEISS:   You can answer that.

5          A.     He has separated employment from FJC.

6          Q.     Did he separate voluntarily?

7          A.     Yes.

8          Q.     I'm going to ask you a question about

9    John Abraham, who worked as a supervisor on the

10   eleven p.m. to seven a.m. shift at Terminal 4

11   during the summer of 2009.   Summer, I mean June

12   and July.  Was John Abraham terminated?

13         A.     I don't know who John Abraham is.

14         Q.     Mr. Donohue, have you sought

15   treatment for mental illness from a priest,

16   minister, rabbi, social worker, mental health

17   professional, psychologist or psychiatrist?

18                MR. WEISS:   I don't think that's an

19         appropriate question.

20                MR. TUCCIO:   You asked me that.

21                MR. WEISS:   That's because I was

22         trying to determine whether you were

23         seeking compensatory damages, which we're

24         entitled to ask that question.   You are not

25         entitled to ask it of the defendant.

```
1                    JAMES JOSEPH DONOHUE
2              That's way beyond the scope of discovery.
3              I'll get on the phone with the Court about
4              that.  I am not going to ask him to give
5              his HIPAA related medical condition -- and,
6              by the way, that's why I asked for a HIPAA
7              release, and, by the way, there's a
8              confidentiality stipulation.  His mental
9              condition is not at issue, yours is.
10             Which, by the way, you have not -- never
11             mind.  You're not claiming that, so I'm not
12             pursuing it, as disclosed in your response.
13             This is not, excuse me, because I do it,
14             you can do it.  That's not how it works,
15             and vice versa, because you do it, I can do
16             it.
17        Q.    Has any employee threatened to bring
18   a lawsuit against FJC Security Services?
19        A.    Based on the size of our organization
20   and the length that we've been established, I
21   would assume, yes, I'm sure there has been legal
22   cases involving FJC.
23        Q.    Do you know of any?
24        A.    Not to my recollection at this time.
25             MR. WEISS:  Other than this one.
```

```
 1              JAMES JOSEPH DONOHUE

 2         Q.    The question is, has any other

 3    employee besides myself brought a lawsuit against

 4    FJC Security Services?

 5              MR. WEISS:  Objection as to form.

 6              But you can answer.

 7         A.    Based on, I believe, the evidence

 8    brought before me --

 9              MR. WEISS:  This is not evidence.

10         A.    Based on the exhibit brought before

11    me, which references a newspaper article that

12    states that a former FJC employee is pursuing or

13    was pursuing a lawsuit against the company, so,

14    yes, I am aware of it now.

15              MR. TUCCIO:  I have no further

16         questions.

17              MR. WEISS:  Let me take a break.  I

18         may have some questions.

19              (At this time, a brief recess was

20         taken.)

21              MR. WEISS:  I have some redirect.

22    EXAMINATION BY

23    MR. WEISS:

24         Q.    Mr. Donohue, Mr. Tuccio asked you a

25    question about Exhibit 2, which is that letter
```

78

1                    JAMES JOSEPH DONOHUE

2    that's dated January 20, 2010; do you recall that?

3          A.    Yes.

4          Q.    I'm going to put that in front of you

5    and then ask you a couple of questions to clarify

6    it.  Is that a document that you prepared

7    yourself?

8          A.    Yes.

9          Q.    Was it prepared about the time or

10   contemporaneously about the time you had the

11   conversation with Mr. Tuccio?

12         A.    Yes, within no more than two hours.

13         Q.    Is that your signature at the bottom?

14         A.    Yes.

15         Q.    Did you type that yourself or did you

16   handwrite it and give it to someone else to type

17   it?

18         A.    No, I typed it myself.

19         Q.    When you were done with it, did you

20   review it?

21         A.    Yes.

22         Q.    Now that you've seen the letter, has

23   that jogged your memory in any way as to what

24   transpired at that time?  It references a meeting

25   with you and Mr. Tuccio.

1               JAMES JOSEPH DONOHUE

2          A.    Yes, the situation.

3          Q.    Can you tell me what he said and what

4    you said in the situation, to the best of your

5    recollection?

6          A.    I can't remember verbatim the

7    discussions that was had.

8          Q.    Sum and substance.

9          A.    I do recall speaking with Mr. Tuccio,

10   advising him of what we felt were his violations,

11   advising him of the severity of the violations.  I

12   do recall, vaguely, when he alleged unfair

13   practices, that we cease speaking about the

14   operational incident that occurred and I addressed

15   those immediately pertaining to where he stated

16   that he felt that he was being treated unfairly by

17   his supervisor.  At that point, I advised him of

18   the facts that were, such as the ones written

19   here, pertaining to who he worked with, his

20   colleagues and how the assignments were made and

21   the reasoning behind the assignments.  I believe I

22   also asked him if he wanted to pursue that further

23   at that point, and I believe he said no.  And then

24   we referred back to the situation at hand, which

25   led to his termination of employment.

1                    JAMES JOSEPH DONOHUE

2          Q.     When you say "pursue further," what

3     do you mean by that?

4          A.     I asked him if he wanted to pursue

5     his -- after I provided him with the response and

6     the reasoning behind the assignments, if he still

7     wanted to pursue further, that he felt that he was

8     being discriminated against.  If he would have

9     chosen yes, that he would have, at that point, I

10    have an obligation to report that to my corporate

11    human resources department, our corporate risk

12    management office and they would have conducted a

13    thorough investigation.  That was not done based

14    on the fact that Mr. Tuccio did not want to pursue

15    it further.  And, at that time, he appeared to be

16    satisfied with the response I gave him as

17    pertaining to post assignment.

18         Q.     You referenced post assignment.  What

19    is the policy regarding a guard refusing post

20    assignment?

21         A.     Someone who refuses post assignment

22    can be grounds for immediate termination.  It is a

23    terminable offense.  Everything is on a case by

24    case basis.

25         Q.     You were asked a series of questions

1                    JAMES JOSEPH DONOHUE

2     regarding Mr. Tuccio's assignment to the bag room.

3     And then his assignment, he asked you questions

4     about assignment out to the tarmac.  Do you recall

5     that series of questions?

6             A.     Yes, sir.

7             Q.     Is the tarmac posting, if you will,

8     part and parcel of the bag room assignment?

9             A.     At times it can be, yes.

10            Q.     Why is that?

11            A.     The bag room assignment originally

12    was for the agents to monitor the baggage that was

13    on the bag carousels, to prevent tampering or

14    threat by the ground handlers.  That was a

15    deterrent.  But then it was determined by our

16    client that there was still forms of pilfering

17    going on on the bags so at that point, we modified

18    the job assignment where the person in the bag

19    room would follow the bags from the bag room to

20    the loading of the aircraft, which involved being

21    outside on the tarmac.

22            Q.     So if I understand you correctly, as

23    of 2009, when Mr. Tuccio was assigned following

24    the bags from the bag room out to the plane, that

25    was a job duty that he was required to perform at

82

1                    JAMES JOSEPH DONOHUE

2    that time?

3              A.    Yes.

4              Q.    Earlier today Mr. Tuccio asked you

5    whether your mother was of Hispanic descent.  Do

6    you feel comfortable with answering that question?

7              A.    Yes.

8              Q.    And is she?

9              A.    Not that I'm aware of, no.

10             Q.    Mr. Tuccio also asked you whether

11   anyone in your family is of Hispanic descent, and

12   I'm paraphrasing, do you feel comfortable

13   answering that question?

14             A.    Yes, that's fine.

15             Q.    Is there anyone of Hispanic descent,

16   to your knowledge, in your family?

17             A.    My first cousin on my mother's side,

18   her mother is, I believe, Puerto Rican, so that

19   would make her Hispanic.  My first cousin on my

20   father's side, I believe his father is of Hispanic

21   descent, also.  And if I think further to see

22   who's married into the family and who their

23   children are, I can determine.

24             Q.    That's okay.

25                   So, Exhibit 2 is a sum and substance

83

```
 1                JAMES  JOSEPH  DONOHUE

 2   of the conversation you had with Mr. Tuccio,

 3   correct?

 4        A.    Yes.

 5              MR. WEISS:  I have no further

 6        questions.

 7              You have the right to redirect.

 8              MR. TUCCIO:  I have a right --

 9              MR. WEISS:  To redirect this deponent

10        based on the testimony given.  But you

11        can't go backwards.  You can only -- I

12        asked him specific questions; you can't go

13        all the way to the beginning and start

14        over.

15              MR. TUCCIO:  You claim that I refused

16        to pursue a discrimination charge; is that

17        correct?

18              THE WITNESS:  What I recall, yes.

19              MR. TUCCIO:  That never happened.

20              I have no further questions.

21              (Continued on next page to include

22        jurat.)

23

24

25
```

85

1

2                    A C K N O W L E D G M E N T.

3

4            I, JAMES JOSEPH DONOHUE, hereby

5      certify that I have read the transcript

6      of my testimony taken under oath in my

7      deposition of August 22, 2013; that the

8      transcript is a true, complete and correct

9      record of my testimony, and that the

10     answers on the record as given by me are

11     true and correct.

12

13          _____
                 JAMES JOSEPH DONOHUE

14

15     Subscribed and sworn to
       before me this 19th day

16     of   November   , 2013.

17          _____
                 NOTARY PUBLIC

18
                      Gina Grath
               Notary Public, State of New York
19                  No. 02GR6114850
                 Qualified in Suffolk County
            Commission Expires August 23, 20 16

20

21

22

23

24

25

```
 1

 2                    C E R T I F I C A T E

 3
      STATE OF NEW YORK    )
 4                        SS.:
      COUNTY OF NASSAU     )
 5

 6      I, KIMBERLY R. JONES, a Shorthand Reporter and

 7    Notary Public for and within the State of New

 8    York, do hereby certify:

 9      That the testimony herein was held before me at

10    the aforesaid time and place.

11      That said witness was duly sworn before the

12    commencement of the testimony and that the

13    testimony was taken stenographically by me and is

14    a true and accurate transcription of my

15    stenographic notes.

16      I further certify that I am not related to any

17    of the parties to this action by blood or by

18    marriage and that I am in no way interested in the

19    outcome of this matter.

20      IN WITNESS WHEREOF, I have hereunto set my

21    hand.

22

23                    _____
                          KIMBERLY R. JONES
24

25
```

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X

SAMUEL TUCCIO,                          Civil Action No.
                                        12-5506(JFB)(GRB)

                    Plaintiff,


              -against-

FJC SECURITY SERVICES INC.

                    Defendant.

-------------------------------------X


                         225 Cadman Plaza East
                         Brooklyn, New York


                         December 9, 2013
                         3:04 p.m.



          DEPOSITION OF GLORIA NOEL, a Third-

Party witness herein, taken pursuant to Court

Subpoena and held at the above time and place

before Alicia Roberto, a stenotype reporter and

Notary Public of the State of New York.

1                    GLORIA NOEL

2          did not do after that date is neither

3          material or relevant to this case.

4               If you want to ask another question, be

5          my guest.

6          Q    Do you remember seeing me on the tarmac

7     standing next to an airplane?

8               MR. WEISS:  Me meaning, Mr. Tuccio.

9          A    No.

10         Q    Did you ever refuse to work on the

11    tarmac standing next to an airplane?

12              MR. WEISS:  Objection as to form.  Also

13         assumes fact not in evidence.

14              You can answer.

15         A    No.

16         Q    Let me ask you one more thing.  I hope

17    this is not -- I'm not trying to be offensive:  Are

18    you Afro-American, or black?

19         A    Black.

20         Q    Black.  Okay.

21              Did you ask to be put on the day shift?

22              MR. WEISS:  Objection as to form, also

23         assumes facts not in evidence.

24         A    No.

25         Q    Did you ask for a promotion?

27

```
 1                    GLORIA NOEL
 2          A    No.
 3          Q    Did you ask for a shift change?
 4          A    No.
 5          Q    Did you ask for different assignments?
 6          A    No.
 7          Q    Were you ever offered a raise, a
 8   promotion or a day shift?
 9          A    No.
10          Q    Were you ever late for work?
11          A    Yes.
12          Q    What happened?
13          A    Maybe traffic or something like that.
14          Q    Did you get written up?
15          A    Yes.
16          Q    Did you call in sick; did you ever call
17   in sick?
18          A    I believe so, yes.
19          Q    Did you get written up for that?
20          A    No.
21          Q    Were you ever a no-show?
22          A    No.
23          Q    This is a general question:  Were you
24   ever written up for anything?
25               MR. WEISS:  Objection as to form, also
```

```
 1                    GLORIA NOEL

 2        asked and answered, but go ahead.

 3        A    No.  I remember for lateness, I think I

 4   had it, like, twice in a week, but I don't remember.

 5        Q    Okay.  For lateness.

 6             Do you believe that your test scores

 7   for the training class were related to your first

 8   assignment?

 9             MR. WEISS:  Objection.  Again, this is

10             beyond the scope.  What a person believes or

11             does not belive, no offense, is irrelevant to

12             this case.  It's beyond the scope of the

13             discovery.

14             Now, if you want to tell me how her

15             beliefs, Ms. Noel's beliefs, are material and

16             relevant, then I'll consider not going to

17             Judge Brown on this, but I don't know what

18             this person believes is relevant in this

19             case.

20        Q    Did anybody tell you that?

21             MR. WEISS:  I believe that was asked

22             and answered.

23        Q    Do you believe that what you got on

24   your test scores counted toward what assignment you

25   got?
```

```
 1                    GLORIA NOEL
 2        A    No.
 3        Q    Why did you separate from FJC Security
 4   Services?
 5             MR. WEISS:  Again, this is not material
 6        or relevant, but if you can answer that
 7        question, it's up to you.
 8             I don't know why her separation has any
 9        relevance in this case.
10        Q    Why did you separate from FJC Security
11   Services?
12        A    I was terminated.  I was terminated.
13        Q    You were what?
14        A    Terminated.
15        Q    Who terminated you?
16        A    I believe, it was James Donohue.
17             MR. TUCCIO:  D-O-N-O-H-U-E, James.
18        Q    Okay.  What did James Donohue say to
19   you on your last day?
20             MR. WEISS:  I'm going to object as to
21        form because that is vague, but again, this
22        is way far field.  Ms. Noel's termination is
23        not an issue in this case.
24             MR. TUCCIO:  But there is --
25             MR. WEISS:  Please tell me why this is
```

1                    GLORIA NOEL

2          relevant.

3               MR. TUCCIO:  This is relevant because I

4          want to see if what happened to her when

5          Mr. Donohue terminated her was the same as to

6          what happened to me.

7               MR. WEISS:  Different situation.

8          Different circumstances.

9               MR. TUCCIO:  That's why I'm asking her.

10         Q    What did James Donohue say to you on

11   your last day?

12              MR. WEISS:  Objection as to form.

13              MR. TUCCIO:  You can answer.

14         A    Um, I had gotten another job with the

15   airport, with another company, so I was juggling the

16   two, and, um, you know, I would call out more than I

17   should with FJC, that's why I was terminated.  You

18   know, try and juggle both jobs and, you know.

19         Q    So --

20         A    But, I mean, he explained to me and I

21   understood.

22         Q    Did he make any false statements?

23         A    No, he didn't.

24         Q    Did he say that the Port Authority of

25   New York and New Jersey was notified?

```
 1                    GLORIA NOEL
 2        in the telephone conferences that the
 3        perimeters of discovery is limited by
 4        materiality and relevances.  Sal said that to
 5        you twice over the phone and on the record.
 6             You know, I've given you some leeway
 7        because you're Pro Se, but it's not necessary
 8        to walk Ms. Noel down this road when her
 9        termination has nothing to do with what's
10        alleged in this case.
11        Q    Did Mr. James Donohue make any
12   ridiculous statements to frighten you?
13             MR. WEISS:  Objection.
14             Please, do not badger the witness.
15             MR. TUCCIO:  I am not badgering the
16        witness at all.  I'm just asking what
17        happened to her.
18        A    No, he explained what the policies of
19   the company was.
20        Q    Do you think that Mr. Donohue acted
21   improper at any time?
22             MR. WEISS:  Objection as to form.
23             Go ahead if you know what that means.
24        A    No, he didn't.  He explained and I
25   understand.
```

```
1                    GLORIA NOEL

2         Q    Do you remember what months you were on

3   the tarmac, what month of the year?

4         A    I think it was, um, the time that I

5   worked in the bag room, if you notice, it was some

6   spaces with dates.  Those were times that I work on

7   the jet bridge and on the jet way, on the tarmac, so

8   every now and then I would ask to work in the bag

9   room, so it was all...

10        Q    Do you recognize what the name of that

11  post was when you were on the tarmac?

12             MR. WEISS:  You're referring to --

13             MR. TUCCIO:  Exhibit 2.

14             MR. WEISS:  Objection as to form.

15        A    What page is that, is that on the

16  10/31/09 date?

17        Q    On any of the dates.  Is there a post

18  for the tarmac?

19        A    Is there a post for the tarmac, not

20  that I can remember.

21        Q    All right.  When you worked on the

22  tarmac, was it extremely cold with a 30 to 40-mile

23  an hour wind?

24             MR. WEISS:  Objection to form.

25             Assume facts not in evidence.
```

1                        GLORIA NOEL

2              Q    Was it extremely cold with a 30 to

3    40-mile an hour wind?

4              A    I mean, it was -- I worked there in the

5    winter and obviously it was cold, yes.

6              Q    Was it raining?

7              MR. WEISS:  Same objection.

8              A    Once or twice it did rain, yes, yeah.

9              Q    Did you complain to anyone about the

10   severe weather conditions when you were working on

11   the tarmac?

12             A    No.

13             MR. WEISS:  Objection as to form.

14             MR. TUCCIO:  Okay.  I guess I have no

15             more questions accept that one about

16             complaining to the management about Alberto

17             Cabanilla and James Donohue.

18             MR. WEISS:  I'm going to try and figure

19             out how we're going to do this.

20                  I wonder if it makes sense for me to

21             ask my questions and then you can ask

22             whatever questions you have off my questions,

23             and then we can circle back to the end.

24             That's the way I've done it in the past.

25             They don't want it to be a piecemeal.  And

1                    GLORIA NOEL

2    about 15 years.

3         Q    Oh, did you?

4         A    Yeah.

5         Q    What did you do?

6         A    Legal records.

7         Q    So you're familiar with what a legal

8    deposition is and what's involved?

9         A    Yes.

10        Q    Now, Mr. Tuccio asked you a series of

11   questions about the bag room and I would like to

12   direct your attention to the time period from

13   August 1, 2009, to, about, January, let's call

14   January 21, 2010.

15        A    Okay.

16        Q    Is there a difference between bag room

17   and bag watch; were you aware of any difference?

18        A    It's the same.   I mean, you go in the

19   bag room to watch the bags, so it's pretty much the

20   same thing.

21        Q    Because you're a security guard?

22        A    Yes.

23        Q    When you were first employed by this

24   company, I think you were employed -- let me back up

25   for a minute.

46

```
1                    GLORIA NOEL
2         Q    I think you testified that no one ever
3    said to you, you just had to pass, correct?
4         A    Yes, yes.
5         Q    And then you were eligible?
6         A    Yes.
7         Q    Your first assignment was to Charlie 1
8    or C1?
9         A    Yes, Charlie 1.
10        Q    That was outside, right?
11        A    Yes, it was.
12        Q    That was traffic duty?
13        A    Yes, it was.
14        Q    You were there for six months?
15        A    As far as I could remember, yes, pretty
16   much about, yes.
17        Q    I think you were first employed on
18   January 1, 2009; does that ring a bell?
19        A    At FJC?
20        Q    At FJC.
21        A    No.  On January 1, no.  It was May, May
22   of '09.
23        Q    Well, you had training in June of 2009;
24   do you recall doing that?
25        A    Yeah.
```

54

```
 1                    GLORIA NOEL
 2   terminal?
 3        A    Right.  Majority of flights come out of
 4   terminal 4.
 5        Q    So there are a lot of other airlines --
 6        A    Oh, yes, a lot, a lot.
 7        Q    Now, when you worked for FJC -- again,
 8   I want you to focus on somewhere around May of '09
 9   to January of 2010.  Were you in -- you mentioned
10   inside and outside, but were you in other locations
11   as well?
12        A    Yes.
13        Q    Did those locations include being
14   outside?
15        A    No.  When I'm inside, I'm inside.  When
16   I'm outside, I'm outside.
17        Q    Okay.  So you were in both places?
18        A    Yes.
19        Q    Traffic duty, is that outside?
20        A    Yes.  Outside.
21        Q    And that was the first six months?
22        A    Yes, about, yes.
23        Q    In those six months did you observe
24   other guards --
25                    MR. TUCCIO:  Objection.
```

56

```
1                    GLORIA NOEL
2          clarify it.
3               MR. TUCCIO:  It wasn't the first six
4          months.
5               MR. WEISS:  I'll clarify it.  I get it.
6          I'll clarify it.  I'll clarify it.
7          Q    When you were on traffic duty, were you
8     on traffic duty in June?
9          A    Yeah, because I started in May.  That
10    was my first set of assignments.
11         Q    When you were on traffic duty, were you
12    out in the elements?
13         A    Yes, yes.
14         Q    Did it rain while you were on traffic
15    duty?
16         A    Yes, there were times when it rained,
17    yes.
18         Q    Were you on traffic duty in July?
19         A    Yes.
20         Q    Was it 80, 90 degrees in July?  It's
21    the summer.
22         A    Yes, yes.
23         Q    And you were outside?
24         A    Yes.
25         Q    How about in August, were you on
```

57

```
 1                    GLORIA NOEL
 2   traffic duty in August?
 3        A     Yes, as far as I can remember, yes.
 4        Q     And you were outside to the elements?
 5        A     Yes.
 6        Q     So you recall doing traffic duty when
 7   it rained and then when it was hot out?
 8        A     Yes, rain, hot, yes.
 9        Q     I've never done this job, but I'm
10   assuming that this is part of the job to be in the
11   elements, isn't it?
12        A     Yes.
13             MR. TUCCIO:  Let me ask you one
14         question.
15             MR. WEISS:  No, no, no.
16             MR. TUCCIO:  Why don't I have the
17         records?
18             MR. WEISS:  Stop.  Stop.  Write them
19         down.  You can ask when I'm done.
20             I get to re-recross and you get to
21         redirect.
22             THE WITNESS:  Can I excuse myself to
23         the bathroom?
24             MR. WEISS:  Please, please.
25             Off the record.
```

58

1                    GLORIA NOEL

2          (Discussion held off the record.)

3      Q    Let's focus on June for a second.  You

4  said that you were at Charlie 1, which is outside

5  traffic; is that your testimony?

6      A    Yes.

7      Q    In June, I show about -- I'm aware of

8  about six times that you were at Charlie 1.  Were

9  you at Charlie 4 as well?

10     A    Yes.

11     Q    What's Charlie 4?

12     A    Charlie 4 is the same thing as Charlie

13  1; traffic.

14     Q    Outside?

15     A    Yes.  Charlie 4, yes.

16     Q    And I show that you were at Delta 1

17  twice, what is Delta 1?

18     A    Delta 1 is arrival.  Let me see.  I

19  believe Delta 1 is arrival, Delta 2 is departure.

20     Q    That's fine.  If you don't remember,

21  that's fine.

22     A    Okay.

23     Q    How about Delta 2?

24     A    Delta 2, yes.

25     Q    Is that arrivals?

```
 1                    GLORIA NOEL
 2        A     Either arrivals or departure.
 3        Q     Is it inside or outside?
 4        A     Wait a minute.
 5        Q     You want to think about it for a
 6   minute?
 7        A     Yes.
 8              Delta 1 and Delta 2 is, um, departure,
 9   that whole strip, yes.  I think the east side was
10   Delta 1 and, yeah, the --
11        Q     Is that inside or outside, the Deltas?
12        A     The Delta is outside, yeah.
13        Q     So Delta 1 and 2 is outside?
14        A     Yeah.
15        Q     That's departure.  Does Delta stand for
16   departure as in D, if you know?
17        A     I don't remember.
18        Q     So you had D1 and 2 which is departure,
19   which you were outside?
20              MR. TUCCIO:  Can I have an objection.
21              Delta 2 is inside, Delta 1 is outside.
22              MR. WEISS:  That's your contention.
23        She's testifying.  That's not an objection.
24        She's testifying.  If you want to clarify,
25        you talk to her about it.
```

60

                        GLORIA NOEL

1

2          Q     So you were at Delta 1 and 2 and

3    Charlie 1 and 4 through June and July; do you recall

4    that?

5          A     Yeah, I forgot about the Deltas.

6          Q     You were in Delta 1 and 2 and 1 and 4

7    through August; do you recall that?

8          A     Yes.

9          Q     What is Charlie 3?

10         A     Charlie 3 is outside too.  I believe

11   Charlie 3 is on the -- I think Charlie 1 is where

12   the traffic enters, Charlie 3 is where it exits, if

13   I remember correctly.

14         Q     Okay.  In September you were again at

15   Delta 1, Charlie 4, 2 and 3, all outside; is that

16   your recollection?

17         A     Yes, I would say yes, yes.  But I did

18   do those posts.  I don't remember the month and

19   whatever, but I did do those posts around that time,

20   yes.

21         Q     When you were at Charlie -- again,

22   we're focusing on June, July and August.

23         A     Yeah, that was pretty much in the

24   beginning.

25         Q     When you were at Charlie 1 and 4 and 3

1                    GLORIA NOEL
2    and Delta 1 and 2, that was outside, correct?
3        A    Yes.
4        Q    Did you see other guards at the posts?
5        A    Yeah.
6        Q    Were those guards also of color?
7        A    They're mixed races.  We had an Indian
8    guy, we had two Indians from India, we had a
9    Hispanic, we had African Americans, um --
10       Q    And you're focusing on June to
11   September, there?
12       A    Yeah, yeah.  It was mixed.
13       Q    Okay.  And your colleagues were there
14   in the rain and the cold and the rest of it just
15   like you were?
16       A    Yeah, you have the posts, you go to
17   your post and you do what you have to do.
18       Q    Okay.  I think that you testified that
19   based on Exhibit -- let's go to Exhibit 2.
20   Mr. Tuccio had you go through these 13 pages, and
21   let's do it in two pieces, break it down a little
22   bit.
23            This is October 31, 2009?
24       A    Mm-hmm.
25       Q    This is a company document, so we

```
 1                    GLORIA NOEL
 2    produced it and we're supposed to show that you are
 3    -- is that your signature there, by the way?
 4        A    Yeah, um-hmm.
 5        Q    Four hours, 09:00.  I'm looking for the
 6    posting.
 7                MR. WEISS:  Off the record.
 8                (Discussion held off the record.)
 9        Q    Okay.  I think Mr. Tuccio asked you a
10    series of questions about the bag room.  Let's talk
11    about the bag room.
12                What is the bag room and, again, focus
13    your attention on November or October of 2009.  What
14    did you observe at the bag room?  What was the post?
15        A    The bag room is where the, um, when the
16    luggage is being checked by TSA, it comes through
17    the system and comes down the conveyer belt and then
18    it would be selected as to which airline, what goes
19    to -- well, of course, well -- when, when, let me
20    put it this way.
21        Q    Take your time.
22        A    Each airline had a certain time for the
23    bags to come out depending on the flight.  So for
24    instance, like, Avianca, you would go in and they
25    would come down the conveyer belt, so they would
```

```
 1                    GLORIA NOEL
 2    just watch it, you know, monitor.  There would be,
 3    if I remember correctly --
 4         Q     Let me just slow you down.
 5               Is this inside a building where these
 6    bags are coming down where you are?
 7         A     It's um, it's, yes, it's inside, yeah,
 8    but the door -- what to put it -- it's a ground
 9    floor of the building and then there were these huge
10    doors, you know, that goes up, like, a garage door.
11         Q     Okay.
12         A     You know, pull it up and it goes up and
13    down, so you can see outside, just like a garage.
14         Q     So you're describing the - I'm not
15    trying to change your testimony.  I'm just trying to
16    understand.
17               MR. TUCCIO:  Objection.
18               I just want to say, you objected when I
19          asked this.
20               MR. WEISS:  I understand.
21               MR. TUCCIO:  How come you're going into
22          it?
23               MR. WEISS:  I understand.
24               MR. TUCCIO:  How come you're going into
25          it?
```

64

1                      GLORIA NOEL

2           MR. WEISS:  I'm just trying to

3      understand.

4           MR. TUCCIO:  You can't have it both

5      ways.

6           MR. WEISS:  No one in the room has been

7      in that baggage room.

8           MR. TUCCIO:  But there are many garage

9      doors, there's about 10, 11, 12.

10          MR. WEISS:  Stop.  You can't testify.

11     You'll get to ask questions.  She's

12     testifying.

13     Q    So I understand you correctly, it looks

14 like a garage with a garage door?

15     A    Yes.

16     Q    And the bags are coming through the

17 garage door?

18     A    No, no, no.  Let's say this is a door

19 (indicating), this is a conveyer belt, comes in an

20 L-shape and then comes out (indicating).

21     Q    From the ceiling?

22     A    No, there's a big whatever, but you

23 can't see where it's coming from.  It just shoots

24 down on the belt, shoots down on the belt, and then

25 we pull it off (indicating).

1                     GLORIA NOEL

2          Q     Is the garage door open or closed?

3          A     Open, but there were times that we

4     would close it, but pretty much open.

5          Q     Why would you close it at times?

6          A     Sometimes when it's, like, really cold,

7     then we close it for a little bit.

8          Q     What was your job when you were there,

9     what were you supposed to do?

10         A     Well, the guys usually would, you know,

11    pull the bags off.

12         Q     The baggage handlers?

13         A     Yeah.  Same security.

14               They would pull the bags.  But we would

15    watch to see if anything was broken, if anything

16    was, like, you know, is falling out, if a zipper is

17    open, anything like that.  If anything like that is

18    open, we pull it aside and we can check to see if

19    anything is leaking or whatever, whatever.

20         Q     The airport security guards would do

21    that?

22         A     Yeah, yeah we did that, yeah.

23         Q     And then once those bags were

24    segregated, then what would you do?

25         A     When the bags are segregated, we would

66

1                    GLORIA NOEL
2  have the Avianca workers there with us as well.
3          Q    The baggage handlers?  Who are the
4  Avianca employees?
5          A    They weren't baggage handlers, they
6  were, Avianca, maybe they were workers, whatever, I
7  would say that.  But if a bag is broken we would put
8  -- pull it aside and we would pretty much take care
9  of it.
10         Q    Do you know why the garage door is
11 open?
12         A    No, they never say.
13         Q    Is there any heaters in the ceiling or
14 anything?  Is there any heat in the room, if you
15 know?
16         A    Was there heat in that room?  I don't
17 remember.  I don't remember.  I know sometimes when
18 it was really windy, we would close it, but heat, I
19 don't remember, heat.
20         Q    So you spent some time in the elements
21 and inside --
22         A    Yes.
23         Q    -- during this time that you were near
24 the bag room or in the bag room, rather?
25         A    When I was in the bag room, I was in

1                    GLORIA NOEL

2    the bag room, but the other times when I was

3    outside, it was not in, you know, in the...

4         Q    So just so I'm understanding you, when

5    you were in the bag room you were inside?

6         A    Yes, yes, yes.

7         Q    In your response to Mr. Tuccio's

8    question, you indicated that there were other

9    assignments that you were involved in while you were

10   in the bag room?

11        A    Yes.

12        Q    You mentioned some gaps?

13        A    Yes, yes.

14        Q    And those other assignments that you

15   mentioned, they were at other places?

16        A    Yes.

17        Q    In the airport?

18        A    Yes.

19        Q    Were they both inside and outside?

20        A    Some was on the jet way, on the jet

21   bridge.

22        Q    Slowly.  The jet way is outside?

23        A    No, inside.

24        Q    Okay.  What's outside?

25        A    Outside is when you would come down

69

```
 1                    GLORIA NOEL
 2    know what they call it.
 3         Q    Conveyer?
 4         A    It's something -- like, the luggage
 5    would slide down, you know, and the guys would grab
 6    it and put it on the trolly and take it to where the
 7    area where, of course, customs would then have to
 8    check it, and passengers would then come to receive
 9    their bags.
10         Q    While you were doing this, this is on
11    the ground outside the building?
12         A    Yeah, right underneath the plane,
13    right, yes.
14         Q    And you were doing these assignments in
15    November, December and January, correct?
16         A    Yes.
17         Q    Were you the only airport security
18    agent doing that type of work in October, November,
19    December, January?
20         A    No, no.
21         Q    Were there other airport security?
22         A    Yes.
23         Q    Were they people of color as well?
24         A    I remember this one lady, she was
25    Italian, um, and Ann is Italian.
```

```
 1                    GLORIA NOEL
 2          Q    And African American?
 3          A    No, she was Italian.
 4          Q    No, no.  Were there others?
 5          A    Yes, there were others.  The lady that
 6   I call.
 7          Q    She is African American?
 8          A    Yeah, she's African American.  Ann
 9   Gazara, she's Italian.
10          Q    Why don't you spell that, if you can,
11   for Alicia.
12          A    Spell what?
13          Q    The one that you just mentioned, the
14   one with the Italian decent.
15          A    A-N-N  G-A-Z-A-R-A.
16               There was another -- there was some
17   Hispanics too, Indian from India, yeah, it was
18   mixed.
19          Q    It was mixed?
20          A    Yeah.
21          Q    You observed these other airport
22   security agents outside on the tarmac during
23   October, November, December?
24          A    Yeah, we all did the same thing.
25          Q    Just so I understand, the jet bridge is
```

```
 1                     GLORIA NOEL
 2   and I were defining the same thing.
 3                In addition to what you testified to
 4   about being on the tarmac and being on the ground
 5   underneath the plane and being there on traffic duty
 6   at Charlie 1, 2, 3, 4 and Delta 1 and 2, during this
 7   time from about November to January 2010, were you
 8   in any other outside locations?
 9        A    No. No, mm-mm.  As far as I can
10   remember, no.
11        Q    Now, I think in response to a question
12   that Mr. Tuccio posed to you about your training --
13   let's see if I can find it.  Just bear with me for a
14   minute.
15                I think you testified that no one said
16   to you that the scores in your training, and I'm
17   paraphrasing, will dictate your initial assignment;
18   do you recall talking about that?
19        A    Yes.
20        Q    So nobody ever said to you if you do
21   better, we're going to give you a better assignment?
22        A    No, not to me.
23        Q    And you weren't present with anybody
24   else that that was said to?
25        A    No, no.
```

1                      GLORIA NOEL

2          Q    Mr. Tuccio asked you about Mr. Alberto

3    Cabanilla; do you remember him?

4          A    Yes.

5          Q    Okay.  Let me direct your attention to

6    -- you mentioned in your testimony that you, you

7    said you had called in sick; do you remember that

8    testimony?

9          A    Yeah, yeah.

10         Q    And I think you called out, isn't that

11   the case?

12         A    Yes.  He would call and say --

13         Q    You didn't call in properly and then

14   you were terminated?

15         A    No, the reason I was terminated, I did

16   call out a few times, as I said I was trying to

17   juggle both jobs.

18         Q    I understand.

19         A    And then according to company policy, I

20   went over the limit.

21         Q    And you understood that you went over

22   the limit?

23         A    Yeah.

24         Q    You had no problem with that because

25   someone had told you that was the policy, right?

```
 1                    GLORIA NOEL

 2         A    Yeah, I knew.  I knew.

 3         Q    When you were tended with the Subpoena,

 4   were you given a check?

 5         A    Yes.

 6         Q    How much did you get?

 7         A    $45.00.  And I returned it, because I

 8   wasn't sure.

 9         Q    You're entitled to that.

10         A    Mr. Tuccio told me that I have to

11   return it and then he said he would send me another

12   one.

13         Q    Have you been paid since?

14         A    No.

15              MR. WEISS:  You have to give her the

16              45.

17              MR. TUCCIO:  Can I make a remark?

18              The process receiver tried to deliver

19              the Subpoena to you three times on Friday,

20              and this morning I contacted him and said he

21              would try and get it to you this morning

22              before she came here.

23              MR. WEISS:  I just want to make sure

24              she get's it.  That's all.

25              Off the record.
```

```
 1                    GLORIA NOEL
 2              (Discussion held off the record.)
 3         Q     When you went to stand near the plane,
 4   when it was unloading, was that part of the job
 5   duty, something that you had to do?
 6         A     When I went?
 7         Q     You mentioned that you would stand
 8   outside on the ground under the jet bridge.
 9         A     Yes, that is out of there.
10         Q     That's the job duty.
11         A     Yes.
12         Q     And you understood that to be your job
13   to do that?
14         A     Yes.
15         Q     When you were in the bag room observing
16   the unloading of the luggage in November, December,
17   January '09, 2010, that was part of your job duty?
18         A     Yes, it was.
19         Q     When you worked on the, I'm going to
20   say the tarmac, down on the outside, you did that in
21   the rain and in the snow in November?
22         A     Yeah, I mean, whatever the element was,
23   if the plane comes in, we have to do what we have to
24   do.
25         Q     You understood that it was part of
```

1                       GLORIA NOEL
2    your --
3         A     Yes.
4         Q     -- you understood that it was part of
5    your job to work in the elements, whatever they may
6    be?
7         A     Yeah, yeah.
8         Q     No one told you otherwise?
9         A     Otherwise meaning...
10              MR. WEISS:  I'll withdraw.
11        Q     Once you were terminated -- I think I
12   understand your testimony, but I want to make sure I
13   understand it clearly.
14              Once you were terminated from FJC, you
15   went to work for the other security guard company?
16        A     I was working at the other job before I
17   was terminated.
18        Q     So when you were terminated from FJC
19   you then continued with the other security guard
20   company?
21        A     As we speak, I'm still working for
22   them.
23        Q     Oh, you still work for that company.
24              What's the name of that company?
25        A     ISS Actions Security.

```
 1                    GLORIA NOEL
 2        Q    So I understand your testimony, you
 3   didn't go back to FJC or take any steps in relation
 4   to your termination from FJC, you just continued to
 5   work at ISS?
 6        A    Yes, I just continued.  As I said, I
 7   started before I was terminated from FJC.  I mean, I
 8   was trying to juggle the two, but it didn't work
 9   out.
10             After I was terminated from FJC, I just
11   continued at --
12        Q    ISS.
13        A    Yes, yes.
14        Q    But you didn't complain to anyone at
15   FJC, you just continued, right?
16        A    Yeah, I didn't have anything to
17   complain about.
18        Q    Okay.
19             MR. WEISS:  I have no other questions.
20   CONTINUED EXAMINATION BY
21   MR. TUCCIO:
22        Q    I just want to ask a couple of
23   questions.
24             We talked about -- Mr. Weiss talked
25   about Charlie 1, 2, 3 and 4.
```

```
 1                    GLORIA NOEL
 2         A    No.
 3         Q    Were any other security guards you
 4    noticed assigned exclusively every single day, week
 5    after week, after week to outside posts?
 6              MR. WEISS:  Objection as to form.  I
 7              don't know if it's in the witness's personal
 8              knowledge.
 9         Q    Do you remember anybody?
10         A    Um, I remember one of the Indian guys
11    -- I don't remember his name that used to work out
12    there -- most of his posts was out there, because he
13    didn't like to be inside.  He was there for a while.
14    I don't remember his name.
15         Q    Would it be a fair statement to say
16    that you were rotated?
17         A    Yes.
18         Q    Would it be fair to say that other
19    security guards that worked for FJC were rotated?
20         A    Yes.
21         Q    Let's go back to Mr. Weiss's question
22    about working on the tarmac outside.
23              How often did you work the tarmac, were
24    you there three times a week?
25              MR. WEISS:  Again, I have an objection.
```

1               GLORIA NOEL

2        I'm assuming you mean, just so I understand,

3        I'm assuming you mean the space under the jet

4        bridge that we talked about.

5        Q     No, what I mean by tarmac is, when they

6   have people on the tarmac next to the plane watching

7   the luggage people unload; how often did you do

8   that?

9        A     It wasn't everyday.

10       Q     No.  Was it four times a week?

11       A     No, I wouldn't say four times.  I might

12  do it for, like, twice or three times a week and

13  then I may not do it for another three weeks.  It

14  wasn't consistent.

15       Q     It wasn't a steady assignment?

16       A     Yes.

17       Q     You weren't picked on or singled out

18   for that assignment?

19             MR. WEISS:  Objection as to form.

20       A     No, I don't belive I was singled out,

21   no.

22       Q     Okay.  All right.  So, basically, all

23   right, you were rotated?

24             MR. WEISS:  Objection.

25             Asked and answered.

1                    GLORIA NOEL

2          A    Yes.   If I was rotated, that is the

3    question, right?

4          Q    Yes.

5          A    Yes.

6          Q    Was your training in May of 2009?

7          A    Yes, because I was hired shortly

8    thereafter.

9          Q    Because the defendant was supposed to

10   supply me --

11              MR. WEISS:  You can't discuss that with

12        her.

13         Q    I wasn't given the records.  I was

14   given the records of May 2009 and your name was not

15   on it.

16              MR. WEISS:  Mr. Tuccio, we've been down

17        this road.  If there is something else that

18        you are looking for, put it in writing and I

19        will produce it if we have it.

20         Q    Your training was in May 2009 and you

21   began work around June 1, 2009?

22         A    Yeah, around there, yeah.

23         Q    Now, you still work for ISS Action

24   Security?

25         A    Yes.

91

```
 1                    GLORIA NOEL

 2               MR. WEISS:  Objection as to form.

 3               Assumes facts not in evidence.

 4          Q    Is that correct?  But the cold air

 5     would blow in; is that correct?  So it would be cold

 6     in the bag room?

 7          A    Let me tell you my experience.

 8               The doors, some of the doors were open,

 9     some were closed.  The doors would be open if a

10     particular airline is using that particular conveyer

11     belt, if not, it was closed.

12               Whenever we, you know, the conveyer

13     belt is in operation for, like, Avianca for example,

14     sometimes we used to go early before loading, so

15     while we were in there, if it gets really, like,

16     freezing, like, cold, the guys would pull the door

17     and one time to, you know, put the luggage on the

18     little trolly to take it to the plane, obviously it

19     wouldn't open up.

20          Q    Okay.  Now, on these sheets I gave you

21     there were 12 sheets.  All right.

22               MR. WEISS:  13.

23          Q    All right.  There are 12 sheets which

24     have your name in the bag room for November,

25     December 2009 and January 2010.
```

```
 1                    GLORIA NOEL

 2              Now, that's about 12 weeks.  So you

 3    were on the bag room about once a week; is that

 4    correct?

 5         A    Probably.

 6         Q    You were not assigned that everyday?

 7         A    No.

 8         Q    No, you were not.

 9              When you were not assigned there, where

10    did you work?

11         A    In the jet bridge, jet way, you know,

12    different.  Sometimes on the tarmac.

13         Q    So would I be correct in saying you

14    were not stuck in any one job?

15              MR. WEISS:  Objection as to form.

16         Q    And you were not stuck day to day

17    working on an outside post, sometimes you would be

18    outside, sometimes you would be inside?

19         A    Yeah.

20         Q    That's correct.

21              MR. TUCCIO:  Did you want to make a

22    phone call?

23              MR. WEISS:  I think we answered the

24         question.

25              MR. TUCCIO:  All right.  Thank you for
```

1                    GLORIA NOEL

2          coming here, Ms. Noel.

3                    I have no further questions.

4    CONTINUED EXAMINATION BY

5    MR. WEISS:

6          Q    Mr. Tuccio asked you about Delta 1 on

7    the second floor of departure.  Departure is on the

8    second floor; that's still outside, right?

9          A    Yeah, departure.

10         Q    I'm trying to remember JFK, and correct

11   me in I'm wrong, there's a road that goes in front

12   of the terminal and it's outside, right?

13         A    Yes.

14         Q    Where is Delta 1?

15         A    It's -- there's levels.

16         Q    I was just there.

17         A    Theres, um, arrival is level 1.

18         Q    Correct.

19         A    Departure is level 2.

20         Q    And where is the post upstairs?  Is it

21   inside the building or outside the building?

22         A    All right.  There's some big doors,

23   right?

24         Q    Yes.

25         A    The post is outside.

94

1                    GLORIA NOEL

2          Q    What post is outside?

3          A    The Delta 1.

4          Q    That's what I thought you meant.

5          A    Yeah, yeah.  It's outside.

6          Q    And then Mr. Tuccio asked you about

7    Charlie 2.  He kept saying Charlie 4 in the middle,

8    but I think he means Charlie 2.  That's downstairs,

9    correct?

10         A    If I remember correctly, yes,

11   downstairs.

12         Q    Where is Charlie 2's post, is it inside

13   or outside, based on your recollection?

14         A    I believe it was outside.

15         Q    When you were posted to Charlie 2 you

16   were outside?

17         A    Yes.

18         Q    When you were posted to Delta 1 you

19   were outside?

20         A    Yes.  If I may say, Delta 1 even though

21   we were outside, the doors in the arrival dorm,

22   once, you know, periodically we could go in, you

23   know.

24         Q    To get warm?

25         A    To get warm, yeah.  It's not like you

1                    GLORIA NOEL

2    had to, you know, stay there.  If traffic got heavy

3    you have to go out and direct, but then, you know,

4    you have the options to periodically come in and

5    then you would get, like, breaks, another security

6    would give us a 15 minute break.

7         Q    While you were assigned to Delta 1 you

8    saw a mix of people of color?

9         A    Yes, definitely.

10        Q    When you were assigned to Charlie 2,

11   you saw a mix of people of color?

12        A    Yes, all my posts were mixed.

13        Q    Like Delta 1, is there an ability to go

14   into the building and still remain at the post to

15   warm up?

16        A    No, Delta 1 is no -- is only, um, Delta

17   1, if I remember correctly, Delta 1 and Delta 2 was

18   the same.  One side to the other one.  I believe the

19   east side was Delta 1, if I remember correctly, and

20   then the west side was Delta 2, I believe.

21        Q    That was outside?

22        A    Yes.  Outside, you know, on the

23   second -- on the second part.

24        Q    Yeah, I've been there.

25             Charlie 2, is an outside post; to your

96

1                    GLORIA NOEL

2    recollection; is that true?

3          A    Yes, as far as I can remember, Charlie

4    2 is outside.

5          Q    And that's downstairs?

6          A    Yes.

7          Q    And if you wanted to, your

8    recollection, not me, you, if you're there in

9    December and it's cold and it's 2009, you can go

10   into the building to warm up?

11         A    That's just Delta.

12         Q    That's only Delta?

13              Okay.  But you have breaks.

14         A    Yes, but with Charlie 3 you have a

15   break, Charlie 1 you do get breaks, you have 15

16   minute breaks.

17         Q    Or you have relief, right?

18         A    Yeah, relief, right.  And you get your

19   lunch.

20              MR. WEISS:  I have no other questions.

21              MR. TUCCIO:  I have one other question.

22   CONTINUED EXAMINATION BY

23   MR. TUCCIO:

24         Q    In terminal 4 there are other posts

25   with other names, Romeo and other posts inside the

100

```
 1
 2                A C K N O W L E D G M E N T
 3
 4    STATE OF NEW YORK )
 5                           :ss
 6    COUNTY OF            )
 7
 8        I, GLORIA NOEL, hereby certify that I have read
 9    the transcript of my testimony taken under oath in my
10    deposition of December 9, 2013; that the transcript is
11    a true, complete and correct record of my testimony,
12    and that the answers on the record as given by me are
13    true and correct.
14
15                GLORIA NOEL
16
17        Subscribed and Sworn to before me
18        this _____ day of _____ , 20__
19        _____
20                NOTARY PUBLIC
21
22
23
24
25
```

103

```
 1
 2              C E R T I F I C A T E
 3
 4        I, ALICIA ROBERTO, a shorthand reporter and
 5  Notary Public within and for the State of New York, do
 6  hereby certify:
 7        That the witness whose testimony is hereinbefore
 8  set forth, was duly sworn by me, and that such
 9  testimony is a true record of the testimony given by
10  such witness.
11        I further certify that I am not related to any
12  of the parties by blood or marriage, and that I am in
13  no way interested in the outcome of this matter.
14        IN WITNESS WHEREOF, I have hereunto set my hand.
15
16              _____
17              Alicia Roberto
18
19
20
21
22
23
24
25
```

*Declaration of Scott A. Weiss*
EXHIBIT: **5**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
SAMUEL TUCCIO,

                    Plaintiff,

                                 Civil Action No.
           -against-              12-5506
                                 (JFB) (GRB)

FJC SECURITY SERVICES, INC.,

                    Defendant.
--------------------------------x

                            100 Federal Plaza
                            Central Islip, New York

                            September 12, 2013
                            1:37 P.M.

    DEPOSITION of FJC SECURITY SERVICES, INC., the

Defendant herein, by EFRAIN SANTIAGO, taken pursuant

to Subpoena, and held at the above time and place

before Ginnette Corr, a stenotype reporter and Notary

Public of the State of New York.

5

```
 1                    EFRAIN SANTIAGO

 2        Q      Please state your position.

 3        A      Of the work?

 4        Q      Yes.

 5        A      I work with New York State DOT, the

 6   HELP program.

 7        Q      Are you an instructor there?

 8        A      No.

 9        Q      What was your position at FJC Security

10   Services on May 1, 2009?

11        A      Training manager.

12        Q      Describe your work experience before

13   FJC Security Services.

14        A      I was human resources for a couple of

15   previous companies, and I've been a training

16   instructor for the past maybe 25 years.

17        Q      When did you begin working for FJC

18   Security?

19        A      I believe it was November of 2003.

20        Q      What was your position and location?

21        A      Training manager at Building 75, JFK

22   Airport.

23        Q      What training did you receive to

24   qualify you to be an instructor?

25        A      I was instructor certified by New York
```

1                          EFRAIN SANTIAGO

2      State as a security guard instructor.  I had

3      certification with an FAA program for airport

4      training.  And normally, company training is

5      something that anybody who works for the company

6      can perform.  There's no actual certification

7      required.  Company training.

8          Q     Do you have a college degree or

9      certificate?

10         A     No.

11               MR. WEISS:  Other than the certified

12            instructor certificate, right?

13               THE WITNESS:  Certificate for certified

14            instructor, yes.

15         Q     Who hired you or appointed you to the

16     position of instructor, training instructor?

17               MR. WEISS:  Objection as to form.

18               You may answer.

19         A     John Pagnotta, the vice president of

20     FJC at that time.

21         Q     Approximately how many times per

22     year -- all these questions I'm asking all relate

23     to 2009, even though I don't preface them with

24     2009.

25               Approximately how many times per year

1                    EFRAIN SANTIAGO

2    did you train a new class?

3         A     I don't recall.

4         Q     How many --

5         A     They vary.

6         Q     About how many people were in a typical

7    class?

8         A     They average anywhere from 10 to maybe

9    20 people.

10        Q     What did the training consist of?

11        A     Company orientation, security guard

12   responsibilities and knowledge of the locations

13   where they're working in the airport.

14        Q     How many hours per day and how many

15   days was the training for an airport security

16   agent?

17             MR. WEISS:  Objection as to form.

18             You may answer if you understand the

19        question.

20        A     I don't fully understand the question.

21        Q     When you were instructor for the

22   training of an airport security agent, how many

23   days did this go on?  Did it go on for five days,

24   six days?

25             MR. WEISS:  Same objection.

1                    EFRAIN SANTIAGO

2      designation D --

3          A      Shows the driver endorsement with

4      the --

5          Q      Which I got as a result of taking that

6      course.

7          A      Right.

8          Q      The other --

9          A      This is the first page of the customer

10     service.  This is the first page for traffic

11     responsibilities.  Fire extinguishers, fire safety

12     (indicating).

13                    MR. WEISS:  Is that a first page?

14                    THE WITNESS:  That's a first page, yes.

15         A      This is a first page of memorandums,

16     just company rules and regulations based on

17     company orientation.  The use of force.  This is

18     all New York State in reference to the laws as to

19     what you can and cannot do as a security officer.

20     Report writing procedures is the next page.  This

21     is the cover page.  Communications, public

22     relations.  This is the first page.  And the FJC

23     contact list, which is -- this is -- I think this

24     is the only page, if I'm correct, that I gave.

25     Just tells you what your contacts are, depending

12

1               EFRAIN SANTIAGO

2    on where they place you.  And this is the first

3    page of the old employee handbook that was given

4    out at that time.

5               MR. WEISS:  Mr. Tuccio, if you would

6          just indulge me just one question, because I

7          just want to make sure something's clear.

8          I'll ask you, and then I'll confirm.  Are

9          these first pages, this being use of force

10         and then report writing?

11              MR. TUCCIO:  Yes.

12              MR. WEISS:  These are first pages.  Do

13         you understand that?

14              THE WITNESS:  Yes.

15              MR. WEISS:  Go ahead.  I just wanted to

16         make sure that was clear.

17    Q      Would I be correct in saying that this

18   was specialized training for the position of

19   airport security agent?

20              MR. WEISS:  Objection as to form.

21              If you understand the question.

22    A      As far as specialized training, no.

23   This was our basic training that security officers

24   normally should have had already when they went

25   through the New York State training.

14

1                    EFRAIN SANTIAGO

2        A     Usually, I kept an individual form,

3   which went into each person's file.  So if I

4   wanted to know if the person had the training, I

5   just opened their file.  It was an individual

6   form.

7        Q     Now, I just want to make one thing

8   clear.

9              Is this a training file that's separate

10  from the employee's personnel file?

11       A     Correct.

12       Q     What did you do with the test scores

13  that new hires in your training class got?

14       A     The training was mostly a review.  It

15  was a pass or fail evaluation.

16       Q     You said they were stored in the

17  training file?

18       A     Correct.

19       Q     Are those test scores used in deciding

20  which assignments were given to new employees?

21       A     No.

22       Q     New employees in 2009 were trained by

23  an instructor, John Harding, of Delta Air Lines to

24  be cargo security screeners; is that correct?

25       A     Correct.

```
 1                   EFRAIN SANTIAGO
 2        Q    Again, is this not specialized training
 3   for an airport security agent?
 4             MR. WEISS:  Objection as to form.
 5             If you understand the question, you may
 6        answer.
 7        A    No.
 8        Q    The Delta Air Lines instructor, John
 9   Harding, gave a test at the end of the eight-hour
10   course; is that correct?
11             MR. WEISS:  Objection as to form.
12             You're still talking about the
13        screening test, right?
14             MR. TUCCIO:  We're talking about the
15        Delta Air Lines -- yes, cargo security
16        screening test.
17             MR. WEISS:  Still objection as to form.
18        You may answer if you understand the
19        question.
20        A    Yes.
21        Q    Did you correct the test?
22        A    No.
23        Q    What was done with the test scores?
24        A    Delta Air Lines kept the original.
25   They just gave me copies to put in our records.
```

16

1                    EFRAIN SANTIAGO

2    Delta was responsible to maintain those records.

3         Q       Those test scores are stored in the

4    training folder; is that correct?

5         A       Just the attendants that I had,

6    attendance sheet, which had the scores on them.

7    It's basically keeping track of the attendants,

8    who was there.  Delta kept the originals.

9         Q       You kept the attendance sheet, which

10   did not have the scores on them?  Is that what

11   you're saying?

12        A       I said it did have the scores.

13        Q       Now, are the test scores from the cargo

14   security screener test used to decide whether or

15   not an airport security agent got assigned to

16   Building 20 doing the testing of luggage for

17   traces of explosives?

18               MR. WEISS:  Objection as to form.

19               You may answer if you understand it.

20        A       I don't fully understand the question.

21               MR. WEISS:  Would you repeat the

22          question?

23               (The requested portion of the record

24          was read back by the reporter.)

25        A       Yes.

17

1           EFRAIN SANTIAGO

2       Q    Also, did you not -- did you teach a

3   one-day class on driving a vehicle on the Tarmac

4   at JFK Airport?

5       A    No.

6       Q    You did not teach this class on airport

7   security agent?

8       A    Then I'm misunderstanding your

9   question.

10          MR. TUCCIO:  Can you read the question

11        back for me?

12          (The requested portion of the record

13        was read back by the reporter.)

14      Q    Did you also teach a one-day class on

15  driving a vehicle on the Tarmac at JFK Airport?

16  That is that class in Exhibit 1.

17      A    I gave the Port Authority AOA driver

18  safety course, which is a -- basically a four-hour

19  training class.

20      Q    Is this not specialized training for an

21  airport security agent?

22          MR. WEISS:  Objection as to form.

23          You may answer if you understand the

24        question.

25      A    No.

18

```
 1                    EFRAIN SANTIAGO

 2          Q      Did you give a test at the end of this

 3     one-day course?

 4          A      Yes.

 5          Q      Did this result in the designation DR1

 6     or EV on the ID badge given by the Port Authority

 7     of New York and New Jersey?

 8                 MR. WEISS:  Objection as to form.

 9          A      If you passed the test, Port Authority

10     decides if they're going to issue you a driver

11     status, which is the DR1.

12          Q      What did you do with the test scores?

13          A      I put them in the individual training

14     file.

15          Q      Are the test scores from the test for

16     driving a vehicle on the Tarmac used to decide

17     whether or not an airport security agent gets

18     assigned to driving Rover 1 or Rover 2 at JFK

19     Airport?

20                 MR. WEISS:  Objection.

21          A      No.

22                 MR. WEISS:  Just so the record is

23           clear, Mr. Tuccio, Rover 1 and Rover 2,

24           that's just a vehicle, right?

25          Q      He wants you to answer.
```

```
 1                     EFRAIN SANTIAGO

 2              THE WITNESS:  It's a position.  It's

 3         just a driving position.  It's like a call

 4         sign for a driving position.

 5              MR. WEISS:  Go ahead.

 6              THE WITNESS:  Just so they can identify

 7         people easier, who's working where.

 8         Q     On what basis are new employees given

 9    their first assignment?  There has to be some

10    basis for this.

11              MR. WEISS:  Objection as to form.

12         A     I do not know.

13         Q     Did you influence the placement of new

14    hires on their first assignment in any way?

15              MR. WEISS:  Objection as to form.

16         A     No.

17         Q     This refers the question to May 2009.

18              What were the names of the other

19    employees and their positions in the personnel

20    department?

21         A     I do not recall who they were at the

22    time.

23         Q     Was one of them Louise Davis?

24         A     Louise was a dispatcher.

25         Q     Did Louise Davis speak Spanish?
```

```
1                    EFRAIN SANTIAGO

2              Assumes facts not in evidence.  You may

3         answer if you know.

4         A    No.

5         Q    Do you still work in any capacity for

6    FJC Security Services?

7         A    No.

8         Q    Why did you separate from FJC?

9         A    Other employment.

10        Q    Did you leave voluntarily?

11        A    Yes.

12        Q    Did the test scores of your four or

13   five-day training class, basic training, or the

14   test scores of your one-day driving class or the

15   test scores of the one-day cargo screening class

16   have any influence on the first assignment given

17   to a new employee?

18              MR. WEISS:  Objection as to form.

19              You may answer if you understand that

20        compound question.

21        A    No.

22        Q    Do you remember an employee named

23   Justin Avery in your general training class of

24   May 2009?

25        A    I do not recall.
```

1                     EFRAIN SANTIAGO

2     you.

3              MR. WEISS:  I have just one.

4     EXAMINATION BY

5     MR. WEISS:

6         Q     Mr. Santiago, I have a question.  You

7     testified in response to Mr. Tuccio's question

8     whether the screening scores -- he asked you

9     whether the screening scores for cargo screening

10    at Building 75 dictated or determined who got the

11    assignment for cargo screening, and you said yes.

12             What level of score dictates the

13    assignment or could you explain that, actually,

14    what that means, what your yes means?

15        A     It's basically a pass or fail.  So if

16    you pass the course, then you are offered a

17    position.  If you do not pass the course, then you

18    cannot get a position.  It's mostly basically

19    evaluating each individual on pass or fail.

20             MR. WEISS:  I have no further

21        questions.  I do have one other question.

22        Excuse me.

23        Q     So any guard, any airport security

24    guard that has passed the screening test -- as in

25    P, meaning passed -- is eligible for this

26

```
 1                    EFRAIN SANTIAGO

 2      assignment?

 3           A     Yes.

 4           Q     Regardless of experience or anything

 5      else?

 6           A     Correct.

 7                MR. WEISS:  I have no further

 8           questions.

 9                    (Time noted:  2:19 p.m.)

10                       *    *    *    *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

27

2              A C K N O W L E D G M E N T

3

4     STATE OF NEW YORK          )
                                         ss:
5     COUNTY OF _____)

6

7          I, EFRAIN SANTIAGO, hereby certify that I have

8     read the transcript of my testimony taken under oath

9     in my deposition of September 12, 2013; that the

10    transcript is a true and complete record of my

11    testimony, and that the answers on the record as

12    given by me are true and correct.

13

14                           _____

                             EFRAIN SANTIAGO
15

16

17    Subscribed and sworn to before me
      this        day of              2013.
18

19    _____
                (NOTARY PUBLIC)

20

21

22

23

24

25

29

2                   C E R T I F I C A T E

3

4

5          I, GINNETTE CORR, a shorthand reporter

6     and Notary Public within and for the State of

7     New York, do hereby certify:

8               That the witness, whose testimony is

9     hereinbefore set forth, was duly sworn by me,

10    and that such testimony is a true record of the

11    testimony given by such witness.

12              I further certify that I am not related

13    to any of the parties by blood or marriage, and

14    that I am in no way interested in the outcome of

15    this matter.

16              IN WITNESS WHEREOF, I have hereunto set

17    my hand.

18                      _Ginnette Corr_

19          _____

20                    Ginnette Corr

21

22

23

24

25

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-----------------------------------------------X

SAMUEL TUCCIO,

                                    Plaintiff,

        -against-            Case No:

                             CV-12-05506-JFB-GRB

FJC SECURITY SERVICES, INC.,

                             Defendant.

-----------------------------------------------X

                DATE:  August 15, 2013
                TIME:  10:23 a.m

        DEPOSITION of the Plaintiff, SAMUEL
TUCCIO, taken by the Defendant, pursuant to the
Federal Rules of Civil Procedure, held at the
U.S. District Court, 225 Cadman Plaza East,
Brooklyn, New York 11201, before Scott
Torrance, a shorthand reporter and Notary
Public of the State of New York.

Case 2:12-cv-05506-JFB-GRB  Document 51-4  Filed 01/24/14  Page 132 of 263 PageID #: 850

```
 1                     S. TUCCIO
 2    ability to remember or -- remember or to
 3    comprehend my questions this morning?
 4         A.    No.
 5         Q.    Are you on any medication that will
 6    impair your ability to testify or remember or
 7    understand my questions this morning?
 8         A.    No.
 9         Q.    When were you first employed by FJC
10    Security Services?
11         A.    Initially, April 20th -- well,
12    April 28, 2009.  I believe that was the first
13    day that I came in.  I did not begin getting
14    paid until the week of May 26th, 2009.
15         Q.    Okay.  What was your date of
16    employment with FJC?
17         A.    Well --
18         Q.    Strike that.  I'm going to rephrase
19    that.
20               What was the last day of employment
21    with FJC?
22         A.    January 20th, 2010.
23         Q.    Were you employed by FJC at any other
24    time, except between those dates?
25         A.    No.
```

                          S. TUCCIO

1      to August 8th, 2009, correct?

2          A.     Yes.

3          Q.     Okay.  So, we're talking about that

4      time period, right?

5          A.     Yes, that's correct.

6          Q.     During that time period you're listing

7      assignments -- you're listing assignments that

8      were available at that terminal during that

9      time, correct?

10         A.     That's correct.

11         Q.     Okay.  And which terminal was that?

12         A.     Terminal 4.

13         Q.     What airport?

14         A.     John F. Kennedy Airport, in Jamaica.

15         Q.     What airline is that, if you know?

16         A.     Well, there are different airlines at

17     the airport.

18         Q.     Okay.

19         A.     There's more than one.

20         Q.     It's not just one, okay.

21                During that time period, were you

22     assigned to driving the patrol car?

23         A.     Never.

24         Q.     You mention Bravo 3.  Oh, there's

S. TUCCIO

1

2      A.     Yes.  And this was only after I had

3   complained to my supervisors that how come I'm

4   always -- I'm never in an inside post.

5      Q.     How about Romeo?  Is Romeo all by

6   itself or is there a --

7      A.     Okay.  Well, Romeo, I believe it's

8   kind of a rolling post around the airport.

9      Q.     Okay.

10      A.     I believe that person, um, goes around

11   and relieves the other guards for lunch and --

12      Q.     That's relief?

13      A.     It's sort of a relief post, yeah.

14      Q.     Did you ever do that?

15      A.     I don't -- no, I don't think so, no.

16      Q.     If I may, when I say "ever," that's

17   ever during the time period of your employment.

18      A.     I do not remember doing that.

19      Q.     Okay, Delta 4.  Were you ever at Delta

20   4 during that time period?

21      A.     Um, I don't remember if I was or not.

22      Q.     How about Charley 1?

23      A.     Charlie 1?  Um, Charlie 1 was inside,

24   um, yes, I was assigned there.

25      Q.     How many times were you assigned

```
1                        S. TUCCIO
2    there?
3        A.    I would guess three.
4        Q.    And when were you assigned there?
5        A.    Um, it was sometime in July, probably
6    around the middle of July.  Probably the middle
7    of July and the end of my --
8        Q.    Just for the record:  When you're
9    saying Bravo, Alpha, Romeo, Delta, that's
10   really B3, A3, R, D4?  Is that what you're
11   doing?
12       A.    Well, no.  That's the titles.  That's
13   what they called them.
14       Q.    Well, Delta is an airline, so, I don't
15   want to confuse the record.
16       A.    But that's the title --
17       Q.    You don't mean Delta Airline 4, you
18   mean --
19       A.    No, no.
20       Q.    Okay, Charlie 2.  Were you ever
21   assigned to Charlie 2?
22       A.    I don't think so.
23       Q.    And then --
24       A.    Delta 1.
25       Q.    -- Delta 1, that was outside?
```

```
1                    S. TUCCIO

2        A.    Yeah.  I was there probably during

3   most of June 2009.  I was there day after day.

4   I think I was there almost every night the

5   first couple of weeks.

6        Q.    Charlie 3?

7        A.    Charlie 3, outdoors.  I was there a

8   lot of times.  That's directing traffic.

9        Q.    When you -- I'm sorry.  Directing

10  traffic?

11       A.    Yeah.

12       Q.    Where were you directing traffic?

13       A.    Um, outside the airport, Terminal 4,

14  uh, vehicles are allowed to pull up to the

15  airport in front of Terminal 4 and the

16  passengers are supposed to get out and, uh,

17  remove their luggage, you know, and they go

18  into the airplane, they go into the air

19  terminal, and then the automobile is supposed

20  to drive away, and sometimes there are, uh,

21  taxis out there, you know, that will provide

22  the ride to passengers who are leaving the

23  airport.  So, the taxis are out in front and

24  the vehicles coming into the airport to leave a

25  passenger or pick up a passenger would come
```

```
1                    S. TUCCIO
2   there and my job would be to stand outside, you
3   know, wearing a -- a vest that would be colored
4   orange and white with my, uh, hat and uniform
5   on and having a whistle in my hand and blowing
6   the whistle and urging the people to move on
7   and many times they would not move on.  They
8   would, uh, answer you back and, um, be very
9   rude doing this and this would be -- the, uh,
10  taxis that would be there, they were -- they
11  were not supposed to be there, but some of them
12  would park there for long periods of time.  You
13  would have to tell them to move on or you
14  would, uh, call a tow truck and then they would
15  wait until you're -- you're on your two-way
16  radio and you would ask the tow truck be
17  dispatched to Terminal 4 and then suddenly they
18  would leave.
19       Q.    Okay.  So, Charlie 3 is the parking --
20       A.    Yeah, Charlie 3 -- I believe Charlie 3
21  and Charlie 4 are both -- Charlie 4 is a little
22  different and then I believe it's, uh, you're
23  standing way out in front of Terminal 4 as the
24  cars come in and you direct them.  You tell
25  them to move on with your hands.
```

1                     S. TUCCIO

2      Q.     How long were you at Charlie 3?

3      A.     Um, boy.  I was there many times

4   during June and July, too many times.  I was

5   there lots of times.

6      Q.     Were you given an initial assignment?

7      A.     An initial assignment?

8      Q.     First assignment after you were

9   processed in personnel.

10      A.     Well, that was it, to work at Terminal

11   4 during 11 p.m. to 7 a.m., that shift.

12      Q.     So, your initial assignment was

13   Terminal 4?

14      A.     That's correct.

15      Q.     And it was 11 a.m. to --

16      A.     No.  11 p.m.

17      Q.     I'm sorry.  11 p.m. to?

18      A.     7 a.m.

19      Q.     Got it.

20             Did that time period ever change for

21   the -- from the period June '09 to August '09?

22      A.     It was the same hours.

23      Q.     Same hours?

24      A.     That's correct.

25      Q.     What was your initial wage rate?

                          S. TUCCIO

1

2      A.    $9 per hour.

3      Q.    Did that rate ever change?

4      A.    No.

5      Q.    Did you have any other benefits, to

6   your knowledge?

7            Did you have health insurance?

8      A.    No.  There's no -- I believe there's

9   no health insurance.

10     Q.    Okay.

11     A.    No pension, um, there's no personal

12  days, there are no sick days, and unless -- I

13  do not believe there is accrued vacation

14  unless -- it's possible.  You would have to ask

15  someone, unless they give you a week's vacation

16  after a year.

17     Q.    That's fine.

18     A.    That's possible, but I do not know

19  about that right now.

20     Q.    In August you were changed to the bag

21  room, correct?

22     A.    Okay.  In August initially --

23     Q.    That's August '09?

24     A.    Yeah.  Well, the next assignment is --

25  I think I may have mentioned it here, was, um,

```
 1                    S. TUCCIO
 2    yeah, right here, No. 2.  They offered me -- I
 3    was called into Building 75 and I spoke to
 4    JC -- that's his name.  He seems to just prefer
 5    his initials.  I don't know what the rest of
 6    his name is.  -- and I was given a form and
 7    asked to sign for a assignment at Building 20,
 8    6 p.m. to 2 a.m., Monday through Friday.
 9         Q.    You're referencing paragraph B?
10         A.    Yes.  In which I was supposed --
11    you're talking about August 2010.  If you
12    remember, that was very different --
13         Q.    August 2009.
14         A.    Uh, 2009.  It was very, very hot.
15    There were 90-degree days there as oppose to
16    2013, which is very cool, and I was supposed to
17    walk outside, around Building 20, for that
18    period of time, 6 p.m. to 2 a.m.  Well --
19         Q.    How long were you doing the
20    walk-around?
21         A.    No, that was -- that was the
22    assignment.  And I turned it down and I told
23    Mr. JC that I wanted to work part-time about --
24    I think he said 20 to 24 hours a week.
25         Q.    Then you were put into the bag room?
```

```
 1                    S. TUCCIO

 2        A.    Um, then I believe he called me back

 3   the next day, said, "I have another assignment

 4   for you," and when I went into -- I went back

 5   to Room 225 in Building 75, he offered me that

 6   job at Avianca Airlines.

 7        Q.    At the bag room?

 8        A.    Yes, from, uh, it's about -- it was

 9   about four -- I'm not sure of the time.  It was

10   about 4 a.m., I think, to 8 a.m.  And then,

11   when daylight savings time came into effect, I

12   think it was changed from 5 a.m. to 9 a.m.

13        Q.    Did your wage rate change?

14        A.    No.

15        Q.    Only your hours changed because you

16   asked for part-time, right?

17        A.    Yes.  But it was, again, a graveyard

18   shift, a nightshift.

19        Q.    This is the bag room, right?

20        A.    Yes.  That's, again, the -- in

21   Building 70 -- in Building -- Terminal 4 -- you

22   know, the airplane terminal is a very big

23   building, but really, attached to the building

24   is another section that is the cargo area,

25   okay, where the -- where cargo is loaded into
```

1                    S. TUCCIO

2    the airplanes and the bag room was in the cargo

3    section of Building 4.

4        Q.    Okay.  So, the bag room was in the

5    cargo area?

6        A.    Yeah.

7        Q.    And you accepted that assignment,

8    correct?

9        A.    Yes.

10       Q.    And you were in the bag room until you

11   were terminated January 20, 2010?

12       A.    Yes.

13       Q.    At the -- if I remember correctly, at

14   the 4 a.m. to 8 a.m. or 5 a.m. to 9 a.m. --

15       A.    Right.

16       Q.    -- 24 hours a week?

17       A.    Well, uh, five days a week.

18       Q.    Five -- I'm sorry.

19       A.    Yeah.

20       Q.    Five days a week.  So --

21       A.    I think it actually -- I think it

22   actually started on Tues -- really Tuesday

23   morning.  I think it was Tuesday morning.

24   Wednesday morning, Thursday morning, Friday

25   morning.  I think the last shift would have

```
1                    S. TUCCIO
2  been really Saturday morning.
3       Q.   So --
4       A.   It --
5       Q.   I'm sorry.  Go ahead.
6       A.   So, you know, you could think of it as
7  Monday night, but it was really Tuesday through
8  Saturday morning, so, it was four hours a day.
9  Five times four is 20 hours.
10      Q.   So, it's not 24, it's 20 hours?
11      A.   That's correct.
12      Q.   Okay.  Let's go off the record for a
13  second.
14           (Whereupon, a discussion was held off
15      the record.)
16      Q.   Everything that I have of you, so, I
17  didn't want to kill trees just to give you more
18  paperwork that you already have.
19      A.   Right.
20      Q.   Okay.
21           MR. WEISS:  I want to mark this as
22      Defendant's Exhibit B, which purports to
23      be a copy of Mr. Tuccio's personnel
24      file.
25           (Whereupon, Defendant's Exhibit B, a
```

                        S. TUCCIO

1

2          copy of Mr. Tuccio's personnel file, was

3          marked for identification as of this

4          date by the reporter.)

5      Q.    Mr. Tuccio, you're going to have lots

6   of opportunity -- I've given you a copy of your

7   personnel file and I'm going to reference a

8   Bates number for that purpose.  We're going to

9   go back and forth a little bit, so just bear

10  with me.

11          I'm going to show you Bates No.

12  D000044, dated May 15th -- I'll put it in front

13  of you -- May 15th, '13, 2013.  45 is for the

14  identical copy.  So, I just you want to take a

15  look at that page.

16      A.    Now, what did you say the date was?

17  May 21st?

18      Q.    I believe so.

19      A.    Yes.

20      Q.    Isn't that your initial assignment?

21      A.    Uh, yes, looks like it.

22      Q.    And if you look at that, the week, is

23  that your signature at the bottom?

24      A.    Yeah.

25      Q.    You're referencing the signature on --

```
 1                    S. TUCCIO
 2   to your left?
 3       A.    Yeah.
 4       Q.    And just so the record is clear:
 5   There's a calendar in the top of that.  Is that
 6   the -- is that that shift that you mentioned?
 7   You said that --
 8       A.    Yes.
 9       Q.    -- your Terminal 4 shift?
10       A.    Yes.  And it says -- on the date -- it
11   says May 26th, 2009 is the start date.
12       Q.    Okay.  So, that's your initial
13   assignment?
14       A.    Yes, that's correct.
15       Q.    Okay.  Thank you.
16             That assignment, aside from the
17   walk-around assignment that you mentioned and
18   the bag room, is the assignment you were in
19   from June '09 to August '09, correct?
20       A.    Yeah.  I think it was August 8th.  I
21   believe it was -- August 8th I believe was the
22   last -- I'm sorry.  Yeah, I think it was --
23   August 8th was the last day that I worked till
24   this -- August 8th was the last day that I
25   worked that --
```

S. TUCCIO

1

2     Q.    That assignment?

3     A.    Yes.  And I think I started Avianca, I

4  believe it's August 11th.

5     Q.    Let's go back to this.  Now, the bag

6  room was inside a building, correct?

7     A.    It was inside -- well, I guess you --

8  it's inside cargo, the cargo building.

9     Q.    So, inside the cargo building at

10  Terminal 4?

11     A.    Yes.

12     Q.    Just so the record is clear:  And

13  that's where Avianca Airlines is?

14     A.    Well, that's where the belts are for

15  the, uh, the luggage comes down there on a belt

16  and, um, the baggage handlers load it from the

17  belt.  They pick it up and they put it on these

18  carts with wheels in it, all right?  And then

19  there were these big, huge garage doors, I

20  don't know, eight, nine, ten of them, and they

21  go out the garage door and the airplane is

22  right outside the garage doors.  It's only a

23  few feet.

24     Q.    Got it.

25     A.    And that would be an A380 or A3 -- I

```
 1                      S. TUCCIO

 2    think it was A350 or an A320.

 3         Q.    So, you're referring to the plane?

 4         A.    Yes.  A 500-passenger plane or a

 5    300-passenger plane.

 6              Even though the -- the bag room's in

 7    the building, don't forget you have these big

 8    garage doors that are open all the time, you

 9    know?  You got the guys who wheel the luggage

10    out to the airplane, empty it into the

11    airplane, come back in with the carts, you

12    know, and the carts usually have like -- it's

13    almost like a forklift that's attached to the

14    carts.  It's a motorized -- it's -- it's a

15    motorized -- it's like a motorized forklift,

16    except it's -- it doesn't -- you know, it

17    doesn't lift pallets, it just -- it's attached

18    to the carts, maybe two or three of them at a

19    time, and it wheels them out into the tarmac.

20         Q.    So, you were -- you maintained the

21    post in the bag room from August until your

22    termination on January 2010, correct?

23         A.    That's correct.

24         Q.    And it didn't change at any time

25    during that time?
```

```
                           S. TUCCIO
1
2         A.    My assignment was just that one, the
3    bag room.  That was the original assignment
4    given to me.  When I signed in the timesheets,
5    to the left of the column it would have bag
6    room.
7         Q.    Let's go back.  Let's get back to the
8    earlier time period.
9              So, did you observe -- were there
10   other -- you referenced Justin Avery and I just
11   want to keep this organized.  Did Justin Avery
12   work in the bag room?
13        A.    Uh, no.
14        Q.    Okay.
15        A.    Well, I never saw him in the bag room.
16   Now, whether -- he may have worked there
17   another time.  As far as -- I never saw him.
18   He did not work with me.  So, I don't know if
19   he was ever assigned there during another
20   period of time.  I don't know anything about
21   that.
22        Q.    Did Lowel Caraballo work with you?
23        A.    In the bag room?  No.
24        Q.    Did Justin Avery ever work with you in
25   the earlier period --
```

```
 1                     S. TUCCIO

 2        A.    Yes, at Terminal 4.  He began the same

 3   time I did.

 4        Q.    Did you ever observe Mr. Avery inside

 5   the terminal?

 6        A.    Yes.

 7        Q.    Did you ever observe him posted inside

 8   the terminal?

 9        A.    Yes.

10        Q.    So, just to focus it in a latter

11   period after August:  He didn't work in the bag

12   room with you?

13        A.    I never saw him in the bag room.

14        Q.    Okay.  But in the earlier period, you

15   did -- you observed him inside -- posted

16   inside?

17        A.    Inside and outside he would be, uh,

18   assigned to Charlie 1 or sometimes there's a

19   post inside the, uh, inside the building.  I

20   believe it's called Charlie 3 --

21        Q.    And this is a Caucasian gentleman?

22        A.    -- or Charlie 2.

23        Q.    Charlie 2.

24              This is a Caucasian gentleman?

25        A.    Yes.
```

```
 1                      S. TUCCIO

 2            Well, I should say -- I should say

 3   Charlie 1.  That would be in the lobby of, um,

 4   Terminal 4.  There's a front lobby nearest the

 5   driveway.  When the people come in to get into

 6   the terminal, there's a main front door.

 7       Q.    And that's where you've seen Mr. Avery

 8   posted?

 9       A.    Yeah, he would be there, and I believe

10   I also saw -- he was also on, um, I should

11   say --

12       Q.    You changed --

13       A.    Charlie -- Charlie 3 or something

14   would be the outdoor post.  He was also in

15   Charlie 3.

16       Q.    You changed the digits a couple of

17   times.

18       A.    Yeah.

19       Q.    So, he's at Charlie 1 and Charlie 3?

20       A.    And Charlie 3, yes.

21       Q.    And Charlie 1 was the lobby?

22       A.    Yes.

23       Q.    That's inside?

24       A.    Yes.  And Charlie 3 would be outdoors.

25       Q.    Outdoors.
```

```
1                        S. TUCCIO
2              And he's a white gentleman?
3       A.    Yes.
4       Q.    Did you ever observe, during the
5  earlier period, before August, when you were at
6  Terminal 4, people -- guards of color posted
7  outside?
8       A.    Yes.
9       Q.    Do you understand what I mean by
10 "people of color"?
11      A.    Excuse me?
12      Q.    Do you understand what I mean by
13 "people of color"?
14      A.    Yes.  Black skin color.
15      Q.    African-American?
16      A.    Well, a person of black skin.  I don't
17 know if they were African-Americans.  They
18 could be Jamaican or Dominican or Haitian.
19      Q.    Did you ever observe Hispanic guards
20 posted outside?  Or Hispanic descent I think is
21 the --
22      A.    Yes, people appeared to be Hispanic
23 sometimes on -- well, I should say not so much
24 on my shift.  I should backtrack a bit.
25      Q.    That's all right, sir.  I'll --
```

Case 2:12-cv-05506-JFB-GRB   Document 51-4   Filed 01/24/14   Page 152 of 263 PageID #: 870

```
 1                     S. TUCCIO
 2   during the few weeks that I saw him there.
 3        Q.     Did you ever observe African-Americans
 4   directing traffic out in front of Terminal 4?
 5        A.     Yes.
 6        Q.     Did you ever observe Hispanic, I mean
 7   guards?  Just so we're clear, guards.
 8        A.     Uh, I do not know if there were
 9   Hispanic people there.  I'm only talking about
10   my shift now, 11 to 7.
11        Q.     All right.
12        A.     I'm not aware of -- there was a, uh,
13   the man who was a supervisor of that post,
14   outdoor post, Charlie 3, was a white man.  I
15   don't remember what his name was.
16        Q.     You're talking about the tour
17   supervisor?
18        A.     Um, yeah, like a tour supervisor,
19   yeah.
20        Q.     And was he the tour supervisor for the
21   entire period that you were there?
22        A.     No.  There would be another man,
23   another tour supervisor that would be also --
24        Q.     And you don't recall the name of the
25   tour supervisor who was there?  Not the one --
```

1                    S. TUCCIO

2      Q.    Or is this something that -- let me

3  finish.

4            This is something that you were

5  standing there while someone was telling her to

6  do this?

7      A.    Okay.  Let me backtrack --

8      Q.    Sir, just please answer the question I

9  asked you, please.

10     A.    Okay.  She worked -- she would be --

11 she would be outside guarding the airplane and

12 sometimes she -- when the supervisor would come

13 back by Mr. Cabalaro (phonetic), Alberto, um,

14 she would ask him, you know.

15     Q.    You mean Alberto Cabanilla?

16     A.    When I checked the sign-in --

17     Q.    Slow down.

18     A.    I --

19     Q.    Slow down.  Just take a breath.

20     A.    Okay.

21     Q.    Are you referring to Alberto

22 Cabanilla?

23     A.    Cabanella (phonetic).

24     Q.    I don't think that's his name, but

25 okay.

                        S. TUCCIO

1                        S. TUCCIO

2              Is that the tour supervisor that

3    you --

4        A.    He's the supervisor, yes.

5        Q.    Now, were you present when the tour

6    supervisor -- this tour supervisor sent her to

7    the tarmac?  Did you hear that?

8        A.    Okay.  Um --

9        Q.    Are you thinking about it?

10       A.    Okay.  You're asking me if I heard him

11   send her out there?  Um, no, I guess I was not

12   present when she -- I saw her out on the

13   tarmac.  Maybe that's the correct --

14       Q.    So, you observed her on the tarmac?

15       A.    Yes, standing beside the airplane.

16       Q.    As you sit here today, you don't know

17   the circumstances how she ended up on the

18   tarmac, you just observed her there?

19       A.    That's correct.  But I checked those

20   sign-in sheets, you know, and she would be

21   assigned in the sign-in sheets to the bag room,

22   all right?  But the same thing happened to me.

23   I would be assigned to the bag room, but you

24   would be taken -- but we would be, uh, outside

25   in the, uh, on the tarmac.

S. TUCCIO

That's inside, right?

    A.    Yes.

    Q.    And this is a white woman?

    A.    Yes.

    Q.    By the way, for the record, the complaint references Supervisor Alberto Cabanilla.  I don't know how that's pronounced?  That's C-a-b-a-n-i-l-l-a, according to the complaint.  Is that the tour supervisor you were referring to?

    A.    That's correct.

    Q.    Going back to the post.  During this time period of June '09 to August '09, did you observe African-American guards driving the patrol car?

    A.    Did I observe, um, African-American you're saying.  Well, the two people -- there was a man, I think, named Sungay, S-u-n-g-a-y, was the first name, and I -- I forgot his last name, but it's on those sheets you gave me yesterday.  I believe he drove it and I believe --

    Q.    He was Afro-American?

    A.    He's not Afro-American, but, um --

S. TUCCIO

1

2      Q.    Dark skin?

3      A.    I guess dark skin.

4      Q.    A person of color?

5      A.    Yeah.  Well, I guess you'd call that,

6   but --

7      Q.    Did you observe --

8      A.    Yeah.

9      Q.    Go ahead.

10     A.    Yeah.

11     Q.    Go ahead.

12     A.    I think he was there, I think, most of

13  the time.

14     Q.    Did you observe Hispanics driving the

15  patrol car during that time period?

16     A.    I, uh, I -- you know, the patrol car,

17  the rover, you know, I would -- it would be out

18  on the tarmac, you know.  I would be inside

19  doing my job, so, I was not able to see who was

20  driving the rover.  It would be out all over

21  the airport, you know, patrolling the airport

22  where I would not be able to see who the driver

23  was.

24     Q.    Did you observe Afro-Americans at

25  Bravo 3?

```
 1                      S. TUCCIO
 2         A.    Yes.
 3         Q.    Same question.  Did you observe
 4    Hispanics at Bravo 3?
 5         A.    Uh, I do not know if they were
 6    Hispanic or not.
 7         Q.    Did you observe Afro-Americans at
 8    Alpha 3?
 9         A.    Yes.
10         Q.    Did you observe Caucasian employees at
11    Bravo 3, aside from yourself?
12         A.    Um, I can't say at this point.  I
13    don't remember.
14         Q.    Did you observe Caucasian employees at
15    Alpha 3?
16         A.    Uh, yes.
17         Q.    I don't know if I asked you this
18    question.  If I did, I apologize.
19               Afro-Americans at Alpha 3?
20         A.    Well, let me put it this way.
21         Q.    People of color.
22         A.    I --
23         Q.    People of color.
24         A.    I don't know if they were
25    Afro-American, but black skinned people.
```

```
 1                    S. TUCCIO
 2        Q.     People of color?
 3        A.     People with black skin.
 4        Q.     Did you observe -- I may have asked
 5   you this question -- any Hispanics at Alpha 3?
 6        A.     I don't know if anybody was Hispanic,
 7   I do not know.
 8               Now, let me just point out something
 9   that I -- you know, every single day I am not
10   able to see who was on these posts.
11        Q.     I understand.  Let me ask you this
12   question.  How did you get -- during this time
13   period, how did you get to work in the morning?
14        A.     Okay.  Um, I would take the Long
15   Island Railroad from Hicksville railroad
16   station --
17        Q.     Okay.
18        A.     -- to Jamaica and then from there
19   there is the air train that takes you to JFK
20   Airport.
21        Q.     When you walked to your post, your
22   initial post off of the bag room, when you
23   walked to the post, were you able to observe
24   every day these posts as you went past them?
25        A.     I was not able to observe them every
```

```
1                       S. TUCCIO

2         A.    Um --

3         Q.    Where is Delta 4?  I know it's at the

4    airport, but where is Delta 4?

5         A.    I believe that's inside, on the second

6    floor of the terminal of Terminal 4.

7         Q.    Did you see a white guard at Delta 4?

8         A.    Um, probably, probably.

9         Q.    Did you see a person of color guard at

10   Delta 4?

11        A.    Yes.

12        Q.    I'm going to put -- how about

13   Hispanic?  Did you see a Hispanic guard --

14        A.    I don't know if -- I don't know if

15   there were Hispanic people assigned there.

16        Q.    How about Delta -- how about Charlie

17   1?  Did you see a white guard at Charlie 1?

18        A.    Yes.

19        Q.    Did you see a person of color guard at

20   Charlie 1?

21        A.    Yes.

22        Q.    Did you see Hispanic at Charlie 1?

23        A.    I don't know if it was Hispanic, they

24   were Hispanic or not.

25        Q.    Okay.  Did you see a person of color
```

```
 1                    S. TUCCIO
 2    at Delta 1, guard?
 3         A.    Did -- repeat the question.
 4         Q.    I'll withdraw that.
 5               That was your assignment, correct?
 6         A.    Yes.
 7         Q.    Delta 1, Charlie 3 and Charlie 4,
 8    that's you?
 9         A.    Yeah.
10         Q.    Got it.  Okay.
11               You don't know the circumstances of
12    these other guards at these other posts
13    starting at Bravo 3 to Charlie 2 and 1 and
14    Delta 4, Romeo and Alpha 3, do you?
15         A.    What do you mean by circumstances?
16         Q.    Their assignments, why they've been
17    posted there.  You don't know that, do you?
18    You're basing your representation -- your
19    allegations on what you're observing?  You
20    don't know the circumstances, correct?
21         A.    Uh, well --
22         Q.    Yes or no, sir?
23         A.    I would say yes, I did know the
24    circumstances of some people.
25         Q.    But you don't know why they were
```

```
 1                       S. TUCCIO
 2    observed, right?
 3         A.    That's correct.
 4         Q.    There's nothing else, other than what
 5    you've observed, correct?
 6         A.    Uh, and also I went through the
 7    sign-in sheets yesterday and, um, I noticed on
 8    the sign-in sheets that there were two
 9    employees that I noticed that, um, were black
10    employees.
11         Q.    How do you know they were black?
12         A.    Oh, because I worked with them.
13         Q.    Which employees are you talking about?
14         A.    One of their names was Stevenson.  I
15    name him somewhere in the complaint.
16         Q.    We'll get there.
17         A.    And the other one was Jason something
18    or other.
19         Q.    Jason Parkinson?
20         A.    Parkinson, yes.
21         Q.    And you say he's a black employee?
22         A.    Yes, black skin, absolutely.
23         Q.    He's a person of color?
24         A.    Yes.
25         Q.    And where did you observe him posted?
```

S. TUCCIO

1

2     A.    Okay.  In the, um, all right.  In the

3  list that you gave me for Avianca Airlines --

4  well, I was assigned to the bag room, he would

5  be assigned to indoor posts all the time, and

6  the same thing with the other guy Stevenson.

7  They were not regular employees, they were

8  people who would come on there to get overtime

9  assignments and they would be -- they were

10  there lots of times.

11     Q.    Your job did not include the

12  assignments of other guards, did it?

13     A.    No.  You asked me if I observed

14  black -- people of color working --

15     Q.    And you had answered that question.

16     A.    That's my answer.

17     Q.    You answered that --

18     A.    Yes.

19     Q.    -- question.

20           But you don't know the circumstances

21  of the assignment of Mr. Parkinson or, I guess,

22  Stevenson?  I think I know who you mean.  You

23  don't know what the -- you don't know why they

24  were posted where they were posted, do you?

25     A.    Um, no.

```
 1                    S. TUCCIO

 2        Q.    You're not inside personnel -- inside

 3   the personnel department making the

 4   assignments, so you don't know, correct?  It's

 5   not part of your job duties?

 6        A.    That's -- that's true.

 7        Q.    Okay.  Let's move on a little bit.

 8              In the bag room, after August --

 9        A.    Now wait.  Let me just go back and

10   answer that question a little fully.

11              You said I don't know, but I did

12   mention, as I said in my complaint, many times

13   to Alberto Cabanilla.  I asked him to put me on

14   an indoor assignment and he would say, "I can't

15   do it.  My hands are tied.  You've been

16   assigned by the personnel department to the bag

17   room.  I can't take you out."

18        Q.    The bag room's inside, in the cargo

19   building?

20        A.    Yeah.

21        Q.    Okay.

22        A.    The other supervisors at, um, Terminal

23   4, I also asked them, you know, you're always

24   putting me out in traffic day after day,

25   outside.  I'm always in Charlie 3 or Charlie 4.
```

```
 1                    S. TUCCIO

 2  class?

 3      A.    That's the training class that was

 4  given by, um, the instructor.

 5      Q.    Well, let me try it this way.  What

 6  did they train you -- what was the training

 7  for?

 8      A.    This was a training that -- that was

 9  on, uh, being an airport agent, given by Efrain

10  D. Santiago, Efrain D.  Santiago.  It was a

11  training class in Building 75 for five days and

12  it was --

13      Q.    Let me ask you a question so he could

14  get it into the record.

15            This was a training class for being an

16  agent at the airport, is what you said?

17      A.    An airport agent.

18      Q.    Go ahead, go ahead.

19      A.    Given by Efrain D. Santiago, at the

20  Building 75.  There's a classroom right next to

21  Room 225 and it's big enough for about 30

22  employees.  It's got desks and chairs and

23  Mr. Santiago was at the blackboard at the front

24  of the building.  And also, Mr. Avery was in

25  another class I took inside Room 228.  There's
```

S. TUCCIO

1

2      a small training class.  If you remember, I

3      sent you a map of the office and right behind

4      the dispatchers --

5          Q.    Well, we talked about the location.

6          A.    Okay.  Yeah.  Okay.  There was a

7      training class for driving a vehicle on the

8      tarmac and that results in a lettering on your

9      badge that says DV1, which means you are

10     authorized to drive a vehicle on the tarmac,

11     and then there's also -- it says EV, which

12     means you're authorized to escort up to two

13     vehicles on the tarmac.  That's on my badge.

14         Q.    Mr. Tuccio, just so we can get a

15     clarification, this is in Defendant's Exhibit

16     B --

17         A.    Yes.

18         Q.    -- from your personnel file?

19         A.    Yes.

20         Q.    Just for purposes of clarification,

21     that exhibit doesn't -- Exhibit 2 is not part

22     of this personnel file, that's just a reference

23     to something else --

24         A.    Yes.

25         Q.    -- that I've already given you.  This

```
 1                    S. TUCCIO
 2    is Bates No. -- I can't make it out.  It looks
 3    like 66, I think.
 4         A.    Yeah.
 5         Q.    Because it got obliterated.  It looks
 6    like a certificate of attendance --
 7         A.    Yes.
 8         Q.    -- by The Port Authority of New York
 9    and New Jersey.
10         A.    Yes.
11         Q.    Is that for you?  It's got your name
12    on it?
13         A.    Yes.
14         Q.    Is that the class that you're
15    referencing?
16         A.    Well, I'm referencing, you know, the
17    class that was given by Mr. Efrain D. Santiago
18    and this other class.  Mr. Avery was in that
19    also.
20         Q.    Well --
21         A.    In other words, he was in the same
22    class as I was in during the month of May of
23    2009.  In other words, they hire a group of 25
24    employees and they train us at the same time.
25    We all go through the same training --
```

```
 1                        S. TUCCIO
 2        Q.    Okay.
 3        A.    -- for four weeks.
 4        Q.    There are a couple of certificates in
 5   your personnel --
 6        A.    Yes.
 7        Q.    There's this one which is referenced
 8   as a security identification display area
 9   training --
10        A.    Yes.
11        Q.    -- which I've been told at times is
12   referred to as SIDA training, and it's run by
13   The Port Authority?
14        A.    Yes.
15        Q.    Did you attend that?
16        A.    Yes.
17        Q.    Okay.  Is that the training that
18   you're referencing -- there may be others, but
19   is that the training class you're referencing?
20        A.    Um, well, the class would be the
21   group -- the whole group of people who went
22   through this training over a three, four-week
23   period.  I'm talking about that -- the group of
24   us.  We all did the same thing, that class.
25        Q.    Well, there's another certificate.
```

1                    S. TUCCIO

2        A.    Okay.

3        Q.    Hold on.

4        A.    So, it's really -- we went to several

5    classes, but I mean, the group of 25 employees

6    who went through the training in May of 2009,

7    I'm talking about that.  We were altogether,

8    that class.  We were all told at the end of the

9    training, at the end of May, we would, you

10   know, then be given different assignments.

11       Q.    Okay.

12       A.    But we were all -- we were all, like,

13   hired at about the same time and we all went

14   together through the same classes for three or

15   four weeks.

16       Q.    Okay.

17       A.    That's what I meant by "class."

18       Q.    Let's go off for a minute.

19             (Whereupon, a discussion was held off

20         the record.)

21       Q.    So, Defendant's Exhibit B, Bates No.

22   D00026, do you recognize that document?

23       A.    Yes.

24       Q.    And that's a security guard training

25   certificate issued to you?

1                         S. TUCCIO

2          A.     Uh, annually I get one every year,

3     yes.

4          Q.     And that's for your security guard

5     license?

6          A.     That's correct.

7          Q.     Okay.  So, you had that as a

8     qualification of the job at FJC before you

9     walked in the door?

10         A.     Yes.

11         Q.     Okay.  Then this is D00027.  This is a

12    security guard training certificate, 16 hours.

13    Do you recognize that?

14         A.     Yes.

15         Q.     And that's issued to you, right?

16         A.     Yes.

17         Q.     And what is that?

18         A.     Well, in order to work as a security

19    guard you have to have a, uh, 16-hour training

20    course initially, and then every year you are

21    required to undergo an annual eight-hour

22    training.

23         Q.     So, that's part of your licensing,

24    regardless of where you work, right?

25         A.     That's correct.

1                    S. TUCCIO

2        Q.    And then the certificate of attendance

3   that I referred to as the SIDA training --

4        A.    Yes.

5        Q.    -- that's a four-hour course, correct?

6   That's issued to you, right?

7        A.    Yeah.  I don't know if it's four

8   hours, but yeah.

9        Q.    Well, how long were you in the room

10  with The Port Authority?

11       A.    It was probably about four hours.

12       Q.    Four, okay.

13             And you said there's a training that

14  FJC provided to you?

15       A.    Uh, yes.  Five days of training, I

16  believe.

17       Q.    Was it before the -- before this

18  training that's the SIDA training?

19       A.    No, I believe it was afterward.  I

20  believe it's the third week of, um, May I wrote

21  the dates of that.  See, I started working on

22  the 26th and I believe it was on the Friday

23  before that.  It was on a Friday and then we

24  came back, Monday, Tuesday, Wednesday.

25       Q.    And that's guard training that FJC

S. TUCCIO

1

2      provided to you?

3          A.    Yeah, yeah.

4          Q.    So, the training class that you're

5      referencing with Justin Avery, is that training

6      class?

7          A.    Well, yes.  And then on, I believe,

8      the Thursday before I started working I was

9      trained at, um, Delta Airlines, on the use of,

10     um, equipment that would be able to detect, um,

11     different kinds of, uh, bomb residues, you

12     know, such as TNT and other chemicals.

13         Q.    Thursday before --

14         A.    It's called the cargo -- cargo

15     screening, where they screen some of the

16     luggage to see if the -- there -- there might

17     be any residues from, uh, some kind of a bomb

18     in it.  So, that was on the Thursday before

19     that and Mr. Avery -- the group of us, in the

20     group of -- I think it's 25 or 30 people, we

21     all underwent the same training.

22         Q.    So, the Thursday before May 26th, '09,

23     that was --

24         A.    Yes.

25         Q.    -- bomb detection?

S. TUCCIO

1

2    A.    I believe that was a Thursday.

3    Q.    And the third week before May 26th or

4  thereabouts?

5    A.    Yeah.

6    Q.    You said the third week of May, Friday

7  before that, was the five-day training with

8  FJC?

9    A.    Yes.

10    Q.    And that's the training course that

11  you're referencing with Justin Avery?

12    A.    Yes.

13    Q.    And that's the training course that

14  you're referencing to Efrain Santiago?

15    A.    Yes.  It may have been four days.  I

16  think it started on a Friday.  It was Monday,

17  Tuesday, Wednesday, so, maybe it was four days

18  rather than five days, and on Thursday was the

19  training on the, uh, cargo, uh, screening

20  training, and that's an all-day course.  And

21  Mr. Efrain Santiago was in attendance on the

22  Thursday.  He sat in the back of the room and

23  then he helped administer the test at the end

24  of the day.  He handed out the sheets and

25  collected the tests and he was the one who

```
 1                      S. TUCCIO
 2    graded them.
 3          Q.    How do you know that?
 4          A.    Oh.  Well, I -- he -- well, he told --
 5    he told us he was grading them.  The other man
 6    taught the course, but he was in charge of the
 7    testing and grading.
 8          Q.    Is Mr. Santiago's of a Hispanic
 9    descent?
10          A.    I believe so.
11          Q.    What grade did you get?
12          A.    I do not -- you're talking about
13    the --
14          Q.    Mr. Santiago's graded test.
15          A.    Which one?
16          Q.    The four-day training from FJC.
17          A.    I believe the grades -- I -- I would
18    have to guess.  It was probably about --
19          Q.    Were you given -- let's back up a
20    minute.
21          A.    They --
22          Q.    Were you given a grade?
23          A.    He did tell us what the score was
24    after he graded it and I -- you know, I believe
25    it was about 93.
```

S. TUCCIO

1

2    Q.    So, if I understand your testimony

3    correctly, you had the guard certificate which

4    you had for your licensing?

5    A.    Yes.  It was 93, uh, guard -- fire

6    guard certification.

7    Q.    Wait a minute.  The fire -- there

8    wasn't a question.  Let me -- let's not get

9    this confused.

10   A.    Okay.

11   Q.    Let's back up for a minute.

12   A.    Okay.  Sorry.

13   Q.    I'll get to the fire guard

14   certification in a minute.

15   A.    Okay.

16   Q.    So, there was guard certification

17   which --

18   A.    Right.

19   Q.    Let me finish.  -- guard certification

20   which you do for your licensing, correct?

21   A.    Yes.

22   Q.    That's the certificate that I showed

23   you that was D25 or whatever that was.  That

24   was the --

25   A.    Eight-hour and 16-hour course.

S. TUCCIO

1

2      Q.    The eight-hour and 16-hour courses?

3      A.    Yes.

4      Q.    Then there's the four-day course that

5   was conducted by Efrain Santiago --

6      A.    Yes.

7      Q.    -- who administered the test and told

8   everybody they were -- he was administering the

9   test, correct?  I mean, he was going to score

10  the test?

11     A.    Well -- okay.  He tested us on the

12  four-day course, and then on Thursday we came

13  back for cargo screening, we were given another

14  test.

15     Q.    Right.

16     A.    And that I do not know what the score

17  I got was.

18     Q.    Okay.

19     A.    He -- at the end of the day, you know,

20  at 5 o'clock he just, uh, wanted to go home and

21  he did not grade them.

22     Q.    And then you had the SIDA training,

23  which I mentioned to you --

24     A.    Yeah.

25     Q.    -- from The Port Authority?

```
 1                         S. TUCCIO

 2               If I understand your testimony, it

 3     wasn't concurrent with the four-day training

 4     at --

 5         A.    No.

 6         Q.    -- FJC?

 7         A.    No, it wasn't.  It was on a different

 8     day.

 9         Q.    And then you were trained on driving a

10     vehicle?

11         A.    Yes.

12         Q.    And you were trained on escorting?

13         A.    Yeah, um, well, yeah, that's part of

14     driving the vehicle, yes.

15         Q.    Well, you mentioned the DV --

16         A.    Yeah, DV --

17         Q.    -- on the --

18         A.    Yeah.  And that could be EV.

19               Now, I don't have -- I did not have

20     EP.  EP means you can escort up to five people,

21     but that was not on my badge.  I think the, uh,

22     policemen -- Port Authority policemen have EP

23     on their bandages, but that was not on my

24     badge.

25         Q.    Okay.  So, that's all the training you
```

1                    S. TUCCIO

2   received, correct?

3       A.    I think there was more, uh, let me

4   see.

5       Q.    Well, that was all the -- ·

6       A.    I think there was one more class.

7   There was one more class given, uh, by, uh,

8   somebody at the airport.  There was a Port

9   Authority training.  And there was another

10  class given by, I think, something like JFK

11  Airport or some part of JFK, but there was

12  another day's training.  It was a half a day, I

13  believe.

14      Q.    Well, isn't The Port Authority

15  training, half day, just the SIDA training?

16      A.    Yeah, but I believe there was another

17  one too.  I believe there was another

18  certificate somewhere.  I'm pretty sure I did

19  get another one.

20      Q.    I'm pretty sure there's only three in

21  there, so . . .

22      A.    Okay.  Well, if you want, when I get

23  home, I could provided you with it, with the

24  other one.

25      Q.    Okay.

1                      S. TUCCIO

2        A.    I have -- probably, if you looked --

3    well, let me see.  I looked through my personal

4    records.  I believe I have the -- the other

5    one.  I'm surprised it's not in the . . .

6        Q.    Well, I might already have it and I'm

7    just misremembering it.

8        A.    See, there would be two other -- yeah,

9    two other certificates --

10       Q.    From The Port Authority?

11       A.    -- like that.

12             I don't think they came -- I don't --

13   one came from The Port Authority.  I think

14   another one came from somebody else at the

15   airport.  But I'm pretty sure there are three,

16   three different -- three ones that look like

17   this, you know, almost like a diploma that

18   you're handed.

19       Q.    Does it have the word "Port Authority"

20   on it?

21       A.    Um, I don't -- I don't think the other

22   ones have the words Port Authority on it, but

23   it does say that I completed the training

24   class.  There's my name, the date and I think

25   somebody signed them.

1                    S. TUCCIO

2    International Union and that they would be

3    taking out fees.  They took out fees.  There

4    was an initial fee for membership.  I think it

5    was $40.  And I believe $40 a month was taken

6    out of my paycheck.

7         Q.    Let's go off the record for a moment.

8              (Whereupon, a discussion was held off

9         the record.)

10        Q.    Let me show on Defendant's Exhibit B,

11   Bates No. D444419.  You checked marked here

12   that you received the -- I can't do it upside

13   down.  The FJC sexual harassment,

14   anti-discrimination form that you signed, do

15   you recall doing that?

16        A.    Yes.

17        Q.    And I believe you also got the terms

18   and conditions of employment.  Do you recall

19   signing a document that said that as well?

20        A.    Um, yes.

21        Q.    In fact, that was an exhibit to a

22   letter that I submitted, that you get a copy of

23   yesterday in response to your objection for

24   De Novo review to Judge Bianco as one of the

25   exhibits.  Do you remember seeing that

1                    S. TUCCIO

2    yesterday?

3        A.    Yes.

4        Q.    It was called terms and conditions of

5    employment.

6        A.    Yup.

7        Q.    And that was your signature at the

8    bottom of that?

9        A.    Yes.

10       Q.    Mr. Tuccio, I'm going to show you

11   what's been marked as Defendant's Exhibit B.

12   It's Bates No. D as in David 000051.  Do you

13   recognize that document?  It's entitled, for

14   purposes of the record, FJC Security Services

15   Employee Statement.

16       A.    Well, let me read it just to make sure

17   that's it entered into the deposition.

18       Q.    No, it doesn't need to be entered.

19   Just read it to yourself.  I don't want to

20   burden the record.  The transcript's expensive

21   enough.

22       A.    Okay.  You have highlighted --

23       Q.    It was highlighted --

24       A.    -- to extreme weather conditions for

25   an entire shift.

1                         S. TUCCIO

2         Q.    Right.

3         A.    That's what you have highlighted.

4         Q.    Yes.   That's not part of the document.

5    That's something my paralegal did.

6         A.    Okay.

7         Q.    So, disregard the highlighting.

8         A.    But that's what it says in it.

9         Q.    Is that your signature at the bottom

10   of there?

11        A.    Yes.

12        Q.    So, you read, understood and signed

13   that document at that time?

14        A.    Yes.

15        Q.    Okay.   I show you under Defendant's

16   Exhibit Bates No. D000066, entitled FJC

17   Security Services Inc. Aviation, open quote, No

18   Restrictions, close quote, Form.   Could you

19   please take a look at that?

20             MR. WEISS:   Let the record reflect

21         that the witness is reviewing that

22         document.

23        A.    Okay.   I just want to comment that --

24        Q.    Do you recognize that -- I'll let you

25   respond, but do you recognize the document?

```
 1                      S. TUCCIO

 2      A.      Yes.

 3      Q.      Did you read and understand the

 4   document?

 5      A.      Yes.

 6      Q.      And is that your signature at the

 7   bottom?

 8      A.      Yes.  It asks me what requirements or

 9   restriction that I have to put them in the

10   place below and I put down I want to get Sunday

11   off and Saturday off, if possible.

12      Q.      Okay.  Well, it's in the document,

13   right?

14      A.      Yes.

15      Q.      Okay.  Okay.

16      A.      Now, it also gives me a chance below

17   that if there are no restrictions to your days

18   off, shift for hours, I could put down I have

19   no restrictions in the space below, which I did

20   not do.

21      Q.      Okay.  That's in the document.  The

22   document speaks for itself.  Let's talk about

23   these two individuals.

24              This morning, Mr. Tuccio, you handed

25   me a letter referencing --
```

1                        S. TUCCIO

2            MR. WEISS:  Why don't we do this:

3        Let's mark this as an exhibit for him.

4            (Whereupon, Defendant's Exhibit C,

5        letter, was marked for identification as

6        of this date by the reporter.)

7       Q.    It is now 12:05.  We've been going

8    from approximately 10:12, 10:15.  I suspect the

9    court reporter's going to want lunch, I suspect

10   we're going to want a little something to eat

11   as well.  Do you want me to go another hour?

12   Would you like to go for another hour, another

13   half hour --

14       A.    Another hour.  1 o'clock would be

15   good.

16       Q.    You're okay with -- until 1 o'clock?

17       A.    (Witness nodding.)

18            MR. WEISS:  Off the record.

19            (Whereupon, a discussion was held off

20        the record.)

21       Q.    This morning, Mr. Tuccio, you handed

22   me what purports to be a letter addressed to

23   me, which I've marked as Defendant's Exhibit C.

24       A.    Yes.

25       Q.    Disregard -- I marked it with my pen.

```
 1                    S. TUCCIO
 2    That was inadvertent.  But is that the letter
 3    that you provided to me today?
 4         A.    Yes.
 5         Q.    Let's talk about Ms. Sonnia,
 6    S-o-n-n-i-a, Alvarado --
 7         A.    Yes.
 8         Q.    Let me finish the name.  --
 9    A-l-v-a-r-d-o.
10         A.    Yes.
11         Q.    You reference her as a black woman,
12    name unknown, who regularly worked as an FJC
13    security guard on the morning, 4 a.m., hyphen,
14    8 a.m. or 5 a.m., hyphen, 9 a.m., at --
15         A.    Yes.
16         Q.    -- Avianca Airlines in Terminal 4 from
17    about August 11, 2009 to January 20, 2009.
18    First of all, let me ask you:  Is this an
19    individual that worked along side your shift
20    during that time?
21         A.    Okay.  Let me just go down to the
22    name.  Um, sometimes on the sign-in sheet she
23    signed her name S-o-n-i-a, but most of the time
24    it was spelled like this (indicating).  My word
25    processor tells me Sonia is usually spelled
```

```
1                        S. TUCCIO
2    Avianca Airlines, that's all.
3         Q.    Oh, never mind.  That was -- that was
4    Gloria Noel.  Never mind.
5         A.    Yes.
6         Q.    Okay.
7         A.    And according to your sign-in sheets,
8    she was there regularly, you know, day after
9    day after day, and she was not one of the
10   regulars that I named in my complaint.
11        Q.    So, you don't know if she's Hispanic
12   or a person of color?
13        A.    I don't know.  Well, a black person --
14   I mean, she had black skin, that's all, okay?
15   She's a tall black woman who worked there every
16   day regularly and she worked on the inside
17   assignments all the time.
18        Q.    I think the politically correct
19   statement for Hispanic is Hispanic -- of
20   Hispanic descent, but it's --
21        A.    I do not know, okay?  I just . . .
22        Q.    Ms. Gloria Noel --
23        A.    Yes.
24        Q.    -- you never met Gloria Noel or --
25   strike that.
```

1                    S. TUCCIO

2        A.    Yes.

3        Q.    Okay.  You list a Mr. John Abraham?

4        A.    Yes.

5        Q.    First of all, is he a person of color?

6        A.    John Abraham?

7        Q.    Yes.

8        A.    No.

9        Q.    He's a Caucasian man?

10       A.    Yes.

11       Q.    And what is it do you believe he

12  knows?

13       A.    Um, John Abraham was one of the, uh,

14  supervisors at Terminal 4 in June of 2009 and

15  I -- he was terminated during, I think, July of

16  2009, and I believe that he was terminated

17  because --

18       Q.    Were you involved in the termination?

19       A.    No.

20       Q.    Are you giving me a supposition?

21       A.    I'm just giving you --

22       Q.    I don't want to know what you believe.

23  What you believe is not really of relevance to

24  Mr. Abraham or this case.  I just want to know

25  what, if anything -- why do you list him as

```
1                    S. TUCCIO

2    being discriminated against by Alberto

3    Cabanilla, and the thing is, they have in their

4    handbook, the employee handbook that they give

5    us, and they tell us that if you want to make a

6    complaint, you were supposed to do it step by

7    step.  You go to your immediate supervisor and

8    make a complaint, and if he does not

9    satisfactory take care of your complaint, the

10   next thing you do is you go to the supervisor

11   of the building.  In this case it was

12   Building -- Terminal 4.  And then, if you

13   weren't satisfied, the next step is, you would

14   go to the general manager, Mr. James Donohue,

15   and bring the complaint to him, or at the same

16   time you could also during this period, uh, go

17   right to the union rep and talk to Mr., uh, I

18   believe it's Al Dooley.

19       Q.    The --

20       A.    Those are the procedures.

21       Q.    Okay.  Let's focus on Mr. Abraham for

22   a minute.

23       A.    Now, if you do not go through the

24   procedures, if you try to jump ahead and go to

25   headquarters, you will be terminated for that.
```

```
 1                    S. TUCCIO

 2        Q.    Did you make a complaint to

 3   Mr. Abraham?

 4        A.    Well, I complained to him that, you

 5   know, I was wondering why I was always put on

 6   traffic and other people who had just been new

 7   hires were being put on a nice indoor

 8   assignment and, uh, I thought there was -- that

 9   I would be moving out of the traffic into

10   indoors and that these new employees would be

11   put on traffic and I didn't feel it was very

12   fair and I had been patient, you know?  I

13   worked there all of June and it was July and --

14        Q.    And was --

15        A.    You know --

16        Q.    Go ahead.

17        A.    -- I felt that, you know, I wanted --

18   I wanted to move in an indoor assignment

19   because traffic is very, very hard.  You're out

20   there in front of the building.  Sometimes it's

21   raining, it's very cold, you, uh, have to

22   interface with these, uh, people that have to

23   move their car and some of them will answer you

24   back, give you a lot of argument and you have

25   to blow the whistle and, you know, do you see
```

```
1                      S. TUCCIO
2    the way I talk?
3         Q.    I understand.
4         A.    I had to holler at the top of my lungs
5    sometimes to get people to move their car, to
6    ask the taxi drivers -- tell them, you've been
7    there too long.  You have to move it, otherwise
8    we will have it towed.
9         Q.    Did Mr. Abraham give you assignments?
10        A.    He gave assignments, yes.
11        Q.    Did he give you assignments to
12   traffic?
13        A.    Yes.
14        Q.    And he's a white man?
15        A.    Yes.
16        Q.    Okay.  Let's go on to the next one.
17        A.    But I felt that the reason why it was
18   explained to me that if you go -- if you do not
19   go through the step-by-step procedure, going to
20   one supervisor and then the next step to the
21   next higher one and the next step the next
22   higher one, if you try to jump ahead and go
23   right to the top, I mean go to headquarters,
24   you could get fired for that, and allegedly he
25   was fired for doing that.
```

1                    S. TUCCIO

2        Q.    You don't know that?

3        A.    Well, no.  But that's what I was told,

4    okay?

5        Q.    That's what you were told?

6        A.    Yes.

7        Q.    Who told you?

8        A.    Well, all the employees were talking

9    about it.  He was -- that he --

10       Q.    What employees?

11       A.    The other employees that I worked

12   with.

13       Q.    What other employees?

14       A.    The -- I don't --

15       Q.    Are you telling me work-place gossip,

16   Mr. Tuccio?

17       A.    That was -- that was what the

18   employees said.

19       Q.    Okay.

20       A.    So -- okay?  So, that was just -- you

21   know, it's a dangerous consequence to go to

22   headquarters and make a complaint.  You have to

23   do things step by step, the way the employee

24   handbook tells you to do it.

25       Q.    You say you complained to Mr. Abraham?

                          S. TUCCIO

1

2        A.     Yes.

3        Q.     Did you complain to the building

4    supervisor?

5        A.     No.

6        Q.     Did you complain to the general

7    manager, Mr. Donohue?

8        A.     About -- no.

9        Q.     Let's go --

10       A.     I did go to the union rep and I

11   telephoned him in July and -- I mean, I

12   telephoned the union rep who then said, uh,

13   Mr. Dooley said, "Oh, gee, I'll get back to

14   you.  I'll call you back."  And then I never

15   got a call back and I kept calling back his

16   office, the secretary, and I'd say, "I want to

17   talk to Mr. Dooley.  He said he was going to

18   get back to me."  She said, "Well, he's out in

19   the field; he's out in Jersey; he's out in" --

20   "he's sick today; he took a personal day off."

21   They would always make an excuse and he'd never

22   get back to me.

23       Q.     That's the union.  I can't control the

24   union.

25       A.     Okay.

```
 1                        S. TUCCIO
 2    airport, you know, with -- I saw him sometimes
 3    working at the airport.
 4         Q.    Outside or inside?
 5         A.    Um, he was working inside.
 6         Q.    Okay.  Let's go on to -- we talked
 7    about Justin Avery, we talked about -- that may
 8    be a different name.  Salem Aziz -- I'll come
 9    back to Justin Avery -- is he a person of
10    color?
11         A.    Salem Aziz I guess is black skinned,
12    if that's what you mean.
13         Q.    And what does he know about you?
14         A.    Well, he worked in the rover, I guess.
15    I -- you know, he always worked in the rover.
16         Q.    The rover being the car?
17         A.    The car that -- yeah.
18         Q.    So, he drove around the airport?
19         A.    Yes.
20         Q.    Outside on the tarmac?
21         A.    That's correct.
22         Q.    In the cold, in the elements, right?
23         A.    Well, what do you mean?  The car --
24    the windows are closed, it's air conditioned in
25    the summer and it's heated in the winter.  No,
```

```
1                    S. TUCCIO
2       Q.    So, when she wasn't with the bag room
3   with you, she was in other places inside?
4       A.    That's correct.
5       Q.    And I think I spelled Ingrid's name.
6   Let's pass by Cabanilla and Caraballo and I
7   know about James Donohue.  Let's talk about
8   Ruby Hooker.
9            MR. WEISS:  R-u-b-y and Hooker is
10          just the way it sounds.
11      Q.    How did she know about you?
12      A.    Ruby Hooker is a regular who worked
13  every day, Monday through Friday, at Avianca
14  Airlines, from August -- when I started,
15  August 11th, when I started at Avianca
16  Airlines, through January 20th.
17      Q.    So, she was --
18      A.    -- a regular.
19      Q.    -- a regular?  Okay.
20      A.    A regular employee who was employed
21  there every day.  And she is, again, a woman
22  who had black skin and worked always an indoor
23  assignment and she always, um, she always, I
24  guess, looked down on me like I was some kind
25  of an inferior person.
```

1                         S. TUCCIO

2        Q.    Okay.  Well, we're not going to talk

3   about that, okay?

4              Do you speak any other languages, sir?

5        A.    No.

6        Q.    You're not bilingual in any way?

7        A.    No.

8        Q.    Did you ever observe Ms. Hooker

9   outside, maybe on the tarmac?

10       A.    Never, never.  Always in the inside.

11       Q.    In the bag room?

12       A.    No.  Always inside.

13       Q.    Where?

14       A.    Usually on the jet bridge.

15       Q.    Muhamed Khan, you spell it

16   M-u-h-a-m-e-d K-h-a-n?

17       A.    Right.  Yeah, I believe that spelling

18   is incorrect.

19       Q.    Probably.  But let me just ask you:

20   You said that Ms. Hooker was a person of color?

21       A.    She was a black skinned woman.

22       Q.    Now we're up to Mr. Khan.  Is he a

23   person of color?

24       A.    He has black skin.

25       Q.    And what does he know about you or

```
 1                      S. TUCCIO
 2   2009, he did not have seniority over me.
 3        Q.    Cecil Santiago -- oh, wait a minute.
 4   That's probably Efrain Santiago, right?
 5        A.    Efrain, that's correct.  I put down
 6   not sure of first name.
 7        Q.    Cecil now equals Efrain?
 8        A.    Efrain D. Santiago, yes.
 9        Q.    Okay.
10        A.    Instructor.
11        Q.    Who's Kevin Stevenson?
12        A.    Kevin Stevenson --
13        Q.    How does he know about you?
14        A.    You didn't ask me.  All right.  Okay.
15   He was in my class of May 2009.  He took all
16   the training classes that I did.
17        Q.    That's why you identified him?
18        A.    Yes.
19        Q.    Is he a person of color?
20        A.    Yes.
21        Q.    And why is -- so, what?
22        A.    Okay.  Well, all right.  I saw him.
23   He would be assigned for a day or two.  He had
24   a regular 40-hour-a-week job some place and I
25   would be -- I would see him when he would be
```

S. TUCCIO

2  employees who were Caucasian and worked

3  overtime?

4      A.    There -- there were some.  That's --

5  yes.

6      Q.    Both inside and outside posts?

7      A.    Yes.

8      Q.    And that was during the entire time

9  that you were there, from when you were first

10  posted until you were terminated in

11  January 2010, right?

12      A.    Um, well, there were very few

13  Caucasian people, uh, there weren't --

14      Q.    My question is:  You observed

15  Caucasian officers working both inside and

16  outside on temporary overtime assignments?  You

17  said there were some?

18      A.    There were some, yes.  Most -- most of

19  them were black skinned.

20      Q.    The overtime?

21      A.    Yes.

22      Q.    I'm just trying to find a breaking

23  point because it's coming up to 1 o'clock.

24          Mr. Tuccio, JC is the personnel member

25  that you reference?

```
1                    S. TUCCIO
2   talk about Sunje and then we'll take a break.
3   What -- first of all, do you know who Sunje,
4   S-u-n-j-e, is?
5        A.    Okay.  I believe his name should have
6   been spelled S-u-n-j-a-y, first name.
7        Q.    Okay.  Is he a person of color?
8        A.    Yes.  Or a black skinned person, yes.
9        Q.    How does he know you?  What's relevant
10  to you in regards to him?
11       A.    Oh.  Well, I believe he would drive
12  the, uh, rover.
13       Q.    He drove the rover?
14       A.    Yeah.
15       Q.    When was he driving the rover?
16       A.    I saw him sometime -- I don't know the
17  exact dates.
18       Q.    So, you don't know the circumstances
19  of his assignment, you're just observing?
20       A.    That's correct.
21       Q.    Okay.  That's a good place to take a
22  breaking point.  That's why I wanted to do it
23  that way.  We'll come back to it.  What do you
24  say we reconvene at 1:45?  Is that good?
25       A.    (Witness nodding.)
```

1                    S. TUCCIO

2       Q.    It is now going on about 1 o'clock.

3             (Whereupon, a recess was taken at

4         12:57 p.m. and the testimony resumed at

5         1:40 p.m.)

6       Q.    I just remind you, you're still under

7    oath.  You have to say it audibly.

8       A.    Yes.

9       Q.    Thank you.

10            Let's talk about the training -- let's

11   talk about Justin Avery and the training course

12   and Lowel Caraballo.

13            It's my understanding that you allege

14   that whoever scored -- that Caucasian employees

15   were scored higher in that training course that

16   we discussed, that you testified to?

17      A.    Well, they -- we did well.

18      Q.    They did well and then they were

19   given -- you say that they were -- you allege

20   that they were given lesser assignments?

21      A.    I don't allege.  They were given.

22   Both -- all three of us, Justin Avery, Lowel

23   Caraballo and myself, all were assigned to the

24   nightshift, that is 11 p.m. to 7 a.m., at

25   Terminal 4, doing traffic outside.  You know,

```
 1                    S. TUCCIO
 2        A.    I don't remember the name of the guy.
 3   And he was kind of gloating over the fact that
 4   I got stuck in traffic while he, uh, was
 5   working over there.
 6        Q.    Was he Caucasian?
 7        A.    Um, no.
 8        Q.    A person of color?
 9        A.    Yes.
10        Q.    But you don't know his name?
11        A.    (Witness nodding.)
12        Q.    There's nothing that would jog your
13   memory?
14        A.    No.
15        Q.    And you don't know the circumstances
16   of his assignment?  You just know what he said
17   to you?
18        A.    Um, yes.  But these three people that
19   I named, you know, um, Justin Avery got high
20   scores.  I mean, he got perfect scores.
21        Q.    And Justin Avery is Caucasian?
22        A.    Yes.
23        Q.    And Lowel Caraballo is Caucasian?
24        A.    Yes.  And he was -- he was assigned
25   to, um, you know, the traffic over and over
```

1                    S. TUCCIO

2    you know, some of the people in my class did

3    end up in other buildings in other jobs, you

4    know, and I was kind of wondering how -- how

5    would some of them end up being, um, you know,

6    cargo scanning, doing cargo scanning in an air

7    conditioned building like Building 20, while --

8    uh, on the dayshift, while I would get stuck,

9    uh, you know, working the graveyard shift --

10        Q.    So --

11        A.    -- doing traffic, which is really the

12   most -- the hardest job and the most

13   undesirable job of all the security guard jobs.

14        Q.    So, you're just drawing a supposition

15   of what you observed, right?

16        A.    Well, I'm just saying this is what

17   happened to the three of us, you know, and

18   that's why I'd like to find out after these two

19   people went on -- left -- finished with

20   Terminal 4, where they went on from there.

21        Q.    You're saying traffic is an

22   undesirable job?

23        A.    Absolutely.

24        Q.    But you're only basing the connection

25   to the scores?  And I'm referencing the

```
 1                    S. TUCCIO
 2    our, um, F93 fire guard license together and
 3    then we were all told to go to Building 14 to
 4    pick up our badge and our photos there.  We did
 5    everything together.  So, that would be sort of
 6    like the class of May 2009.
 7         Q.    I get you.  But what I'm trying to
 8    make sure I understand is this:  The course to
 9    which you refer, that you and Mr. Avery and
10    Mr. Caraballo got these allegedly high scores,
11    is the course that Efrain Santiago scored the
12    test, that FJC Security gave to the applicants,
13    the one that you mentioned, for four days,
14    that's -- that's the one, right?
15         A.    Well, it was that course, plus the
16    one-day course when we took to drive on the
17    tarmac.  You know, Justin Avery and I were in
18    the same -- we were in the same course.  There
19    were three people who trained for that and on
20    the other course that was for the bomb detector
21    on Thursday.  Now, I did not train at the same
22    time that Lowel Avery trained.
23         Q.    Okay.
24         A.    So, I don't know what scores he got.
25         Q.    You just confused me.  You don't know
```

Case 2:12-cv-05506-JFB-GRB  Document 51-4  Filed 01/24/14  Page 202 of 263 PageID #: 920

```
  1                         S. TUCCIO

  2        A.     All right.  I had to go to Room 228 in

  3   Building 75.

  4        Q.     How did you know that?

  5        A.     I was telephoned by JC at my home.

  6        Q.     Do you know when that happened?

  7        A.     Um, it -- May 21st -- let's see.  It

  8   says May 21st.  He may have called me up on

  9   that date.  I don't remember the exact date,

 10   but he may have called me on that date.

 11        Q.     And then you went to the airport and

 12   to this building.  What building?

 13        A.     Yes, this -- well, this Building 75,

 14   Room 228.  And he -- he gave me this sheet.

 15   And I believe this was given to me after the

 16   class -- I think this is about the time that

 17   the classes were completed.  It says May 21st.

 18   May 21st may have been -- I think it might have

 19   been a Thursday or a -- I think it's a Friday.

 20   Yeah, I think it's a Friday, after the classes

 21   were finished.

 22        Q.     And you went to this building.  Who

 23   did you go to see?

 24        A.     I went to see JC, JC himself.

 25        Q.     And what did he say to you and what
```

```
 1                        S. TUCCIO
 2    did you say to him?
 3         A.    Oh, I don't remember the discussion.
 4         Q.    Anything that would refresh your
 5    recollection?
 6         A.    Excuse me?
 7         Q.    Anything that would refresh your
 8    recollection?
 9         A.    No.
10         Q.    No?
11         A.    I don't think so.
12         Q.    And what did he do?  Did he give you
13    something?
14         A.    Well, he -- he -- he gave me this.
15         Q.    And did you read through it?
16         A.    Um, yeah.
17         Q.    Did you ask any questions?
18         A.    No.
19         Q.    Did you see him fill out the name at
20    the top there where it says --
21         A.    I don't remember seeing or . . .
22         Q.    You didn't fill out your name at the
23    top there, the --
24         A.    I --
25         Q.    -- print that says --
```

1                      S. TUCCIO

2        A.    Yes.

3              MR. WEISS:  Let's mark this.

4              (Whereupon, Defendant's Exhibit E,

5        Declaration of Samuel Tuccio, was marked

6        for identification as of this date by

7        the reporter.)

8        Q.    Mr. Tuccio, I'll represent to you that

9    this is a declaration that you delivered to me

10   in support of your initial disclosures.  It's

11   entitled Declaration of Samuel Tuccio and it's

12   marked Defendant's Exhibit E.  Do you recognize

13   that?  It's a multiple-page document.

14       A.    Yes.  Okay, yes.

15       Q.    That is your declaration, right?

16       A.    Yes.

17       Q.    And if you turn the page once or twice

18   to your signature, on that second and fourth

19   page, that's your signature there?

20       A.    Yes.

21       Q.    May I have that back, please?

22       A.    (Handing.)

23       Q.    Let's go back to -- unfortunately,

24   this is not Bates stamped.  I'm going to show

25   you the last document on that document.  It's

```
 1                        S. TUCCIO

 2     entitled FJC Securities, Inc.

 3          A.    Yes.

 4          Q.    It's apparently another scheduling

 5     form.  Do you recognize that?

 6          A.    Yeah, this is the assignment sheet to

 7     Avianca Airlines.

 8          Q.    How did you acquire that document?

 9     Where did you go to get that document?  Let me

10     rephrase that.

11               When did you first see that --

12          A.    I --

13          Q.    I'm rephrasing.  Hold on.

14               When did you first see that document?

15     Go ahead.

16          A.    Okay.  I -- this is a document I had

17     to go to Room 228 at, um, the Building 75, and

18     I believe I signed this and I believe they gave

19     me a copy of it.

20          Q.    How did you know to go to Building 75?

21          A.    Um, Mr. JC telephoned me.  He left a

22     message on my telephone answering machine.

23          Q.    When you arrived, where did you go?

24          A.    Well, I went to Room 228.

25          Q.    And who was there at the time?  Did
```

                        S. TUCCIO

1

2    you see Mr. JC?

3        A.    Yes.

4        Q.    And did he identify himself as JC or

5    did you know it was JC?

6        A.    Well, I knew it was JC because I've

7    seen him before.

8        Q.    Did he say anything to you?

9        A.    Well, he told me that, you know, he

10   had found an assignment -- he said -- I asked

11   for 20 to 24 hours and he had found an

12   assignment, a part-time one that -- he said

13   that, you know, he wanted to know if I was

14   interested.

15       Q.    So, he offered it to you?

16       A.    Yes, that's correct, yeah.

17       Q.    And did you accept it?

18       A.    Um, yes.

19       Q.    Did you review and read that document

20   before you signed it?

21       A.    Yes.

22       Q.    I'm going to ask you again.  The

23   top -- let me see just -- just push it down so

24   I could see it.  It says Tuccio, I guess Sam or

25   S.  Do you know whose handwriting that is?

```
 1                      S. TUCCIO
 2      A.    No.
 3      Q.    Do you recall ever filling in that
 4   blank at the top for the name?
 5      A.    No.
 6      Q.    And that's your signature at the
 7   bottom, is it not?
 8      A.    Yes.
 9      Q.    Your left corner.
10      A.    Yes.
11      Q.    Okay.
12            MR. WEISS:  By the way, the
13         August 10th, 2009 scheduling form that
14         the witness just testified to is listed
15         in his declaration as paragraph 22, for
16         purposes of the record.
17      Q.    Would you agree with me --
18      A.    What did you say?
19      Q.    -- that what you just looked at is
20   paragraph 22?
21      A.    Yup.
22      Q.    Because I don't have it Bates stamped,
23   so I'm referencing your paragraphs.
24            Paragraph 9 of the declaration
25   references an affidavit you gave to a National
```

```
 1                    S. TUCCIO
 2    that to that effect?
 3         A.    Yes.
 4         Q.    What was the stated reason?
 5         A.    Um, the stated reason was that I, uh,
 6    refused an assignment --
 7         Q.    Okay.
 8         A.    -- to work on the tarmac earlier that
 9    morning on January 20th.
10         Q.    You deny that you refused the
11    assignment?
12         A.    No.
13         Q.    Did you also go through a security
14    door?
15         A.    Yes.
16         Q.    And did you also enter an incorrect
17    pin in that security door?
18         A.    No.
19         Q.    Did an alarm sound?
20         A.    Yes.
21         Q.    What did Mr. Cabanilla -- was
22    Cabanilla one of the tour supervisors?
23         A.    He was the supervisor on duty at that
24    time.
25         Q.    Okay.  And he gave you an assignment
```

```
 1                         S. TUCCIO
 2    to the tarmac?
 3         A.    Yes.
 4         Q.    What did you tell him?
 5         A.    I told him that it was too cold to
 6    work out there on the tarmac and I -- I said,
 7    "You" -- "You know, you" -- "you put me out
 8    there before.  It's much too cold to work out
 9    there.  I would rather go home than work
10    there."
11         Q.    You went home?
12         A.    Um, and I -- I told him I was going --
13    you know, I -- he would not change his mind, so
14    I told him --
15         Q.    What did he say to you?
16         A.    -- I'm going home.
17               Um, he just stood -- stood aside and
18    followed me as I walked out the door and he
19    stood out there in the hallway and he asked me
20    for my badge and I said, "I need it to go out."
21         Q.    Now, this is January --
22         A.    20th.
23         Q.    -- 20th.  This says January 19th,
24    2010.
25         A.    Well, it really meant -- it should
```

```
1                       S. TUCCIO
2    have been the 20th.
3         Q.     January the 20th?
4         A.     Yeah.
5         Q.     Are you issued a coat for cold
6    weather?
7         A.     Cold weather?
8         Q.     Cold weather coat, cold weather gear.
9         A.     Um, I don't remember whether they gave
10   me -- gave us a jacket -- a small -- a light
11   jacket or not, but it was not a -- I don't -- I
12   don't really remember.
13        Q.     Do you own --
14        A.     I think it was -- it was -- you know,
15   it -- this -- when you're talking about a
16   jacket, you're not talking about a jacket
17   that's made for Siberia, you're talking about
18   temperatures where the temperature is
19   17 degrees above zero out there and there's
20   always -- at night, you know, I'm talking about
21   4 a.m., 5 a.m. in the morning, 35 to 40 mile an
22   hour wind that makes the windchill factor make
23   it feel like it's 10 degrees below zero.  It is
24   brutal in the winter.  It's so brutal that
25   those men that work for American Eagle, some of
```

```
 1                    S. TUCCIO
 2   them, they would talk about -- and some of them
 3   did quit.
 4            MR. WEISS:  Move to strike as
 5        nonresponsive.
 6        Q.    I don't care about any other employee
 7   other than FJC.
 8        A.    Okay.
 9        Q.    You swiped your card and put in your
10   pin, did you not?
11        A.    Yes.  I put in the correct pin.
12        Q.    And you couldn't get through?
13        A.    And the alarm went off and I swiped
14   the card a second time and put in my pin again.
15   Mr. Alberto Cabanilla was at the end of the
16   hallway watching me and he was talking to
17   somebody on his cell phone while I did that.
18        Q.    Did you go through a door?
19        A.    Did I go through the door, yes.
20        Q.    While the alarm was sounding?
21        A.    Yes.
22        Q.    In all this training that you had
23   done, were you not -- weren't you trained in
24   the importance of security procedures?
25        A.    Um, yes.
```

```
1                    S. TUCCIO

2       Q.    So you know this was wrong, didn't

3   you?

4       A.    I believe that Mr. Cabanilla was --

5       Q.    Sir --

6       A.    -- on the telephone --

7       Q.    -- did you not breach the perimeter?

8       A.    -- telling somebody to void my pass --

9   my ID.

10      Q.    You don't know that for a fact, do

11  you?

12      A.    I do not know that for a fact.

13      Q.    Did you breach the perimeter?

14      A.    Did I breach the perimeter?  The alarm

15  went off --

16      Q.    Okay.

17      A.    -- and he was a witness.  He saw me go

18  through the door.

19      Q.    Alberto Cabanilla?

20      A.    Yes.  He was standing in the hallway

21  outside the doorway of Avianca Airlines and he

22  was on the cell phone talking to someone.

23      Q.    But you weren't in enough close

24  proximity for him to know what he was saying

25  and what he was doing, other than seeing him on
```

```
 1                    S. TUCCIO

 2   putting them outside."

 3       Q.    But that language you just said about

 4   the young, muscular men, that's not in the

 5   affidavit, is it?

 6       A.    No.

 7       Q.    Okay.  And he did offer you other

 8   options in this paragraph ten that you reviewed

 9   and signed under penalty of perjury, correct?

10       A.    Cabanilla on a couple of occasions

11   gave the option --

12       Q.    -- of not working?

13       A.    Yes.

14       Q.    Okay.  You mentioned a fire guard

15   license in Exhibit -- Defendant's Exhibit E,

16   and we'll have to find the paragraph.  Is that

17   the fire guard license which says -- let me

18   just --

19       A.    To answer your question, that's a

20   receipt.  It is not -- the fire guard license

21   is like a badge with a picture of the --

22       Q.    I understand, but --

23       A.    That's the receipt --

24       Q.    It says over here --

25       A.    -- for passing the exam.
```

```
 1                        S. TUCCIO

 2        Q.    It says NYCFD?

 3        A.    Yeah.

 4        Q.    That's the receipt for passing the

 5    fire guard exam, correct?

 6        A.    Yes.

 7        Q.    Okay.  And that is -- you reference it

 8    as paragraph 21 in your declaration, just for

 9    the record.

10        A.    Paragraph 21.

11        Q.    Right.  Okay.

12        A.    Oh, yeah.

13        Q.    In Defendant's Exhibit B, Bates No. D

14    as in David 000005, do you recognize this

15    employee violation notice dated August 10,

16    2009?

17        A.    I believe this was attached to a

18    letter I sent to the union.

19        Q.    Well, is that your signature on the

20    right side?

21        A.    Yes.

22        Q.    Yes, the right side.  Okay.  That's

23    all I want to know.

24              Other than your hours changing to

25    24 hours, did your rate change at any time
```

```
 1                    S. TUCCIO

 2    during your employment?

 3        A.    No.  Well, yes, yes, it did, uh, I

 4    think initially when I was at Terminal 4, at

 5    the first week or more, I don't know how many

 6    weeks, it was considered to be a probationary

 7    period and I got paid a starting rate of $7.25

 8    an hour the first week and I don't remember how

 9    many weeks afterward.  It was -- it's

10    considered to be train -- you know, training

11    for the job, so, they just paid me the minimum

12    wage which is $7.25 an hour.

13        Q.    And then it moved up to $9 an hour?

14        A.    Afterward, yes.

15        Q.    But it didn't change after that?

16        A.    Yes, that's correct.

17        Q.    These are the nonemployees.  I think

18    you mentioned Gabriel Cruz already.

19        A.    Yes.

20        Q.    Is he listed only because he worked in

21    the bag room?

22        A.    Um, well, I guess he knew the

23    conditions of the place that, you know, the,

24    um, bag room area was unheated.  It had no

25    heat, got very cold, until November 27th, the
```

```
 1                    S. TUCCIO
 2   day after Thanksgiving.  At that time there
 3   were just two space heaters way up on the
 4   ceiling, a very high ceiling, this big
 5   building, you know, that, you know, it was
 6   extremely cold in there and, you know, he saw
 7   me when he was there, obviously because --
 8   and as well as his crew, uh, of baggage
 9   handlers.
10       Q.    And Al Dooley is the gentleman you
11   mentioned before?
12       A.    The union representative.
13       Q.    Did you file a grievance with the
14   union?
15       A.    Um, well, the grievance was filed on,
16   I think, uh, February -- let's see, um, I think
17   it may have been -- I think maybe it was in
18   April.
19       Q.    Did you --
20       A.    In April of 2010.
21       Q.    Have you since pursued that grievance
22   in any way?
23       A.    Well, what happened was, Mr. Dooley
24   had to respond to the, uh, National Labor --
25   see, the National Labor -- the problem with
```

S. TUCCIO

1

2     Mr. Dooley was that he never answered a

3     telephone call.

4          Q.    You mentioned that before.

5          A.    Yes.

6          Q.    I don't want to litigate the --

7          A.    Okay.

8          Q.    -- National Labor Relations Board

9     charge here.

10         A.    Okay.

11         Q.    I just want to know if you pursued

12    it --

13         A.    Okay.

14         Q.    -- further with the union.

15         A.    I, um, went to the National Labor

16    Relations Board on February 5th of 2010 and

17    complained that the union that I pay dues for

18    and have a beautiful building out there in

19    Babylon, with beautiful secretaries and

20    everything else, had not helped me, and

21    Mr. Dooley had never talked to me.  I had

22    called his office up over and over and over and

23    asked his secretary, this is important, to

24    please tell him to get back to me starting in

25    July, and then in December -- December 12th I

```
1                    S. TUCCIO

2     hear about things, rumors.  I suspect that

3     Mr. Dooley may have heard about this, because

4     on February 9th, four days after I went to the

5     National Labor Relations Board, complained

6     about him, and then he did not give me any

7     attention at all even though I had written to

8     him and called his office many times.  He

9     finally called me up at home and he talked to

10    me and said, "I'm going to try to get your job

11    back.  I'll speak to Mr. James Donohue, try to

12    get your job back for you."

13         Q.    Is that as far as it went?

14         A.    Um, well, then I believe, um, I

15    believe the documents that I submit to the

16    National Labor Relations Board, then he called

17    me and said that he had talked to Mr. Donohue

18    and Mr. Donohue said that he was willing to

19    give me the job back, but there was one thing

20    in its way, that The Port Authority of New York

21    and New Jersey would not issue me a new badge.

22    I mean this is what Mr. Dooley said orally on

23    the telephone.

24         Q.    Okay.  This is Dooley talking, right?

25         A.    Yes.
```

1                    S. TUCCIO

2        Q.    Did you --

3        A.    So, then --

4        Q.    Did --

5        A.    Okay.  You have copies of the letters.

6    Just let me just finish.  That I asked

7    Mr. Dooley to put this in writing.  In other

8    words, I said, "Would you put this in writing?"

9    And I sent him a letter.  I believe it was sent

10   by a certified mail, return receipt requested.

11   And I believe that was supplied to you, uh,

12   earlier, um, that I asked Mr. Dooley to put --

13   I said, "I want you to put down in writing that

14   the only reason why I could not get a job was

15   that The Port Authority of New York & New

16   Jersey would not give me a badge," and

17   Mr. Dooley --

18        Q.    And -- go ahead.

19        A.    -- Mr. Dooley did not do that.  And

20   when I called him up on the phone and asked him

21   to do it, he refused to do it.

22        Q.    Did --

23        A.    I said, "Why not?  Why didn't you put

24   it in writing?"

25        Q.    Did you ask him to get a position in

1                    S. TUCCIO

2      A.    Well, if it covers the period -- you

3   know, you listed 2008 to the present and that's

4   what covers that period.

5      Q.    But this is just treatment that you

6   sought for things -- for other things unrelated

7   to your employment at FJC, correct?

8      A.    Unrelated to my employment at FJC?

9   Uh, I guess that would be correct, yeah.

10      Q.    Okay.  In interest to your privacy, I

11   haven't been clear about it, about what it is;

12   although, all of this is covered by the

13   confidentiality stipulation.

14            During the course this litigation,

15   when you filed this lawsuit in -- before, when

16   you filed the charge with the E -- with the New

17   York State Department -- the State Division of

18   Human Rights, you've been representing

19   yourself; isn't that true?

20      A.    That's correct.

21      Q.    So, you have not incurred any

22   attorneys' fees?

23      A.    That's correct.

24      Q.    Earlier today I asked you whether you

25   had received the FJC sexual harassment and

```
 1                    S. TUCCIO

 2    antidiscrimination policy and you testified

 3    that you did and admitted signing it, which was

 4    actually an exhibit to the letter I sent to

 5    Joseph -- the Honorable Joseph Bianco, which is

 6    the U.S. district judge in this case.  Do you

 7    recall testifying to that?

 8         A.    Yes.

 9         Q.    Did you file any complaint with the

10    company under that procedure?  Let me rephrase

11    that question.

12              Did you file any written complaint

13    under that procedure with the company since

14    you -- during the -- from May '09 to

15    January 2010?

16         A.    January 2010?  Well --

17         Q.    I mean, I know --

18         A.    The written -- of course the written

19    is the -- originally I went to the, you know,

20    the New York State --

21         Q.    I'm not interested in the agencies and

22    the --

23         A.    Other than that, I did not write to

24    the company officials about the, uh,

25    discrimination of Alberto Cabanilla and putting
```

```
1                    S. TUCCIO
2    me on the tarmac all the time during heavy
3    rain, extreme cold, and asking me to do this
4    two, three times a week in December 2009 and
5    January 2010, while other employees who were
6    working at regular jobs that were indoors
7    were --
8         Q.   I understand, sir.
9         A.   -- not asked to go out there and
10   apparently consider themselves too good to go
11   out there from the way they looked at me.
12        Q.   Okay.  I --
13        A.   They looked at me like I was some kind
14   of second-class or third-class citizen when
15   they saw me.
16        Q.   Did anyone ever tell you -- I withdraw
17   that question.  Just bear with me.
18             In your disclosures which is --
19        A.   Yes.
20        Q.   -- Defendant's Exhibit D, you
21   disclosed that you're seeking damages of
22   23,940.
23        A.   Um, yes.
24        Q.   And you create a calculation down
25   there?
```

1                   S. TUCCIO

2     you know, asking him to help me with the

3     problem, to telephone me, and I never got a

4     response.

5          Q.     So, that is tied to the same

6     grievance?

7          A.     Well, it is sort of like an oral

8     agreement -- well, it is a written agreement in

9     a way because I did write to him asking for

10    help in this problem that I was having with

11    Mr. Alberto Cabanilla, uh, selecting me to go

12    out there on the tarmac while other people who

13    signed the same agreement as me with black skin

14    or who were Hispanic, who he treated as if they

15    were better.  I mean, we didn't go into that,

16    but he treated them like they were better than

17    me.  He treated them with greater respect than

18    me, which I objected to.  And this was -- I

19    think I mentioned that, that the women were on

20    the, uh, who were working out there on the jet

21    bridge, they would be assigned from 4 a.m. to 8

22    a.m.  They would wait inside the building where

23    it was warm until about 5:06 in the morning

24    when the plane came in.  They worked two hours

25    on the airplane, on the jet bridge or -- and

1                    S. TUCCIO

2    it's just breaks, my job would be to, uh, put

3    it inside a big plastic -- it was like an

4    oversized Glad bag, and I would wrap it up and

5    then I would remove one of the airplane's

6    stickers.  There would be a sticker with a

7    number on it and you -- you could remove part

8    of it and I would have to give that to

9    Mr. Alberto Cabanilla and report to him that a

10   bag had burst, and it would have, you know, the

11   name of the passenger, I guess the destination,

12   whether it was Medina or Bogota, Columbia, and

13   the name of the airline.

14        Q.    Anything else?

15        A.    Uh, no.  As I pointed out in my, uh,

16   you know, in my rebuttal, the description that

17   was supplied by the attorney was incorrect.

18        Q.    Let me just give you one more

19   reference, Defendant's Exhibit B.  I show you

20   what is Bates No. D000048.  Do you recognize

21   that document?

22        A.    Your asking me if I --

23        Q.    Do you recognize that document?

24        A.    That's -- yeah.  It's the document I

25   signed.

1                    S. TUCCIO

2       Q.    Did you read and understand it when

3   you signed it?

4       A.    Yes.

5       Q.    Is that your signature at the bottom

6   of the page?

7       A.    Yes.

8       Q.    Okay.

9             (Continued on next page to include

10         jurat.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    S. TUCCIO
 2           MR. WEISS:  I don't think I have any
 3      more questions at this time of this
 4      witness.
 5           I reserve the right to recall the
 6      witness in the event that things change.
 7           We will probably be ordering a
 8      transcript.  Mr. Tuccio, you'll receive
 9      is a copy of the transcript, at which
10      time you'll have an opportunity to
11      review the transcript for typos that he
12      may undertake.  That's it.  That's all I
13      have.  Thank you.
14           (Time noted:  3:44 p.m.)
15
16
                        _____
17                      SAMUEL TUCCIO
18
19      Subscribed and sworn to before me
20      this _____ day of _____, 20   .
21
        _____
22           NOTARY PUBLIC
23
24
25
```

```
 1                      S. TUCCIO

 2                  C E R T I F I C A T E

 3

 4    STATE OF NEW YORK        )

                               :

 5    COUNTY OF BRONX          )

 6

 7         I, SCOTT TORRANCE, a shorthand reporter

 8    and Notary Public of the State of New York, do

 9    hereby certify:

10

11         That, SAMUEL TUCCIO, the witness whose

12    examination is hereinbefore set forth, was duly

13    sworn, and that such examination is a true

14    record of the testimony given by such witness.

15

16         I further certify that I am not related

17    to any of the parties to this action by blood

18    or marriage; and that I am in no way interested

19    in the outcome of this matter.

20

21

22                              Notary Public

23

24

25
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
SAMUEL TUCCIO,

                    Plaintiff,

                                    Civil Action No.
          -against-                 12-5506
                                    (JFB) (GRB)

FJC SECURITY SERVICES, INC.,

                    Defendant.
--------------------------------x


                        100 Federal Plaza
                        Central Islip, New York

                        September 12, 2013
                        11:19 A.M.




     DEPOSITION of FJC SECURITY SERVICES, INC., the

Defendant herein, by FRANCES VELAZQUEZ, taken

pursuant to Notice, and held at the above time and

place before Ginnette Corr, a stenotype reporter and

Notary Public of the State of New York.

4

```
 1                    FRANCES VELAZQUEZ
 2              (Plaintiff's Exhibit 1, Airport
 3         security agent training marked for
 4         identification.)
 5  F R A N C E S   V E L A Z Q U E Z,    the Witness
 6              herein, having been first duly sworn by
 7              Ginnette Corr, a Notary Public of the
 8              State of New York, was examined and
 9              testified as follows:
10  EXAMINATION BY
11  MR. TUCCIO:
12       Q    Please state your name for the record.
13       A    Frances Velazquez.
14       Q    Where do you presently reside?
15       A    104-80 127th Street, Richmond Hill, New
16  York 11419.
17       Q    Good morning, Ms. Velazquez.  Thank you
18  for being here this morning.
19              Would you please state your full name
20  for the record?
21       A    Frances Velazquez.
22       Q    What is your current business address?
23       A    Building Number 75, JFK Airport,
24  Jamaica, New York 11430.
25       Q    Please state your position.
```

1                    FRANCES VELAZQUEZ

2         A      Personnel office manager.

3         Q      What was your position at FJC Security

4    Services on May 1, 2009?

5         A      Personnel office manager.

6         Q      Describe your work experience before

7    FJC Security Services.

8         A      I was working at the Delta Terminal as

9    a security office manager.

10        Q      For how many years?

11        A      For 15 years.

12        Q      When did you begin working for FJC?

13        A      I began May of 2004.

14        Q      What was your position and location?

15               MR. WEISS:  Objection as to form.  You

16          may answer.

17        A      My position was an administrator, and

18   we were located at Building 80.

19        Q      What was your next position and

20   location after that?

21               MR. WEISS:  Objection as to form.

22               You may answer.

23        A      I was the office manager, and the next

24   location was Building 75.  Personnel office

25   manager, Building 75.

 1                    FRANCES VELAZQUEZ

 2        Q    What year did you start that?

 3        A    2005.

 4        Q    What was your next position and

 5   location?

 6             MR. WEISS:  Objection as to form.

 7             You may answer.

 8        A    It's the current position and location.

 9        Q    You began that what year?

10        A    Began --

11             MR. WEISS:  Objection.

12        Q    Your current position.

13             MR. WEISS:  Objection; asked and

14        answered.

15             But you may answer it.

16        A    2005.

17        Q    What training did you receive to

18   qualify you to be a personnel office manager?

19             MR. WEISS:  Objection as to form.

20             You may answer.

21        A    The training that I received was

22   basically on the job and years of experience.

23        Q    Do you have a college degree or

24   certificate?

25        A    No.

8

```
 1                    FRANCES VELAZQUEZ

 2           Are you interested in now or in 2009?

 3           MR. TUCCIO:  Well, in 2009.

 4           MR. WEISS:  Okay.  You can answer.

 5      A    In 2009, I have no knowledge of how the

 6   human resources was run.  I was not part of human

 7   resources.

 8      Q    The personnel department.  You were not

 9   a part of the personnel department?

10      A    Personnel, yes, but you said human

11   resources.

12      Q    All right.  How does the personnel

13   department test new employees for the job of

14   airport security agent?

15      A    They're given a training class.  It's

16   not an actual test.

17           MR. WEISS:  I don't mean to interrupt

18       you, but you're still in 2009, correct?

19           MR. TUCCIO:  Yes.

20      Q    Training class for how many days?

21      A    2009?  Five days.

22      Q    How does the personnel department

23   determine which assignments to give to new

24   employees?

25           MR. WEISS:  Not to burden the record,
```

1                    FRANCES VELAZQUEZ

2          so I'm not objecting every time, I'm going

3          to suggest to you that you're talking about

4          2009, unless you say otherwise.

5                    MR. TUCCIO:  Yes.

6                    MR. WEISS:  We're in agreement,

7          correct?

8                    MR. TUCCIO:  Yes.

9                    MR. WEISS:  Go ahead.  This is in 2009.

10         Go ahead, Frances.

11         A        Personnel -- I'm sorry.  What was the

12    question?

13                   MR. WEISS:  Why don't you read back the

14         question.

15                   (The requested portion of the record

16         was read back by the reporter.)

17         A        The assignments are random.  They're

18    not determined by the personnel department.

19         Q        I just want to give you Exhibit Number

20    1.  I'll give one to you and one to your attorney

21    (handing).

22                   MR. WEISS:  One second.

23         Q        Just look this over.  It has five tabs

24    in it.  The first one, you'll see the tab has --

25    in each case, what I've done is either I have a

13

```
 1                    FRANCES VELAZQUEZ

 2              If you understand the question, you may

 3          answer it.

 4          A     I don't understand your question.

 5          Q     Is there any relation between the test

 6      scores in the training class given by the

 7      instructor, Efrain Santiago, and the first

 8      assignment given to a new airport security agent?

 9          A     No.

10          Q     Is there any relation to the test score

11      of the F93 fire exam and the first assignment

12      given to a new airport security agent?

13              MR. WEISS:  Objection as to form.

14              You may answer if you understand the

15          question.

16          A     No.

17          Q     Is there any relation -- let me just

18      point out one thing.  It's on the last tab.

19      You'll see it says "cargo security screener."  The

20      question is about that course.

21              Is there any relation to the test score

22      of the exam given at the end of a course taught by

23      John Harding of Delta Air Lines on a cargo

24      security screener --

25              MR. WEISS:  Objection as to form.
```

14

```
1                    FRANCES VELAZQUEZ
2         Q    -- and the first assignment given to an
3    airport security agent?
4              MR. WEISS:  Objection as to form.
5              You may answer.
6         A    No.
7              MR. WEISS:  Spell Harding, just so she
8         has it, Mr. Tuccio.
9              MR. TUCCIO:  H-A-R-D-I-N-G.
10        Q    The next question is on tab number one,
11   those certificates.  One of them is from The Port
12   Authority of New York and New Jersey.
13             Is there any relation to the test score
14   of a four-hour course given by The Port Authority
15   of New York and New Jersey and the first
16   assignment given to a new airport security agent?
17        A    No.
18        Q    The next question is tab number two.
19             On the driving course, driving on the
20   Tarmac, is there any relation to the test score
21   given on the driving test course and the first
22   assignment given to a new airport security agent?
23             MR. WEISS:  Objection as to form.
24             You may answer.
25        A    No.
```

1              FRANCES VELAZQUEZ

2          MR. WEISS:  For the record, Mr. Tuccio,

3     I want to point out to you that I've never

4     seen this document, which is entitled

5     "airport ground vehicle operations."

6     Everything you've given to me in these tabs

7     for this litigation started with this page.

8          MR. TUCCIO:  No.

9          MR. WEISS:  I'm not arguing.  I'm just

10    saying, this is the first time I've seen it.

11         MR. TUCCIO:  At the last deposition of

12    James Donohue, the exhibit -- this is the

13    same exhibit.

14         MR. WEISS:  That's fine.  I just

15    pointed it out to you.

16    Q     Is there any relation to the number of

17 years of experience as a security guard and the

18 first assignment given to a new airport security

19 agent?

20         MR. WEISS:  Objection as to form.

21         You may answer.

22    A     No.

23    Q     Does the previous employment record of

24 an employee have any relation to the assignment

25 given to a new airport security agent?

1                    FRANCES VELAZQUEZ

2                    MR. WEISS:  Objection as to form.

3                    You may answer it.

4          A    No.

5          Q    Is there any relation between an

6    employee's educational background and the first

7    assignment given to a new airport security agent?

8                    MR. WEISS:  Objection as to form.

9                    You may answer.

10         A    No.

11         Q    Who makes the decision on which

12   assignment to give a new employee?

13                   MR. WEISS:  Objection as to form.

14                   You may answer.

15         A    The schedules are written up and handed

16   out randomly.

17         Q    Let me just go back.

18                   You are telling me that there is no

19   person who is involved in making the decision on

20   which assignment goes to a new airport security

21   agent?

22         A    Correct.

23         Q    Are you in charge of hiring instructors

24   or members of the personnel department?

25         A    No.

20

```
 1                    FRANCES VELAZQUEZ
 2        Q     Are the test scores used in deciding
 3   which assignments are given to the airport
 4   security agent?
 5              MR. WEISS:  Objection; asked and
 6         answered.
 7              You may answer.
 8        A     No.
 9        Q     What happens to the test scores?  You
10   said they're stored in a folder.  Okay.
11              MR. WEISS:  Are you answering your
12         question?
13              MR. TUCCIO:  She answered.
14        Q     New employees are trained by an
15   instructor, John Harding, of Delta Air Lines to be
16   cargo security screeners; is that correct?
17              MR. WEISS:  Objection as to form.
18              You may answer.
19              Please refrain from cross-examining the
20         witness.
21        A     He at that time participated in one
22   aspect of the training.  He is not a trainer for
23   FJC Security.
24        Q     Again, I'm asking this question.
25              Referring to the last question, is this
```

21

```
 1                   FRANCES VELAZQUEZ
 2    not specialized training for an airport security
 3    agent?
 4              MR. WEISS:  Objection as to form.
 5              If you understand the question.
 6              Please refrain from cross-examining the
 7         witness.
 8         A    I don't know.
 9         Q    The Delta Air Lines instructor, John
10    Harding, gives a test at the end of the eight-hour
11    course.
12              What happens to this test?
13              MR. WEISS:  Objection as to form.
14              If you understand the question, you may
15         answer it.
16         A    I have no knowledge of what happens to
17    that.
18         Q    Are the test scores from the cargo
19    screener test used to decide whether or not an
20    employee gets assigned to Building 20 doing the
21    testing of luggage for traces of explosives?
22              MR. WEISS:  Objection as to form, but
23         you may answer.
24         A    No.
25              MR. WEISS:  I'm going to interrupt.
```

22

1                        FRANCES VELAZQUEZ

2           Can you read the question back again?

3                   (The requested portion of the record

4           was read back by the reporter.)

5      Q      In 2009, Efrain Santiago taught a

6   one-day class on driving a vehicle on the Tarmac

7   at JFK.

8                   Is this not specialized training of an

9   airport security agent?

10                  MR. WEISS:  Objection as to form.

11                  If you understand the question, you may

12          answer.

13     A      It's not specialized if everybody's

14  doing it.

15     Q      Isn't it specialized in the sense that

16  this is not general security guard training that

17  can be used for any job anywhere?

18                  MR. WEISS:  Objection as to form.

19                  Please refrain from arguing with the

20          witness.

21     Q      I don't understand what you mean, it's

22  not specialized if everyone is doing it.

23                  What do you mean by that?  Not --

24                  MR. WEISS:  You want to rephrase the

25          question?

23

1                    FRANCES VELAZQUEZ

2          Q     What did you mean by that, if

3     everyone's doing it?

4                MR. WEISS:  Objection as to form.

5                You may answer if you understand it.

6          A     To me, something that is special,

7     specialized is when there's a small group, a

8     specialized group only doing this particular

9     function.  Anybody with a driver's license can

10    take this class and does take this class and is

11    able to drive at the airport.  It's not a

12    specialized particular skill.

13         Q     But the training is specialized in that

14    it's for an airport security agent position at the

15    airport.  I mean, you don't have Tarmacs

16    everywhere in the state.

17               MR. WEISS:  Mr. Tuccio, that's not the

18         testimony.  I'm going to object to the

19         question.

20               Please refrain from restating the

21         testimony and mischaracterizing it.  Go on to

22         your next question.  That's fine.  If you

23         have follow-up questions, be my guest.

24         Q     I just want to point out in that tab --

25               MR. WEISS:  Which tab?

24

1                FRANCES VELAZQUEZ

2          MR. TUCCIO:  The tab -- the picture of

3      my badge at the end -- at the end of tab

4      two.  It should have a picture of my badge.

5      Next page.

6          MR. WEISS:  You're referencing --

7      Q    That driving course --

8          MR. WEISS:  For the record, you're

9      referencing the badge dated, looks like,

10     May 11, 2010?

11         MR. TUCCIO:  Yes.  That's the badge

12     given to me by The Port Authority.

13         MR. WEISS:  Go ahead.

14     Q    That by taking that course, that

15  results in the designation DR1 or EV on this

16  badge.

17          Isn't that so?

18     A    I'm sorry?

19     Q    See the designation over here, DR1 EV?

20  That's put on my badge, because I took the driving

21  course.

22         MR. WEISS:  Mr. Tuccio is referencing

23      the DR on the picture of the badge.

24     A    Yes.

25     Q    For this particular course, what

1               FRANCES VELAZQUEZ

2    happens to the test scores for the driving course?

3               MR. WEISS:   Objection as to form.

4               If you understand the question, you may

5         answer.

6    A    They're given to The Port Authority.

7    Q    Are they stored anyplace at FJC?

8               MR. WEISS:   Objection as to form.

9               You may answer.

10   A    They're stored in your training file,

11   in a training file, yes.

12   Q    Are the test scores from the test for

13   driving a vehicle on the Tarmac used to decide

14   whether or not an airport security agent gets

15   assigned to driving Rover 1 or Rover 2 at JFK

16   Airport?

17              MR. WEISS:   Objection as to form.

18              You may answer if you understand the

19        question.

20   A    No.

21   Q    Again, I just want to make sure I

22   understand this.

23              On what basis are new employees given

24   their first assignment?   There must be some basis.

25   Test scores, experience, education,

1                        FRANCES VELAZQUEZ

2       recommendations?

3                 MR. WEISS:  Objection as to form, and

4             that's argumentative.

5                 You may answer if you understand the

6             question.

7       A       There's no basis.  It's random.  It's

8       first come, first gets the schedule.

9       Q       Do you influence placement of new hires

10      on their first assignment in any way?

11                MR. WEISS:  I'm sorry?

12      Q       Do you influence the placement of new

13      hires on their first assignment in any way?

14                MR. WEISS:  Objection as to the form.

15                If you understand the question, you may

16            answer.

17      A       No.

18      Q       I'm talking about May 2009 again.

19                What were the names of the other

20      employees and their positions in the personnel

21      department at Building 75?

22      A       2009, Stacey Thomas, JC Noboa.

23      Q       Was there a woman named Louise Davis?

24      A       She's not part of personnel.

25      Q       She's not part of personnel.

27

```
 1                    FRANCES VELAZQUEZ
 2               Well, was she in the office at Building
 3      75?
 4         A    Yes.
 5         Q    Does Louise Davis speak Spanish?
 6         A    Not that -- no.  Not that I know of.
 7         Q    Is Louise Davis Spanish or Hispanic?
 8         A    I don't know.
 9         Q    Did the other employees in the
10      personnel department influence the placement of
11      new hires on their first assignment in any way?
12               MR. WEISS:  Objection as to form.
13               I don't know what you mean, Mr. Tuccio,
14          but if you understand the question, you may
15          answer.
16         A    No.
17         Q    Okay.  If the placement of new hires
18      was entirely random, why not flip a coin to
19      determine which job they get, just as in football?
20      A coin is flipped to determine who gets the chance
21      to pass or receive the ball in every game.
22               MR. WEISS:  Mr. Tuccio, I'm going to
23            object to the form.
24               Please refrain from -- there's a couple
25            of reasons why that question is improper.
```

```
1                    FRANCES VELAZQUEZ

2           MR. WEISS:  Assumes facts not in

3       evidence, and it's objection as to form.

4           You may answer it if you understand the

5       question.

6    A     No.

7    Q     The answer is?

8    A     No.

9    Q     Who made the decision on the second or

10   third assignments given to a new airport security

11   agent?

12          MR. WEISS:  We're still in '09, right?

13          MR. TUCCIO:  Yes.

14          MR. WEISS:  Objection as to form.

15   A     James Donohue.

16   Q     Do the new hires who are trained in

17   Mr. Santiago's five-day class or in his driving

18   class or in the Port Authority class, are they

19   paid for their time during training?

20          MR. WEISS:  Objection as to form.

21          If you understand the question, you may

22       answer it.

23   A     No.

24   Q     Are you aware that training an employee

25   without paying them is illegal under the state
```

31

```
1                    FRANCES VELAZQUEZ
2         pages.
3              MR. TUCCIO:  Let's go off the record
4         for a minute.
5              (Whereupon, a discussion was held off
6         the record.)
7    A    No.
8              MR. WEISS:  My objection is stated on
9         the record.  Go on to your next question.
10        Go ahead.
11   Q    Now I'm going to talk about my
12   assignment at Avianca Airlines in August of 2009
13   through January 20th of 2010.  My supervisor was
14   Alberto Cabanilla.  Supervisor Alberto
15   Cabanilla -- let me just say something, and then
16   I'll ask a question -- took me off my assignment
17   in the bag room on December 4, 2009 and ordered me
18   to work on the -- to stand on the Tarmac for three
19   and a half hours during heavy rain on that day,
20   cold weather in the 20-mile-an-hour wind.
21             Why didn't FJC Security Services
22   provide me with a vehicle such as a Ford Escape or
23   a Jeep Liberty for this job?
24             MR. WEISS:  Objection as to form.
25             If you want to answer that long
```

36

```
 1                      FRANCES VELAZQUEZ
 2           to bring your facts and circumstances,
 3           because that, I think, is a relevant
 4           question.  I'm not going to have her answer
 5           questions about people who may have driven
 6           drunk and were issued warrants or done all
 7           sorts of myriad things that has nothing to
 8           do with what you're talking about.  You're
 9           talking about breaching a perimeter.  You
10           said in the question Mr. Donohue said if you
11           breach the perimeter -- I'm paraphrasing
12           your question -- breach the perimeter, a
13           warrant can be issued.  Ask her that
14           question.
15      Q    All right.  What I'm saying is, did
16   this ever happen, in fact?  In other words, for
17   breaching a perimeter, an airport security agent
18   going through a door and the alarm goes off and
19   they keep on going, to your knowledge, did the
20   Port Authority ever issue, Port Authority police,
21   did they ever issue a warrant for the arrest of an
22   agent?
23           MR. WEISS:  Go ahead.
24      A    Yes.
25      Q    Again, this is just a little different.
```

38

1                    FRANCES VELAZQUEZ

2            MR. WEISS:  Objection as to form.

3            You may answer it if you understand the

4       question.

5       A    I don't work at terminals.  I don't

6  know.

7       Q    Did any airport security agent ever

8  complain about James Donohue?

9            MR. WEISS:  You may answer.  I don't

10       know how that's relevant, but go ahead.  You

11       may answer.

12      A    No.

13      Q    Did any airport security agent ever

14  accuse James Donohue of making a statement such as

15  his actions caused the cancellation of flights or

16  for an entire terminal to be cleared of all

17  passengers?

18           MR. WEISS:  Objection as to form.

19           You may answer it if you know the

20       answer.

21      A    I don't understand the question.

22      Q    Did any airport security agent accuse

23  James Donohue of making statements that were not

24  true, such as that his actions caused the

25  cancellation of airline flights or that his

1                    FRANCES VELAZQUEZ

2     actions, the airport security agent's actions

3     caused an entire terminal at the airport to be

4     cleared of all people?

5              MR. WEISS:  Objection as to form.

6              You may answer.

7     A     To whom?

8     Q     To the management at FJC Security

9     Services.

10             MR. WEISS:  Objection as to form.

11             You may answer.

12    A     No.

13    Q     Did anyone ever accuse James Donohue of

14    telling them that the Port Authority police would

15    issue a warrant for their arrest when this was not

16    true?

17             MR. WEISS:  I lost the first part of

18         it.  Don't repeat it.  Have her read it

19         back.

20             (The requested portion of the record

21         was read back by the reporter.)

22             MR. WEISS:  Objection as to form, but

23         you may answer.

24    A     To whom?

25    Q     To the management at FJC Security.

40

```
 1                    FRANCES VELAZQUEZ
 2        A     No.
 3        Q     Did anyone accuse James Donohue of
 4   saying that he would refuse to hire an airport
 5   security agent or rehire them because the Port
 6   Authority of New York and New Jersey would not
 7   issue them a new ID badge when this was not true,
 8   was not, in fact, true?
 9              MR. WEISS:  Objection as to form.
10              Read the question again.
11              (The requested portion of the record
12          was read back by the reporter.)
13              MR. WEISS:  Objection as to form.
14              You may answer if you understand it.
15        A     No.
16        Q     Has any airport security agent said
17   that he believed that James Donohue is mentally
18   ill?
19              MR. WEISS:  Okay.  I don't understand
20          why that's even relevant.  What does
21          Mr. Donohue's mental condition or any
22          complaint about his mental condition --
23              MR. TUCCIO:  Answer to that is going
24          back to my initial complaint, that he
25          claimed that my going through the door on
```

41

```
 1              FRANCES VELAZQUEZ

 2      the morning of January 20, 2009, that this

 3      caused the cancellation of all airplane

 4      flights that morning, and he said that it

 5      caused the clearing of all passengers from

 6      Terminal 4, and he also said that the Port

 7      Authority police would issue a warrant for

 8      my arrest and for me to go home and wait for

 9      them to come to me.

10          MR. WEISS:  That's your allegation.  I

11      understand that's your allegation.

12          MR. TUCCIO:  If somebody is doing this,

13      you know, it makes me wonder about this

14      man's sanity.

15          MR. WEISS:  Well, his sanity --

16          MR. TUCCIO:  It makes me question his

17      sanity.

18          MR. WEISS:  Sane or not, his mental

19      state is irrelevant in this action.

20      Q      The question was, did any other airport

21  security agent question Mr. James Donohue's

22  sanity?

23          MR. WEISS:  Off the record.

24          (Whereupon, a discussion was held off

25      the record.)
```

```
 1                 FRANCES VELAZQUEZ
 2            MR. WEISS:  You may answer.
 3      A     No.
 4            MR. WEISS:  Just so the record is
 5       clear, you keep saying airport security
 6       agent.  You're talking about at FJC?
 7            MR. TUCCIO:  Yes.  At FJC Security.
 8      Q     I want to thank you very much,
 9   Ms. Velazquez, for coming to the deposition.  I
10   have no further questions for you.
11            MR. WEISS:  I have no questions of this
12       witness.  The deposition is concluded?
13            MR. TUCCIO:  Yes.
14            (Time noted:  12:28 p.m.)
15                  *    *    *    *
16
17
18
19
20
21
22
23
24
25
```

43

2                    A C K N O W L E D G M E N T

3

4       STATE OF NEW YORK          )
                                           ss:
5       COUNTY OF _____)

6

7            I, FRANCES VELAZQUEZ, hereby certify that I

8       have read the transcript of my testimony taken under

9       oath in my deposition of September 12, 2013; that the

10      transcript is a true and complete record of my

11      testimony, and that the answers on the record as

12      given by me are true and correct.

13

14                              _____

                                 FRANCES VELAZQUEZ
15

16

17      Subscribed and sworn to before me
        this          day of                2013.
18

19      _____
                    (NOTARY PUBLIC)

20

21

22

23

24

25

45

2                    C E R T I F I C A T E

3

4

5            I, GINNETTE CORR, a shorthand reporter

6     and Notary Public within and for the State of

7     New York, do hereby certify:

8            That the witness, whose testimony is

9     hereinbefore set forth, was duly sworn by me,

10    and that such testimony is a true record of the

11    testimony given by such witness.

12            I further certify that I am not related

13    to any of the parties by blood or marriage, and

14    that I am in no way interested in the outcome of

15    this matter.

16            IN WITNESS WHEREOF, I have hereunto set

17    my hand.

18

19    _____

20               Ginnette Corr

21

22

23

24

25

County of Kings          )
State of New York         )

# AFFIDAVIT

I, Samuel Tuccio, have been given assurances by an agent of the National Labor
Relations Board that this Confidential Witness Affidavit will be considered a confidential
law enforcement record by the Board and will not be disclosed unless it becomes
necessary to produce the Confidential Witness Affidavit in connection with a formal
proceeding.

My address is P.O. Box 285, Hicksville, New York 11802.

1.    I was employed by FJC Security Services as a security guard from
      technically May 8, 2009, although I attended classes for about three weeks
      and didn't start working until the last week of May 2009.

2.    There was a two-week class to familiarize ourselves with the airport and
      what the job was all about.  There were approximately 25 people in the
      class.  I also took a course to be screener and passed that test, and also a
      Firemen's test.  My scores were about 94 or 96.  I think I got a 96 on the
      Firemen's test.

3.    The General Manager for FJC was James Donohoue. There were other
      supervisors but I don't remember their names at this time.  I have that
      information at home.  I had to pay dues to the Union, Special and Superior
      Officers Benevolent Association, and an initiation fee from the first
      paycheck.  I was sent a card by the Union that had the names of four
      employees who were maybe Shop Stewards.  Al Dooley is a
      Representative for Al Dooley.

4.    I had filled out a form, when hired, requesting to work a day shift, and not
      the graveyard shift.  I was first assigned to Terminal 4 at JFK, from 11
      p.m. to 7 a.m., for about two months.  I was posted at the public entrance
      to the Terminal on the fourth floor, and then the first floor, were people
      drove up in cars to pick up incoming passengers.  I basically stood for
      about 8 hours at my first post.

5.   About the first week of August, I was called into the office for a reassignment. I was reassigned to Building 20, where I was supposed to patrol the building outside for 8 hours/day, from about 2 to 10 p.m. I told them instead that I wanted to work part time, so I was assigned to Cargo Area in Terminal 4, first from 4 a.m. to 8 a.m., and then from 5 a.m. to 9 a.m., Monday through Friday. My job was to patrol the area where the checked bags were loaded onto carts to be taken to the planes so that no theft occurred from the bags. I was at that position from about the first week of August until my termination on January 20, 2010.

6.   When I worked at Terminal 4, I got the job of walking outside, whereas other newer employees got the more desirable postings of walking inside the building. I called Al Dooley and complained, asking why I was always getting the least desirable job. All I got was the run-around. The secretary for the Union would tell me that Dooley would call me back. I called at least three times but never got a response from anyone. I assumed that he did nothing about it.

7.   When I worked in the Cargo Area, there are big doors leading outside and there was no heat in the building until the day after Thanksgiving. I would call the IT office at the Airport and complain and was told that the heat would not go on until the temperature went below 35 degrees. I talked to my Site Supervisor, Alberto Cabanilla. He said that he could not take me out of the Cargo Area because that was my permanent assignment.

8.   Other employees would ask for overtime, and generally they were the screeners who would then come in and work in the Cargo Area for about four more hours. Generally, those security guard would be on the jet bridge watching the passengers getting off the plane. After the passengers left, the security guard's job was to guard the airplane, make sure that the only people going on the plane were authorized to do so. Guards would also search the plane after passengers departed. The jet bridge or plane was usually heated, thus it was warm in the winter. On December 2 or 3, Cabanilla took me out of my Cargo Area assignment and told me that he wanted me to stand on the tarmac beside the airplane. It was cold. I did

2

this also on December 9, for about 3 ½ hours, when it was rained. I complained to Cabanilla and asked why I was being put outside when he had other new employees come in. He told me that he was rotating employees. I asked him why he wasn't giving me some of the assignments inside, such as inside the jet bridge or leading up to the control tower. I told him it was very unfair. I told him that I didn't want to be out there. He told me that nobody want to be out there. I sent a letter to the Union complaining. I got no response. I would call the office and the secretary would give me excuses, she'd say he was in the field, or in the meeting, or out sick, or in New Jersey. The letter I sent, along with the FedEx receipt, is attached as Exhibit __1__. Enclosed in the letter was also a copy of an Employee Violation Notice, for supposedly not calling in sick on time, which I contested. They wrote me up as unexcused absence.

9.     I called again on Sunday, December 20, telling the dispatcher that I couldn't come into work because of a bad snowstorm, there was no service on the LIRR. I was again written up.

10.     On January 6, I was again asked to work outside by Cabanilla. I objected, stating that he had other employees in the Cargo Area that never went to work outside, and that other employees from other posts came and Cabanilla was not putting them outside. Cabanilla on a couple occasions gave me the option of not working that day instead of going outside, so I went home.

11.     On January 19, 2010, I went to work and Cabanilla told me that I had to work outside. I told him that I was going home, I did not want to work outside because he was it too cold. He demanded my badge, and I didn't give it to him, I just walked out. As I was walking away, I heard him and saw him on his cell phone. I assumed he was calling the airport tower to invalidate my card. When I got to the door, I swiped my card and put in my pin, but access was denied, but I pushed the door anyway. The alarm can be heard on the second floor area. The alarm is loud enough to be heard through the hallway. I walked down from the second floor to the ground floor, and walked out through the front of Terminal 4, where the

3

passengers walk out, and took a bus home. I got a telephone call at home
to report to the FJC office, which I did, went in and turned in my badge. I
spoke to Donohue, and told him that I felt that I had been treated unfairly,
that I was assigned to treat outside, not at my post, while other people
were given preferential treatment to work inside on these cold days. He
told me that the other people that worked outside were better qualified and
bilingual. He asked me to write out an Incident Report. He also told me
that when I went outside, the alarm went off. He said that the entire
Terminal 4 was evacuated and the flight was delayed for hours.

12.     I was sent a termination letter by certified mail, which I picked up on
January 26. The letter says that if I wanted to contest the termination, the
Union Representative and I should contact FJC by February 2, 2010. I
immediately called the Union; the secretary gave me the usual run around,
saying he wasn't there, but then Dooley came on the phone. I told him
that I had lost my job and wanted to talk to him. He asked me to fax him a
copy of the letter and told me that he would get back to me. I faxed him a
copy of the termination letter that same day, along with another written
explanation of the events leading up to my termination, dated January 27.
That is attached as Exhibit _2_.

13.     I called the Union the next day, the 27th of January. The secretary told me
that Dooley was supposed to call me that afternoon. I never got a call
from him.

14.     On the 28th, I faxed to the Union a copy of my December 12 letter, which I
had already sent, and is attached as Exhibit _1_. Again I got no
response.

15.     I called the Union again and the secretary told me that there had been a
death in the family, that he would be out for a few days. I asked to speak
to some other representative, she told me that he was the only one who
worked with FJC. She would sometimes say that she would email him
and tell him that I had called.

16.     On February 1, I went in person to the Union's office in Babylon. I asked
to speak to Al Dooley. I told the secretary that I had until February 2 to

4

meet with FJC. The secretary told me that Dooley wasn't there. I showed her the termination letter, she told me she would make a copy of it and put it on his desk. She came back after a few minutes and told me that this week, Dooley was having a medical procedure, but that she would email him and maybe he would call me from home. I told her that I just wanted to be able to sit down and discuss my situation. I never asked them to go to FJC and get my job back. Once again, I never got a response.

17. I called the Union again, she told me again that he was having a procedure but that she would send him an email and maybe he would contact me.

18. On February 9, I finally got a call from Al Dooley, he left a message asking me to call him back. I eventually spoke to him. He told me that he had contacted the General Manager to try to get my job back, and he said that because I had gone through the door which set off the alarm, the Port Authority Police would not allow me to go back to work. I sent him a letter two days later, attached as Exhibit _3_. I never got a response to the letter.

19. I don't know that all the other people assigned to the jet bridge had more seniority. But one employee told me that he had been there a few months less than me. He told me that he worked on the jet bridge on the United Arab Emirates terminal. I don't think that assignments to the jet bridge or control tower were on seniority.

20. There was another guard working in the Cargo Area with me, but that person was not a permanent person, it would be a different person everyday. I was the only one there on a permanent basis.

21. I don't speak Spanish. The first week I was assigned to the Cargo Area, I actually did some shifts in the jet bridge. I asked Cabanilla later if I could work there again, and he told me that I was permanently assigned to the Cargo Area. When some of the people came to work on the jet bridge, I would see Cabanilla explaining to them what they had to do, thus apparently it was their first time doing that task.

I am being provided a copy of this Confidential Witness Affidavit for my review. If, after reviewing this affidavit again I remember anything else that is relevant, or desire to make any changes, I will immediately notify the Board agent. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.

I have read this statement consisting of _6_ pages, including this page. I fully understand its contents and I certify it is true and correct to the best of my knowledge and belief.

_Samuel Tuccio_
Samuel Tuccio

Subscribed and Sworn to before me at Brooklyn, New York, this May 7, 2010.

_Ashok C Bokde_
Ashok Bokde, Board Agent
National Labor Relations Board

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine used for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary. However, failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.